No. 22-1950

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## UNITED STATES,

### Appellee

### Vs.

## JOSE PADILLA-GALARZA, a/k/a Joey

### Defendant- Appellant

_____

## <u>ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO</u>

## <u>APPELLANT'S BRIEF</u>

**RAFAEL F. CASTRO LANG**
Federal Circuit Bar #26074
Attorney for Appellant
P.O. Box 9023222
San Juan, P.R. 00902-3222
Tel:(787)723-3672 / (787)723-1809
Email: rafacastrolang@gmail.com;
rafacastrolanglaw@gmail.com

# TABLE OF CONTENTS

JURISDICTION ............................................................................. 1-2
STATEMENT OF ISSUES ............................................................ 2-3
STATEMENT OF THE CASE ........................................................ 3-10
STATEMENT OF FACTS ............................................................. 10-61
SUMMARY OF ARGUMENT ........................................................ 61-71
ARGUMENT ............................................................................. 71-122

**I- Following a bench trial the District Court found Padilla-Galarza guilty as to counts 1-3, 5 and 6. Although the Court did not make any findings of facts, it is obvious from the record that such a finding was based on credibility determinations.**

**II-The District Court judge abused her discretion when she failed to grant a continuance of trial that was repeatedly requested by Padilla-Galarza which prejudiced Padilla/Galarza at trial and violated his constitutional right to a fair trial.**

**III- The District Court abused its discretion when it summarily denied approving additional funds in order to have CJA private investigator Roberto Vizcarrondo locate and interview witnesses, assist counsel in trial preparation and during trial and failing to hold an Ex-Parte Hearing to justify said services.**

**IV- The District Court's evidentiary rulings were erroneous as a matter of law, prevented material extrinsic Fed. R. Evidence 613(b) from being introduced at trial, which constituted impeachment evidence of witnesses and inconsistent trial evidence that could have affected the verdict.**

**V- The District Court should have dismissed Counts 2 and 6 of the Superseding Indictment, since the addition of those two new substantive counts, not alleged in the first indictment, were time barred.**

CONCLUSION .......................................................................... 122
CERTIFICATE OF COMPLIANCE PURSUANT TO F.RA.P. 32(a)(7) ............ 124
CERTIFICATE OF SERVICE ........................................................ 125

# TABLE OF AUTHORITIES

## Cases

<u>Ake v. Oklahoma</u>, 470 U.S. 68, 76 (1985)………………………………....……103

<u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573-576 (1985)………………71,73,74

<u>Daubert v. Merrell,</u> 113 S. Ct. 2786 (1993)……………………………………….. 116

<u>Giglio v. U.S.,</u> 405 U.S. 150, 154 (1972)…………………………………………...116

<u>Olano,</u> 507 U.S. at 734-35…………………………………….………………………118

<u>People v. Smith,</u> 155 N.E.3d 396, 404 (S.C. Ill. 2019)…………...………………119

<u>Portalla,</u> 985 F.2d at 622……………………………………………………...……74

<u>U.S. v. Anonymous</u>, 629 F.3d 68, 73 (1st Cir. 2010)……………………….....117

<u>U.S. v. Barrett</u>, 539 F.2d 244, 254-256 (1st Cir. 1976)……………………...……110

<u>U.S. v. Bresil</u>, 767 F.3d. 128, 129 (1st Cir. 2014)………………………………...109

<u>U.S. v. Collazo-Aponte</u>, 216 f.3d 163, 184 (1st Cir. 2000)………………………110

<u>U.S. v. Colon-Munoz</u>, 192 F.3d 210, 229 (1st Cir. 1999)…………………..……118

<u>U.S. v. Cotto-Flores</u>, 970 F.3d 17, 46 (1st Cir. 2020)………………………………74

<u>U.S. v. Delgado-Marrero,</u>744 F3d. 167, 198(1st Cir. 2014)………………………91

<u>U.S. v. Durant</u>, 545 F.2d 823, 827-828 (2nd Cir. 1976)…………………….……104

<u>U.S. v. Ellis</u>, 2008 U.S App. Lexis 2622 (4th Cir. unpublished opinion)…………105

<u>U.S. v. Estrada-Lucas</u>, 651 F.2d 1261 (9th Cir.)………………………………….117

<u>U.S. v. Falsia</u>, 724 F.2d 1339, 1341 (9th Cir. 1983)………………………………117

4

U.S. v. Fink, 499 F.3d 81, 89 (1st Cir. 2007)………………………..……………..……….92

U.S. v. Garcia, 452 F.3d 36, 38 (1st Cir. 2006)……………………….…….110

U.S. v. Gilmore, 282 F.2d 398, 406 (6th Cir. 2002)………………………....105

U.S. v. Henderson, 463 F. 3d 27, 32 (1st Cir. 2008)……………………………72

U.S. v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996)……………………110

U.S. v. Hudson, 970 F.2d 948, 953-956 (1st Cir. 1992)……………………110

U.S. v. Lindell, 881 F.2d 1313, 1326 (5th Cir. 1989)………………….………116

U.S. v. Lynn, 856 F.2d 430 (1st Cir. 1988)…………………………………116

U.S. v. Malick, 928 F.2d 17, 22-23 (1st Cir. 1991)………………………110

U.S. v. Mangual-Santiago, 562 F. 3d 411, 430-431(1st Cir. 2009)……………...…91

U.S. v. Manning, 79 F.3d 212, 218 (1st Cir. 1996)………………………104

U.S. v. Meserve, 271 F.3d 314, 329 (1st Cir. 2001)……………………….....118

U.S. v. Mulinelli-Navas,111 F.3d 983, 988 (1st Cir. 1997)………………………101

U.S. v. Mitchell, 141 F3d 8, 17 (1st Cir. 1998)…………………………………71

U.S. v. O'bryant, 998 F.2d 21, 23 (1st Cir. 1993)……………………….....121

U.S. v. Oliver, 626 F.2 254, 259 (2nd Cir. 1980)…………………………105

U.S. v. Oquendo-Rivera, 586 F.3d 63, 67 (1st Cir. 2009)…………………….73,74

U.S. v. Orlando-Figueroa, 229 F.3rd 33, 39, 40 (1st Cir, 2000)……………………91

U.S. v. Osorio, 929 F.2d 753, 760-762 (1st Cir. 1991)…………………….……98

U.S. v. Padilla-Galarza, 2022 U.S. Dist. LEXIS 7348…………………..…120

U.S. v. Perdomo, 92 F.2d 967, 969-970 (3rd Cir. 1991)………………………….. 97

U.S. v. Perez-Ruiz, 353 F.3rd 1, 8 (1st Cir. 2003)……………………….…91

U.S. v. Piccinonna, 885 F.2d 1529, 1536 (11th Cir. 1989)………………..……117

U.S. v. Posado, 57 F.3d 428, 432-433 (5th Cir. 1995)……………………………116

U.S. v. Pulido, 69 F.3d 192, 205-206 (7th Cir. 1995)……………………………116

U.S. v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir. 1995)…………………………110

U.S. v. Rodriguez-Duran, 507 F.3rd 749, 762, 763 (1st Cir. 2007)………………..92

U.S. v. Rodriguez-Romero, 18 F.Supp. 3d 116, 122 (D.C. P.R. 2014)…………...90

U.S. v. Rounsavall, 905 F. Supp. 662, 665 (D.C. Neb. 1995)…………………...122

U.S. v. Strong, 724 F.3d 51, 60 (1st Cir. 2013)…………………………………71

U.S. v. Taylor, 145 S.Ct. 2015, 2020 (2022)……………………………………119

U.S. v. Teague, 469 F.3d 205, 210 (1st Cir. 2006)………………………….…109

U.S. v. Thorton, 1 Fd.3d 149, 158 (3rd Cir. 1993…………………………………97

U.S. v. Williams, 998 F.2d 258, 264 (5th Cir. 1993)……………………..……104

U.S. v. Zvi, 168 F.3d 49, 54-55 (2nd Cir. 1999)…………………………………121

United States v. Burgos, 703 F.3d 1, 4 n. 1 (1st Cir. 2012)………………………71

United States v. Forbes, 181 F.3d 1, 7-8 (1st Cir. 1999)………………..…..73,74

United States v. Forty-Febres, 982 F.3d 802 (1st Cir. 2020)……………..……71,91

United States v. Fosher, 590 F.2d 381, 384 (1st Cir. 1979)………………….....104

United States v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006)……………………...73

United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005)……………………..…..73,74

United States v. Lacouture, 835 F.3d 187, 191–92 (1st Cir. 2016)………………..74

United States v. Mateos-Sanchez, 864 F.2d 232, 240 (1st Cir. 1988)……………104

United States v. Medina–Martinez, 396 F.3d 1, 5 (1st Cir. 2005)………………...71

United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014)…………………………71

United States v. Rodríguez, 735 F.3d 1, 7 (1st Cir. 2013)………………………...71

United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir.1995)………………………91

United States v. Sears, Roebuck Co., 785 F.2d 777, 778-79 (9th Cir.)…………..121

United States v. Soldevila-Lopez, 17 F.3d 480, 487 (1st Cir.1994)………………..91

United States v. United States Gypsum Co., 333 U. S. 364, 333 U. S. 395 (1948)..72

United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003)…………………………73

Wainwright v. Witt, 469 U. S. 412 (1985)………………………………..………..72

Whalen, 82 F.3d at 532……………………………………..……………………..73

## Statutes

18 U.S.C. 922(a)(1)(A)……………………………………………………………3

18 U.S.C. 922(g)(1)……………………………………………….……….. 3,4

18 U.S.C. 923(a)…………………………………………………………………3

18 U.S.C. 924(a)(1)(D) and 2……………………………………………………3

18 U.S.C. 924(a)(2) and 2…………………………………………….…………3,4

18 U.S.C. 924(c)(1)(A)(ii)……………………………………….………3,4,94,119

18 U.S.C. 924(l)……………………………………………………....…………..3

18 U.S.C. 1951……………………………………………….……3,4,119,120

18 U.S.C. 3006 (A)(e)(1)…………………………………………..103,104,105,107

18 U.S.C. 3231……………………………………………………………….…….1

18 U.S.C. 3282………………………………………………………………..120

18 U.S.C. 3742(a)………………………………………………………………1

28 U.S.C. 1291……………………………………………………………..1

## Rules

Rule 613(b)……………………………………………………….….68

Rule 801(d)(2)…………………………………………………...………111

## Dockets

Docket 71- Motion to Appoint New Counsel – 06/14/17………………………….5

Docket 73- Motion to Withdraw as Attorney- 06/28/17……………………...………5

Docket 75- Order granting 73- 07/11/17……………………….………….…5

Docket 88- Order granting 87- 03/21/18………………………………………4,5

Docket 129- Plea Agreement- Guill Reabing-Padilla- 11/21/18………..……..5,79

Docket 157- NOTICE of Disclosure of PSR- 03/18/19………………19,24,28,79,94

Docket 165- Motion in Limine- 04/05/19………………………………………114

Docket 172- Response in Opposition by USA re: 165- 04/22/19………………..114

Docket 173- Order re: 172- 04/23/19…………………………………………114

Docket 181- Order granting 180- 07/11/19…………………………………………...…87

Docket 228- MOTION for change of plea- 01/14/20………………………………87

Docket 241- Plea Agreement – 01/21/20…………………………………….…..5,67

Docket 258- Motion to Compel Cell Phone Analysis- 01/31/20…………………6

Docket 276- Motion to Compel Prod. Of Grand Jury Evid. - 05/08/20……..……6

Docket 292- Response in Opposition by USA- 06/19/20…………………..….……6

Docket 323- Motion to Compel- 09/14/20…………………………………………6

Docket 328- Response in Opposition by USA- 09/28/20…………………………6

Docket 329- Order as to Padilla-Galarza – 09/30/20………………….…………6

Docket 331- Motion for Reconsideration- 10/05/20……………….…………6

Docket 334- Order as to Padilla-Galarza – 10/05/2020…………………………6

Docket 343- Motion for Discovery- 10/20/20…………………………...………5

Docket 353- Response in Opposition by USA- 11/13/20…………………………5

Docket 365- Amended Judgment – 12/15/20…………………………………..67

Docket 380- Supplemental Motion for Discovery- 01/19/21……………………....5

Docket 409- Response in Opposition- 03/05/21…………………………………5

Docket 418- Reply to Response- 04/12/21…………………………………5

Docket 431- Motion for Discovery by USA- 04/27/21……………………………5

Docket 433- Response to Motion to Gov.- 05/03/21………………………………5

Docket 440- Motion Requesting Order- 05/26/21………………………….………5

Docket 456- U.S. Mot. for Reduction of Sent. - Samuel Figueroa- 03/08/22…….39

Docket 467- Order denying 455 Motion – 11/05/21…………………………….108

Docket 470- Motion under Rule 12- 11/08/21……………………………...…6

Docket 471- Motion Requesting Order- 11/10/21…………………………….…7

Docket 475- Motion Waiving Trial by Jury- 11/19/21……………………..……7

Docket 478- Motion Requesting Order- 11/29/21…………………………….…7

Docket 482- Order denying 469 – 12/06/21…………………………………...107

Docket 485- Pretrial Conference – 11/30/21…………………………….……7

Docket 487- Motion for Extension of Time – 12/10/21…………………….…107

Docket 488- Motion In Limine- 12/10/21…………………………..…………6

Docket 495- Response in Opposition by USA- 12/13/21…………………..………7

Docket 497- Response in Opposition by USA- 12/14/21………………………6,7

Docket 513- Order denying 478 Motion- 12/22/21…………………………….7

Docket 516- Motion for Rule 404(b)- 12/22/21…………………………….…6

Docket 534- Order denying without prejudice 490 – 01/11/22………………107,108

Docket 538- Opinion and Order denying 488- 01/11/22…………………………6

Docket 546- Response in Opposition to 516- 01/19/22…………………………6

Docket 551- Minute Entry for Proceeding- 01/21/22………………………………7

Docket 552- Order granting 471- 01/24/22……………………………………7

Docket 553- Order as to Padilla-Galarza- 01/27/22……………………..…7,92

Docket 556- Motion In Limine- 02/22/22…………………………………6,87,88

Docket 557- Opinion and Order- 03/01/22……………………….…….….6

Docket 563- Response in Opposition by USA- 03/18/22……………….…6,88

Docket 565- Reply to Gov. Motion in Oppos. - 03/25/22……………….…6

Docket 567- Order denying 556- 03/29/22………………………….…..6,88

Docket 575- Superseding Indictment- 04/07/22………………….……4,7,94

Docket 578- Motion In Limine- 04/08/22……………………….………6,94

Docket 579- Amended Motion under Rule 12- 04/08/22…………..…….…7,95

Docket 583- Motion to Continue Trial- 04/12/22………………….…..7,92,95,100

Docket 585- Response in Opposition by USA- 04/12/22…………….…6,7,92,95

Docket 586- Opposition to Motion in Limine- 04/13/22………..………………94

Docket 589- Order granting 583- 04/13/22………………………………………7

Docket 591- Motion to Compel Discovery- 04/18/22………………….7,98,114

Docket 592- Motion to Dismiss Superseding- 04/18/22…………………7,94,120

Docket 594- Opinion and Order denying 578 – 04/18/22………………….……6,95

Docket 598- Response in Opposition by USA- 04/19/22……………....…7,98-114

Docket 601- Motion to Continue- 04/19/22…………………………8,92,96,99,105

Docket 606- Response in Opposition Defendant- 04/19/22………….…….……8,92

Docket 607- Response in Opposition by USA- 04/19/22…………….…….7,94,120

Docket 608- Opinion and Order denying 591- 04/19/22…………….....7,92,98,114

Docket 610- Memorandum of Law- 04/19/22…………………………………………8

Docket 612- Supplemental Motion by USA- 04/20/22……………..8,92,96,105,106

Docket 613- Memorandum of Elements and Case Law- 04/20/22…………………8

Docket 615- Motion for Reconsideration re 608- 04/20/22……………………..8,115

Docket 621- Amended Motion under rule 12- 04/20/22……………………………8

Docket 623- Order denying 615 Motion- 04/20/22……………………………8,115

Docket 625- Opinion and Order denying 592- 04/20/22……………………7,94,120

Docket 626- Notice to the Court- 04/21/22…………………………………………8,47

Docket 632- Transcript of bench trial held on 04-22-22- 04/24/22………………..8

Docket 635- Transcript of bench trial held on 04-25-22- 04/26/22…………..……8

Docket 636- Motion Misc. Relief by USA- 04/26/22………………………………9

Docket 638- Transcript of bench trial held on 04-26-22- 04/27/22…………8,44,100

Docket 643- Transcript of bench trial held on 04-27-22- 04/28/22…………..8,46,47

Docket 644- Transcript of bench trial held on 04-21-22- 04/28/22………….8,93,96

Docket 646- Motion Requesting Order- Admit Docs- 04/30/22…………………8,9

Docket 647- Motion Requesting Order- Admit Evid.- 04/30/22………………9,110

Docket 649- Motion Submitting Records by USA- 05/02/22………………….9,57

Docket 654- Informative Motion by Padilla-Galarza- 05/03/22…………………...9

Docket 657- Transcript of bench trial held on 05-02-22- 05/03/22………..……8,25

Docket 658- Transcript of bench trial held on 05-03-22- 05/04/22…………..……8

Docket 659- Transcript of bench trial held on 05-04-22- 05/06/22…………………8

Docket 660- Transcript of bench trial held on 05-05-22- 05/07/22…………………8

Docket 662- Motion Submitting Document by USA- 05/09/22……………………9

Docket 663- Transcript of bench trial held on 05-06-22- 05/09/22…………………8

Docket 668- Order granting 662 Motion- 05/09/22…………………………………9

Docket 697- Notice of Disclosure of PSR- 07/28/22……………………………9,60

Docket 698- Notice of Disclosure Amended PSR- 08/25/22………………………9

Docket 700- Motion to Continue Sentence Hearing- 08/29/22…………………..…9

Docket 704- Objection to PSR by USA- 09/12/22………………9,24,25,60,103,109

Docket 710- Disclosure of Amended PSR- 10/05/22…………………………………9,60

Docket 711- Second Addendum to PSR- 10/05/22……………………….………...9

Docket 714- Sentencing Memorandum- 10/07/22…………………………...……..9

Docket 716- Objection to PSR by USA – 10/11/22……………………………..9,60

Docket 719- Sentencing Memorandum by USA- 10/12/22………………………...9

Docket 731- Notice of Court-ordered changes in PSR- 11/17/22…………..…9,36,60

Docket 733- Judgment- 11/16/22……………………………………………...1,10

Docket 734- Notice of Appeal re: 733- 11/28/22………………………..……2,10

Docket 747- Transcript of Sentencing Hearing – 11/16/22……………..…9,60,61

Docket 757- Transcript of Pretrial held on 04-20-22- 06/27/23 …………………….

…………………………………………………………….....8,93,96,97,99,100,101

## <u>STATEMENT REGARDING RECORD CITATION</u>

References to the Addendum, transcript, and other parts of the record below will be as follows:

**"Add"** refers to the Addendum, followed by the page number (e.g. Add. 20)

**"Tr"** refers to portions of the trial transcript. If they are not followed by an App. or Add. they have not been included in the Appendix nor the Addendum (e.g. Tr. 10/16. pg. 75)

**"App"** refers to Appendix followed by the page numbers. (e.g. App. 20-30)

(e.g. Tr. 10/16. pg. 75)

No. 22-1950


**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**
_____

**UNITED STATES,**

**Appellee**

**vs.**


**JOSE PADILLA-GALARZA, a/k/a Joey**


**Defendant- Appellant**

`

_____


**<u>APPELLANT'S BRIEF</u>**

**COMES NOW** appellant **Jose Padilla Galarza** through his Court appointed counsel and most respectfully submits his Brief to this Hon. Court:

**<u>JURISDICTION</u>**

This is an appeal from a bench trial in the District Court of Puerto Rico. Jurisdiction over this criminal prosecution is conferred pursuant 18 U.S.C. 3231. This Court's appellate jurisdiction is invoked pursuant 28 U.S.C. 1291 and 18 U.S.C. 3742(a). Judgment was entered on 11/16/2020. (Docket 733, Add. 1-6). A

timely Notice of Appeal was filed on 11/28/2020. (Docket 734-App.1580).

## STATEMENT OF ISSUES

1- In a bench criminal trial, where Padilla-Galarza's finding of guilt was based on untrustworthy, contradictory, internally inconsistent, and unreliable evidence, the District Court's determination is clearly erroneous. A finding of guilt based on untrustworthy evidence can never rise to the level of proof beyond a reasonable doubt.

2- The District Court abused its discretion when it failed to grant a 30-day continuance, violating Padilla-Galarza's constitutional due process rights to a fair trial.

3- The District Court abused its discretion when it failed to grant funds for expert to interpret cell phone location data and private investigator required for trial preparation, location, and interview of witnesses.

4- The District Court abused its discretion when making evidentiary rulings and ex -parte requests for production of documents that were admissible and material to Padilla-Galarza's defense, depriving the judge from having a record that justified acquitting him, and Padilla-Galarza's due process constitutional rights to present a defense.

5- The District Court should have dismissed Counts 2 and 6 of the Superseding Indictment, since the addition of those two new substantive counts, not alleged in

the first indictment, were time barred.

## STATEMENT OF THE CASE

Padilla-Galarza was indicted on 10/14/2015, on 5 counts for having participated in the robbery of the P.R. Police Isla de Cabras Armory that occurred on 10/26/2010, just 12 days prior to the 5-year statute of limitations expiring. **Count 1** charged him with having conspired with Gilberto Ramos-Quinonez, Ramon Santiago-Ortega a/k/a Pucho, and Guill Reading-Padilla a/k/a "Gil" & "El Negro" for having knowingly, and unlawfully obstruct, delay, and affect commerce and the movements of articles and commodities in such commerce, by robbery, all in violation of 18 U.S.C. 1951; **Count 2** charged the same defendants, on the same date, of aiding abetting brandish and possess firearms and ammunition with unknown make and serial numbers in addition to a HK pistol, model P-229, 9mm. cal., Serial # 245635, and a Sauer pistol, model P-229-40 cal., serial #32403, taken from duty police officers in furtherance of a crime of violence, as charged in count one, all in violation of 18 U.S.C. 924 (c)(1)(A)(ii) and 2; **Count 3** charged the same defendants on the same date for having aided and abetted one another in stealing 125 firearms as detailed in count one, which had moved in interstate and foreign commerce in violation of 18 U.S.C. 924(l), 924(a)(2) and 2; **Count 4** charged the same defendants and date of engaging in the business without a license (firearms) in violation of 18 U.S.C. 922(a)(1)(A), 923(a), 924(a)(1)(D) and 2; and **Count 5** which

charged the same defendants and date for being a prohibited person in possession of a firearm; Convicted Felon, in violation of 18 U.S.C. 922(g)(1), 924(a)(2) and 2. (App.1-12).

A six count Superseding Indictment was filed on 04/07/2022, just 2 weeks prior to the trial beginning, where a sixth count was added, charging a substantive 18 U.S.C. 1951, 2 aiding and abetting offense of Interference with Commerce by Robbery and count 2, an 18 U.S.C 924(c) offense charging *Carrying a Firearm During and in Relation to a Crime of Violence*, was amended to remove as the underlying offense the conspiracy charged in Count One and substituting it with the new substantive aiding and abetting count 6, adding 2 firearms taken from the duty officers the night of the robbery and changing the modality from 'Possession' to 'Carrying'. The conspiracy to interfere with commerce by robbery charged in Count One was amended to add 2 new firearms to the conspiracy, an HK pistol 9mm. Cal. Seria #245635 and a Sig Sauer pistol model P-229 .40 cal. Serial #32403, which were the 2 firearms taken from the duty police officers. (Docket 575- App.13-23).

The case was originally assigned to Hon. Judge Gustavo A. Gelpi but after he was selected to become an appellate judge of this Court, the case was reassigned to Hon. Sylvia Carreno-Coll.

Prior to attorney Rafael Castro-Lang being Court appointed on 03/21/2018 (Docket 88), Padilla-Galarza had three previous Court appointed counsels. (Hector

A. Deliz, Ernesto Hernandez-Millan, and Melanie Carrillo- (Dockets 71,73, 75, 88-App.1624,1625). The 3 co-defendants eventually pled guilty; Santiago-Ortega (Docket 241-App.1976-1991), sentenced to time served; Reabing-Padilla (Docket 129-App.1992-2000), sentenced to 60 months (App. 2002). Gilberto Ramos-Quinones became a government cooperating witness and had his original sentence reduced to time served (Sealed App. 168-179). Another cooperating witness, Samuel Figueroa had his sentence in Cr. 15-079 reduced to time served. (Sealed App. 121).

Pretrial motions were extensive. Multiple Ex-parte motions were filed by Padilla-Galarza; Dockets 93, 94, 97, 103, 145, 177, 189, 197, 205, 212, 215, 217, 236, 249, 253, 256, 282, 297, 303, 311, 317, 358, 386, 402, 455, 469, 481, 490, 505, 559,627, 653, 686,690, 692, 707,728,738,745, 749. Given that these were ex-parte Motions they are not included in any of the appendixes, those relevant are included in a Sealed Addendum of Ex-Parte Motions and Orders that has not been notified to the Government.

Multiple Discovery Motions were filed.;[1] Dockets 343-Motion for Discovery; Opp. at Docket 353; Supplemental Motion for Discovery by Padilla-Galarza (Docket 380) Opp. at Docket 409- A Sub Reply was filed (Docket 418); Government Motion for discovery (Docket 431), which was replied by appellant (Docket 433). Motion for In Camera Inspection (Docket 440); A First Amended

---

[1] A complete copy of docket entries of Padilla-Galarza has been filed in Vol. IV- 1574-1631

Designation of Evid. was filed by the Government. (Docket 470).

A Motion to Compel Cell phone analysis was requested. (Docket 258). A request for Grand Jury evidence was requested due to Prosecutorial misconduct (Docket 276), which the Government opposed. (Docket 292). A Motion to Compel was filed (Docket 323), which the Government opposed. (Docket 328). The Court, after reviewing in camera grand jury testimonies and exhibits denied the motion. (Docket 329). A Motion for Reconsideration/Reply was filed (Docket 331), which was denied. (Docket 334).

Numerous Motions *in Limine* were filed by the parties; 1- By the Government- Motion to exclude Alternative Perpetrator and failed polygraph results by defense (Docket 488-App. 1722-1729), which was Opposed (Docket 497-App. 1730-1733), and denied by the Court (Docket 538- App. 1734-1737 ); 2- A Rule 404(b) disclosure was filed by the Government (Docket 516), which was Opposed (Docket 546) and the Court denied in part (Docket 557); A Motion *in Limine* was filed by Padilla-Galarza for exclusion of unreliable identification of co-defendant Santiago-Ortega (Docket 556-App. 2072-2179), which was Opposed (Docket 563-App. 2180-2189), and a Sub Reply filed (Docket 565-App. 2192-2195), and denied by the District Court. (Docket 567-App. 2196-2203). A second rule 404(b) motion was filed by the Government (Docket 578), which was Opposed (Docket 585) and denied by the Court. (Docket 594).

Padilla-Galarza filed a Motion Waiving Trial by Jury (Docket 471), which was unopposed by Government (Docket 475). A Motion for Hybrid Representation was filed (Docket 478) which the Government Opposed (Docket 495), and a Sub reply filed. (Docket 497). The Court approved the waiver of trial by jury (Docket 551, 552), but denied the Hybrid Representation Motion. (Docket 513).

Numerous trial continuances were requested by the parties at 2 status conferences; (Docket 485- continued from 12/01/21 to 02/07/2022- App. 2016-2017); from 02/07/2022 to 04/18/2022 (Docket 551, 553-App.1632-1643 ); Padilla-Galarza requested a continuance on 04/12/2022 (Docket 583-App.1632-1643) which the Government Opposed (Docket 585-App.1644-1661). The Bench trial was rescheduled for 04/21-29/2022 (Docket 589).

A Superseding Indictment was filed on 04/07/2022 (Docket 575- App.13-23). A Motion to Dismiss the Superseding Indictment was filed on 04/18/2022 by Padilla-Galarza (Docket 592-App. 2229-2232) and Opposed (Docket 607-App.-2239-2250). The Court denied the Motion. (Docket 625-App. 2251-2262).

A Second Amended Designation of Evidence was filed by the Government on 04/08/2022 (Docket 579)

A Motion to Compel Discovery was filed on 04/18/2022 (Docket 591-App. 1738-1743), which was Opposed (Docket 598- App. 1744-1749). The Motion to Compel was denied by the Court (Docket 608-App. 1750-1755). A Motion for

Reconsideration was filed (Docket 615-App. 1756-1759) and denied (Docket 623).

On 04/19/2022 a Motion to Continue Trial was filed by Padilla-Galarza (Docket 601- App. 1662-1667), which was Opposed (Docket 606- App. 1668-1679); A Supplemental Motion in Support of Continuance was filed by Padilla Galarza on 4/20/22. (Docket 612-App.1680-1689). At a Pre-Trial Conference held that same day, the Court, after hearing arguments, denied the request for trial continuance. (Docket 757-App. 24-77).

A Third Rule 12 Amended Designation was filed by the Government on 04/20/2022 (Docket 621). A Notice of Intent to Introduce Records was filed by the Government on 04/21/2022 (Docket 626- App. 2018-2071), and one by Padilla-Galarza. (Docket 646-App. 1760-1781).

Both parties filed Memorandums of Law on Elements of Offenses (Govt. Docket 610; Appellant Docket 613).

The trial began on 4/21/2022 (Docket 644-App.78-217) and was held on 04/22/2022 (Docket 632-App.218-469, 04/25/2022 (Docket 635-App. 470-637), 04/26/2022 (Docket 638-App. 638-825), 04/27/2022 (Docket 643-App. 826-925), 05/02/2022 (Docket 657-App. 926-1151), 5/03/2022 (Docket 658-App. 1152-1221), 5/04/2022 (Docket 659-App.1222-1411), 5/05/2022 (Docket 660-App. 2263-2322), 5/06/2022 (Docket 663-App. 1412-1573), where the Court found Padilla-Galarza guilty on all counts except count 4, where he was acquitted. (Docket 663, App. 1412-

1509).

During the trial the Government filed a Motion for Misc. Relief (Docket 636-App.197-200); Padilla-Galarza, a Motion requesting Order to Admit Documents (Docket 646-App. 1760-1781); a Motion Requesting to Admit Extrinsic Evidence (Docket 647-App. 2212-2214); Motion Submitting Records (Docket 649-Sealed App. 201-210); an Informative Motion with 4 exhibits (Docket 654-App. 2323-2336); Motion submitting document (Docket 662- Sealed App. 211-214), which was granted (Docket 668).

A PSR was prepared (Docket 697- Sealed-App. 1-24) and an Addendum (Docket 698), which was objected to by Padilla-Galarza (Docket 704-Sealed App. 49-91). An amended PSR and Addendum was prepared (Dockets 710,711). A second Objection to the Amended PSR was filed. (Docket 716-Sealed App. 92-119). A Corrected Amended PSR and Addendum was filed (Docket 731-Sealed App. 25-48).

The Government filed a Sentencing Memorandum (Docket 719) as did Padilla-Galarza. (Docket 714-Sealed App. 162-1678). Padilla Galarza's Sentencing Hearing had to be continued due to his high blood pressure and nose bleeds he was suffering. (Dockets 700). Once sentenced, the Court ordered changes to the PSR were filed. (Docket 731-Sealed App. 25-41).

The Sentence Hearing was held and entered on 11/16/2022 (Docket 747-App.

1510-1573; Docket 733-Add. 1-6). Padilla-Galarza was sentenced to 240 months as to counts one and six; 120 concurrent terms as to counts three and five and a consecutive 60 months as to count two for a total of 300 months imprisonment and 5 years of supervised release. (Docket 733-Add. 1-6).

A timely notice of appeal was filed on 11/28/2022. (Docket 734).

## STATEMENT OF FACTS

On 10/26/2010, around 2:50 a.m., a robbery occurred at the P.R. Police station located Isla de Cabras Shooting Range where 125 firearms were forcibly stolen from the vault. At that time Isla de Cabras entrance security gate shed guard Emanuel Cosme (hereinafter Cosme) opened the gate to a white Ford Crown Victoria[2] with police lights that entered Isla de Cabras with two policemen that told him they were going to eat something and say hi to old friends at the shooting range. (Tr. 04/22/2022, pg. 37-38, App. 254-255; Tr. 04/22/2022, pg. 76-App. 293, pg. 85-App. 302).

That day, at the station house office, security guard police officer Orlando Rosado-Batista (hereinafter 'Rosado-Batista') and Maria De Los Angeles-Alvarez (hereinafter 'Maria') were working the night shift of 4:00 pm. – 4:00 am. (Tr. 04/21/2022, pg. 42- App.119; Tr. 04/22/2022, pg. 137-App. 354). Luis Enrique

---

[2] The evidence was conflictive as to the type of vehicle. Range Security guard Rosado-Batista described it as a white Crown Victoria or Grand Marquis. (Tr. 04/21/2022, pg. 56- App.133).

Oquendo (hereinafter 'Oquendo'), a big, strong, tall guy, that also worked the night shift; would sleep at the station house in his vehicle due to marital problems, was not working that night, but sometime during the night came by and got a pair of jeans. (Tr. 04/21/2022, pg. 51,55- App. 128, 132; Tr. 04/22/2022, pg.13,131,138- App. 230-231, 348, 355).

Rosado-Batista testified Padilla-Galarza visited Oquendo at the shooting range. Padilla-Galarza would visit Oquendo 2- 4 times /week; mostly they would talk. (Tr. 04/21/2022, pg. 51-54- App.128-132). Cosme testified Padilla-Galarza was a friend of Oquendo, who would go there weekly, at night after 11:00 pm. He saw Padilla Galarza enter the front desk. The members of the station house treated Padilla-Galarza normally, except Maria who was distant from him. (Tr. 04/22/2022, pg.18-19, 31-32-App. 235-236, 248-249). The night of 10/2610, after his shift started, Padilla-Galarza called him to let him know a cousin of his was going to bring him some Halloween dolls for a party they were going to have, to be at the shed house so he could receive them. Padilla-Galarza called him 5-6 times that night. (Tr. 4/22/22 -App. 251-252). Maria testified Oquendo would bring friends to the shooting range. Padilla-Galarza was one of them. He would go at night while Oquendo was working. They would have barbecues, drinks, and hang out. (Tr. 04/22/2022, pg.131-133- App. 348-350).

**Neither Rosado-Batista, Cosme, nor Maria identified Padilla Galarza as a participant in the robbery.**

According to shed entrance guard **Cosme**, who was standing beside the driver's side of the white Crown Victoria, **it had no police insignias,** and that's why he said it was an unmarked vehicle. (Tr. 04/22/2022, pg. 39- App. 256). He **denied seeing a large police insignia on the Chauffeurs side**. (Tr. 04/22/2022 pg. 61-App. 278). Station guard **Rosado-Batista testified he saw a small police logo, like the ones used in motorcycles, on the driver's side of the police car.** (Tr. 04/21/2022 pg. 56, 93-94- App.133, 170-171). Station House desk office area police officer **Maria** testified that around 2:50 a.m. shed guard Cosme called her informing her that internal affairs was coming in. At that time, she saw a white Crown Victoria with very tinted windows **and a Big Patch of the P.R. Police Dept. on the driver's side.** (Tr. 04/22/2022, pg. 140, 175-176-App. 357, 393-394)[3].

Cosme opened the gate to let them in and locked it afterwards. He went to the fishing club to make rounds where there were 2 fishermen. He later noticed the white Crown Victoria patrol car leaving and he went to open the gate but when he arrived, they had already opened it and left Isla de Cabras. You needed a key to open the gate. (Tr. 04/22/2022, pg. 41-42- App. 258-259).

---

[3] It should be noted that the morning after the robbery, when their memory was fresh, all three officers working that night at Isla de Cabras were interviewed by the police and federal agents.

Cosme also testified that there was an entry/exit/incident book that he kept at the shed entrance for his employer Capitol Security. He wrote down on the same day of the incident what happened at the shooting range. Prosecutor Max Perez-Bouret informed the Court the Government had learned of the book's existence just now, as a consequence of Cosme's cross examination. (Tr. 04/22/2022, pg. 51-59-App. 268-276). This representation is incredible, given that the P.R. police, the FBI, ATF and HSI began investigating the robbery immediately after it occurred; that none of the agencies experienced investigators asked, inquired nor were told by station house employees about its existence! Although requested, the register book was never produced. Capitol Security claimed it had been destroyed due to the passage of time. Given the intensity and importance of the investigation, how credible is the prosecution's trial claim they were never made aware of its existence?

At the station house Rosado-Batista saw a Sgt. in full uniform come out of the driver's side and 2 other officers got out of the police car.[4] He stayed looking at the Sgt. who was a tall man, **about 6ft. tall**, grey hair, skinny cheeks, sunken cheek bones, **he didn't have eyeglasses**. He was a lot taller than Rosado-Batista who is 5'8" tall. (Tr. 04/21/2022, pg. 57,89,94- App.134, 166). The Sgt. came into the station house to go check inside. When Rosado-Batista turned around, the Sgt.

---

[4] Cosme testified he only saw 2 people in the Crown Victoria. (Tr. 04/22/2022, pg. 85- App. 302).

assaults his face, takes his firearm and points to him saying, *"motherfucker this is a robbery, if you don't cooperate, we're going to kill you."* He put him in a room, lay him down, handcuffed him and put blindfolds on him with grey tape. (Tr. 04/21/2022, pg. 57-60-App.134-138). Later they took him to the police office station desk area, asked for the keys of the vault, which he didn't have, threatened his life, took his chain watch and cell phone, informing him that they knew where he lived and would kill him and his family if he didn't cooperate. (Tr. 04/21/2022, pg. 61-62 App.138-139).

After that they took him to the men's bathroom and threw him to the ground blindfolded and handcuffed. The Sgt. went outside to the officer's area, and he could hear strong noises. The Sgt. came back, gets on top of his back, takes off the handcuffs, put plastic bindings on, and covered his mouth with tape. He was transferred to the women's bathroom and told him to lie on top of Maria who was lying on the floor weeping, crying and nervous. The first time he saw Maria was when they are placed together in the women's bathroom where he was thrown on top of her, he face down and she face up. Afterwards he heard noises and eventually it stopped. (Tr. 04/21/2022, pg. 62-65, 105-106- App.141-142, 180-181).

Maria was able to take off the tape on his eyes and mouth. Since he couldn't open the door, he broke the window and jumped out, went to the desk area, and made a radio 1050 call informing they had been robbed. This was around 3:45-4:00 am.

(Tr. 04/21/2022, pg.67-73-App.144- 150).

Maria testified she was working the night of the robbery at the station house desk area with Rosado-Batista, who would walk the grounds. (Tr. 04/22/2022, pg. 137-138- App. 354-355). When the white Crown Victoria came in, she didn't see anyone exit the vehicle. Sometime afterwards she saw a Sgt. walking by the window, dressed in a class A police uniform. He was whistling as he stood in the front door. He barged in, called out it was an assault, **jumped over the counter desk (Govt. Exh. 5 App. 1806),** grabbed her by the hair, banged her head on the counter and threw her on the floor face down. He disarmed her, took her car keys, cell phone and sweater she had on. He put his foot over her head and repeatedly told her not to look at him or he would kill her. (Tr. 04/22/2022, pg. 141-145- App. 359-362). Sometime later someone else came through the door, her hands were restrained, and she couldn't see. The Sgt. gave custody of her to him and sometime afterwards they came in with Rosado-Batista. She heard Rosado-Batista's voice, and they were asking him for the keys of his car. He was unresponsive. She yelled at him and told him to give the keys, informing them the keys were on the door of his car. (Tr. 04/22/2022, pg. 146-148 App. 363-365). It should be noted that Rosado-Batista contradicted her testimony, stating that while he was in the station room with Maria, he never heard her say anything. (Tr. 04/21/2022, pg. 105- App.182).

She was taken to the women's bathroom where the person fondled her breasts

and private parts. He told her he had just gotten out of prison. After that someone else came in and told him they didn't have time for that. She was seated on the toilet and when Rosado-Batista was brought in she was placed on the floor on her back, and Rosado-Batista on top of her. When the commotion ended, she was able to move Rosado-Batista and take her flexi cuffs and tape off. She helped release Batista-Rosado who broke the bathroom window, and they both jumped out. (Tr. 04/22/2022, pg. 149-158- App. 366-375).

**On 10/29/2010, she described the robbery Sgt., as having dark skin (Tr. 04/22/2022, pg. 198-199- App. 415-416),** thin features on his face, sunken cheeks, **black pronounced eyebrows, and dark skin. (Tr. 04/22/2022, pg. 202-203- App. 419-420). On 01/01/2013 Maria** was shown photos and she **identified Sgt. Rolando Gonzalez-Rodriguez (Def. Exh. C—App. 1941), as resembling the robbery suspect.** (Tr. 04/22/2022, pg. 204- App. 421). **She provided a signed statement** to police investigator Wanda Lee Rodriguez on 05/20/2013, where she informed, she had seen the Sgt. previously at the shooting range, **identifying a photo of Sgt. Hector Villegas-Negron as resembling the robbery suspect. (Tr. 04/22/2022, pg. 192-194- App. 409-411  Def. Exh. C- App. 1941).** On 01/01/2013 she was shown photos and she identified Rolando Gonzalez-Rodriguez as resembling the robbery suspect. (2/22/22, pg. 204-App. 421). On 07/12/2013 she was interviewed on 2 occasions and shown photo lineups. The first time she didn't

identify anyone and the second time she identified person #4(Pucho) whose photo had the strongest backup color than the rest and was clearly suggestive. (App. 2138). She testified that in September 2012, she saw him come into the negative certificates division where there were 2 policemen but she did not go to the director nor the policemen to tell them she had just seen one of the robbers of the Isla de Cabras armory to have him arrested! (Tr. 4/22/22 pg. 204-210-App. 421-423, 422, 425-426).

**It needs to be highlighted that the person the Government alleged was dressed as a Sgt. the day of the robbery was defendant Ramon Santiago-Ortega a/k/a Pucho who is white skinned, he is 5'9'' tall, with a large nose, that does not resemble at all the descriptions given by Rosado-Batista and Maria. (App. 1949). The relevance of this obvious misidentification will be further discussed in the Brief, when challenging the District Court's credibility determinations.**

Relief officer Angel Mulero first arrived at the station house and was informed of the robbery. Afterwards the other relief officer Nilsa Morales arrived. They usually relieve them at 4:00 am. **Oquendo arrived with Padilla Galarza at the station house 30-40 minutes later, around 4:30 am. (Tr. 04/21/2022, pg. 73-74, 127- App. 150-151, 204). Padilla-Galarza was driving a big black vehicle, later identified by Oquendo as a black Lincoln Continental. (Tr. 04/22/2022, pg. 42-43- App. 259-260; Tr. 04/26/2022, pg. 29 App. 666). Upon arriving, they got out of the vehicle and Maria testified she saw Padilla-Galarza consoling and**

**touching Batista-Rosado's back outside the station house.[5] (Tr. 04/22/2022, pg.
167-App. 384). It is obvious Padilla-Galarza did not leave the Isla de Cabras
station house area until at least 4:45 am.**

Codefendant Ramos-Quinones a/k/a 'Papote', 'Bolillo', 'Belleza', testified as
a cooperating defendant. He is presently on bail for the last year and 2 months
because of his health and cooperation. Tr. 04/25/2022, pg. 5- App. 476).

Prior to his indictment in this case, he had an extensive criminal history. After
getting married he started selling refrigerators, tv's and other things at a drug point.
There he got to meet drug point owners, sellers, and addicts. He was promoted by
his boss 'Cholo' to purchase items with false, cloned checks duplicated with a
computer. There came a point where he started cloning checks himself without a
partner. He did this until the year 2000[6], when he got arrested federally for making
a 15-kilo cocaine sale to an undercover agent. (Tr. 3rd day- 04/25/2022, pg. 8-11-
App. 477-480). On 11/30/2000 he was arrested and sentenced on 12/12/2001, in Cr.
95-005 (CCC) for having engaged in conspiracy to possess with intent to distribute
cocaine. He was sentenced to 5 years' incarceration and 4 years of supervised
release. His term of supervised release started on 04/08/2005 and ended on

---

[5] Her testimony was contradicted Oquendo who testified he saw Padilla-Galarza gave his hand to
Batista-Rosado. (Tr. 4th day, pg. 36-App. 674).
[6] He was never caught while engaging for years in this deceitful criminal activity.

04/07/2009.[7] (Docket 157- PSR, pg. 13, par. 59- Sealed App. 139).

While incarcerated at MDC he met Padilla-Galarza a/k/a 'El Loco' (the crazy man), was his cell mate in 2001, and while there he told Padilla-Galarza about the frauds he did with false identifications and checks.[8] He lost contact with Padilla-Galarza when he was designated to Florida. He regained contact with him while he was at the halfway house and on **one occasion** while on pass, they saw each other. They wanted to meet about the falsifications. While at the halfway house they did this together until the year 2014. During that time period Ramos-Quinones met 'El Indio' (the Indian- cooperating witness Samuel Figueroa), who was one of the workers that would cash checks. He identified him through a photo shown to him. (Tr. 04/25/2022, pg. 11-13, 21-23- App. 480-482, 490-493; Exh. 38-App.1832).

On cross examination Ramos-Quinones testified that **at the halfway house Padilla-Galarza provided him with a printer and a computer.[9] (Tr. 04/25/2022, pg. 79- App. 548). While on supervised release he was told he could not communicate with another convicted person or be together with one. For 2 years Ramos-Quinones filed monthly reports where he falsely stated he had not talked nor been with a convicted person, lying to the probation officer in his**

---

[7] This indictment did not involve Padilla-Galarza.

[8] The case manager at MDC Guaynabo Jannelle Muniz-Marin testified their records reflect Padilla-Galarza and Ramos-Quinones in 2001-02 were in the same unit and the same cell. (Tr. 04/26/2022, pg. 104-107-App. 741-744).

[9] The Government stipulated during trial that at the halfway house printers and computers were prohibited.

**monthly reports. For years he tricked banks into cashing false checks and was never caught nor charged with this extensive criminal conduct. (Tr. 04/25/2022, pg. 79-80- App. 548-549).**

From 2008-2019 he had an ice cream truck and a motorcycle repair shop. During that period, he packed kilos to send abroad with a friend he had in Mayaguez, made fake FBI jackets and identifications s for him; robbed a bar and took kilos and money for a drug dealer. (Tr. 04/25/2022, pg. 30-31- App. 499-500).

From 2007-2009[10] he went with Padilla Galarza to the Isla de Cabras shooting range **at night** to see Padilla Galarza's friend Oquendo. He went there on 2 occasions, once for a barbecue and another to play baseball. They would take Oquendo to the bowling alley that had a strength machine because he was a beast-hulk and Oquendo broke the record.[11] Padilla-Galarza had a good friendship with the members that worked at the police station. (Tr. 04/25/2022, pg. 32-35-App. 501-504).

Padilla-Galarza told him that at Isla de Cabras is where they kept all the weapons for target practice. **One of the times they left there**, Padilla-Galarza told him it was a good place to make a hit and steal the weapons. **They planned the**

---

[10] Ramos-Quinones was still on supervised release during that time period.
[11] It appears Ramos-Quinones testified falsely when he said he had been there only on 2 occasions but, what they did was play baseball, have a barbecue and going to the bowling alley.

**robbery for 2 years before doing it.**[12] The plan was that they couldn't do it while Oquendo was there because he would try to repel the attack and get shot. The plan was always delayed because of money or vehicle that the firearms would be placed in. They needed a vehicle that looked like a patrol car, a Crown Victoria, or a Grand Marquis. They were going to disguise the car as a patrol car with insignias, siren[13], and hub caps. They needed $10,000.00 to buy the car, fake police uniforms and weapons. He tried to recruit people, but Padilla-Galarza eventually recruited them. (tr. 04/25/2022, pg. 36-40- App. 505-509).

At the end he put $500.00 because Padilla Galarza told him that if he didn't, he would only get paid for his participation in the robbery. Ramos-Quinones wanted equal parts in the money obtained from sales of guns. Another investor was 'El Viejo' (Pucho), who was like a father to Padilla-Galarza and a very good friend of his father, named Doober. (Tr. 04/25/2022, pg. 40-41-App. 509-510).

They bought a sledgehammer[14] to break the door where the firearms were kept, large straps grey tape and an electrical extension at Home Depot several months before the robbery. (Tr. 04/25/2022, pg. 42- App. 511).

Padilla-Galarza was going to take Oquendo out that night to a bar to hang out

---

[12] This testimony would establish that the planning of the robbery began while he was still on supervised release.

[13] This contradicts Cosme's testimony who said it was an unmarked police car.

[14] He contradicted himself on cross examination stating they had bought a drilling hammer. (App. 565).

so he wouldn't be at Isla de Cabras. He was going to tell Oquendo he was having problems with a woman so he could get away and talk with Ramos-Quinones, who would be outside of Isla de Cabras in a red Ford Ranger and would be communicating with him in his Open Mobile cell phone. (Tr. 04/25/2022, pg. 42-44, App. 511-513).

Ramos-Quinones found out who would be in the robbery about 2 days before the robbery occurred. El Viejo was going to go, but they still didn't have the other people. On the day of the robbery Padilla-Galarza told him the nephews of El Viejo were going to do the robbery.[15] Ramos-Quinones arrived at Isla de Cabras from 9-10 pm. He called Padilla-Galarza who told him that El Viejo and his nephews were getting ready. (Tr. 04/25/2022, pg. 45-46- App. 514-515).

It was a calm night and there were almost no people there. That's a stretch of road that's barely any businesses there. The robbery patrol car arrived in the early morning hours. It was very late. Ramos-Quinones called Padilla-Galarza on several occasions. He saw 2 people in the front seat and there were people in the back, but he couldn't see them because the back seats were tinted. They were all dressed as police officers. After they went in the security guard closed the gate. (Tr. 04/25/2022,

---

[15] No nephews were ever indicted nor identified as participants by any of the victims nor witnesses. Aside from El Viejo (Ramon Santiago-Ortega a/k/a Pucho), the only additional defendant charged with participating in the robbery was Reading Guill Padilla, a personal friend of Ramos Quinones, whom he exculpated the same day he started cooperating with the Government and at trial where he reaffirmed the Reabing-Padilla 'did not go 'and 'refused to participate.' (Tr. 04/25/2022, pg. 105-110-App. 574-579).

pg. 46-48-App. 515-517).

After they entered another patrol car came from afar. He called Padilla-Galarza to notify the people inside because he didn't know them nor had their phone numbers. The patrol car came up to the gate around 3:00 am and left. After the patrol car left, Ramos-Quinones went up to the gate through the area the sand is, so the security guard wouldn't see him, and he could hear a saw being used.[16] (Tr. 04/25/2022, pg. 51- App. 520).

Several minutes later he saw the fake patrol car coming out and he knew the job had been done because it scrapped a speed bump because it was full. After they went by, he put the fishing equipment in the truck that he had to make it look like he was fishing and took off behind them. On cross examination he testified that he was at the beach area, giving surveillance. It was dark and difficult to see who was coming and going. From the beach he would tell Padilla-Galarza who was coming and going. He sat at the beach and from time to time, he would go sit on the rocks and leave the fishing rod in place. If someone arrived, he would see them.  (Tr. 04/25/2022, pg. 52,114-116-App. 521, 583-585). **Significantly, when interviewed for his PSR on 03/07/2019, 3 years prior to trial, he told the probation officer that *"he was not present when the people inside the shooting range were victimized, <u>since he was a lookout and was driving around the establishment.</u>"***

---

[16] Security guard Cosme testified he never heard any noise that night.

(Docket 157-PSR PG. 10, PAR. 29- Sealed App. 137; Docket 704-Sealed App. 65). He never mentioned this version during his cooperation interviews nor at trial. This is a serious contradiction with his trial testimony.[17] In addition, at trial he testified he went down to the 'sandy area' that is <u>before</u> the Isla de Cabras guardhouse.   He also asserted that any car that would come by would be able to see his truck. However, photos taken and submitted to the Court prior to sentencing[18] demonstrate that there is no beach or sandy area there, only slanted rocks that go all the way to the water, which is very deep, since you can observe that there are divers nears the rocks. (Docket 704-7, Sealed App. 70-78).

He saw a patrol car on one occasion. (Tr. 04/25/2022, pg. 116-117- App. 585-586).

Particularly troublesome is the testimony of Toa Baja Municipal policewoman Anabel Ayala-Morales who was subpoenaed by Padilla-Galarza. At trial she testified that on the night of the robbery (10/26/2010), she patrolled by Isla de Cabras around 3:00 am and the gate was closed. She saw a red vehicle and a gentleman was seated on a rock. She recalled being interviewed by agents

---

[17] As the saying goes; *'a liar has a hard time repeating the same lie.'*

[18] These photos were not taken prior to trial because there were no CJA funds approved by the Court for an investigator to carry out the task of examining and photographing that area, which was identified by Ramos-Quinones during his trial testimony as the place where he was giving surveillance. Counsel could not drive by there to investigate the area because he was too busy with his trial preparation of examining witnesses.

on 10/28/2010 and identified in Court case agent Ivys Rosado as one of the agents that interviewed her. She admitted that her memory was better at that time than now. When she provided answers, she was truthful. (Tr. 05/02/2022, pg. 61-64-App 986-989). Ivys Rosado was called as a witness by Padilla-Galarza. She admitted having interviewed policewoman Anabel Ayala on 10/28/2010 and had read her report of the interview prior to testifying. (Her report is at Docket 704- Sealed App. 86-89). She admitted Anabel had told her she had gone to Isla de Cabras entrance at 2:25 a.m. and 3:15 a.m. doing preventive rounds and <u>when asked if she had seen a white Crown Victoria or a red pickup truck she said "no".</u> (Docket 657-Tr. 05/02/2022, pg. 109-113- App. 1034-1038). A photo of Ramos-Quinones' <u>red truck</u> was admitted in evidence, which was identified by him at trial. (Def. Exh. H-App. 1946; Tr. 04/25/2022, pg. 89-App. 558). In her interview Anabel was very specific as to the vehicles she had observed that night. *"She <u>emphasized</u> that if those vehicles had been there, she would have identified them as part of her preventive job."* (Docket 704-9, pg. 2-Sealed App. 89). As to other vehicles and persons she saw the night of the robbery, she stated:

*"That at 2:15 a.m. she entered towards Palo Seco to do a preventive patrol and noticed a couple in a wine-colored car, and observed a **green pickup** that belonged to some individuals who were fishing. She also observed a **wine-colored or dark brown minivan,** outside of which an individual was sitting on the rocks staring towards the Police Shooting Range of Isla de Cabras. This individual was described*

*as being 35-40 years of age, dark-skinned, with **neck-length curly hair**[19].  She shone a spotlight on the individual, but he didn't react.  Ayala-Morales reported that she saw the security guard's car, **a blue Susuki Aerio** parked in the area.".* Sealed App.88-89).

**That interview occurred just 2 days after the robbery. <u>One has to wonder, how is it that 12 years after the robbery she recalled for the first time seeing a red truck, when 2 days after the robbery she described all of the vehicles seen that night and emphasized she had not seen a red truck.  More importantly, who prepared her to testify in such a perjurious manner at trial? This testimony smacks of Government misconduct!</u>**

Ramos-Quinones' version that his truck was parked in front of the entrance to Isla de Cabras was seriously contradicted by Capitol Security shed guard Cosme who testified that outside of the security entrance gate there was only one car, **far away from the security entrance, around Bouy 4 which is pretty far off, from ½ to 1 mile away and it was so far away he could not identify it.** (Tr. 04/22/2022, pg. 64-70-App. 281-287).

Ramos-Quinones sped up until he caught up and got next to their vehicle and told them to take off the police logo, which he described as being a small decal, on the left side of the door. The Crown Victoria had a government license plate (Tr. 04/25/2022, pg. 127-App. 596). He saw the person driving. That was the last time

---

[19] Ramos-Quinones is bald headed. (App.  1955).

he saw the fake patrol car, that went towards Levittown and he towards San Juan. (Tr. 04/25/2022, pg. 63-App. 532).

A video was shown to him dated 10/26/2010, at 3:41a.m. taken by the cameras of the Palo Seco Electric plant in the area where there is seaweed. Ramos-Quinones testified he could recognize the area because it is the only road that leads to Isla de Cabras and the 2 cars that appear in the video are the robber's vehicle and his truck. An objection was raised because the cars that appear in the video are not clear, there are no license plates reflected and the testimony was insufficient. The judge overruled the objection, and the video was admitted as Government exh.40b. (Video Disc filed separately with the Court; Tr. 04/25/2022, pg. 56-62- App. 525-531). He identified a photo of a sledgehammer[20], tape, and straps as similar to the ones they bought at Home Depot.[21] (Government Exh. 24-App. 1820, tape; Exh. 25-App. 1821, straps Exh.18- App. 1816). He saw Padilla-Galarza again on October 26 at Rio Hondo, who was worried because the sledgehammer had been left behind and he didn't want to go to jail again. He would commit suicide. He was also worried because the firearms were in El Viejo's power, and they could be stolen. The firearms were kept by El Viejo for 2-3 days. That's when they decided to put the firearms in Ramos-Quinones' motorcycle repair shop. (Docket 635- Tr. 04/25/2022,

---

[20] **That is neither a big sledgehammer nor a drilling hammer as he previously testified.**
[21] No video of Home Depot nor purchase receipts were presented in evidence by the Government.

pg. 30, 65-67, 135- App. 499, 534-536, 604). **Yet, when Ramos-Quinones was interviewed for his PSR on 03/07/2019, he never mentioned owning a mechanic shop during that time period, only an ice cream truck. (Docket 157, PSR, pg. 16, par. 76-Sealed App. 142, par. 76). Over 100 rifles, pistols and shotguns were stored in his mechanic shop on the second floor, for 6-7 months.** That night, El Viejo came in a van. The Viejo he saw was the same person he saw on the night of the robbery. He testified Government Exh. 37 (App. 1831) 'looks like El Viejo', only that when he first met him his hair was shaved, and he had a small mustache. (Tr. 04/25/2022, pg. 67-69- App. 536-538).

**Ramos-Quinones** initially received a rifle and 2 pistols as payment**. He sold 30-50 weapons:** rifles for $2-3 thousand dollars and pistols from $1-1500.00 dollars. He never mentioned selling shotguns. He sold firearms in Cupey to a friend of his, Raymond Molina.[22] (Tr. 04/25/2022, pg. 72-73, 117-App. 541-542). **He was present when Padilla-Galarza obliterated the serial number of the firearms. (Tr. 04/25/2022, pg. 121- App. 590). This is not true. The Government stipulated 7 firearms stolen from Isla de Cabras were seized during different times and persons that had their serial numbers. (App. 1966-1968). Not one single firearm sold by Ramos-Quinones was recovered nor did any of the persons he sold**

---

[22] By coincidence, the only person he mentioned was Molina, who was killed in a drive by shooting. (Tr. 04/25/2022, pg. 117- App. 586).

**firearms to were identified in discovery nor testified at trial. No firearms were ever recovered from Padilla-Galarza.**

**Prosecutor Max Perez-Bouret summoned Ramos-Quinones for an interview in the year 2014. At that time Ramos-Quinones told him neither he nor Padilla-Galarza had anything to do with the robbery of Isla de Cabras. The prosecutor told him to sleep with his clothes on because he was going to arrest him in the summer. On 12/11/2014, agents interviewed him, and he told them that he had learned of the robbery in the news and that he spoke with Padilla-Galarza that day, who informed him that he had learned through the news. (Tr. 04/25/2022, pg. 73, 88-89- App. 542, 557-558).** Ramos-Quinones got worried and called Padilla-Galarza, they met, and when he told him what had happened Padilla-Galarza got hysterical and told him he had nothing to do with the robbery. (Tr. 04/25/2022, pg.74-App. 543).

About a month after he had met with prosecutor Perez-Bouret, Padilla Galarza called Ramos-Quinones and asked him to make a call to ATF to try to delay the investigation enough so that these 5 years that happens in the cases—what do you call that?' He told him to call agent Paduil and tell him about some corrupt police officers that had to do with the job at Isla de Cabras and another shooting range that was close by. He called but was never able to reach him. (Tr. 04/25/2022, pg. 75-App. 544). On cross, Ramos-Quinones admitted he was again willing to lie. (Tr.

04/25/2022, pg. 132-App. 601).

When Ramos-Quinones began cooperating in 2016, he told the agents that co-defendant Guill Reabing-Padilla was a friend of his and that Reabing-Padilla had refused to participate in the robbery. The next day after the robbery Ramos-Quinones called him and told him he was a fool (pendejo) in not going because it went off well. On cross examination he admitted that when he involved Padilla-Galarza for the first time in the robbery he told the agents Reabing-Padilla had refused to participate. He admitted knowing Reabing-Padilla had pled guilty to the Isla de Cabras robbery conspiracy yet refused to identify him as a participant. (Tr. 04/25/2022, pg. 105-108-App. 574-577). On redirect he testified Reabing-Padilla had accompanied him on one occasion to Mayaguez where Ramos-Quinones sold a firearm. (Tr. 04/25/2022, pg. 137-138-App. 606-607).

Ramos-Quinones testified he would like to come out with time served when sentenced in this case and is aware he is supposed to tell the truth as part of his plea agreement. (Tr. 04/25/2022, pg. 139-140-App. 608-609).

ATF Special agent Jorge Escribano testified as a firearms expert, identified 2 firearms with serial numbers DTC95411 and DTF 8068 (Government Exh. 49 and 50-App. 1838), that appear in the list of firearms stolen from Isla de Cabras. (Government Exh.1-App.1790-1795). Both firearms travelled in interstate commerce. Agent Yvys Rosado gave him the firearms. Both firearms do not have

their serial numbers obliterated. (Tr. 04/25/2022, pg. 151-152-App. 620-621).

Luis Enrique-Oquendo ('Oquendo') was the Government's next witness. He worked for the P.R. police from 1988 to July 2013. When he began, he was 2 ½ years at Barrio Obrero where Padilla-Galarza mentored him. They became friends and would go out. After that he went to tactical operations at the Housing Projects. There he arrested approximately 50 persons and assisted in 200 arrests. In 1994-95 he was transferred to Isla de Cabras. He was living at Isla de Cabras in his truck because his wife Carmen Reyes had filed 12 complaints for domestic violence against him and as result of a Law 54 Domestic Abuse complaint he was disarmed. He is six feet two inches tall and weighed 308 pounds. (Tr. 04/26/2022, pg. 12, 21-App. 649, 658). Isla de Cabras front desk policewoman officer Maria testified Oquendo was nicknamed 'The Monster' (El Monstruo) because a lot of people were afraid of him because he was big, about 6'2" and had black curly hair and a mustache. (Tr. 04/22/2022, pg. 128, 131-App. 345, 348). **In 2010, Oquendo would sign in at Isla de Cabras, leave and go to a part time job he had and would come back and sign out as if he had worked at Isla de Cabras all day**. (Tr. 04/26/2022, pg. 15-App. 652).

He met security guard Cosme. They were friends and would go out to fish. The night before the robbery he was at a pub with Parra and Cosme. (Tr. 04/26/2022, pg. 22, 24-App. 659, 661; Exh. 45- App. 1836; Tr. 04/26/2022, pg. 25-App. 662).

The guys would invite people into Isla de Cabras. Padilla-Galarza would visit him once or twice a week, they were friends. On one occasion he went to Padilla-Galarza's house and met his father, Dubber. He was treated by the other officers as a coworker. Padilla-Galarza had access to all areas, including the desk office. Padilla-Galarza introduced him to 'Papote' (Ramos-Quinones), who went on one occasion to Isla de Cabras to play softball and do a barbecue. They once went to a bowling alley where there was a punching bag and Oquendo broke the record. The last time he saw 'Papote' was 12-14 years ago when they went to the bowling alley. (Tr. 04/26/2022, pg. 16-21, 24- App. 653-658, 661).

On the night of October 25/2010, Oquendo was at K-mart buying some fans for his cousin for the activity. While there Padila-Galarza called him inviting him to an activity of a friend of his, Edgardo Gonzalez (Eggy). Padilla-Galarza picked him up at the K-mart and they went in Padilla's father's **black LincolnTown car** to Isla de Cabras so Oquendo could pick up some long pants. On the way they stopped at a McDonalds so Oquendo could eat. That was around 9:50pm. At 11:00 pm Oquendo put his long pants on, they went to Las Fuentes establishment where Edgardo Gonzalez and Dr. Pepe were there. Padilla-Galarza left some minutes after they arrived. On Oct. 26 he told the agents Padilla-Galarza left around 12-12:15am. He didn't know where he was. His vehicle wasn't there. Oquendo asked 'Eggy' to take him to Isla de Cabras and they went to eat at a business called El Kiosco on

Baldorioty de Castro around 3:00 am. Oquendo didn't try to call Padilla-Galarza, Eggy did. He arrived at El Kiosco around 3:20 am. Padilla-Galarza was rubbing his face and asked him if it was reddish because he had argued with a woman who hit him in the face. After they ate Padilla-Galarza took him to work. As they were nearing Isla de Cabras around 3:50am they saw 2 patrol cars go by them. Cosme opened the gate for him. (Tr. 04/2620/22, pg. 26-35-App. 663-672). At Isla de Cabras Padilla-Galarza parked in a roundabout. Numerous patrol cars were there. Rosado-Batista came running towards him screaming; 'if you had been here this wouldn't have happened.' Padilla-Galarza was next to Oquendo and shook his hand. Oquendo remembered he had left his shorts in Padilla-Galarza's car and went to get it. When he opened the door and took his shorts out, he saw Padilla-Galarza hit the steering wheel and tells him; *"motherfucker, that- man, that was me.[23] The robbery, man. Those weapons: but if you say anything I'm going to kill your children."* He mentioned their names Chachi and Uni, whom he knows. Oquendo took the shorts and went running to the police station. He was confused, nervous. (Tr. 04/26/2022, pg. 36-38-App. 673-675).

After he went to the police station he saw Rosado-Batista who asked him to take a strap he still had on. He went to the locker to place his pants and officer Hilda

---

[23] On cross examination he provided a different version, admitting that in his signed statement dated 05/31/2011, he said; *"I understood" he said, "I was the one who did it, or I know who did it, one of the two".* (Tr. 04/26/2022, pg. 82-App. 719).

Melendez told him he couldn't be there. (Tr. 04/26/2022, pg. 38-App. 675).

At noon he was interviewed by officers Jose Rodriguez and Jose Pedro. He didn't disclose Padilla-Galarza's threats to him at that time. He was afraid. Even though he is 6'2" and weighed 308 pounds, he feared Padilla Galarza because he had the weapons and Oquendo was disarmed. (Tr. 04/26/2022, pg. 38-40- App. 675-677). During the afternoon Padilla-Galarza called him on the phone, asked him where he was going and he said to be interviewed at the Bayamon Command Center and Padilla-Galarza told him; *"Hey motherfucker, remember your children."* (Tr. 04/26/2022, pg. 39- App. 676).

On cross examination he admitted that while working in the tactical division for 5 years he observed violent incidents and has been involved with people resisting arrest. People acting in a threatening or violent manner was something he had experienced while being a police officer. His duty is when he finds out about a crime you arrest the person. Padilla-Galarza is a lot smaller than he is. They were alone in the car and **Padilla-Galarza wasn't armed at the time**. If anyone threatened his family he would take corrective action, depending on the situation. He claimed he couldn't arrest him because when he opened the door Padilla-Galarza was at the steering wheel with the car on he could take off suddenly. He contradicted himself with his immediate previous testimony stating he didn't know if Padilla-Galarza was armed and when he told him, he was in shock. Padilla-Galarza was Oquendo's

friend, but Oquendo wasn't his friend. Oquendo took his pants, closed the door, and went to the police station. He wasn't expecting that comment from him. He denied that the best way to protect his children was to arrest the person that had just threatened them. At that time, he didn't follow his obligations as a policeman. (Tr. 04/26/2022, pg. 44-48- App. 681- 685).

Oquendo admitted he never committed a crime with Padilla-Galarza nor did Padilla-Galarza ever tell him about crimes he was committing. He doesn't know why Padilla-Galarza out of the blue would tell him he had committed the robbery.

Padilla-Galarza made the comment without him asking any questions. (Tr. 04/26/2022, pg. 48-49-App. 685-686). When Oquendo went to the police station there were several armed police officers there. He didn't tell them about Padilla's confession because he was protecting his children. (Tr. 04/26/2022 pg. 49-App. 686).

When asked, Oquendo mentioned he had seen Padilla Galarza engage in violence while he worked with him in Barrio Obrero. (1988-1990). Counsel tried to intervene because he meant to ask him while Padilla-Galarza was with him at Isla de Cabras but the Court denied the objection stating; "**I want to hear the answer now.**" (App. 688). The witness mentioned having seen Padilla-Galarza slap a person twice in the face for having stolen a radio, told Oquendo to slap him and he did so; On another occasion a man with a shopping cart with several cash registers was taken

to the police station and Padilla-Galarza told him; *"My boots are size 12.*[24] *If you don't tell me where you got that from, I'm going to kick your face."* The person said, *"I'm telling you the truth"* and Padilla-Galarza kicked him in the chest and slapped him like 3 times. The guy confessed he had stolen them from an office in Baldrich. They located it, went to the police station and Padilla-Galarza jumped on the cash registers, breaking them. When Oquendo asked him why he had done that, he said that he didn't want to file any charges. Oquendo had observed 5-6 incidents of violence. On cross examination he admitted never filing a complaint against him with his supervisors concerning these incidents. **He was then asked if while he was with him at Isla de Cabras, if he had seen any incidents of violence by Padilla Galarza, and he answered 'No'.** (Tr. 04/26/2022, pg. 50-55-App. 687-692). On redirect he testified he was 22 years old when he saw Padilla-Galarza slap an individual. He was brand new to the police, maybe months. On one occasion an egg was thrown to the police car and Padilla-Galarza got out of the car with a shotgun and fired twice at the drug point. The people ran away and said it's 'El loco' (the crazy man). He was called that way because he was aggressive, would go anywhere, to the drug point, and get aggressive.[25] (Tr. 04/26/2022, pg. 91-93- App.728-730).

---

[24] That is a lie. Padilla-Galarza wears a size 10.
[25] The Court should be aware Padilla-Galarza while a police officer, obtained a $5,000.00 cash award, was selected on several occasions Police Officer of the Year, and received a medal of honor. (Docket 731-PSR, pg. 19, par. 75-Sealed App. 43, par.75).

Oquendo was interviewed by the police on 10/26/2010 about the robbery at the Bayamon precinct. He denied having said he had been out with a Sgt. or a Lt. and did not mention he had been out with Padilla Galarza that night. He lied about it because he was protecting his children. He also denied security guard Cosme had called him on the way back and told him about the robbery, contradicting Cosme's trial testimony. When they got to the entrance, he called Cosme to open the gate, asked him what had happened and Cosme replied that he didn't know, contradicting Cosme again. (Tr. 04/26/2022, pg. 58-App. 695).

On cross examination, Oquendo admitted that on 10/26/2022, he was interviewed a second time by federal agents. At that time, he was in a secure, safe area. He told the federal agents that during the first interview he had not told them all that he knew because he was nervous and didn't know what to say. He never mentioned during that interview Padilla-Galarza's admission he had been part of the robbery, nor the that he had threatened the life of his children. The federal agents had told him he had to be truthful, but he didn't say he was with Padilla-Galarza that night. He told the agents that when Padilla-Galarza arrived at Fuentes bar he appeared to have a mark on his face. He told them he knew him, that they had a close relationship, and that everyone that knew Padilla-Galarza treated him like part of the

crew. **For him Padilla-Galarza was an upstanding person at his work.**[26] (Tr. 04/26/2022, pg. 59-62, 90- App. 696-699, 727).

Oquendo was interviewed a third time on 10/26/2010[27], by FBI Agents Mapp and McCurdy. He denied having told the agents that night he had gone to Las Fuentes bar in his truck and by coincidence Padilla-Galarza arrived there. He denied having stated in all of those interviews that while in K-mart on 10/25/2010, he received a call from Egui, who told him he was with Dr. Pepe at las Fuentes Bar, inviting him for some drinks. The call was from Padilla Galarza. (Tr. 04/26/2022, pg. 64-66-App. 701-703).

Oquendo admitted there was nothing illegal in Padilla Galarza having called him to invite him out for drinks; that while at Fuentes bar all they did was drink and watch pretty girls, so there was no reason for him to fail to mention that Padilla Galarza had participated in those events. He didn't remember telling the agents he had driven to Fuentes bar in his truck, nor having said he arrived there at 10:30 pm and left around 2:45 am. He denied having memory problems and having participated in the Isla de Cabras robbery. He had nothing to hide from the police by admitting he had gone out to drink at Fuentes Bar. He didn't remember having told the agents that he and Gonzalez were in the restaurant until 3:15 a.m. nor that he had

---

[26] This totally contradicts his testimony about the physical abuses he allegedly saw Padilla-Galarza commit while he was with him as a policeman.

[27] On one occasion by the FBI and on 2 occasions by ATF. (Tr. 04/26/2022, pg. 71- App.708).

arrived in his truck alone to Isla de Cabras at approximately 4:10 am. (Tr. 04/26/2022, pg. 66-67- App. 703-704). At trial he testified he didn't recall at what time Padilla Galarza had left the station house in his car. (Tr. 04/26/2022, pg. 73-App. 710).

The Government called as a cooperating witness Indio-Samuel Figueroa (hereinafter 'Figueroa')[28]. Padilla-Galarza objected to the testimony being given at that time. As stated at the pretrial conference and during trial, his counsel was not ready to cross examine Figueroa because he didn't have the opportunity to investigate many statements he made, that Padilla-Galarza could obtain, to impeach him. The Government opposed it. After hearing arguments from the parties, the judge denied the motion for additional time because she had moved the trial from Thursday to Monday. (Tr. 04/26/2022, pg. 110-120- App. 747-757). This matter will be further developed as part of an argument on Appeal in this Brief.

At that time, the Government alerted the Court of its filing a Rule 35 Motion for Reduction of sentence in Cr.15-079 due to his cooperation in this case (Docket 456- Sealed App.157-161 ; Tr. 04/26/2022, pg. 123-124-App. 760-761), on behalf of Figueroa and the Court's Amended Judgment entered on 03/10/2022, reducing Figueroa's sentence to time served (Sealed App. 121), over a month prior to this trial

---

[28] Figueroa was not charged in this case. He was serving a sentence for robbery in Cr. 15-079 (DRD).

beginning.[29]

Incredibly, Figueroa began his testimony falsely representing under oath he did not have a cooperation agreement with the Government (Tr. 04/26/2022, pg. 127-App. 764), when in fact the Government had already awarded him for his cooperation prior to his testifying, when it filed the granted Rule 35 Motion for Substantial Assistance.

Figueroa went on to say he was testifying because he wanted to close a chapter in his life and because of a call Padilla-Galarza had made to his son during the year 2018- 2019 saying that if he was going to cooperate Padilla-Galaza was going to make sure that everybody in P.R. found out about it.[30](Tr. 04/26/2022, pg. 127-App.764  ).

After graduating from high school, he worked as an auto mechanic. He went to live to the mainland and around 1985-86 he returned to P.R., living at Ingenio and after becoming unemployed at Goya, he sold crack for 8 months for Pakitin and quit when he met his wife, Rosa. (Tr. 04/26/2022, pg. 129-131-App.767-768).

---

[29] The Government reduced his sentence in Cr. 15-079 prior to his having completed his cooperation, that included, as appears in the Rule 35 Motion, testifying at trial. Usually, a reduction of sentence is not filed until the defendant completes his cooperation. The Government insured his testimony with this advanced benefit.

[30] During those years it was unknown that Figueroa would testify in this case. This was discovered when Jencks materials were provided to counsel on 04/15/2022, via email. During those years there was no reason for Padilla-Galarza having made that call. According to the prosecutor it wasn't until shortly before trial after the prosecutor told Figueroa he couldn't indict him due to the statute of limitations period having passed, that Figueroa agreed to testify.

Eventually he moved from Ingenio to Levittown where he rented a studio apartment on the bottom floor of a two-story house. (Government Exh. 79- App. 1907). On the second floor Padilla-Galarza lived there with his parents and sister. He had a good relationship with Padilla-Galarza's father, named Duber, with whom he had like a father-son relationship. He would go with Duber in trucks to deliver merchandise in St. Just, Mayaguez, Ponce, and Cayey. Padilla-Galarza was a police officer at the time, and they had a good friendship. He had to leave the studio apartment because he met a girl in front. Duber got him a job working at a body shop in Villa Olga.[31] He lost contact with Padilla-Galarza but not with Duber. (Tr. 04/26/2022, pg. 130-135-App.767-772).

He lost contact with Padilla-Galarza because he had gone to jail. When Padilla-Galarza got out Figueroa gave his telephone number to Duber in order for him to call him. They met and Padilla Galarza offered him a job cashing checks. An objection was raised because Figueroa was going to testify about 404(b) evidence the Court had excluded. Before Padila-Galarza was incarcerated he had taxis. Figueroa would go with Duber to collect taxi rental checks. (Tr. 04/26/2022, pg. 137-138- App. 774-775).

**On the morning of the Isla de Cabras robbery Padilla Galarza woke him up at 4:00-4:30am**. (App. 793), and told him he had something to show him, that

---

[31] By the time trial began Duber was already dead.

he couldn't say anything about it. Figueroa identified photos of the place where he lived at that time. (Government Exh. 39, 39A-App.1833-1835; Tr. 04/26/2022, pg. 139-140-App. 776-777).

Padilla-Garza arrived in his father's car, a **grey Lincoln Town car that belonged to his father. (App. 777)**[32] He opened the trunk that was full of firearms, long weapons, shotguns, Ar-15's. In the back seat of the car there were pistols and rifles. Padilla-Galarza told him they had to move the weapons from there. Figueroa testified there was a car outside waiting for him**.** They removed the firearms from the back seat and placed them in his white Sebring. They went towards Catano on Rd. 2 in his father's car, Figueroa was behind 'them' in his Sebring. They arrived in a home in Catano, Padilla-Galarza put his dad's car in reverse through an open gate. Figueroa would pass the firearms to Padilla-Galarza, and he would pass them to a 'guy' that was in the house.[33] You could hear a woman in the house. He took out of the trunk more than 40 weapons. When his father's car was emptied Padilla-Galarza took the car out and Figueroa placed his Sebring in reverse, and he took out duffels from the trunk. When it was emptied Padilla Galarza told him to leave. Figueroa went back to his home. There he prepared breakfast and turned on the tv where a special bulletin informed that the Isla de Cabras shooting range had been robbed.

---

[32] On cross examination Figueroa was asked if Padilla-Galarza arrived in a grey Crown Victoria and he answered, "*The grey one that was his fathers*". (App. 793-794).
[33] That house nor any of the occupants were identified at trial.

(Tr. 04/26/2022, pg. 140-145-App. 777-782).

As the day went on, around 10:30 am., Padilla Galarza arrived at his home, informed him the firearms were from the Isla de Cabras robbery. He told him he would be back and later he arrived in a white Crown Victoria[34], telling him it was the car used in the robbery and he wanted to turn it into a taxi. He brought the taxi light that goes on top of the vehicle, the taxi logos and some frames where the headlights are located. Figueroa worked on the car the whole day. About 6:30-7:00 pm. they moved the car to Barrio Obrero. Figueroa drove the taxi and Padilla Galarza was in an old champagne colored Gallant that he had. They took it to a Plaza where Dominicans have taxis and stand by. After he parked it, he went back home. Eventually the taxi was sold for $300.00-$400.00.[35]  The first time he went to the square Padilla-Galarza paid him $600.00 and the second time they went there, he paid him $800.00 for his services. (Tr. 04/26/2022, pg. 145-149-App.782-786).

They would frequently go out to eat and the whole time he would receive a call from someone called 'Pucho', who had gone to the shooting range robbery, and was pressuring him about the firearms. Padilla-Galarza stated that the firearms needed to be 'repaired', which he understood to mean that they had to be put in

---

[34] On cross examination he stated it was a white Grand Marquis. He couldn't keep his story straight. (App. 795).

[35] Although Figueroa was present when Padilla-Galarza sold the vehicle and knew where the buyer's home was located in Macon, where Padilla Galarza's parents' house was, he did not provide his name, nor could he remember if the told the agents where the residence of the person that purchased it was located. (Tr. 04/22/2026, pg.165, 166-App. 802-803).

conditions to sell them. He participated with him in making 3 of the AR-15 rifles shorter and obliterating their serial numbers. The firearms were in his home for about 6 months and afterwards they were transferred to the trunk of a 71-orange Malibu Figueroa had that was located under a tarp between his home and the third home, where there was a space. (Government Exh. 39A-App. 1834). When the firearms were moved from his home to the trunk of the Malibu, Padilla-Galarza lived at Figueroa's home for a while and later he rented a home. (Government Exh. 39b-App. 1835). A guy that lived in the first floor of the residence where Figueroa lived, saw him working on the Crown Victoria that was converted to a taxi.[36] (Tr. 04/26/2022, pg.149-152- App. 786-789).

On cross examination Figueroa admitted telling FBI agent Ivys Rosado on 02/02/2017, that Padilla-Galarza arrived at his home the night of the robbery at approximately 4:00-4:30 am.[37] He also told the agents that later that same day, October 26, Padilla-Galarza arrived at his house in a white Grand Marquis to be converted to a taxi. While he was doing that, he never removed any police logos from the white Grand Marquis. (Tr. 04/26/2022, pg. 156-158-App. 793-795).

Figueroa has 17 children. (Tr. 04/26/2022, Docket 638- App. 804). On one

---

[36] No one testified at trial about having observed Figueroa converting the vehicle into a taxi.
[37] During cross examination counsel referred to the grey Lincoln Town car Figueroa had mentioned belonging to Duber as a grey Crown Victoria and later a grey Grand Marquis that contained the firearms which neither the Court, Figueroa nor the prosecutor corrected, which raises the question, was it a grey Lincoln, a grey Crown Victoria, or a grey Grand Marquis? (Tr. 04/26/2022, pg.157, 165-App. 794, 802).

occasion, during an election period, Padilla-Galarza hit Figueroa on the head with the butt of a pistol and he had to get 5-6 stiches at the Doctors Hospital in Bayamon. He denied Padilla Galarza hit him because Figueroa had a dog tied up for 3 days without water or food and this made him angry. He never accused Padilla-Galarza criminally. On re-direct he stated Padilla-Galarza was half drunk that day and in front of Duber and Javier Siete's stepfather he hit him with a pistol because Padilla Galarza claimed Figueroa had told the sister of a girl he was dating that the car that had been turned into a taxi was the one used in the robbery. (Tr. 04/26/2022, pg.173, 182-App. 810, 819). Figueroa denied having sold Padilla Galarza a stolen car, telling him falsely he had bought it in an auction. He was arrested on one occasion by the Bayamon police for selling stolen vehicles, but he never went to Court for that. He denied having been dismissed from his employment on numerous occasions for stealing. Figueroa was shown Government Exh. 39, App.1833-1835), who admitted he lived on the second floor of the house that appears there. On the bottom floor a guy named Javier Siete lived there. He denied that Javier ever rented out garage space to him. On re-direct he identified Javier Siete was the person that saw him working on the white Crown Victoria that he was converting into a taxicab. [38] (Tr. 04/26/2022, pg. 173-176, 182- App. 810-813, 819).

---

[38] These matters of cross examination were not proven because the Court refused to provide additional CJA funds for the investigator to locate the witnesses that would have impeached Figueroa about those matters.

Figueroa was shown a series of photos that he had been shown when interviewed in the year 2017, and he admitted that when he was shown his photo, he said he didn't know who it was. Claims it was something he did jokingly, and he was dying to go to the bathroom when he said that. He admitted it would have taken the same amount to say, 'yes' instead of 'no'. (Tr. 04/26/2022, pg.178-180-App. 815-817).

When shown Def. Exh. P he recognized it as being Pucho and when shown Government Exh. 37 he said it 'looks like Pucho.' When he was interviewed in 2017, he was never shown a photo of Pucho. (Tr. 04/26/22, pg.180-181-App. 817-818; Def. Exh. P- App. 1952; Government Exh. 37-App. 1832).

On re-cross examination Figueroa denied resenting Padilla Galarza for having beaten him, considered him like a brother, and never accused him of anything. (Tr. 04/26/2022, pg.185-App. 822).

Sgt. Mario Reyes-Mulero testified he has been a police officer for 40 years and is presently the director of Weapons Deposit of the P.R. Police. (Docket 643-Tr. 04/27/2022, pg. 4- App. 829). They obtain new weapons by trade-ins of the old ones. A bidder makes a proposal of the value of the guns and General Services decides if the trade will occur. The most recent one they submitted 13,500 firearms that were packaged and sent to the U.S. In the homicide section of the police, they used Crown Victoria's and when he was an escort they used a Grand Marquis, which

is a more luxury car. On cross examination he admitted that policemen that have worked for years in the force can recognize a Crown Victoria when it comes by them. (Docket 643-Tr. 04/27/2022, pg. 4-11-App. 829-836).

A Stipulation was filed that Padilla Galarza had previously been convicted on 11/26/2010, and that he was aware of said conviction. (App. 1962 – Tr. 04/27/2022, pg.12-13-App. 837-838). The parties further stipulated that Ramon Santiago-Ortega a/k/a Pucho is the owner of 'Perfumeria Chris' located at Ave. Gregorio Ledesma Ave., HP-23, Seventh section, Levittown, P.R. (Tr. 04/27/2022, pg. 19-App. 844; Exh. 79-App. 1907).

The Government proceeded to argue Docket 626, which consisted of Certification of Domestic Records. The Government moved to partially exclude Id. 67, which consisted of the AT&T location data of Oquendo's cell phone. (Docket 626-App. 2062-2065; Tr. 04/27/2022, pg. 21, 23-App. 846, 848). The Government proceeded over objection to introduce into evidence the Open Mobile records of calls for telephones; 787-627-9463- Padilla-Galarza's); 787-603-8819–Santiago-Ortega's a/k/a, Pucho; 787-533-1134- Ramos-Quinones (Government Exh. 63, 64, 64A, 65, 66 – App. 1839-1886). The objection raised was due to the Stipulation of the parties of the call detail report of Open Mobile Corporate Security employee Edgardo Ruiz-Sanchez, where he certified that in 2010 Open Mobile's information system did not include seconds and if any calls were made in less than one minute it would be

rounded out to 1 minute. (Stipulation-App.- 1964). Given that the telephone records were inaccurate, where the majority were rounded up to 1 minute, their use was unreliable and toll records should not be admitted. Calls that lasted less than a minute would appear as one minute in the Open Mobile Toll records. After extensive argument the court admitted the Open Mobile toll records. (Tr. 04/27/2022, pg. 29-45-App.- 853-870).  The Government rested. (Tr. 04/27/2022, pg. 46-App. 871). Rule 29 arguments heard. Court appointed counsel for Padilla-Galarza made an extensive argument, that given that the trial was a bench trial and the Court was to make credibility assessments, the rule that only the jury could assess facts and credibility determinations did not apply and extensively reviewed the Government's evidence which was so unreliable and inherently untrustworthy that under any standard of review it could not rise to proof beyond a reasonable doubt. (Tr. 04/27/2022, pg. 47-72- App. 872-897).

The Government argued that viewing the evidence in light most favorable to the prosecution, it should be denied.  The Court agreed and denied Rule 29 relief. (Tr. 04/27/2022, pg.72-79, 82-App. 897-898, 907).

The defense began its presentation of evidence with a stipulation that 7 firearms recovered subsequently from the Isla de Cabras robbery all had their serial numbers. (Tr. 05/02/2022, pg. 3-4- App. 928-929; 1966-1968).  The Court admitted def. Exh. K, **Santiago Ortega's** a/k./a Pucho certified electoral card which

demonstrated **he is 5'9" tall and his skin is white**. (Def. Exh. K-App. 1949). A stipulation was admitted concerning ATF Fingerprint Specialist Andrew McIntyre analysis, where 4 latent fingerprints raised at the robbery scene were compared to Santiago-Rivera's a/k/a Pucho's fingerprints and his fingerprints did not match any of the latent fingerprints obtained from the Isla de Cabras robbery scene. (Tr. 05/03/2022, pg. 47-49-App. 1198-1200; App. 1970-1971).

Miguel A. Maldonado-Maldonado, President of the Isla de Cabras Fishing Club when the robbery occurred was called as a witness to establish Fed.R. Evid. 613 impeachment evidence concerning capitol Security guard Emanuel Cosme. Maldonado admitted he had been interviewed shortly after the robbery, and his memory was better then than now, but he couldn't remember what he said. When counsel tried to confront him with the specific statement he made to investigators shortly after robbery (that Cosme had requested from him a copy of the keys to the gate the day before the robbery because he had lost his set), the Government objected as being leading and the court refused to allow the question, forcing defense counsel to make open ended questions, and the witness was never able to be confronted due to his lack of memory. (Tr. 05/02/2022, pg. 48-53- App. 973-978).

Municipal Police officer Anabel Ayala was also called as a witness to lay foundation for impeachment and/or Rule 613 testimony. **When initially interviewed on 10/28/2010, she emphatically denied ever seeing a red truck**

**parked at the entrance of Isla de Cabras that night when she made 2 rounds at 2:15 and 3:00 am (Sealed App. 88-89), yet at trial**, **12 years later,** she testified she saw a 'red vehicle' during those rounds. She identified case agent Ivys Rosado as one of the agents that interviewed her, and admitted her memory was better at that time and that she was truthful during that interview. (Tr. 05/02/2022, pg. 61-65- App. 986-990). **Agent Ivys Rosado was called as a witness, who testified she interviewed policewoman Ayala on 10/28/2010, and that she said that during her rounds, which she made close to the gate entrance, at 2:15 am and at 3:00 am at Isla de Cabras Palo Seco entrance she never saw a red pickup truck**. (App. 1038). When counsel tried to go into that policewoman Ayala had emphasized about not seeing a red truck, the prosecutor objected because she testified having no recollection, and was beyond her direct, as to what she said, and again counsel was prevented from obtaining Rule 613 evidence that established she had emphatically denied observing a red truck during her rounds. (Tr. 05/02/2022, pgs.106-116-App. 1031-1041).

Police officer, ATF task force agent for 18 years, Paduil Torres was called to testify (Tr. 05/02/2022, pg. 71- App. 996), as a Rule 613 witness because he interviewed policewoman Maria on 11/27/2010. (Tr. 05/02/2022, pg. 74-App. 999). He admitted he was trained how to prepare ROI'S and one of the most important features of a report is it be accurate. (App. 998).  During his interview of Maria, he

showed her the photo of Sgt. Hector Villegas Negron (Def. Exh. C-App. 1941). He testified at trial that Maria told him Sgt. Villegas-Negron resembled the Sgt. that participated in the robbery. She recognized him because Villegas-Negron was a Sgt. that used to go to the shooting range. When confronted with a report of an interview where the photo of Sgt. Villegas was shown to Maria **, he admitted the report states that Maria identified him as one of the robbers,** but denied the accuracy of the report, stating it must have been an error in the translation.(Tr. 05/02/2022, pg. 83-84 -App.1008-1009).

ATF case agent Ivys Rosado-Diaz, who was present in Court throughout the trial, was called as a defense witness. She admitted that when she prepares a report it must be as accurate as possible and should include important facts and statements made during the interview. Prior to signing a report, she reads it to ensure its accuracy. However, the report is a summary. (Tr. 04/27/2022, pg. 92-93-App. 1017-1018).

Agent Rosado prepared a written statement where she stated that in the reenactment of the scene with Maria of the robbery and 2 photos that were taken, the window was closed which would have prevented Maria from seeing anybody, but denied having ever asked her if the window was open or closed. (Pg. 97-98- App. 1022-1023).

Prosecutor interferes with questioning her about her interview with Anabel Ayala and bases his objection on the trial testimony examination of Ayala whereas a consequence of his objections counsel was not able to ask her about what she emphasized during the interview.

Discussion is made about witnesses avoiding impeachment by testifying they don't remember making a statement and the Court preventing counsel from going into the specific contradictory statement that appears in the report. (Tr. 04/27/2022, pgs.114-119- App. 1038-1044).

Agent Rosado-Diaz admitted that when she interviewed cooperating witness Ramos-Quinones on 12/11/2014 (App. 1041), he told her he had bought the red truck in the year 2011 or 2012. (App. 1044).

Agent Rosado-Diaz also admitted that when she interviewed cooperating witness Samuel Figueroa a/k/a Indio she showed him a series of photographs one of which was Exh. Q- App.1953, which agent Rosado-Diaz identified as being Guill Reabing Padilla. Figueroa answered that he '*had seen him somewhere but does not know his name*.' He never stated Reabing was a participant in the robbery, (Tr. 04/27/2022, pg. 121-122- App.1046-1047). Figueroa was shown a photo of Oquendo (Def. Exh. R- App. 1954), and he was unable to recognize him. (Tr. 04/27/2022, pgs.124-125- App. 1049-1050).   Rosado-Diaz showed Figueroa a photo of Ramos - Quinones (Def. Exh. S-App. 1955), and **he said that Ramos-Quinones is in MDC**

**Guaynabo but that he doesn't know him from the street**. (Tr. 04/27/2022, pg. 125-126-App. 1050-1051).

Rosado-Diaz began as an ATF task force officer in November 2012. Since that date the robbery was her case. At that time, it was a cold case. (Tr. 05/02/2022, pg.149- App.1074).

Extensive discussion and objections concerning what agent rosado claims exhibits 34, 40, 76, 83 show (App. 1074-1081), when the Court denied objections of Rosados' characterization of the photos/screenshots, which counsel disagreed with. (App.-1075- 1083; App. 1782-1787).

On cross examination the Government had her look at Government Exh. 40- a video. She says she saw a white vehicle and a pickup. (Tr. 05/02/2022, pg.158- App. 1083).

Objections raised to relevance of photos of Palo Seco station area of sargasso. The Judge admitted them in evidence because reference has been made road 870, so it has corroboration value. Govt. Exh. 80, 81-1-7, 82- App. 1909-1919; 05/02/2022 pg.159-169-App. 1084-1094). She identified Exh. 82 pages 1-6 (App.1919-1924) which show area where videos are installed at Palo Seco. Exh. 82-6 depicts camera that took Government Exh. 40. Other video cameras were identified. (Tr. 05/02/2022, pg. 171-174-App. 1096-1099).

Rosado-Diaz compared Exh. 40 with Id. 84, where the time frame in both is 3:41:33 am. Objection raised as to id. 84 because you can't tell what kind of vehicle is there. Judge rules that counsel cannot object based on his perception. (App. 1104-1107). Goes into what is reflected in video. Claims it is a white vehicle. Objection raised because Government is reopening their case in chief. Rosado-Diaz' testimony is going way beyond the scope of direct. (App. 1111-1114). On re-direct she admitted that in her signed statement she stated that from the 2 photos taken of the window that day, it was closed. She read the statement before signing it and to the best of her ability she was being truthful at the time. (Tr. 05/02/2022, pg. 202-203-App. 1133-1134).

Christian Santiago-Cruz, who on 10/26/2010 worked for Capitol Security as an entrance gate guard at Isla de Cabras, who did rounds while he worked, was called as a defense witness. He confirmed that at the entrance gate there is a novelty book where police cars that entered the station would be logged. When the gates of the facilities were closed the guard had to log the entry of any police car. (Tr. 05/03/2022, pg. 53-54-App.1204-1205). He knows Padilla-Galarza, who was introduced to him by Oquendo. (App. 1207). When Padilla-Galarza would go to Isla de Cabras he would frequently speak with him. Padilla-Galarza would talk to him about when he worked at the police, and about the Halloween party of a co-worker that he showed up to. (App. 1206). On cross examination he admitted he did not work on the night

of the robbery, but he did the night before. He admitted that when initially interviewed by law enforcement on 11/05/2010, he did not mention knowing Padilla-Galarza. (Tr. 05/03/2022, pg. 57-58- App.1208-1209).

Rule 613 witness, Police officer for 22 years Wanda Lee Rodriguez-Miranda testified on behalf of the defense. She conducted an official police administrative investigation of the Isla de Cabras robbery. As part of her investigation, she interviewed the President of the fishing club at that time, Maldonado-Maldonado, who informed her that he had complained about Cosme having requested from him a copy of the keys to the main gate and he refused, instructing him to make the request for the key through National Parks. (Tr. 05/04/2022, pg. 13-15- App. 1234-1235). She also interviewed guard Maria who told her that she had identified as one of the participants a Sgt. that she had already seen previously at the firearms depository. On cross examination she stated that as part of her investigation Padilla-Galarza had been mentioned as a possible suspect. On re-direct she acknowledged having rendered her report over 3 years after the robbery occurred. Upon questioning by the judge, she informed that the scope of her investigation was to identify improper or irregular conduct on behalf of members of the force and although there were contradictions Maria was not found to have committed administrative violations. (Tr. 05/04/2022, pg. 15-25- App.1236-1246).

Police officer from 1987-2013, Hector Guadalupe Martinez testified on behalf of the defense. He was the first agent in charge of the Isla de Cabras robbery. At the time he was an investigative agent of CIC Bayamon. He arrived at the armory at 5 am on 10/26/2010. (App.1248). On the day of the robbery neither of the victims showed signs of violence on their faces. (App. 1276). Private investigator Roberto Vizcarrondo interviewed him and showed him a photo of [39] a person that he couldn't identify nor considered a suspect in the robbery. He couldn't recall if he told them that agent Oquendo and security guard Cosme were the main suspects. (App.1277-1278). On cross examination he stated that an important intelligence tool is to obtain NCIC criminal history of suspects. On 11/05/2010 he requested NCIC reports of Ramos-Quinones and of Santiago-Ortega because they were suspects. (Tr. 05/04/2022, pg. 92-93, 99 - App. 1313-1314, 1320).

ATF agent Jose Antonio Pedro testified he participated in the investigation of the Isla de Cabras robbery. On 10/26/2010, the day of the robbery, he interviewed agent Oquendo, who told him that night he was out with Eduardo Gonzalez and a doctor named Pepe. Oquendo did not mention he had been out with Padilla- Galarza. (Tr. 04/05/2022, pg. 118- App. 1339). In a later interview Oquendo told him he had met Padilla-Galarza at the early stage of his career and that they became friends and

---

[39] As testified by Vizcarrondo the photo shown to him was of Padilla-Galarza. (App. 1419).

stayed close throughout the years.[40]  Oquendo later mentioned Padilla-Galarza during a second interview on 10/28/2010 and was available for further interviews by the FBI where he gave totally conflictive versions. (Tr. 05/04/2022, pg. 130- App. 1351).

Ice certified Intel analyst for 14 years, Carlos Ivan Moreno-Rodriguez (hereinafter referred to as 'Moreno'), was called as a defense witness.  As an Intel analyst he is acquainted with the Pen Link analysis of phone calls. During his career he has made more than 500 Pen Link telephonic analysis. (App. 1357-1358).

Pen Link is a tool base, not a data base, where you must put the data into the Pen Link in order to get results. **Pen Link will not create anything that is not put into the system.** (App. 1360-1361) Pen Link identifies data links, frequencies, time lengths, call associations using an array of charting tools. (App. 1389). Pen Link used AT&T and Open mobile data because the other companies would provide him with data that would be usable for the Pen Link to provide a better result. (1369-1370).   The data of telephone 787-930-7185 (Oquendo's cell phone-Exh. Y-App.1961), was obtained through AT&T.  Moreno conducted Pen Link to obtain the results of an analysis of cell phones 787-627-9463 (Padilla-Galarza's), 787-533-1134 (Gilberto Ramos, 787-930-7165 (Oquendo), and 787-603-5819 (Ramon Santiago-Pucho). (Docket 649- 1-4 Sealed App. 201-210; Def. Exh. X, Y, Z-

---

[40] This contradicted Oquendo's trial testimony that Padilla-Galarza was not a friend of his.

App.1958-1961**). The Pen Link software allows you to obtain the duration of a call if the data is available. (App. 1366). The data that was provided to Pen Link from AT&T and Open Mobile reflects that it included seconds duration of a call.** (App.1376, 1378-1379). On cross examination Moreno admitted that the Open Mobile records would only record minutes while the Pen Link analysis read them in seconds.[41] (App. 1391-1394). The Pen Link analysis records were admitted in evidence. Moreno does not analyze, nor chart missed calls, only calls that connected. Nor did Open mobile send information on missed calls. (App. 1395-1396). Moreno opined that when he scanned the original documents from Open Mobile, Pen Link was reading the minute and converting it into seconds. (App. 1394).

CJA private investigator Vizcarrondo testified that he interviewed agent Guadalupe-Martinez, who had initially been in charge of the Isla de Cabras robbery, on 01/29/2020, wrote a report, and again on 05/02/2022, when he subpoenaed him. At that time, he went by the whole document and read it out loud in Spanish. No objections were raised to his written report. At that time Guadalupe-Martinez stated his main suspects in the robbery were Oquendo and Cosme.[42] (Tr. 05/06/2022, pg.

---

[41] This was misleading cross examination since Pen Link could also use data obtained by AT&T, which would provide seconds of call durations.

[42] At trial Guadalupe testified his suspects were Ramos-Quinones and Santiago-Ortega.

7- App.1418). He showed him a picture of Padilla-Galarza and he couldn't identify him as a suspect. (Tr. 05/06/2022, pg. 8- App. 1419).

Defense counsel informed the Court that it was not able to locate additional witnesses so he couldn't comply with the Friday deadline. (App.1429-1430). The defense wanted to have agent Ivys Rosado testify concerning a contradiction of trial testimony at page 142 and her interview. The contradiction was that when interviewed, she said the Sgt., when he came in didn't say anything, hit her in the face with bis hands and jumped over her desk[43] and grabbed her by the hair while at trial she claimed the Sgt. said, *"This is a robbery, this is a robbery"*. (Tr. 05/06/2022, pg. 21- App.1432), the Government stipulated the contradiction. (Tr. 05/06/2022, pg. 30-31- App.1441-1442).

Padilla-Galarza rested, and the Government had no rebuttal evidence. (App. 1442). Padilla Galarza renewed his Rule 29 motion. App.1447-1448). The Government opposed and the Court denied the motion. (App.1449-1450).

The Court granted each party 45 minutes for closing arguments. (App. 1450).

The Government gave its initial closing argument. (App. 1450-1464). Counsel objected to the Government's closing argument that Figueroa testified that

---

[43] This is an incredible, unbelievable event, only a young man could have jumped over that desk. (Gov. Exh.5- 6 App. 1805-1806).

the guns were taken to Pucho's daughter's home, only that it had been taken to a house in Cataño. The Court stated it would review the record. (App.1490-1491).

Padilla-Galarza reincorporated his Rule 29 arguments and argued that the Government's evidence concerning the 2 witnesses that testified he was the head of the robbery was so untrustworthy and full of contradictions that the Court should conclude that it failed to prove his guilt beyond a reasonable doubt. (App. 1464-1483). The Government admitted during their rebuttal argument (App.1484-1507), that a lot of inconsistencies had been brought up but to keep in mind that the witnesses are recounting events occurring 12 years ago. (App.1497).

The Court recessed at 12:48 pm and at 3:23 resumed, rendering a guilty verdict on all counts except count 4. (App. 1507-1508).

A PSR was prepared (Docket 697-Sealed App. 1-24), which was objected to by Padilla-Galarza. (Docket 704- Sealed App. 49-91). An amended PSR was filed (Docket 710), which was also objected (Docket 716- Sealed App. 92-119), and during the Sentence Hearing some changes were ordered by the Court. (Docket 747- Tr. Sent. H. pg. 3-15 App. 1510-1573), and an Amended PSR was filed. (Docket 731-App. 25-48).

**In his initial objections (Docket 704- Sealed App. 49-91), Padilla-Galarza included material documents and photos that demonstrated Ramos-Quinones had testified falsely at trial concerning what he did on the night of the robbery**

**and his owning a motorcycle mechanic shop in 2010, where he allegedly stored firearms, that his PSR contradicted.[44] The Government also filed its Sentencing Memorandum requesting Padilla-Galarza be sentenced to 300 months. (Docket 719).** An extensive allocution was made by counsel requesting the Court impose a concurrent sentence with the 23-year sentence he was already serving, given that a consecutive sentence is the equivalence of a life sentence. (Tr. Sent. H. pg.18- 20- App. 1526-1529). The Government argued the Court should impose a sentence of 300 months. The Court rejected Padilla-Galarza's arguments requesting a concurrent sentence with his previous conviction (App. 1530-1548) and imposed a concurrent sentence of 240 months as to counts 1 and 6 (the statutory maximum for those counts), ten years concurrent as to counts 3 and 5, plus a 5 year consecutive sentence as to count 2, consecutive to the sentence he is already serving, for a total of 25 years. (Add. 1-6; Docket 747- Tr. 11/16/2022, pg. 57- App. 1566). The sentence imposed is the equivalent of a life sentence for Padilla-Galarza.

The present appeal followed.

## SUMMARY OF ARGUMENT

1- All of the Government's evidence/witnesses to convict Padilla-Galarza was so contradictory, internally inconsistent, their testimony impeached both as to their

---

[44] **Counsel failed to confront on cross examination Ramos-Quinones about said contradictions due to his inability to properly prepare for trial given the amount of work and records he had to review prior to trial that justified granting him a continuance.**

initial statements to law enforcement and trial testimony, some of which was so incredible that it was not believable to a reasonably rational trier of facts, provided by witnesses that had spent all their life lying and had something to gain, that the District Court's finding of guilt was clearly erroneous and should be set aside because its untrustworthiness could not rise to the level of proof beyond a reasonable doubt. There were serious unbelievable contradictions/versions in the Government's key evidence;  the type of car used for the robbery, if it had any police logos or was unmarked; the description of the Sergeant that entered the station house that did not resemble at all Santiago-Ortega, who was later identified as the Sgt. through suggestive identification methods (App. 2072); the number of persons within  the white Crown Victoria the night of the robbery; whether the entrance  gate was open or closed when  they left Isla de Cabras; statements given by Cosme the night of the robbery and at trial when he testified that he never saw a red vehicle parked outside of the entrance to the Isla de Cabras shed house; the type of vehicle Padilla-/Galarza arrived at Figueroa's house and the hour he arrived there; the need of Padilla-Galarza to go to Figueroa's' home to transfer the firearms ,which had allegedly already been transferred to a different vehicle than the white Crown Victoria that did not resemble at all the robbery car, or the need to go to  his home given that another vehicle was following Padilla-Galarza where the firearms could have been placed making going to his home unnecessary; the post arrest inconsistent versions given to Government

agents immediately after the robbery by key government witnesses, perjurious testimony provided by municipal agent Anabel Ayala concerning 2 rounds to the entrance of Isla de Cabras she made the night of the robbery where she emphasized immediately after the robbery occurred not seeing a red vehicle, and at trial 12 years later testified she saw a red vehicle at the entrance; internally inconsistent versions provided by cooperating witness Ramos-Quinones to the probation officer during his PSR interview as to what he did the night of the robbery and failing to mention he owned a motorcycle repair shop, which totally discredited his trial testimony; the false statement and perjurious  testimony by Ramos-Quinones that his friend Guill Reabing-Padilla had not participated in the robbery, given during the statement where he first implicated Padilla-Galarza in the robbery, when Reabing -Padilla had pled guilty to being a coconspirator  in the robbery;  the contradictory versions provided by Ramos-Quinones and Figueroa as to the storage of the firearms; the falsity of the testimony that Padilla-Galarza had obliterated the series from  the stolen firearms when 7 of them were recovered that had the serial numbers; the failure of the government to recover any of the 30-50 firearms that Ramos-Quinones sold from the robbery; the testimony of Figueroa that he didn't know Ramos-Quinones from the street when Ramos-Quinones testified he knew him from a fraudulent check scheme they had before the robbery where Figueroa was one of the persons that changed the checks and had a false ID.; Figueroa and Ramos-Quinones' lack of knowledge that

each of them had participated in the robbery and the storage of firearms, Maria's incredible testimony that in the year 2012 she saw the Sgt. of the robbery while at a police department and did not inform the policemen that were there, that she had just seen one of the Isla de Cabras robbers, to have him arrested; the incredible story of Oquendo, a policeman that had worked previously in the tactical division of the police dept. who is 6'2" tall, weighed 368 pounds, and was nicknamed 'the monster', after several interviews mentioned for the first time that out of the blue Padilla-Galarza told him he was the person that conducted the robbery or knew who did it, and if he said anything about it he would kill his children, failing to arrest him at the time, nor informing the station house policemen about the confession, in order to have him arrested; the unreliability of the videos and photos taken at the Palo Seco electricity station where it could not be seen with sufficient precision the vehicles that past by there at 3:43 am. the night of the robbery; the untrustworthiness of the Open Mobile telephone records which could not register seconds and would round up calls to a minute when the more reliable Pen Link analysis performed by FBI intel annalist Moreno demonstrated the majority of the calls lasted a second.

If the Court analyzes all of these evidentiary conflicts it should arrive to the conclusion that the district court's finding of Padila-Galarza's guilt was clearly erroneous, and no reasonable rational trier of facts could have found him guilty

beyond a reasonable doubt. This Court should set aside the guilty verdict given the untrustworthiness of the evidence used to sustain the conviction.

2-      The District Court judge abused her discretion when she failed to grant a continuance of trial that was repeatedly requested by Padilla-Galarza which prejudiced Padilla/Galarza at trial and violated his constitutional right to a fair trial.

As appears from the statement of facts, the government at the last hour ambushed Padilla Galarza with discovery, various motions *in limine*  and a superseding indictment that had to be studied, researched an opposed; it disclosed for the first time on 04/15/2022,  trial cooperating witness Figueroa,  that Padilla-Galarza was not able to review his ROI with counsel until 04/18/2022 due to the lack of electricity at MDC from 04/15-17/2022. Upon reviewing the same, given that Padilla-Galarza knew Figueroa, the legitimate need arose to locate witnesses, interview them and have them testify at trial to impeach his credibility and trial testimony. It was impossible to accomplish this in that short period of time, particularly when the court had refused to grant additional funds to pay the CJA private investigator for that work, who was  subpoenaing witnesses during that period, and counsel was busy preparing for  direct and cross examination of  10 witnesses, having to review substantial discovery that had been provided 2-3 years prior to trial which was time consuming. Counsel requested a continuance on 04/18,19,20/2022 and at the beginning of the bench trial informing that he was

unprepared. As result of his inability to properly prepare for trial, counsel failed to cross examine Ramos-Quinones concerning important impeachment evidence that he had provided to his probation office years prior to testifying, giving a totally inconsistent version of facts as to what he did while providing surveillance on the night of the robbery, that he had failed to mention that he had a motorcycle repair shop from 2009 until his indictment, when at trial he testified firearms had been stored there for 7 months, that totally contradicted is trial testimony; was unable to go to Isla de Cabras to take photos that established the falsity of Ramos-Quinones' version of what he did that night, which were obtained after the trial; was unable to consult an expert witness to interpret the location data of Oquendo's cell phone which was provided on 04/08/2022 for the first time, that could have provided accurate time periods given that Oquendo was with Padilla-Galarza the night of the robbery and that of Padilla-Galarza's which local investigators had requested shortly after the robbery, and it was unknown if they had obtained it; 2 appellate briefs that he filed before this Court on 03/03/2022 and 03/17/2022 that took time away from trial preparation. The amount of time that was required to properly prepare for trial was insufficient and it is obvious the district court should have granted the 30-day continuance requested.

3- The District Court abused its discretion when it summarily denied approving additional funds in order to have CJA private investigator Roberto Vizcarrondo

locate and interview witnesses, assist counsel in trial preparation and during trial and failing to hold an ex parte hearing to justify said services. As appears from the statement of facts said funds were needed to reimburse the investigator for time consuming tasks he had to make concerning multiple witnesses that needed to be located and interviewed shortly before and during trial in order to be able to properly investigate and impeach the recently announced cooperating witness Figueroa, whose effective cross examination was impeded at trial. The District Court's conclusion that such services were not allowed for an investigator was an abuse of discretion.

In addition, an expert witness was needed by counsel to interpret the last-minute notice of Oquendo's cellphone location data, which was impossible to decipher from the document provided, which contained important locations that could have been used to establish time periods, given that Oquendo was with Padilla-Galarza that night. The Government decided not to use said location data trial because it could 'confuse' the court which clearly creates the inference that it contradicted the government's version of events. Without the expert, Padilla-Galarza was unable to make that determination, affecting not only the verdict but this Court's review of the issue. The Court's denial of the expert because the Government was not going to introduce it at trial was an abuse of discretion. Given the importance

and legitimate need of said services Padilla-Galarza was prejudiced at trial and a new trial should be ordered.

4-    The District Court's evidentiary rulings were erroneous as a matter of law, prevented material extrinsic Fed. R. Evidence 613(b) from being introduced at trial, which constituted impeachment evidence of witnesses and inconsistent trial evidence that could have affected the verdict.

The District Court's insistence upon the Government's objections, that Padilla-Galarza prior to confronting a witness with a specific prior inconsistent statement under Rule 613,  provided 12 years prior to trial, that  he first had to **generally** ask the witness if they remembered what they  told X or Y agent  at that distant time, and when they obviously answered 'no', prevented Padilla-Galarza to ask a leading question about the statement because they had already denied remembering what they said constituted an erroneous application of the and consequently an abuse of discretion since counsel's intended line of direct examination of said  hostile  Government witnesses was permissible under Rule 611(c) and **required by Rule 613(b)** which states that prior to the extrinsic impeachment evidence be allowed to be produced at trial,  the witness must be afforded the opportunity to admit or deny making the statement and the opportunity to explain. As a result, the District Court did not hear the total contradictory statement given shortly after the robbery by municipal agent Anabel Ayala

**emphasizing** that if she had seen a red truck when she made 2 rounds at the entrance of the Isla Cabras that night, she would have identified them as part of her preventive job. Such a precise denial should have led the Court to conclude that Ayala had perjured herself when she testified at trial, she had seen a red truck that night. Ayala should have been an important impeachment witness of Ramos-Quinones' version of what he did that night, and at trial was turned into a corroborating witness! What's going on here?

The District Court even though she was provided ROIs that reflected **Maria** and 4 other employees that were stationed at Isla de Cabras when the robbery occurred had failed polygraph tests, she not only ruled that she would not consider polygraph test results at trial because she considered them unreliable, but when Padilla-Galarza received expert reports that Oquendo and Cosme had been polygraphed, she refused to order the production of said polygraphs test results for use at trial by Padilla-Galarza agreeing with the Government that they did not have to produce that in discovery. Had Oquendo and Cosme failed their polygraph tests it was important to find out what questions were asked that revealed deception. The fact that the Government refused to provide the test results indicated that they were found to be deceptive. The Court ignored multiple precedents that hold them admissible as impeachment/Brady materials that could be used at trial. When one contrasts those rulings with her insistence over objection that Oquendo narrate

violent incidents he had observed Padilla-Galarza make during the years 1988-1990 when they worked together as policemen, an abuse of discretion occurred in calibrating decisions. A tendency to allow harmful evidence that had little evidentiary value as part of the record while refusing to allow evidence that Maria, Oquendo and Cosme had failed polygraph tests, which constituted relevant credibility evidence under Rule 401 and had impeachment value, demonstrates bias and an abuse of discretion. Given the exclusion of such important evidence because of her erroneous evidentiary rulings that prejudiced Padilla-Galarza, this Court should grant a new trial.

5-      Count 2 and 6 of the superseding indictment should be dismissed on statute of limitations grounds. The robbery and forcible use of firearms began and ended on 10/26/10. As of that date the statute of limitations for substantive offenses related to said robbery began. The filing of a superseding indictment on 4/07/22, twelve years after the robbery occurred, that added 2 new substantive counts, that could have been filed within the 5-year limitations period should be considered time barred. Those counts were not conspiracy counts that can extend themselves for years, tolling the statute of limitations period if they are related to the initial offense and do not alter or expand those originally filed. Given that the Government could have filed those 2 substantive counts initially and did not, the Government should not have been allowed to file them in a superseding indictment since those

substantive offenses had ended on 10/26/2010 and were charged for the first time over 6 years after the statute of limitations had run out. Those counts should be dismissed.

## **ARGUMENT**

1-    Following a bench trial the District Court found Padilla-Galarza guilty as to counts 1-3, 5 and 6. Although the Court did not make any findings of facts, it is obvious from the record that such a finding was based on credibility determinations.

*"In reviewing sufficiency-of-the-evidence challenges, "we consider whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014) (quoting United States v. Rodríguez, 735 F.3d 1, 7 (1st Cir. 2013))".* United States v. Forty-Febres, 982 F.3d 802 (1st Cir. 2020).

As held in U.S. v. Strong, 724 F.3d 51, 60 (1st Cir. 2013); even where a challenge to a determination is preserved, "*a fact finder's determination of credibility is subject to clear error review. See U.S. v. Mitchell, 141 F3d 8, 17 (1st Cir. 1998)."*

*"(on sufficiency of the evidence challenge we ask "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government," established guilt (quoting United States v. Medina–Martinez, 396 F.3d 1, 5 (1st Cir.2005) (internal quotation mark omitted))); United States v. Burgos, 703 F.3d 1, 4 n. 1 (1st Cir. 2012) ("[W]e view the evidence, and all reasonable inferences therefrom, in the light most favorable to the Government."). This is a cardinal rule of appellate review."*

As held in Anderson v. Bessemer City, 470 U.S. 564, 573-576 (1985):

*"Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles, as the Fourth Circuit itself recognized, is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>United States v. United States Gypsum Co.</u>, 333 U. S. 364, 333 U. S. 395 (1948.*

*When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.* See <u>Wainwright v. Witt</u>, *469 U. S. 412 (1985). This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.* See, e.g., <u>United States v. United States Gypsum Co.</u>, supra, *at 333 U. S. 396. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."*

Although this is a high standard, both the Supreme Court and this Appellate Court have reversed convictions based on credibility determinations. See <u>U.S. v. Henderson</u>, 463 F. 3d 27, 32 (1st Cir. 2008), where this Court, in reversing a conviction based on the trial Court's credibility determination of police officer Kominsky's testimony held:

*"We recognize that "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." <u>United States v.</u>*

*Weidul*, 325 F.3d 50, 53 (1st Cir.2003). Moreover, our inability to see witnesses face-to-face or to appraise in person their "demeanor and inflection," *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), makes us "especially deferential" to the district court's credibility judgments, *United States v. Ivery*, 427 F.3d 69, 72 (1st Cir. 2005). Still, as the Supreme Court stated in its seminal case on clear error review:

> [F]actors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Anderson*, 470 U.S. at 575, 105 S.Ct. 1504. See also *United States v. Forbes*, 181 F.3d 1, 7-8 (1st Cir.1999) (vacating after clear error review factual findings based on a police officer's testimony as to a vehicle stop, where the officer's testimony was "improbable" and "call[ed] into question" by "extrinsic evidence," and the district court "did not explain why it found [the police officer] to be credible"). The basic standard is familiar: we will overturn a district court's factual findings after a suppression hearing "only if, after reviewing all of the evidence, we have a 'definite and firm conviction that a mistake has been committed.'" *Ivery*, 427 F.3d at 72, quoting *Anderson*, 470 U.S. at 573, 105 S.Ct. 1504. Such instances are rare, especially when the factual findings at issue are made by such a careful and able judge. But this is such an instance".

In U.S. v. Oquendo-Rivera, 586 F.3d 63, 67 (1st Cir. 2009), this Court set aside

Oquendo's 5-year imprisonment supervised release violation sentence and rejected

the trial Court's credibility determinations because "*real doubt exists about*

*Oquendo's guilt.*" In remanding the case to the District Court this Court held:

> "The finding of violation in this case — that Oquendo had a weapon and fired at an officer — is a factual determination reviewed by us primarily for clear error. See *Whalen*, 82 F.3d at 532. This, we have said, would require a "definite and firm conviction" that the finding was erroneous, *United States v. Henderson*, 463

*F.3d 27, 32 (1st Cir. 2006) (quoting United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005), cert. denied, 546 U.S. 1222, 126 S.Ct. 1448, 164 L.Ed.2d 146 (2006)), a conclusion made difficult because the reviewing court must interpret the evidence in the light most favorable to the government, Portalla, 985 F.2d at 622, and credibility is largely a matter for the fact-finder, Ivery, 427 F.3d at 72.*

*Because the district judge chose to believe one and not the other of two witnesses before him, it might seem that the choice of whom to credit resolves the matter. But the credibility of a story depends not only on the seeming sincerity of witnesses and their demeanor in the courtroom but also on more objective criteria: for example, consistency (both internal to the testimony and with the physical evidence), probability, access of the witness to information, his bias or interest, and corroboration or unexplained contradiction of his testimony by undisputed testimony or empirical evidence. As the Supreme Court has said, "[d]ocuments or objective evidence may contradict the witness' story; or the story may itself be so internally inconsistent or implausible on its face that . . . the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Here, both of the key witnesses had a stake in the outcome".*

See also U.S. v. Cotto-Flores, 970 F.3d 17, 46 (1st Cir. 2020), where this Court

reversed Cotto's conviction and remanded for a new trial held:

*"Thus, when it appears (but is not certain) that "[d]ocuments or objective evidence ... contradict[ed] the witness' story," or when the relied-on testimony seems "implausible" or "internally inconsistent" on a critical issue, we have required judges to give more explanation for their conclusions. See, e.g., Oquendo-Rivera, 586 F.3d at 67–68 (vacating revocation judgment based on the judge's failure to explain why he credited a key witness's story despite apparent contradictions in the evidence); United States v. Forbes, 181 F.3d 1, 7–8 (1st Cir. 1999) (vacating order denying a motion to suppress for the same reason); see also United States v. Lacouture, 835 F.3d 187, 191–92 (1st Cir. 2016) (vacating sentence because judge failed to explain why he credited child victim's statements in transcript of a forensic interview despite "apparent inconsistencies" in the child's story). "How much explanation" is needed "depends on the circumstances — for example, on the closeness of the case, the nature and extent of gaps or doubts" that plague the record, and the "suppositions" needed "to fill the gaps or answer the*

*doubts." <u>Oquendo-Rivera</u>, 586 F.3d at 68. But the upshot is that "[i]n some cases, a result, possibly defensible, may not have been adequately explained or supported."*

It is clear from the above that credibility determinations of the trial Court are not insulated from review. As the cited cases show, when the record indicates that the Government's evidence was untrustworthy, contradicted and internally inconsistent, this Court will set aside a conviction. Inherent in all of the Court's analysis is the principle that **untrustworthy evidence can never meet the standard of proof beyond a reasonable doubt nor sustain a judge's credibility assessments.** No rational factfinder, together with all reasonable inferences, viewed in the light most favorable to the Government, could have found Padilla-Galarza guilty beyond a reasonable doubt. That is the case here. The following contradictory, internally inconsistent, unreliable evidence was presented by the Government:

a- **The robbery vehicle- Cosme** testified it was an **unmarked vehicle without insignias or police identification. He was standing next to the door of the driver, so he had a clear view of the vehicle and its description. Rolando-Batista testified he saw a small police logo, like the ones used in motorcycles, on the driver's side of the vehicle. Maria testified the vehicle had a big patch of the P.R. Police Dept. on the driver's side** and that it was a white Crown Victoria, while Rosado-Batista described it as a Crown Victoria or Grand Marquis vehicle. Figueroa testified a white Crown Victoria or Grand Marquis was brought to him the morning of the robbery to turn into

a taxi that had no police logos nor identifications. Since Cosme, Maria and Rosado-Batista were interviewed immediately after the robbery it is impossible for the Government to excuse these serious inconsistencies based on an argument of time lapse since at that time their memory was fresh from the occurrence.

b-      **The main Government witness, Ramos-Quinones, also had serious credibility issues.** His plea agreement filed on 12/20/2018 (App. Sealed App. 180-184), had a sentencing range of 168-195 months. When he agreed to cooperate, he was released on bail, claiming that he had parked his red truck in front of the entrance to Isla de Cabras to be a lookout during the robbery, which was negated by shed guard Cosme who testified the only car outside of the entrance was 'far away' about ½- 1 mile away, around Buoy 4 (Exh.  L - App.  1951).

Ramos-Quinones gave 2 conflicting versions as to what he did the night of the robbery; **1-** When interviewed for his PSR on 03/07/2019,  three years prior to his trial testimony,  he said that  he was not present when the people inside the shooting range were victimized, since he was a lookout and was **driving around the outside of the establishment**, never mentioning he saw when the white Crown Victoria entered Isla de Cabras nor left (Docket – Sealed app. 136). At trial he testified he was at the '**beach area**' giving

surveillance, never mentioning he was driving around the entrance of the guard house. After a patrol car left around 3:00 am, he went up to the gate **through the area the sand is** so the guard couldn't see him and observed when the fake patrol car came out. From time to time, he would go sit on the rocks and leave the fishing rod in place. Padilla-Galarza demonstrated this was false testimony since photos were taken of the area that demonstrate there is no beach or sandy area there, only steep rocks that go into the sea.

When Ramos-Quinones was interviewed by prosecutor Max Perez in 2014, he denied that he nor Padilla-Galarza had participated in the robbery, stating that they learned about it in the news that morning.

Aside from this, Ramos-Quinones lifestyle has been one of deceit and lying. He spent years preparing false checks and identifications, successfully cashing them, defrauding banks for years without getting caught. During his supervised release term, he lied for 2 years to his probation officer, filing monthly reports that he had not talked nor been with a convicted felon. He also falsely stated that while at the halfway house Padilla Galarza provided him with a computer and printer, something that the Government stipulated was not allowed.

Given those conflicting, internally inconsistent versions, what is the truth? Can such a lifelong, untruthful person be believed?

The Government will surely argue that the photographs it took, and videos obtained from Palo Seco corroborate Ramos-Quinones. This is not true. To begin with Ramos-Quinones testified he only went to Isla de Cabras on 2 occasions **at night.** An examination of govt. exhibits 80-82 (App. 1909-1924), demonstrates that from highway 870 you cannot see the sargasso area of Palo Seco since there are fences that block the view and Rd. 870 is located well above the sargasso area, preventing visual observation of the same. A person driving a car at night on that road would never be aware of its existence. This is physical evidence that contradicts the truthfulness of his recognizing that area at trial. Someone had to have coached him as to his sargasso trial testimony!

Another unbelievable assertion of Ramos-Quinones was that they planned the robbery for 2 years before doing it. Since the robbery occurred on 11/26/2010, the planning began as far back as 11/26/2008 while Ramos Quinones was still on supervised release! He never testified that while on supervision he went to Isla de Cabras with Padilla-Galarza, only that on one pass he was given he went to Padilla's residence. His well of deceit grows deeper when he stated that 2-3 days after the robbery the guns were moved from Pucho's to **Ramos-Quinones' motorcycle repair shop**. Here again an internal inconsistency arises since Ramos-Quinones, when interviewed by

probation for his PSR, only identified that from 08/23/2009 to the date of his arrest in this case he was an 'ice cream truck' salesman. **His history of employment does not reflect anywhere his working nor owning a motorcycle repair shop from 2008-2015. (Docket 157, Sealed App. 142, par. 76).** Another lie! How many times does a witness have to get caught lying to arrive at the conclusion that anything he says is so untrustworthy that a conviction based on such unreliable evidence can never rise to the standard of guilt beyond a reasonable doubt? Just because you become a Government cooperating witness, that now qualifies you as being a truthful person? Ramos-Quinones had important reasons to lie; to regain his liberty, get out of prison, and be back with his family, which he obtained once he began cooperating.[45] This could only be achieved by implicating Padilla Galarza. **It should also be taken into account that when Ramos-Quinones implicated Padilla-Galarza in 2016, he exonerated his friend, codefendant Guill Reabing-Padilla, stating he never participated.** Yet Reabing-Padilla pled guilty to having participated in the conspiracy to rob the firearms located at Isla de Cabras.[46] (Docket 129- App. 2000). Did he lie about Padilla Galarza to

---

[45] He was sentenced to time served as a result of his cooperation.
[46] Had he only accompanied Ramos-Quinones after the robbery to sell a gun in Mayaguez, he could at most only been charged with being an accessory after the fact, not as a coconspirator in the actual robbery, as he pled to.

obtain his benefit and lied about his friend Reabing-Padilla not being a participant because he wanted to protect him? He also told the agents that he had bought the red truck in 2011-2012 yet at trial claimed it had been in 2005. All these versions create an inconsistent internal narration of events by persons that are supposed to be telling the truth that cannot be reconciled.

The video and still shots 1-5 don't help either. (Govt. Exh. 84- disc filed separately; still shots- App.1782-1787). An examination of the same reveals that it is impossible to identify what type of vehicle is going by Palo Seco and Ramos-Quinones' testimony at trial that still photos 5 and 6 show the presence of his truck[47] is unbelievable since it is impossible to determine what vehicle, if any, is there. The same occurs with Govt. Exh. 40-b (Disc filed separately by mail), where one cannot observe any police car with police logos on the side doors nor what color/type of vehicle appears somewhat distant from it. That evidence was unreliable to give any weight to it.  All they prove is that 2 vehicles were in the Palo Seco entrance area, which is over a mile from the Isla de Cabras gate entrance and could have been workers of the Electric Authority. (Exh. L-App. 1951).

---

[47] Padilla-Galarza objected to this testimony, but the judge denied the objection, claiming counsel could not object to what the witness's impression is.

The Government will probably argue that the Open Mobile-AT&T records of calls presented in evidence justified a finding of guilt. These toll records were shown to be unreliable by the certification provided by Open Mobile security analyst Edgardo Ruiz-Sanchez, that in 2010 their system could not identify calls less than a minute and if any were made, they would be rounded out to 1 minute. (Stipulation-App. 1964) As appears in Govt. Exh. 64a (Padilla-Galarza's cell phone), from 12:00 am.- 5:15 a.m. a total of 36 incoming/local calls were made, of which 32 are rounded out to 1 minute, and 4 have a 2-minute duration. (App.1850-1851). Ramos-Quinones conveniently testified that the calls he made/received from Padilla Galarza were of 1-2 minutes duration. However, the Pen Link analysis performed by HIS Intel analyst Moreno reflects that the majority of the calls lasted 1 second. (Def. Exh. X- App. 1959). Moreno testified Pen Link **will not create anything that is not put into the system, and that the data obtained reflected that it included seconds duration of a call.** Pen Link was used because it would provide better results. Under these circumstances the Open mobile telephone records and Ramos-Quinones testimony were proven to be unreliable and all they reflected was that Padilla-Galarza made/received numerous calls during that time period where no conversation occurred. Had they lasted 1 minute or more the Pen Link data would have reflected it. Given said evidence, his

opinion on cross examination that Pen Link was reading the minute and converting it into seconds is unbelievable since it contradicts his previous testimony as to how Pen Link works. It should be noted that the Court refused to consider Moreno an expert witness, although he was trained by the Army to conduct Pen Link analysis and has performed over 500 of said telephone analysis. Under these circumstances the telephonic Open Mobile records did not tip the balance to justify the Court's finding of guilt. Padilla-Galarza had been out that night drinking with friends and he could have been calling them to join him and later to inform them about the robbery, when he learned of it when he took Oquendo back to Isla de Cabras.

Padilla-Galarza submits that if one considers what a liar Ramos-Quinones is, the multiple inconsistent internal versions of events that he provided and when compared to what others testified, his testimony could never support a finding of guilt beyond a reasonable doubt as to any of the charged counts.

Nor does the testimony of Figueroa sustain the sequence of events of the robbery. His version is impossible to believe given the timeline and vehicles involved. **Figueroa testified that Padilla-Galarza arrived at his home at approximately 4:00- 4:30 am in a grey Lincoln Town car that belonged to his father, full of firearms. Yet Rosado and Oquendo placed**

**Padilla-Galarza during that time period driving back to the Isla de Cabras station house and consoling Rosado once they arrived and driving a black Lincoln Crown car. It is impossible for Padilla-Galarza to have met with the persons in the white Crown Victoria somewhere after the robbery, park the black Lincoln he was driving somewhere, transferred 125 rifles, pistol and shotguns from the white Crown Victoria vehicle to a grey Town car, and arriving at Figueroa's residence at that time. Figueroa's version of events is unbelievable and further establishes the untrustworthiness of the Government's evidence to satisfy a beyond a reasonable doubt standard of proof, the counts charged.**

Figueroa never identified knowing Ramos-Quinones, stating he did not know him from the street, only that he is in MDC. Incredibly they never spoke to each other at MDC. Ramos-Quinones identified knowing Figueroa as one of the persons that cashed false checks for him while making false identifications. It is incredible that the two persons that incriminated Padilla-Galarza and participated in the Isla de Cabras robbery could not identify each other as participants, one saying he did not know him from the street and the other saying he had never seen Figueroa personally but could recognize him as one of the persons that would cash false checks for him with false identifications! Although Ramos-Quinones and Figueroa both participated in

the storing of firearms neither of them could identify each other as a participant in the Isla de Cabras robbery nor the subsequent transfer/storage of firearms.

In addition, Figueroa's participation on the night of the robbery for the transfer of firearms from the grey Lincoln Town car to his white Sebring is highly suspect and unbelievable since when Padilla-Galarza arrived at his residence, there was another car outside waiting for him. Had there been another car outside Figueroa's residence, the firearms could have been stored there and there was no need to go to Figueroa's home. That trip was totally unnecessary since the firearms could have been placed in the other vehicle and driven directly to Catano where they were allegedly unloaded the same night of the robbery.

The place of storage of the firearms is also internally inconsistent. According to Ramos-Quinones the firearms were kept by El Viejo (Pucho) for 2-3 days after the robbery, but Padilla-Galarza was worried about leaving them there, so they decided to move them to Ramos-Quinones' motorcycle repair shop. That night El Viejo came in a van that contained all of the firearms which were stored there for 6-7 months.

Figueroa testified that he would go out to eat with Padilla Galarza and that he learned of Pucho's participation as one of the persons that went into the

station house on the night of the robbery based on a **comment** of Padilla-Galarza that Pucho[48] was busting his balls about the firearms. Consequently, the firearms were brought to Figueroa's residence by Padilla-Galarza where he kept them for about 6 months **and later transferred** to the trunk of an orange Malibu he had, located in a tarp between his home and the third home where there was a space. What need was there to bring the firearms to Figueroa's home due to Pucho, when 2 days after the robbery they were transferred to Ramos-Quinones' motorcycle repair shop? Given that Ramos-Quinones sold between 30-50 of the firearms it is obvious he had direct access to them. Ramos-Quinones never testified he went to Figueroa's residence to pick up firearms.

**Figueroa lied to the Court under questioning by the prosecutor when he testified, he didn't have a cooperation agreement with the Government, when he had already received in Cr. 15-079 (DRD) a Rule 35 substantial assistance time served cooperation sentence as a prize for his future testimony at trial against Padilla-Galarza**. (Sealed App. 157-161). Although Figueroa claimed to have been an accessory after the fact in

---

[48] Figueroa knew Pucho prior to the robbery since he rented an apartment that belonged to Pucho. When he was first interviewed, Santiago-Ortega (Pucho) had already been indicted. Since he knew Pucho it was easy for him to invent the 'comment' Padilla-Galarza made to him about his being one of the participants in the robbery.              ` .

the robbery by assisting storing the stolen firearms the night of the robbery, he was never charged nor convicted for said offense conduct. He had a stake in the outcome since he received his sentence reduction to time served by agreeing to be a witness against Padilla-Galarza, providing a totally inconsistent version of events than the other witnesses, further establishing the untrustworthiness of the Government's evidence that did not rise to proof beyond a reasonable doubt under those circumstances.

c-    The identification and description of the fake Sgt. that participated in the robbery was totally contradictory and couldn't have been Santiago-Ortega a/k/a Pucho. **As appears from Def. Exh. P (App. 1949), Pucho is white, 5'-9" tall, wears glasses, has a white moustache, a wide nose, and his cheeks are not skinny nor sunken in, they are normal. Yet Rosado-Batista described the fake Sgt. as a *'tall man, about 6 ft. tall, dark skinned, skinny cheeks and sunken bones. Rosado-Batista is 5'-8"* (App. 04/21/2022, pg. 89, and admitted the Sgt. was a lot taller than him. (App. 166). Maria also described the Sgt. as having dark skin, thin features on his face, sunken cheeks. None of those descriptions given early on after the robbery resemble him. In 4 sketches they provided to agents after the robbery, does the Sgt. have eyeglasses. (Def. Exh. A-1-A-2, E, G- App. 1939-1940, 1943-1945). Only in one sketch does a dark-skinned person appear with**

glasses. (Def. Exh. F- App. 1944). Santiago-Ortega wears glasses.

In addition, 4 latent fingerprints were lifted at the robbery scene and none of them matched Santiago-Ortega's. (Stipulation- App. 1970-1971).

The Government most surely will argue that this allegation of misidentification is frivolous because Santiago-Ortega pled guilty and admitted he was one of the robbers that entered Isla de Cabras stationhouse the night of the robbery. (Docket 241- Plea Agreement, pg. 9- App. 1984). As argued by defense counsel, Santiago-Ortega's guilty plea was one of convenience because that was the quickest way of getting out of prison and he received a sentence of time served. (Docket 365, Judgment, pg. 2- App. 2343-2350). Prior to caving into a guilty plea Santiago-Ortega filed a pro se motion to the court on 07/11/2019, requesting new Court appointed counsel because his counsel Masisi had only visited him once, on March, 2017, and had ignored Padilla-Galarza's counsel's request for a meeting to discuss a meritorious suppression motion of his identification. (Docket 556-App. 2082-2086, 2088 2092-2094, 2096). Although said pro se motion requesting new counsel was granted on 07/11/2019 (Docket 181), no new Court appointed counsel was ever named. On 01/14/2020 counsel Masini filed a Motion for Change of Plea on his behalf. (Docket 228). Upon being sentenced to time served Santiago-Ortega regained his freedom, which was the result he was

seeking when he plead guilty. Plenty of defendants enter into guilty pleas because by doing so they will be released from prison and avoid the risk of higher sentences.[49] Although Padilla-Galarza filed a Motion *in Limine* requesting the Court determine the unreliability of his pretrial identification by Maria and Ramos-Quinones (Docket 556- App. 2072-2178), that the Government opposed (Docket 563), the District Court refused to entertain the motion claiming that was a suppression issue that only Santiago-Ortega had standing to raise. (Docket 567- App. 2196-2203).

d-      **As testified by Cosme, there was no vehicle parked near the entrance gate to Isla de Cabras the night of the robbery**. The nearest car he saw was about a mile away. This is internally totally inconsistent with Ramos-Quinones' testimony, since Cosme does not place Ramos-Quinones red truck nor him near the entrance gate. Cosme was never identified by anyone as being a knowing participant in the robbery. By the time Cosme testified he couldn't even be charged as one. These crucial factual contradictions by Cosme, who was present during the time period of the robbery, should have led the Court to reject Ramos-Quinones' testimony, and this Court should reject it on appeal.

---

[49] Of the 5% of defendants that go to trial, 98% are found guilty. Exercising your constitutional right to trial is like playing Lotto with your freedom. Your chances of winning are very low.

e- Oquendo's belated confession to the agents that Padilla-Galarza told him he had participated or knew who had participated in the robbery, and that he threatened to kill his children if he said anything about it, and didn't do anything when Padilla-Galarza made the threat while he was in the car with him nor told the 5 agents that were at the station house about it when he walked back to it, because he was scared of Padilla-Galarza, is incredible and unbelievable. Oquendo, the person Maria described as the 'monster', is 6'2'' tall, weighed 308 pounds, a tactical P.R. police officer for 5 years, who had 12 domestic violence complaints filed against him by his wife, and consequently had been disarmed when the robbery occurred, did not fear Padilla-Galarza. He did fear being considered a suspect in the robbery and had reason to invent the story to disassociate himself with it. Having been disarmed, there was no reason for Padilla-Galarza to take him out that night for drinks, since the robbers were armed, and they would have no reason to fear him regardless of his size. Padilla- Galarza had no reason to tell him that, much less threaten his children while he was beside him in the car. Wouldn't such a strong, big, experienced policeman arrested Padilla-Galarza the moment he made such a threat or informed the agents in the station house the confession so that they would immediately arrest him? It is obvious he had ulterior motives when he invented the 'overheard' comments. As recognized

in <u>U.S. v. Rodriguez-Romero</u>, 18 F.Supp. 3d 116, 122 (D.C. P.R. 2014); ***"judges should not, after all, be so naïve as to believe statements which no one else would believe."*** *(*Citation omitted.).

f-      In addition, as appears in Govt. Exh. 6 -App. 1805-1806 and 33-App. 1827, the robbers left in front of Maria's desk the firearms that couldn't be used. Why were they left where she sits in the front desk? Did Maria tell them they were ruined? Maria recognized them as firearms that were left there which were rusty. (Tr. 04/22/2022, pg. 219-220).

g-      Regardless of the standard of review of a Rule 29 motion, once the case is submitted for decision in a bench trial, the Court cannot ignore substantial impeachment evidence that demonstrates the Government's evidence to convict is so untrustworthy that it cannot meet the beyond a reasonable doubt analysis. Although credibility issues are rarely considered on appeal, as the above cited cases demonstrate, when the evidence is so conflictive, internally inconsistent and the Government witnesses shown to be blatant liars, this court has not hesitated to set aside convictions. Such is the case here.

**2-      The District Court abused its discretion when it failed to grant a 30-day continuance, violating Padilla-Galarza's constitutional due process rights to a fair trial.**

The standard of review for denial of continuance of trial is abuse of discretion. U.S. v. Perez-Ruiz, 353 F.3rd 1, 8 (1st Cir. 2003), U.S. v. Orlando Figueroa, 229 F.3d 33, 39-40 (1st Cir. 2000). This Court does not apply a mechanical test but instead evaluates each case on its own facts. U.S. v. Forty-Febres, 982 F.3d. 802, 808 (1st Cir. 2020). In U.S. v. Orlando-Figueroa, 229 F.3rd 33, 39, 40 (1st Cir, 2000), the principles and elements of review of a denial of continuance of trial based on ability to prepare for trial were detailed:

> "That discretion is nonetheless limited by the defendants' constitutional rights to effective assistance of counsel and to the testimony of defense witnesses. United States v. Soldevila-Lopez, 17 F.3d 480, 487 (1st Cir.1994).
>
> Among the factors to be considered in reviewing a denial of a motion for a continuance are the amount of time necessary for trial preparation, the amount of time actually available for preparation, the defendant's diligence, the inconvenience to the court and other parties, the likely utility of a continuance, and any unfair prejudice caused by the denial. United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir.1995), cert. denied, 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); Soldevila-Lopez, 17 F.3d at 488". See also U.S. v. Delgado-Marrero, 744 F3d. 167, 198 (1st Cir. 2014) where this Court, applying said factors, set aside Delgado-Marrero's' conviction due to the failure of the District Court to grant a continuance. In U.S. v. Mangual-Santiago, 562 F. 3d 411, 430-431(1st Cir. 2009), this Court found an abuse of discretion but did not order a new trial because appellant had not shown how his defense was prejudiced by the denial.

In "assessing whether denial of a request to postpone the start of trial constitutes an abuse of discretion requires a careful review of the facts of the particular case…We will find an abuse of discretion only if defendants show that "the court exhibited an 'unreasonable and arbitrary insistence upon

*expeditiousness in the face of a justifiable request for delay.""* U.S. v. Rodriguez-Duran, 507 F.3rd 749, 762, 763 (1st Cir. 2007). In U.S. v. Fink, 499 F.3d 81, 89 (1st Cir. 2007), this Court granted the Government's request for remand due to the District Court's refusal to grant a continuance, where the Government had demonstrated a legitimate reason for additional time to contest a challenged conviction by defendant for career offender status.

It is Padilla-Galarza's position that the District Court abused its discretion and prejudiced Padilla-Galarza's defense when it failed to continue his trial for the following reasons:

The District Court had scheduled on 01/27/2022 the trial to begin on 04/18/2022. (Docket 553). A request for Continuance of trial was filed on 04/12/2022 (Docket 583- App. 1632-1643), which the Government Opposed (Docket 585-App.1644-1661), and the Court only granted a 3-day continuance for 04/21/2022. (Docket 583- App. 1632-1643). Due to the recurring last-minute disclosures and the continuing reasons for continuance advanced at Docket 583, on 04/19/2022, Padilla-Galarza filed a second motion for continuance (Docket 601-App.1662-1667), which the Government Opposed (Docket 606-App.1668-1679), and the Court that same day denied. (Docket 608- App.175-1755). On 04/20/2022, Padilla-Galarza filed a Supplemental Motion for Continuance (Docket 612-App.1680-1689 ), where the Court was informed that when reviewing the discovery

provided on 04/08/2022, the Government had produced for the first time[50] the cellphone location records of Oquendo and that it had requested the **location records** for telephones 787-645-8410 (Padilla-Galarza's cell) and that of Luis Oquendo (787-930-7165) in 2011. (App. 1682). During a Pre Trial Conference held that day, Padilla-Galarza again requested a continuance, which the Government opposed and the Court denied the request (Docket 757- App.24-77). On 04/21/2022, the first day of trial, Padilla-Galarza informed the Court he was not prepared, requested a continuance, which the Court denied. (Docket 644-App. 81). He was forced to begin trial that day. The **global reasons** advanced that justified granting his multiple requests for a continuance are the following:

**Due to the failure of the Court granting the continuance requested, which was justified due to the volume of work/discovery that had to be reviewed, counsel failed to cross examine Ramos-Quinones at trial concerning crucial impeachment/ contradictory statements he had given the probation officer when interviewed for his PSR that seriously affected the veracity of his trial testimony concerning what he was doing the night of the robbery, and failing to mention during his employment/work history narration that he**

---

[50] Padilla-Galarza had requested this previously to prosecutor Max-Perez by e-mail and he informed none existed. He tried to obtain that evidence prior to trial by means of subpoena to AT&T and Open Mobile but by the year 2020 those records were not available due to the passage of time.

owned a motorcycle repair shop from 2009 until his arrest. (Docket 157-Sealed App.136, Par. 28, 142 par. 76). Said PSR was provided as Jencks on 04/15/2022, was looked at, but counsel did not identify those serious factual contradictions. Had he been given additional time this would have surely been noticed and used at trial. This omission of confrontation of this highly relevant factual impeachment evidence during trial clearly prejudiced Padilla-Galarza's defense since it could have led to an acquittal given the internal inconsistencies it created.

On 04/07/2022, **the Government filed a Superseding Indictment,** adding a substantive Hobbs Act robbery violation as count 6 and amending the 18 U.S.C. 924(c)(1)(a)(i) firearms offense charged in count 2, by substituting the underlying conspiracy charged in count one with the newly added substantive robbery count charged in count 6. (Docket 575- App. 13-23**). Padilla-Galarza on 04/18/2022 filed a Motion to Dismiss the Superseding Indictment** (Docket 592-App. 2229-2232), which the Government opposed (Docket 607-App. 239-2250). The District Court on 04/20/2022 issued a published opinion denying the Motion to Dismiss the Superseding Indictment (Docket 625-App. 2251-2262; U.S. v. Padilla-Galarza, 2022 U.S. Dist. LEXIS 7348); On 04/08/2022, **the Government filed** a Motion In Limine to allow 404(b), evidence to be introduced at trial (Docket 578- App. 2215-2220), to which **Padilla-Galarza filed an Opposition on 04/13/2022** (Docket 586-App.

2221-2228). The Court on 04/18/2022 entered an Opinion and Order denying the Government's Motion In Limine (Docket 594-App. 2223-2238); On 04/07/2022, Padilla-Galarza filed a Motion to Continue, providing multiple reasons that justified granting it (Docket 583-App.1632-1642), which the Government opposed (Docket 585-App.1644-1658); On 04/08/2022 and 04/20/2022, the Government filed a second and third Amended Designation of Evidence (Dockets 579, 621); On 02/15/2022 and on 04/08/2022 the Government provided new discovery which included extensive messages and call records of 2 Government witnesses that had to be studied, videos, and recordings that were provided to MDC for Padilla-Galarza to review and was unable to do so until 04/11/2022, when he was provided the internal control number of MDC (Docket 583-App.1634, 1638); On 03/03/2022 and 03/17/2022, counsel filed Briefs before this Court in Appeals No. 21-1508 and 21-1661, that took time away from trial preparation (Docket 583- App. 1634); On 04/15/2022, the Government announced a new cooperating witness, Samuel Figueroa, who Padilla-Galarza knew, but was unaware he was going to be a cooperating witness at trial. On 04/16/2022, counsel reviewed an extensive 6-page ROI of Figueroa's interview of 02/02/2017 **and was not able to review it with Padilla-Galarza until 04/18/2022**, **given that there was no electricity at MDC from Friday, 04/15/2022 until Sunday, 04/17/2022, which further affected trial preparation and investigation of Figueroa. (Docket 627- Pretrial Conf. pg. 32-**

**App. 55 ); After interviewing Padilla-Galarza for the first time on 04/18/2022**

**concerning Figueroa, just 3 days before the trial was scheduled to begin, it was**

**impossible to locate and interview at least 3 witnesses within that time period**

**that would establish that Figueroa did not deserve any credibility[51] and would**

**impeach his trial testimony (Docket 601- pg. 2- App. 1663; Docket 757- pg. 44-**

**45-App. 67-68; Docket 644);** The Government provided discovery packages on

02/15/2022, 03/30/2022, two on 04/04/2022, that included some new discovery and

reiterated some of the old discovery packages of 10/27/2015, 03/28/2019,

05/17/2021, and 12/10/2021, which were substantial, and required a lot of time to

review for trial preparation given the amount of time that had transpired from the

receipt of said discovery packages and the trial date. The discovery package of

04/08/2022 included for the first time a document that reflected that the local

Government on 10/26/2010 had requested Padilla-Galarza's and Oquendo's cell

phone location records of 10/25-26/2010 (Docket 612- App.1688-1689; Govt. Exh.

67-App. 1888). The discovery included location data of the Oquendo's cellphone

787-930-7165, but not that of Padilla-Galarza. (Docket 612- App. 1680-1689).

**When counsel reviewed Oquendo's cell phone location data it was impossible to**

---

[51] Names of witnesses are never provided ahead of time given the practice of Government agents visiting them before they testify, intimidating them of potential obstruction of justice, perjury charges that frequently cause the witnesses not to testify at trial for fear of retaliation by the Federal Government. In addition, prior to announcing names of witnesses' counsel would have to interview them in the presence of the private investigator in order to insure they were willing to testify and corroborate the contents of their testimony.

**understand and counsel would have to consult someone that could interpret them to be in a position to determine if they were useful at trial and he could not blindly accept what the prosecutor said, telling the Court; "*I cannot practice law that way."* (Tr. Pretrial- Docket 757, pg. 22-23-App. 45-46).** The Government announced it would not use them at trial, to avoid confusion (Docket 757- Pretrial, pg. 26-App. 44, 49), and the Court denied said discovery for that reason. (Tr. Pretrial pg. 20, 21-App. 43-44). However, they were introduced as Exh. 67 at trial. (App. 1887-1895). Contrary to the Government's position that said discovery was not relevant because they were not claiming Padilla-Galarza was present during the robbery (Docket 757- pg. 18- App. 41), since Oquendo was with Padilla-Galarza that night, his cell phone location data was relevant to establish the time periods, particularly that of when they arrived to the Isla de Cabras station house on 10/26/2010, which was a crucial fact in the trial that would have impeached the story of Figueroa. As to Padilla-Galarza's location data prosecutor Max -Perez told the Court; '*I have no information regarding 645-8410"* (Padilla-Galarza's cell phone) (Tr. Pretrial Conf., pg. 12- App. 35), and as a consequence was not required to produce it since it was the local investigative agency that had requested it. In denying the discovery request for that reason the District Court erred since pursuant to U.S. v. Thorton, 1 Fd.3d 149, 158 (3rd Cir 1993), quoting U.S. v. Perdomo, 92 F.2d 967, 969-970 (3rd Cir. 1991); "*The prosecution is obligated to produce certain*

*evidence actually or constructively in its possession or accessible to it."*　See also U.S. v. Osorio, 929 F.2d 753, 760-762 (1st Cir. 1991), where this Court held that the prosecution had a duty to search out possible exculpatory material even if it was in the hands of other agencies. As stated in Gurule, Complex Criminal Litigation, Section 13-1(b)(1), pg. 598 (Lexis 2nd Ed.); *"At a minimum, the prosecution is responsible for disclosing all Brady material in the possession of any law enforcement agency involved in the criminal investigation."*　The Court should have continued the trial and ordered　the local agency that was participating in their investigation of the robbery, inform if it had obtained Padilla-Galarza's cell phone location that had been requested and if it had been produced to the Government back then,　or was still　in their possession.; On 04/18/2022, Padilla-Galarza　filed a Motion to Compel requesting discovery that had not been provided; 1- polygraph test results of Oquendo and Cosme　taken by SA Collen Muggier (App. 1742); 2- Search Warrant of Perfumeria Chris, announced by the Government for the first time in its second amended designation of evidence dated 04/08/2022; 3- Rule 11 proffer of　Figueroa and his Amended Judgment that was filed selected parties and inaccessible to appellant; 4- All non-intrusive tracking device records installed as part of the investigation; 5- Grand Jury exhibits shown to Maria (Docket 591-App. 1738-1742). The Government Opposed the Motion (Docket 598-App. 1744-1748), and the Court denied the discovery request (Docket 608-App. 1750-1755); Counsel

and Padilla-Galarza had identified 28 witnesses for which Touhy justification letters and subpoenas had to be prepared and served. (Docket 601- App. 1662-1667).

**Extensive arguments were provided to the Court during the Pretrial Conference that demonstrated prejudice if a continuance was not granted. (Docket 757- Pg. 3-45- App. 26-68). Said arguments are incorporated to this Brief.**

As appears from the above history of motions that required time to research and prepare; multiple last minute discovery disclosures (one that required consultation with an expert), announcement of a new crucial cooperating witness that required time to investigate his story, locate and interview impeachment witnesses, the filing of a Superseding Indictment, loss of electricity for 4 days shortly before trial was to begin that prevented counsel's access to Padilla-Galarza for trial preparation and consultation, **Padilla-Galarza's argument that in that short period of time he was facing a new case (Pretrial pg. 27, 45- App. 50, 68), was correct, and he could not adequately prepare for trial given all the matters he had to attend during that short period of time. The short 3-day continuance from 04/18-21/2022 was insufficient time given the volume of work that needed to be done. As stated by counsel during trial:**

*"MR. CASTRO-LANG:        oh, of course.  But the problem, the problem is that where the government ambushed the defense is that in that last week of trial, the most important week of trial, we had to prepare a lot of motions, time that I was going to use to prepare cross-examination.  As you can see, pretty – I go into – I*

*go into the facts of the case. And so I was sidestepped in having to do all these motions, and – instead of preparing for trial. And I'm one person, Your Honor. I wish I had all the resources the government has."*(Docket 638, pg. 122-App.759).

The judge stated she was "**adamant not to continue this case because it's a 2015 case, and I imagine, M., Castro-Lang that your client does want his day in court**". **(Docket 757- pg. 10- App. 33).** The fact that it was a 2015 case was a second reason that justified granting a continuance. She acknowledged there were **621 docket entries that had to be reviewed**. (Tr. pg. 11- App. 34). As counsel informed the Court it was impossible for him to remember discovery provided 3-4 years prior to trial. All of it had to be studied again. Given that counsel was a sole practitioner and had no law clerk, all trial preparation, motions, research, and subpoenas had to be prepared by him solely. (Docket 583, pg. 4- App. 1635; Docket 757, pg. 30,- App. 53). Contrary to the Court's imagination, Padilla-Galarza also wanted a continuance. She could have asked him instead of relying on her imagination.

The Government's argument that this was a simple case, where the trial would only last 5 days, was incorrect. As Padilla-Galarza informed the Court on 04/12/2022, the trial would last at least 10 days (Docket 583- App.1635**), as it did**. **It took 5 days of trial of defense presentation of hostile Government impeachment witnesses, that counsel was not able to adequately prepare for,** nor to locate, interview impeachment witnesses and evidence to rebut Figueroa's

version of events.[52] The evidence and witnesses needed to be located did not constitute collateral evidence as the District Court ruled. (Tr. 04/20/2022, pg. 27-App.50). As held in U.S.v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1997); "*A matter is collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence."* Here, counsel had to locate and interview a witness that Padilla-Galarza knew but needed an investigator to find him. Said witness could have testified that he never saw the taxicab logos being placed on the white Crown Victoria on the morning of the robbery. A witness could have been brought to establish that when Padilla-Galarza struck Figueroa in the face with his fist, not a pistol butt, it was because Figueroa had left a dog tied for 3 days without giving him food or water (Docket 757, pg. 173- App 810), not because a girlfriend of Figueroa had been told that the car that had been turned into a taxi, was the one used in the robbery, as he testified at trial, nor that Figueroa had stored firearms in the trunk of his Malibu (Tr. 04/26/2022, pg. 173, 182- App. 810-819).

In addition, Padilla-Garza subpoenaed the Police of P.R. custodian of records to bring the size boots he wore as a policeman, which was needed to impeach

---

[52] As appears from Figueroa's cross examination, counsel confronted him with various incidents he had selling stolen cars and being dismissed from his employment for stealing, which Figueroa claimed were 'lies'; witnesses that could be located that observed the incident when Padilla-Galarza hit him, that could deny seeing firearms in Figueroa's Malibu, nor observing him change the white 'Grand Marquis/ Crown Victoria into a taxi the morning of the robbery could not be located for lack of time nor funds to pay an investigator, so counsel was unable to impeach him. Since this case was a credibility case, that evidence was not collateral. (Tr. 04/26/2022, pg.173-175-App. 810-812.

Oquendo, who quoted Padilla-Galarza as telling him he would hit him over the head with his **'size 12' boot** (App. 689), when narrating the objected stale past history of incidents of violence he had allegedly observed Padilla-Galarza commit during the time period he worked with him[53], since Padilla-Galarza is 5'9" tall and **wears a size 10 boot.** That evidence was never obtained due to time constrictions because the police dept. need more time to locate them.

**As appears from documents and photos submitted after the trial ended, crucial impeachment evidence was not presented during cross examination of Ramos-Quinones that could have affected the guilty verdict. In his Sentencing Memorandum Padilla-Galarza brought to the Court's attention that Ramos-Quinones, during his PSR interview, had given a totally contrary version of what he was doing while giving surveillance the night of the robbery and that he failed to mention he had a motorcycle repair shop during the years 2009 until his arrest. Due to the pressure of the amount of material counsel reviewed preparing for trial, he failed to confront Ramos-Quinones about said serious**

---

[53] When Oquendo started testifying about the incidents of violence he observed many years ago, counsel objected because counsel was referring to the period of time they would see each other at Isla de Cabras, which the court denied, emphasizing that **she wanted to hear it**. (App. 688). This also was an abuse of discretion in her measuring of the decisional scales, when one considers she refused to allow the presentation at trial of the failed polygraph tests of Maria, Oquendo and Cosme, that were clearly more relevant than alleged incidents of violence Oquendo allegedly observed Padilla-Galarza commit from 1988-1990, when he started working as a policeman, although Padilla-Galarza was never charged for these incidents nor did Oquendo file complaints against him. (App.691-692). She obviously wanted to poison the well.

material contradictions that could have swayed the judge to acquit Padilla-Galarza. The Objection to the PSR also included photos that Padilla-Galarza was not able to obtain prior to trial due to the Court's failure to grant additional funds for the private investigator that would have demonstrated Ramos Quinones' version of events as to what he did while making surveillance at the 'beach' was false. (Docket 704-App. 49-91). The failure to grant a continuance clearly prejudiced Padilla-Galarza at trial.

For all of the above stated reasons this Court should find that the District Court abused its discretion when it failed to grant the 30-day continuance Padilla-Galarza requested and remand the case for a new trial.

3- The District Court abused its discretion when it failed to grant additional funds for expert and private investigator under 18 U.S.C. 3006A.

18 U.S.C. 30006A(e) provides:

*SERVICES OTHER THAN COUNSEL.—*
*(1) UPON REQUEST.—*
*Counsel for a person who is financially unable to obtain investigative, expert, or other services **necessary for adequate representation** may request them in an ex parte application. **Upon finding, after appropriate inquiry in an ex parte proceeding,** that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.*

In <u>Ake v. Oklahoma</u>, 470 U.S. 68, 76 (1985), the Supreme Court reiterated that *"when a State brings its judicial power to bear on an indigent defendant in a*

*criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake".*

This Court in <u>U.S. v. Manning</u>, 79 F.3d 212, 218 (1st Cir. 1996), recognized that requests for expert services pursuant to 18 U.S.C. 3006 (A)(e)(1) should be granted when said services are *"necessary"* or *"pivotal to the indigent defendant's defense"... "A district court's denial of a request for such services is reviewed only for an abuse of discretion*. <u>United States v. Mateos-Sanchez</u>, 864 F.2d 232, 240 (1st Cir. 1988); <u>United States v. Fosher</u>, 590 F.2d 381, 384 (1st Cir. 1979)".

In <u>U.S. v. Durant</u>, 545 F.2d 823, 827-828 (2nd Cir. 1976), failure to grant authorization to retain expert services under 18 U.S.C. 3006A was found to constitute reversible error where it was determined said services were *"necessary to an adequate defense"* as described by the statute. *"Necessary" should at least mean "reasonably necessary," and "an adequate defense" must include preparation for cross-examination of a government expert as well as presentation of an expert defense witness."* See also <u>U.S. v. Williams</u>, 998 F.2d 258, 264 (5th Cir. 1993).

A conviction was reversed, and the case remanded for a new trial due to the District Court's failure to grant a continuance requested by defendant in order to be able to retain a voice expert in the case of U.S. v. Ellis, 2008 U.S App. Lexis 2622 (4th Cir. unpublished opinion). As recognized in U.S. v. Oliver 626 F.2 254, 259 (2nd Cir. 1980) ("*Most courts rely on the judgment of the defense attorney if he makes a reasonable request in circumstances in which he would independently engage in such services if his client was able to pay for them.")* As summarized in U.S. v. Gilmore 282 F.2d 398,406(6th Cir. 2002):

> *We synthesize the existing standards of other circuits: An indigent defendant may obtain authorization for investigative, expert, or other services under 18 U.S.C. § 3006A(e)(1) upon a demonstration that (1) such services are necessary to mount a plausible defense, and (2) without such authorization, the defendant's case would be prejudiced. The decision of the trial court would then be reviewable for abuse of discretion. We think that these criteria provide the means for determining whether the requested services are "necessary" under § 3006A.*

On 04/19/2022, Padilla-Galarza informed the Court that he had received on 04/08/2022, a discovery package that contained for the first time Oquendo's cell location data which was still pending study. (Docket 601, pg. 2-3-App. 1662-1667). On 04/20/2022, a Supplemental Motion for Continuance was filed informing the Court that after reviewing Oquendo's AT&T location data records they were impossible to interpret, and counsel would need to retain an expert in order to understand them. (Docket 612- App. 1680-1689). At the pretrial conference held on 04/20/2022, the judge inquired about the need to retain an expert to interpret the

location data of Oquendo. Counsel reiterated he could not interpret the location data report and that since Oquendo was with Padilla-Galarza the night of the robbery, they had contacted each other telephonically, and were together when Oquendo returned to Isla de Cabras, to determine if they were useful for the defense **he had to consult an expert**. The judge refused the request because the Government announced they would not be using it at trial. The Court's ruling was incorrect because the cell location data would be very useful to determine the time periods, particularly when they arrived together at the station house that night. Counsel would not be able to interpret them without an expert. Contrary to the Government's argument that they would only create confusion, finding out the cell phone location of calls made after 12:00 am. would create greater certainty as to where they were the rest of the night. Contrary to the Government's argument, it appears that page 5 is incomplete[54], and page 6 is missing. (Docket 612-2, pg. 5, 7-App. 1687-1688). The missing toll records happen to be the period after 12:00 am, the crucial time periods of this case. Under the above circumstances, the refusal of the Court to allow Padilla-Galarza sufficient time to consult an expert and obtain the missing information constitutes an abuse of discretion and prejudiced his defense.

---

[54] It raises the possibility that it was purposely blocked out when being photocopied, and page 6 withdrawn to hide its contents. The Court should examine Ex-Parte motion filed on that reflects there was evidence someone else committed the robbery. (Docket 282- 5-14). The witness backed out at the last minute because he feared for his life.

But there is more. Early on in the case counsel realized that in order to be able to provide effective assistance of counsel he needed to retain an investigator. On 05/23/2018, he filed an Ex Parte motion requesting authorization to hire a private investigator, former U.S. Marshall Roberto Vizcarrondo. As justification for his services counsel mentioned they were necessary to properly prepare for trial since witnesses had to be located and interviewed, field examinations needed to be conducted, alibi evidence and background examinations of the Government witnesses needed to be conducted. (Docket 94- Sealed Add. 1-4). The need for said services continued during pretrial and at trial. The initial request of $2,450.00 was used up quickly. On 05/25/2020 (Docket 282- Sealed Add. 5-13), 10/27/2021 (Docket 455-Sealed Add. 25-26), additional funds were requested and denied by the Court (Sealed Add. 27-28), 11/08/2021 (Docket 469-Sealed Add.29-30), and on 12/10/2021 (Docket 490), Padilla-Galarza requested Ex-parte additional funds for the private investigator since he was needed to locate and interview additional witnesses, to be present when counsel interviewed potential witnesses, and for trial preparation. **At Docket 490, counsel specifically requested that the Court hold an Ex-Parte proceeding pursuant to 18 U.S.C. 3006A(e)(1)(3) so that Padilla-Galarza could detail the many investigative services required. An additional $2,500.00 was requested. (Docket 490- Sealed Add. 32). All motions were summarily denied by the District Court (Dockets 482, 487, 534), without ever**

**holding an Ex-Parte proceeding, which the statute requires.** The District Court abused its discretion when it failed to celebrate the hearing requested where more detail of the many reasons he was needed would have been established.

In denying said motions summarily, the District Court concluded that trial preparation was not an investigator's services, that she considered it attorney or paralegal work! (Docket 467 -Sealed Add. 28, Docket 534-Sealed Add. 35-41); that an investigator was not needed when counsel interviewed witnesses to have corroboration of what they said[55]; that the need for an investigator was not substantiated sufficiently for her to grant said services. All of the motions were denied without prejudice. Given her repeated rulings that an investigator was not necessary for trial preparation, counsel gave up trying to obtain said compensation. Although Vizcarrondo assisted counsel in serving subpoenas without being able to file a voucher, and interviewing one person, he could not carry out all of the services needed without CJA compensation, particularly trying to locate the 3 witnesses to impeach Figueroa regarding material facts of the case that were in dispute, a matter the Court was informed of repeatedly and at the close of all evidence. (Tr. 05/04/2022, pg.181-App. 1402; Tr. 05/06/2022, pg.19-App. 1430).

---

[55] **The situation informed at Docket 282 (Sealed App. 5-13),** made it necessary for him to be present when counsel interviewed him. Without Vizcarrondo's presence, counsel would not interview such a person.

The District Court's conclusion that locating/interviewing witnesses and that investigators are not necessary for trial preparation is clearly erroneous and constituted an erroneous interpretation of the law, which requires de novo review. U.S. v Bresil, 767 F.3d. 128,129 (1st Cir. 2014), citing U.S. v. Teague, 469 F.3d 205,210(1st Cir. 2006). This need not only arose prior to trial but also during trial.[56] This Court should find that the District Court abused its discretion in failing to hold an ex-parte hearing to justify the need for additional investigative and provide funds for the defense to cover investigative costs that arose shortly prior to trial and during trial. The failure affected Padilla-Galarza's due process right to a fair trial and prevented him from presenting material evidence in support of his defense, which prejudiced him. The conviction should be set aside, and Padilla-Galarza granted a new trial.

**4-    The District Court abused its discretion when making evidentiary rulings and ex-parte requests for production of documents that were admissible and material to Padilla-Galarza's defense, depriving the judge from having a**

---

[56] The photos of the area Ramos-Quiniones testified about at trial concerning where he was located, that seriously impeached Ramos-Quinones' version of his being at the 'beach' area that night, submitted in Padilla-Galarza's Objections to PSR (Docket 704- Sealed App. 70-79) could not be obtained until after the trial, when another person was able to go there and take the photos. This could have called into question whether he was there that night as he claimed. See also inconsistent statement he gave to the probation office while being interviewed that he was driving around the area that night (Sealed App. 136 Par. 29), which also supported that conclusion.

**record that justified acquitting him, and Padilla-Galarza's due process constitutional rights to present a defense.**

This Court reviews "the District Court's evidentiary rulings or abuse of discretion." U.S. v. Collazo-Aponte, 216 f.3d 163, 184 (1st Cir. 2000); U.S. v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996); U.S. v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir. 1995); U.S. v. Garcia, 452 F.3d 36, 38 (1st Cir. 2006). Federal Rule of Evidence 613(b) allows extrinsic evidence of a prior inconsistent statement as long as the witness is afforded an opportunity to explain or deny the same as was done in this case. This Court has consistently held that extrinsic evidence of a prior inconsistent statement is admissible at trial for purposes of impeachment. See U.S. v. Barrett, 539 F.2d 244, 254-256 (1st Cir. 1976) [conviction reversed due to District Court's failure to allow extrinsic impeachment evidence under Rule 613(b)]; U.S. v. Hudson, 970 F.2d 948, 953-956 (1st Cir. 1992); U.S. v. Malick, 928 F.2d 17, 22-23 (1st Cir. 1991).

Padilla-Galarza prior to trial informed the Court of his intent to present extrinsic impeachment evidence in accordance with Federal Rule of Evidence 613(b). (Docket 647-App. 2212-2214). Said rule states:

*Witness's Prior Statement*

*(a) **Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or*

*disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.*

*(b) Extrinsic Evidence of a Prior Inconsistent Statement. Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).*

The Government developed a trial strategy of forcing Padilla-Galarza to prior to confronting a witness that he had subpoenaed to testify about a particular statement, ask him if he remembered saying something 12 years ago to X witness, which the Court agreed with. When the witness would answer they could not recall, and counsel tried to confront him/her with the specific statement made to an agent shortly after the robbery that impeached their trial testimony, the Government would object on grounds counsel was asking leading questions and that the witness had already denied remembering what was said so many years ago, so the confrontation required by the Rule 613(b), that the witness be given an opportunity to explain or deny the statement did not occur**.** This was clearly an erroneous interpretation of the law for numerous reasons. To begin, requiring Padilla-Galarza to make open-ended questions on direct examination about a witness remembering statements made 12 years ago was not practical and would obviously receive an "I Don't remember" answer. Under those circumstances, allowing leading questions was entirely proper.

**Crucial extrinsic impeachment evidence of prior statements that were more**

**reliable because they were made shortly after the robbery, and denied or not remembered during their trial testimony, were erroneously prevented from being established on those grounds. The most glaring example of this occurred during the direct examination by the defense of hostile witness Municipal Police officer Anabel Ayala who on direct examination incredibly testified she had seen a red truck parked at the entrance when she made rounds at 2:15 and 3:00 am. the night of the robbery when 2 days after the robbery she gave a statement to agent Ivys Rosado emphatically denying having seen a red truck that night, depriving the judge from hearing admissible extrinsic impeachment evidence that contradicted her perjured trial testimony;** the same occurred during cross examination of the president of the Isla de Cabras fishing club. He had told police investigators shortly after the robbery that Cosme had requested keys for the entrance, the day before the robbery. At trial he couldn't remember what he had said. When counsel tried to confront him with the specific extrinsic impeachment statement, the Government objected as being leading and the Court refused to allow the question. Counsel objected to the Court's ruling and the Government's strategy of objecting as leading questions that required a witness to recall what he/she had said 12 years ago. Under those circumstances allowing counsel to ask leading questions was permissible.[57] Under Fed. R. Evid. 611(c) a party can ask leading

---

[57] Counsel was never able to interview those 2 witnesses prior to their testimony.

questions to a witness that is identified with an adverse party. Both were. In addition, Fed. R. Evid. 613(b) specifically holds that a 'witness must be given the opportunity to explain or deny' the statement. This requirement instructs that the person who made the extrinsic statement be confronted with it and allowed to explain or deny it. Given the language of the Rule it is clear counsel had to confront them with the precise inconsistent statement as part of the Rule 613 examination that allows extrinsic impeachment evidence. To comply with the Rule, a leading question related to the inconsistent statement was permissible. It is obvious the district court abused its discretion when it did not allow counsel to question those witnesses in a leading manner. Padilla-Galarza was clearly prejudiced since the Court deprived itself of hearing and considering in arriving to a verdict material impeachment evidence that discredited the Government's version of events on important facts of the case, since Ayala's complete comments to agent Rosado-Diaz made shortly after the robbery, raised the specter that  Ramos-Quinones was not present near the entry gate the night of the robbery, calling into question the truthfulness of what he testified he saw and did that night; and as to the president of the Fishing Club, evidence linking Cosme to the robbery was not allowed to come in and considered by the trial judge.

During discovery the Government disclosed the results of 5 polygraph tests taken of **Maria Alvarez,** Steve Parra, Gabriel Cruz, Ignacio Couvertier, and Esquel Rosado Gonzalez all of whom worked at the Isla de Cabras Police range at the time

of the robbery and were asked questions related to their participation or knowledge of the robbery. **Four of them failed the polygraphs and one, Rosado-Gonzalez refused to take it**. The questions asked to **Maria** were 1- Did you participate in any way in that robbery? 2- Did you participate in any way in that robbery of the police range? 3- Did you know that robbery was going got happen before it did? She answered 'No' to all of them. The result of her answers were that; "**Deception was detected.**" A Motion in Limine was filed, that included applicable case law, to have them used at trial as impeachment evidence. (Docket 165-App. 1706-1717). The Government filed an Opposition. (Docket 172-App. 1718-1721). Hon. Judge Gelpi initially ruled that he would decide the matter "prior to trial once the Government announces its witnesses". (Docket 173). **Subsequently the Government provided discovery that reflected polygraph tests had been submitted to Oquendo and Cosme, but not the test results.** On 04/18/2022, Padilla-Galarza filed a Motion to Compel Discovery attaching the ROI that reflected the administration of the polygraph tests to them and justifying their need "*to enable defendant to further investigate and study said **impeachment evidence**. (Docket 591- App.1738-1743). The Government Opposed (Docket 598- App. 1744-1749), and the District Court denied the motion claiming Padilla-Galarza had not explained why they were material to his defense and that "***since she would not place any weight on polygraph results, we will not admit them at trial***". (Docket 608, pg. 4-App .1753). Padilla-

Galarza filed a Motion for Reconsideration detailing that the polygraph tests, pursuant to case law, were admissible at trial as impeachment evidence (Docket 615-App. 1756-1759), a reason that had already been advanced in its Motion to Compel and briefed at Docket 165. Incredibly, the Court again denied the motion stating that Padilla-Galarza had not provided any grounds to support a motion for reconsideration since a *"judge's experience does not impact a party's obligation to develop its arguments and meet its burdens as set forth by rule, statue, and case law."* (Docket 623-App. 1590). It is obvious from her Opinion that she already had prejudged and would not place any weight to polygraph test results. Her conclusion that Padilla-Galarza had not developed his arguments was clearly erroneous. An examination of Dockets 165, 591, 615 reveals he had. How many times has a party have to repeat an argument that has already developed?

**It is Padilla-Galarza's position that the District Court abused its discretion when it denied the production of said discovery**. **To begin with this was a bench trial that rested on credibility assessments. Oquendo and Cosme were crucial trial witnesses, and the results of their polygraph tests were relevant, and admissible as <u>Brady</u> impeachment evidence. Important evidence was never obtained by Padilla-Galarza that would have been part of his defense, had they failed the polygraphs. This Court on appeal is also deprived of said**

**results, which could be relevant in the resolution of this appeal.[58] Now the Government will argue that Padilla-Galarza has not demonstrated they were material to his defense or prejudiced him. The case law recognizes that polygraph test results are admissible at trial.**

Courts have repeatedly held that **failed** polygraph tests constitute <u>Brady</u> material that is discoverable and that the District Court judge has the discretion to allow their introduction at trial.  In <u>U.S. v. Lindell,</u> 881 F.2d 1313, 1326 (5th Cir. 1989) the Court held; "*In addition to exculpatory evidence, the* <u>Brady</u> *rule covers evidence that might be used for impeachment purposes.  <u>Giglio v. U.S.,</u> 405 U.S. 150, 154 (1972). **Impeachment evidence includes the results of a polygraph test.**".*  Numerous Courts have recognized that after <u>Daubert v. Merrell,</u> 113 S. Ct. 2786 (1993), there is no per se rule against the admission of polygraph tests results and that due to the advances in said testing if the proponent satisfies the <u>Daubert</u> tests said evidence is admissible, granting the District Court the discretion to admit them at trial subject only to the abuse of discretion standard on appeal. <u>U.S. v. Posado,</u> 57 F.3d 428, 432-433 (5th Cir. 1995); <u>U.S. v. Pulido,</u> 69 F.3d 192, 205-206 (7th Cir. 1995).

In <u>U.S. v. Lynn</u>, 856 F.2d 430 (1st Cir. 1988), this Court held that a defendant had the right to cross examine a government witness concerning his failed polygraph

---

[58] This Court should require the Government to produce said polygraph results.

test. In <u>U.S. v. Estrada-Lucas</u>, 651 F.2d 1261 (9th Cir.), the Court held that polygraph results are admissible for reasons other than proving the substance contained therein, such as impeachment. See also <u>U.S. v. Piccinonna</u>, 885 F.2d 1529, 1536 (11th Cir. 1989), where the Court recognized that polygraph evidence is admissible for purposes of impeachment. Admission of polygraph test results fall within the sound discretion of the trial Court. <u>U.S. v. Falsia</u>, 724 F.2d 1339, 1341 (9th Cir. 1983).

From the above precedents it is obvious the District Court committed an error of law and abused her discretion when she refused to order the Government to produce the results of the polygraph test results of those two key witnesses. The Government had an obligation under <u>Brady</u> to produce them. "***A material error of law constitutes a per se abuse of discretion***". <u>U.S. v. Anonymous</u>, 629 F.3d 68, 73 (1st Cir. 2010). The polygraph test results constituted relevant, impeachment evidence that the Judge could consider in arriving at their credibility assessments, the heart of this trial. See Fed. R. Evid. 401 which states:

> ***Test for Relevant Evidence***
>
> *Evidence is relevant if:*
> (***a***) *it has any tendency to make a fact more or less probable than it would be without the evidence; and*
> (***b***) *the fact is of consequence in determining the action.*

If Maria, Oquendo, and Cosme had all failed polygraph tests, wouldn't that be 'relevant' since it has a tendency to make a fact (their credibility) more or less

probable? **Why didn't the Government produce those polygraph results as they had already previously done with Maria? Obviously, they must have been detrimental, and discoverable by Padilla-Galarza prior to trial. Here, the District Court deprived appellant of relevant impeachment evidence that supported his line of defense. An abuse of discretion occurred.**

Nor can the above cumulative errors be considered *"harmless"*. *"In reviewing for harmless error, we ask whether the result would have been the same if the disputed evidence had not been admitted. We have therefore said that a conviction will be upheld if it is 'highly probable' that the result would have been the same."* U.S. v. Colon-Munoz, 192 F.3d 210, 229 (1st Cir. 1999). *"Unlike the plain error analysis, the government bears the burden of persuasion with respect to showing that the error was harmless.* Olano, *507 U.S. at 734-35. The greater the weight of the other evidence against the defendant, the less likely it is that a given error swayed the jury,"* but the greater the probable impact of the error, the less likely it is that the court can conclude that the error was harmless". U.S. v. Meserve, 271 F.3d 314, 329 (1st Cir. 2001). In the present case the error cannot be considered harmless due to the conflictive nature of the evidence presented by both sides.

**5- The District Court should have dismissed Counts 2 and 6 of the Superseding Indictment, since the addition of those two new substantive counts, not alleged in the first indictment, were time barred.**

The robbery of the Isla de Cabras police armory occurred on 10/26/2010. On that date the commission of the substantive 18 U.S.C. 1951, 2 Hobbs Act robbery **was complete** since on that date the aiders and abettors unlawfully took from another person against their will by means of actual and threatened force the firearms stored there. U.S. v. Taylor, 145 S.Ct. 2015, 2020 (2022). On that same date the robbery ended since the "*commission of the robbery ends when force and taking, the elements which constitute the offense, have ceased.*" People v. Smith, 155 N.E.3d 396, 404 (S.C. Ill. 2019).

As appears from a comparison of the initial Indictment filed on 10/14/2015 (App.1-12), and the Superseding Indictment filed on 04/07/2022 (App. 13-23) reveals that a new substantive 18 U.S.C.1951, 2 count charging Interference with Commerce by Robbery was added. Count Two of the indictment was varied in that in the initial indictment the underlying crime sustaining the 924(c)(1)(A)(ii) firearms charge was the conspiracy charged in count one whereas in the superseding indictment the underlying crime sustaining the 924(c) offense was the new substantive count 6 of the indictment. In addition, count 2 of the original indictment charged 'Possession' of a firearm in furtherance of a crime of violence whereas the superseding indictment charged the 'Carrying' and 'use' of a firearm during and in relation to a crime of violence. 18 U.S.C. 924(c)(1)A)(i).

Padilla-Galarza filed a Motion to Dismiss the Superseding Indictment on statute of limitations ground and that he was prejudiced from its tardy filing, since it significantly affected his trial strategy. (Docket 592- App. 2229-2232). The Government Opposed (Docket 607-App. 2239-2250), and the District Court denied the motion (Docket 625-App. 2251-2261), issuing a published opinion and order, U.S. v. Padilla-Galarza, 2022 U.S. Dist. LEXIS 7348, concluding that it was timely because it neither materially broadens nor substantially amends the charges against the defendant, and although the charge is new, the underlying allegations and conduct are not, so they relate back to the original indictment.

Padilla-Galarza submits that as to Counts 2 and 6 of the superseding indictment, the District Court erred in its legal analysis and should have dismissed them on statute of limitations grounds. 18 U.S.C. 3282 provides;

### *Offenses not capital*

*(a) IN GENERAL.—*
*Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.*

Given that the new substantive count 6, Hobbs Act violation of 18 U.S.C. 1951, 2, stems from the actual robbery of 10/26/2010, the statute of limitations period for that count began that day because the robbery was completed that day also, and since it was filed for the first time on 04/07/2022, it was not tolled by the

original indictment. Said offense conduct was known by the Government when it filed the original indictment and could have charged it then. Under these circumstances a new substantive count, charged over 11 years after the robbery was complete must be dismissed because it exceeded the 5-year statute of limitations period.

Count 2 should be dismissed for the same reasons. Originally, the 924(c) firearms offense count 2 was anchored to the conspiracy count charged in count one whereas the amended count 2 of the superseding indictment was tied to the substantive new aiding and abetting Hobbs Act crime charged in count 6, whose statute of limitations period had run out over by 6 years. A conspiracy consists of an agreement to violate the law that can last for years while the aider and abettors responsibility ends when the crime is complete. To equate the original conspiracy with aiding and abetting criminal conduct is incorrect as a matter of law and should be treated differently as it pertains to the application of statute of limitations periods.

As this Court recognized in U.S. v. O'bryant, 998 F.2d 21, 23 (1st Cir. 1993);

*"It is well settled that bringing an indictment tolls the statute of limitations on the charges set forth in that indictment. See United States v. Sears, Roebuck Co., 785 F.2d 777, 778-79 (9th Cir.) (collecting cases), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986".*

A superseding indictment filed after the 5-year statute of limitations is timely "*so long as it neither materially broadens nor substantially amends*" the timely filed original indictment. In U.S. v. Zvi, 168 F.3d 49, 54-55 (2nd Cir. 1999), the prohibition

of not 'broadening or substantially amend the original charges' was defined as;

"*Superseding indictments have been deemed timely when they* **simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous."**. There the Court dismissed the superseding indictment because it added money laundering counts even though they were part of the scheme to defraud. See also U.S. v. Rounsavall, 905 F. Supp. 662, 665 (D.C. Neb. 1995), where the Court as an additional reason to apply the 5-year statute of limitations considered that the Government waited until the last moment to file the superseding indictment **when it was aware of the offense conduct before the statute of limitations had expired.**

The same analysis of those cases justifies dismissing counts 2 and 6 of the superseding indictment.

## **CONCLUSION**

Given that the evidence to sustain Padilla-Galarza's conviction is **untrustworthy,** this Court should conclude that it does not rise to the level of '*proof beyond a reasonable doubt*' and order the dismissal of all charges against him. In the alternative the Court should order a new trial and or dismiss counts 2 and 6 of the superseding indictment on statute of limitations grounds.

In San Juan, Puerto Rico, this 9th day of April 2024.

*S/ Rafael F. Castro Lang*
**RAFAEL F. CASTRO LANG**
Federal Circuit Bar #26074
Attorney for Appellant
P.O. Box 9023222
San Juan, P.R. 00902-3222
Tel:(787)723-3672 / (787)723-1809
Fax (787) 725-4133
Email: rafacastrolang@gmail.com;
      rafacastrolanglaw@gmail.com

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO F.RA.P. 32(a)(7)</u>

I hereby certify that this Brief complies with the type-volume limitations specified in Rule 32(a)(7) of F.R.A.P.

According to the Word Processing System used, this Appellant's Brief contains 30,958 words, 122 pages, and 2,535 lines of text.

In San Juan, Puerto Rico, this 9th day of April 2024.

<div style="margin-left:40%">

*S/ Rafael F. Castro Lang*
**RAFAEL F. CASTRO LANG**
Federal Circuit Bar #26074
Attorney for Appellant
P.O. Box 9023222
San Juan, P.R. 00902-3222
Tel:(787)723-3672 / (787)723-1809
Fax (787) 725-4133
Email: rafacastrolang@gmail.com;
rafacastrolanglaw@gmail.com

</div>

## CERTIFICATE OF SERVICE

I, Rafael F. Castro Lang, Court appointed counsel for Appellant **Jose Padilla-Galarza,** a/k/a "Joey", hereby certify that I electronically filed today with the United States Court of Appeals for the First Circuit by using the CM/ECF system the Appellant's Brief, Certificate of Compliance Pursuant to F.R.A.P. 32 (a)(7) and this Certificate of Mail. I certify that the parties or their counsel of record stated in the Service List are registered as ECF Filers and that they will be served by the CM/ECF system. A copy of Motion Filing Documents Under Seal, Appendix and Sealed Appendix has been hand delivered to AUSA Myriam Fernandez, U.S. Attorney's Office, Torre Chardon, Suite 1201, 350 Carlos Chardon Ave., San Juan, PR 00918.

In San Juan, Puerto Rico, this 9th day of April 2024.

*S/ Rafael F. Castro Lang*
**RAFAEL F. CASTRO LANG**
Federal Circuit Bar #26074
Attorney for Appellant
P.O. Box 9023222
San Juan, P.R. 00902-3222
Tel:(787)723-3672 / (787)723-1809
Fax (787) 725-4133
Email: rafacastrolang@gmail.com;
rafacastrolanglaw@gmail.com

## Service List for Case: [22-1950](22-1950) US v. Padilla-Galarza

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| Mariana E. Bauza Almonte<br>US Attorney's Office<br>350 Carlos Chardon Ave<br>Torre Chardon, Ste 1201<br>San Juan, PR 00918-0000<br>Email: mariana.e.bauza@usdoj.gov | [22-1950](22-1950) | Email | Active |
| Vanessa Elsie Bonhomme<br>US Attorney's Office<br>350 Carlos Chardon Ave<br>Torre Chardon, Ste 1201<br>San Juan, PR 00918-0000<br>Email: vanessa.e.bonhomme@usdoj.gov | [22-1950](22-1950) | Email | Active |
| Rafael F. Castro Lang<br>Rafael F.Castro Lang Law Office<br>PO Box 9023222<br>San Juan, PR 00902-3222<br>Email: rafacastrolang@gmail.com | [22-1950](22-1950) | Email | Active |
| Jenifer Yois Hernandez-Vega<br>US Attorney's Office<br>350 Carlos Chardon Ave<br>Torre Chardon, Ste 1201<br>San Juan, PR 00918-0000<br>Email: jenifer.hernandez@usdoj.gov | [22-1950](22-1950) | Email | Active |
| Jose Padilla-Galarza<br>USP Coleman II<br>PO Box 1034<br>Coleman, FL 33521-0000 | [22-1950](22-1950) | US Mail | |
| Max J. Perez-Bouret<br>US Attorney's Office<br>350 Carlos Chardon Ave<br>Torre Chardon, Ste 1201<br>San Juan, PR 00918-0000<br>Email: max.j.perez@usdoj.gov | [22-1950](22-1950) | Email | Active |
| Jose A. Ruiz-Santiago<br>US Attorney's Office<br>350 Carlos Chardon Ave<br>Torre Chardon, Ste 1201 | [22-1950](22-1950) | Email | Active |

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| San Juan, PR 00918-0000<br>Email: jose.ruiz3@usdoj.gov | | | |

## INDEX TO ADDENDUM

**PAGE**

1- Judgment in a Criminal Case-15-633- Docket 733…………………….…1-8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
              Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> Jose PADILLA-GALARZA | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  3:15-cr-00633-SCC-1

USM Number:  19158-069

Rafael F. Castro-Lang, Esq.
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)    One (1), Two (2), Three (3), Five (5) and Six (6) of the Superseding Indictment on 5/6/2022.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18  U.S.C. § 1951 | Conspiracy to interfere with commerce by robbery. | 1/31/2011 | One (1) |
| 18  U.S.C. § 924(c)(I)(A)(i) AND 2 | Carrying a firearm during and in relation to a crime of violence. | 10/26/2010 | Two (2) |
| 18  U.S.C. § 924(I) AND 924(a)(2) AND 2 | Stealing firearms. | 10/26/2010 | Three (3) |

   The defendant is sentenced as provided in pages 2 through    8    of this judgment. The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    Four (4)

☐ Count(s)           ☐ is  ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/16/2022
Date of Imposition of Judgment

s/ Silvia L. Carreno-Coll
Signature of Judge

Silvia L. Carreno-Coll, U.S. District Judge
Name and Title of Judge

11/16/2022
Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

DEFENDANT:   Jose PADILLA-GALARZA
CASE NUMBER:   3:15-cr-00633-SCC-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 922(g)(l), 924(a)(2) | Prohibited person in possession of firearm: convicted felon. | 10/26/2010 | Five (5) |
| 18 U.S.C. § 1951 AND 2 | Interference with commerce by robbery. | 10/26/2010 | Six (6) |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    3    of    8

DEFENDANT:      Jose PADILLA-GALARZA
CASE NUMBER:   3:15-cr-00633-SCC-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Two hundred and forty (240) months as to Counts One and Six; One hundred and twenty months (120) as to Counts Three and Five, to be served concurrently with each other; and Sixty (60) months as to Count Two, to be served consecutively, for a total of Three hundred (300) months.

☑ The court makes the following recommendations to the Bureau of Prisons:
    Defendant to be designated to FCI Fairton in New Jersey. Defendant to enroll in vocational training.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
                                    UNITED STATES MARSHAL

                              By _____
                                    DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page  4  of  8

DEFENDANT:  Jose PADILLA-GALARZA
CASE NUMBER:  3:15-cr-00633-SCC-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

**Three (3) years as to Counts One, Three, Five and Six and Five (5) years as to Count Two to be served concurrently with each other.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☑ The above drug testing condition is suspended, based on the court's determination that you
        pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT:   Jose PADILLA-GALARZA
CASE NUMBER:   3:15-cr-00633-SCC-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT:    Jose PADILLA-GALARZA
CASE NUMBER:  3:15-cr-00633-SCC-1

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall not commit another Federal, state, or local crime, and shall observe the standard conditions of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

2. The defendant shall not unlawfully possess controlled substances and shall refrain from possessing firearms, destructive devices, and other dangerous weapons.

3. The defendant shall provide the U.S. Probation Officer access to any financial information upon request.

4. The defendant shall cooperate in the collection of a DNA sample as directed by the Probation Officer, pursuant to the Revised DNA Collection Requirements, and Title 18, U.S. Code Section 3563 (a)(9).

5. The defendant shall submit his person, property, house, vehicle, papers, computers (as defined in 18 U.S.C. Section 1030(e)(1)), other electronic communication or data storage devices, and media, to a search conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT:   Jose PADILLA-GALARZA
CASE NUMBER:   3:15-cr-00633-SCC-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until __2/14/2023__ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:  Jose PADILLA-GALARZA
CASE NUMBER:  3:15-cr-00633-SCC-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $  500.00  due immediately, balance due

☐ not later than _____ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Case Number
Defendant and Co-Defendant Names      Total Amount      Joint and Several      Corresponding Payee,
(including defendant number)                                Amount               if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
Upon conviction of one or more offenses in violation of Title 18, United States Code, Sections 924(c), 924(1), 922(a)(1) and 922(g)(1) set faith in Counts Two through Five of the Indictment, the defendant, Jose Padilla-Galarza, shall forfeit to the United States pursuant to Title 18, United States Code, Section 2461(c), any firearms and ammunition involved or used in the commission of the offense, including, but not limited to, one hundred and twenty five (125) firearms, as detailed in Count One of the Indictment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.