# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## APPEAL NO. 22-1950

### UNITED STATES,
Appellee,

**v.**

### JOSE PADILLA-GALARZA, a/k/a Joey
Defendant-Appellant.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

## BRIEF FOR APPELLEE

---

W. Stephen Muldrow
United States Attorney

Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

Ricardo A. Imbert-Fernández
Assistant United States Attorney

Thomas F. Klumper
Assistant United States Attorney
Senior Appellate Counsel
United States Attorney's Office
Torre Chardón, Room 1201
350 Carlos Chardón Avenue
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

## TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Jurisdictional Statement ............................................................................ 1

Statement of Issues on Appeal .................................................................. 2

Statement of the Case ............................................................................... 3

    I.    Statement of the Facts .................................................................. 3

        A. Planning ................................................................................. 3

        B.  Robbery ................................................................................. 4

        C. Aftermath .............................................................................. 5

    II.   Procedural History ....................................................................... 7

        A. 2015-2018 ............................................................................. 7

        B.  2020 ..................................................................................... 10

        C.  2021 ..................................................................................... 15

        D. 2022 ..................................................................................... 22

        E.  April 20, 2022 Pretrial Conference .................................... 31

        F.  The Trial ............................................................................. 43

Summary of the Argument ...................................................................... 46

Argument ................................................................................................. 48

I.    **Padilla has waived the dismissal claim for failure to address the district court's reasoning. And even if not waived, the district court did not err in finding Counts Two and Six of the superseding indictment were not barred by the statute of limitations because they related back to the date of filing the original indictment.**

Issue.................................................................................................48

Standard of Review.......................................................................48

Discussion ....................................................................................49

    A.  Padilla has waived his claim for failure to address the district court's ruling ...................................................................56

    B.  Even if not waived, the district court did not err in the dismissal .................................................................................58

II.    **The district court did not abuse its discretion in denying Padilla's 30-day trial continuance request.**

Issue.................................................................................................70

Standard of Review.......................................................................70

Discussion ....................................................................................70

III.    **After the mid-April 2022 disclosure of the AT&T records and Figueroa, Padilla waived any request for additional funds for expert and investigative services because he never submitted a request for additional funds for an expert or an investigator under 18 U.S.C. § 3006A(e). In any event, he failed to address the plain error prongs, warranting waiver. But even if not deemed waived, the district court did not plainly or otherwise err in failing to *sua sponte* provide additional funding for these services**

**under § 3006A(e). And the district court did not abuse its discretion in failing to hold an ex parte proceeding regarding his two prior requests for additional funding.**

Background ....................................................................................88

Issue..............................................................................................92

Standard of Review.......................................................................93

Discussion ....................................................................................93

    A. Padilla's contentions are waived..................................96

    B. Even if not waived and reviewed under plain error review, Padilla has waived his contentions for failure to address plain error prongs....................................................................100

    C. Even if not waived, the district court did not plainly or otherwise err by failing to *sua sponte* provide additional funding for an expert or investigator after the April 2022 disclosures .......................................................................101

        1. Padilla failed to demonstrate that funding for an expert was necessary for an adequate defense...........................102

        2. Padilla also failed to demonstrate that additional funding for an investigator was necessary for an adequate defense ................................................................108

**IV.   The district court did not clearly err in making its determinations of fact and credibility.**

Issue..............................................................................................119

Standard of Review.......................................................................119

Discussion ....................................................................................120

A. Padilla is Doomed by His Failure to Request Findings............121

B. Padilla Fails to Develop His Arguments ....................................123

C. His Claims Are Meritless ...............................................................125

    1.   The Police Logo.....................................................126

    2.   The Red Pick-Up Truck Outside the Gate.......................129

    3.   The Sargasso Treatment Area .............................................132

    4.   Approaching Through the Sandy Area ...........................133

    5.   Ramos's Trustworthiness and Potential Motivations ..137

    6.   The Printer Padilla Provided  ............................................139

    7.   Planning the Robbery For Two Years .............................140

    8.   The Motorcycle Repair Shop .............................................141

    9.   "Exonerating" Guill Reabing-Padilla  ..............................142

    10. The Purchase of the Red Pick-Up Truck ........................143

    11. The Palo Seco Videos ..........................................................144

    12. The Open Mobile Phone Records ....................................145

    13. The Pen Link Analysis  ......................................................146

    14. Time of Arrival at Figueroa's House and Transfer of
        Guns ...................................................................................148

    15. Whether Ramos and Figueroa Knew Each Other .........151

16. Storage of the Firearms ......................................153

17. Cooperation Agreement ...................................155

18. Santiago's Identification and Fingerprints ....................157

19. Padilla's threat to Oquendo ...............................162

20. The Rusty Guns ..................................165

**V.    The District Court did not abuse its discretion in its treatment of prior inconsistent statements or polygraph results.**

Issue.............................................................167

Standard of Review..........................................167

Discussion ....................................................167

A. Padilla Waives His Claim by Failing to Cite the Record..........168

B. Ayala's and Maldonado's Statements.........................170

C. Polygraph Results..........................................175

Conclusion....................................................178

Certificate of Compliance ....................................179

Certificate of Service .........................................180

vi

# TABLE OF AUTHORITIES

## FEDERAL CASES

Acosta v. Lynch, 819 F.3d 519 (1st Cir. 2016) .......................................... 176-177

Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985) .............. passim

Bonin v. Calderon, 59 F.3d 815 (9th Cir. 1995) ................................................. 116

Carey v. United States, 50 F.3d 1097 (1st Cir. 1995) ...................................... 156

Cesario v. United States, 200 F.2d 232 (1st Cir. 1952) ............................ 121-123

Conto v. Concord Hospital, Inc., 265 F.3d 79 (1st Cir. 2001) ......................... 98

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ........... 176

deVries v. St. Paul Fire & Marine Ins. Co.,
    716 F.2d 939 (1st Cir.1983) .............................................................................. 176

Diaz-Alarcon v. Flandez-Marcel, 944 F.3d 303 (1st Cir. 2019)............. 160, 162

Etienne v. Edmark, 119 F.4th 194 (1st Cir. 2024) ........................................... 177

Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415 (1996)............................ 67

In re Carlyle, 644 F.3d 694 (8th Cir. 2011)........................................................ 96

In re Motor Fuel Temperature Sales Pracs. Litig.,
    872 F.3d 1094 (10th Cir. 2017) ......................................................................... 57

Keefe v. LendUS, LLC, 659 F. Supp. 3d 196 (D.N.H. 2023)........................... 174

Lawson v. Dixon, 3 F.3d 743 (4th Cir.1993).................................................... 117

Michelson v. Digital Fin. Servs., 167 F.3d 715 (1st Cir. 1999) ........................ 98

Morris v. Slappy, 461 U.S. 1 (1983) .................................................................71

Nixon v. City & Cnty. of Denver, 784 F.3d 1364 (10th Cir. 2015) ........ 124-125

Perkins v. Volkswagen of America, Inc., 596 F.2d 681 (5th Cir. 1979) ........174

Rodríguez v. Municipality of San Juan, 659 F.3d 168 (1st Cir. 2011) ..........124

Ross v. Moffit, 417 U.S. 600 (1974) .................................................................95

Salinas v. United States, 522 U.S. 52 (1997) ....................................................62

Suarez Matos v. Ashford Presbyterian Cmty. Hosp., Inc.,
    4 F.3d 47 (1st Cir. 1993) .........................................................................174

Ungar v. Sarafite, 376 U.S. 575 (1964) .............................................................71

United States v. Abreu, 202 F.3d 386, 389 (1st Cir. 2000) ...................... 93, 103

United States v. Arboleda, 929 F.2d 858, 863 (1st Cir. 1991) ..........................75

United States v. Armstrong, 517 U.S. 456 (1996) .............................................52

United States v. Babichenko, Case No. 1:18-cr-00258-BLW,
    2020 WL 4462066 (D. Id., Aug. 3. 2020) ................................................64

United States v. Balser, 70 F.4th 613 (1st Cir. 2023) ......................................177

United States v. Barner, 441 F.3d 1310 (11th Cir. 2006) ..................................52

United States v. Barrett, 539 F.2d. 244 (1st Cir. 1976) ...................................169

United States v. Beauchamp, 986 F.2d 1 (1st Cir. 1993) ...................................81

United States v. Ben Zvi, 168 F.3d 49 (2d Cir. 1999) .................................. 66-67

United States v. Bertling, 370 F.3d 818 (8th Cir. 2004) ..................................117

United States v. Bishop, 469 F.2d 1337 (1st Cir. 1972) .......................... 121, 123

United States v. Boyd, 620 F.2d 129 (6th Cir. 1980)..........................................87

United States v. Brant, 112 F.3d 510 (4th Cir. 1997) .......................................117

United States v. Brechner, 99 F.3d 96 (2d Cir.1996) .......................................156

United States v. Brown, 603 F.2d 1022 (1st Cir. 1979)....................................173

United States v. Brown, 870 F.2d1354 (7th Cir. 1989) ....................................100

United States v. Bucci, 839 F.2d 825 (1st Cir. 1988) ..........................................51

United States v. Campos, 237 F. App'x 949 (5th Cir. 2007)...........................105

United States v. Canessa, 644 F.2d 61 (1st Cir. 1981) ................................ 93, 96

United States v. Chagra, 669 F.2d 214 (5th Cir. 1982)......................................52

United States v. Charney, 537 F.2d 341 (9th Cir. 1976)............................. 55, 58

United States v. Chenaur, 552 F.2d 294 (9th Cir. 1977) ...................................53

United States v. Cortés-Medina, 819 F.3d 566 (1st Cir. 2016) .......................167

United States v. Crocco, 15 F.4th 20 (1st Cir. 2021) ..........................................78

United States v. Davis, 588 U.S. 445 (2019) .......................................................50

United States v. Davis, 714 F. Supp. 853 (S.D. Ohio 1988)..............................65

United States v. Davis, 953 F.2d 1482 (10th Cir. 1992)......................... 54-56, 58

United States v. De Jesus, 211 F.3d 153 (1st Cir. 2000) ........................... 94, 105

United States v. DeCoteau, 648 F.2d 1191 (8th Cir. 1981) ...............................85

United States v. Delgado-Marrero, 744 F.3d 167 (1st Cir. 2014) ..................70

United States v. DeSimone, 488 F.3d 561 (1st Cir. 2007) ...............................169

United States v. DiTomasso, 621 F.3d 17 (1st Cir. 2010)................................78

United States v. Duarte, 246 F.3d 56 (1st Cir. 2001) .........................................49

United States v. Eagle, 586 F.2d 1193 (8th Cir. 1978) ............................... 93, 96

United States v. Escobar-de Jesús, 187 F.3d 148 (1st Cir. 1999).....................61

United States v. Espinoza, 490 F.3d 41 (1st Cir. 2007) ...................................119

United States v. Fernandez, 722 F.3d 1 (1st Cir. 2013)....................................48

United States v. Fitzpatrick, 67 F.4th 497 (1st Cir. 2023) ...... 120, 124, 149, 161

United States v. Flete-Garcia, 925 F.3d 17 (1st Cir. 2019) ...................... passim

United States v. Fosher, 590 F.2d 381 (1st Cir. 1979).....................................104

United States v. Gadison, 8 F.3d 186 (5th Cir. 1993) ............................... passim

United States v. Gagnon, 616 F. App'x 332 (9th Cir. 2015) ..........................101

United States v. Gant, 691 F.2d 1159 (5th Cir. 1982) .....................................122

United States v. Garcia-Ortiz, 904 F.3d 102 (1st Cir. 2018) ...........................50

United States v. Gengo, 808 F.2d 1 (2d Cir. 1986) ............................... 63-64, 67

United States v. Girard, 97 F.3d 1445,
    1996 WL 550087 (1st Cir. 1996).......................................................................75

United States v. Goodwin, 770 F.3d 631 (7th Cir. 1985) ...............................118

United States v. Grady, 544 F.2d 598 (2d Cir. 1976) .................................. 54-56

United States v. Greaux-Gomez, 52 F.4th 426 (1st Cir. 2022) .............. 173-174

United States v. Grossman, 843 F.2d 78 (2d Cir. 1988) ................................... 69

United States v. Hardin, 437 F.3d 463 (5th Cir. 2005) ........................... 117-118

United States v. Harris, 165 F.3d 24 (5th Cir. 1998) ...................................... 113

United States v. Harris, 542 F.2d 1283 (7th Cir. 1976) ................................... 112

United States v. Hartsell, 127 F.3d 343 (4th Cir. 1997) ................................... 95

United States v. Henry, 848 F.3d 1 (1st Cir. 2017) ................................. passim

United States v. Herbst, 565 F.2d 638 (10th Cir. 1977) ................................... 52

United States v. Hernandez-Salazar, 813 F.2d 1126 (11th Cir. 1987) ........... 122

United States v. Hicks, 748 F.2d 854 (4th Cir. 1984) ..................................... 174

United States v. Holden, 806 F.3d 1227 (9th Cir. 2015) ................................... 56

United States v. Holmquist, 36 F.3d 154 (1st Cir. 1994) ................................. 48

United States v. Italiano, 894 F.2d 1280 (11th Cir. 1990) .................... 54-56, 65

United States v. Jesenik, Case No. 3:20-cr-228-SI,
    2022 WL 11815826 (D. Or., Oct. 20. 2022) ......................................... 64

United States v. Jones, 612 F.2d 453 (9th Cir. 1979) .................................. 75-76

United States v. Kantengwa, 781 F.3d 545 (1st Cir. 2015) .............................. 57

United States v. Kasto, 584 F.2d 268 (8th Cir. 1978) ....................................... 95

United States v. King, 356 F.3d 774 (7th Cir. 2004) ..........................................95

United States v. Knox, 540 F.3d 708 (7th Cir. 2008) ......................................109

United States v. Kuper, Crim. No. 05-167-3,
  2009 WL 1119490 (E.D. Pa., April 27, 2009) ....................................................64

United States v. Lancaster, 64 F.3d 660 (4th Cir. 1995) ........................ 110, 114

United States v. Lara, 970 F.3d 68 (1st Cir. 2020) ..............................................50

United States v. La-Rouch, 896 F.2d 815 (4th Cir. 1990) ................................72

United States v. Larson, 555 F.2d 673 (8th Cir. 1977) ......................................84

United States v. Lea, 249 F.3d 632 (7th Cir.2001) ...........................................176

United States v. Mala, 7 F.3d 1058 (1st Cir. 1993) ..........................................124

United States v. Maldonado, 708 F.3d 38 (1st Cir. 2013) ......................... 70-72

United States v. Manning, 79 F.3d 212 (1st Cir. 1996) ...................................93

United States v. Marino, 277 F.3d 11 (1st Cir. 2002) ........................................62

United States v. Marino, 833 F.3d 1 (1st Cir. 2016) ....................... 120, 149, 158

United States v. Marion, 404 U.S. 307 (1971) ....................................................51

United States v. Martin, 694 F.2d 885 (1st Cir. 1982) ....................................169

United States v. Martin, 920 F.2d 345 (6th Cir. 1990) .....................................63

United States v. Martinez-Hernandez, 118 F.4th 72 (1st Cir. 2024) ..... 168-170

United States v. Mateos-Sanchez,
  864 F.2d 232 (1st Cir. 1988) ..................................................... 93, 110, 113, 116

United States v. Matthews, 498 F.3d 25 (1st Cir. 2007) ..................................161

United States v. McMillan, 600 F.3d 434 (5th Cir. 2010) .......................... 55, 68

United States v. Melendez-Torres, 420 F.3d 45 (1st Cir. 2005) ....................122

United States v. Mott, 772 F.2d 366 (7th Cir. 1985) .................................... 74, 76

United States v. Mulinelli–Navas, 111 F.3d 983 (1st Cir. 1997) .....................82

United States v. Mundt, 508 F.3d 904 (10th Cir. 1974) ..................................115

United States v. Muñoz-Franco, 487 F.3d 25 (1st Cir. 2007) ................... 48, 68

United States v. Obasi, 435 F.3d 847 (8th Cir. 2006) ......................................114

United States v. O'Bryant, 998 F.2d 21 (1st Cir. 1993) ............................... 54, 64

United States v. Ojedokun, 16 F.4th 1091 (4th Cir. 2021) ......................... 54, 60

United States v. Pabon, 819 F.3d 26 (1st Cir. 2016) ................................ passim

United States v. Pacheco, 912 F.2d 297 (9th Cir. 1990) ...................................56

United States v. Padilla-Galarza, 990 F.3d 60 (1st Cir. 2021) ..........................3

United States v. Paladin, 748 F.3d 438 (1st Cir. 2014) .....................................81

United States v. Patterson, 438 F.2d 328 (5th Cir. 1971) ........................... 93, 99

United States v. Perrera, 842 F.2d 73 (4th Cir. 1988) .....................................102

United States v. Perry, 757 F.3d 166 (4th Cir. 2014) .........................................53

United States v. Pontoo, 666 F.3d 20 (1st Cir. 2011) ................................ passim

United States v. Ponzo, 853 F.3d 558 (1st Cir. 2017) ......................................111

United States v. Praddy, 725 F.3d 147 (2d Cir. 2013) ........................................51

United States v. Prieto, 812 F.3d 6 (1st Cir. 2016) ...........................................103

United States v. Prochilo, 629 F.3d 264 (1st Cir. 2011) .....................................84

United States v. Pulley, 891 F.2d 296,
     1989 WL 150059 (9th Cir. 1989) .......................................................115

United States v. Ramos-Baez, 86 F.4th 28 (1st Cir. 2023) ...............................177

United States v. Raymond, 697 F.3d 32 (1st Cir. 2012) ...................................120

United States v. Reis, 788 F.2d 54 (1st Cir. 1986) ..............................................84

United States v. Rivera-Carrasquillo, 933 F.3d 33 (1st Cir. 2019).......... passim

United States v. Rivera-Rodriguez, 75 F.4th 1 (1st Cir. 2023)............... passim

United States v. Robinson, 753 F.3d 31 (1st Cir. 2014)............................... 71-72

United States v. Rodriguez, 457 F.3d 109 (1st Cir. 2006) ...............................149

United States v. Rodríguez-Berríos, 573 F.3d 55 (1st Cir. 2009) ...................176

United States v. Rodriguez-Duran, 507 F.3d 749 (1st Cir. 2007) ...................71

United States v. Rodríguez-Marrero, 390 F.3d 1 (1st Cir. 2004) ....................73

United States v. Rodríguez-Torres, 939 F.3d 16 (1st Cir. 2019) ......................59

United States v. Roman, 121 F.3d 136 (3d Cir. 1997) ........................................95

United States v. Ross, 210 F.3d 916 (8th Cir. 2000)...........................................94

United States v. Rounsavall, 905 F. Supp. 662 (D. Neb. 1995)......................67

United States v. Ruidíaz, 529 F.3d 25 (1st Cir. 2008)....................................119

United States v. Saccoccia, 58 F.3d 754 (1st Cir. 1995) ............................... 70-71

United States v. Sacko, 247 F.3d 21 (1st Cir. 2001) ..........................................57

United States v. Sailer, 552 F.2d 213 (8th Cir. 1977).........................................95

United States v. Salmonese, 352 F.3d 608 (2d Cir. 2003) .......................... 66-68

United States v. Santana-Avilés, 120 F.4th 7 (1st Cir. 2024).........................167

United States v. Santos-Rivera, 726 F.3d 17 (1st Cir. 2013)...........................149

United States v. Scheffer, 523 U.S. 303 (1998) .................................................176

United States v. Schmick, 904 F.2d 936 (5th Cir. 1990)....................................69

United States v. Schultz, 431 F.2d 907 (8th Cir. 1970)....................................113

United States v. Scott, 48 F.3d 1389 (5th Cir. 1995) ...................... 93, 97, 99-100

United States v. Sears, Roebuck & Co., 785 F.2d 777 (9th Cir. 1986)....... 55-56

United States v. Serrano-Delgado, 29 F.4th 16 (1st Cir. 2022) ........................50

United States v. Sevilla-Oyola, 770 F.3d 1 (1st Cir. 2014)..............................124

United States v. Smith, 197 F.3d 225 (6th Cir. 1999) ................................. 54, 68

United States v. Soldevila-Lopez, 17 F.3d 480 (1st Cir. 1994).........................72

United States v. Sorich, 523 F.3d  702 (7th Cir. 2008).......................................68

United States v. Stapleton, 56 F.4th 532 (7th Cir. 2020) ........................ 95, 105

United States v. Stokes, 124 F.3d 39 (1st Cir. 1997) ...........................................52

United States v. Strong, 724 F.3d 51 (1st Cir. 2013) ........................................119

United States v. Takesian, 945 F.3d 553 (1st Cir. 2019) .............................. 48-49

United States v. Tarantino, 846 F.2d 1384 (D.C. Cir.1988) .............................92

United States v. Teixeira, 62 F.4th 10 (1st Cir. 2023) .......................................159

United States v. Turner, 501 F.3d 59 (1st Cir. 2007) .........................................49

United States v. Valverde, 846 F.2d 513 (8th Cir. 1988)..................................108

United States v. Williams, 536 F.2d 1202 (7th Cir. 1976) .......................... 75-76

United States v. Williams, 630 F.3d 44 (1st Cir. 2010)................................ 71-72

United States v. Winbush, 580 F.3d 503 (7th Cir. 2009)..................................116

United States v. Winchenbach, 197 F.3d 548 (1st Cir.1999) ..........................169

United States v. Zannino, 895 F.2d 1 (1st Cir. 1990)................................ passim

United States. v. Ermoian, 752 F.3d 1165 (D.C. Cir. 2013) ...........................117

## **FEDERAL STATUTES**

18 U.S.C. § 924(c) ...............................................................................................51

18 U.S.C. § 924(c)(1)(A)......................................................................................65

18 U.S.C. § 924(c)(3) ..........................................................................................50

18 U.S.C. § 1951...................................................................................................51

18 U.S.C. § 3006A(d) ...........................................................................96

18 U.S.C. § 3006A(e)(1) ......................................................................94

18 U.S.C. § 3006A(e)(3) ............................................................. 96, 110

18 U.S.C. § 3282(a) ..............................................................................51

18 U.S.C. § 3500...................................................................................84

18 U.S.C. § 3500(a) ..............................................................................74

18 U.S.C. § 3500(c) ..............................................................................75

## OTHER AUTHORITIES

Barreto-Orta, M., Méndez-Tejeda, R., Rodríguez, E., Cabrera, N., Díaz, E., &
    Pérez, K. (2019). "State of the beaches in Puerto Rico after Hurricane
    Maria (2017)." *Shore & Beach*, 87(1), 16 .........................................136

Google Maps (2024) Isla de Cabras,
    https://maps.app.goo.gl/M8q1jt41ypXcdRRUA [Accessed 19 December
    2024] ...................................................................................................136

*Merriam-Webster.com Dictionary*, s.v. "beach," accessed October 2, 2024,
    https://www.merriam-webster.com/dictionary/beach .........................135

*Merriam-Webster.com Dictionary*, s.v. "provide," accessed October 3, 2024,
    https://www.merriam-webster.com/dictionary/provide .....................139

Pérez Valentín, J. M., & Müller, M. F. (2020). "Impact of Hurricane Maria
    on beach erosion in Puerto Rico: Remote sensing and causal
    inference." *Geophysical Research Letters*, 47 ..................................137

*Trigueño*, WordReference.com, accessible at:
    https://www.wordreference.com/es/en/translation.asp?spen=trigue%
    C3%B1o................................................................................................159

Wright & Miller, Federal Practice and Procedure:
  Criminal, 4th Ed., § 374 ................................................................121

## **FEDERAL RULES**

District of Puerto Rico Local Rule 144A(j)(2) ..................................................117

Fed. R. App. P. 28(a)(8)(A) ........................................................... 125, 168

Fed. R. App. P. 28(a)(9)(A) ..............................................................98

Fed. R. App. P. 28(e) ....................................................................168

Fed. R. App. P. 4(b)(1)(A) .................................................................1

Fed. R. Crim. P. 23(c) ...................................................................121

Fed. R. Evid. 608 .........................................................................92

Fed. R. Evid. 611(c)(2) .................................................................174

Fed. R. Evid. 702 ........................................................................175

Fed. R. Evid. 802 ........................................................................175

Fed. R. Evid. 901 ........................................................................175

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over appeals from final orders of the district courts under 28 U.S.C. § 1291.[1] On November 16, 2022, the district court sentenced defendant-appellant José Padilla-Galarza. (DE732). It entered the written Judgment nine days later. (DE733, AD1). Padilla timely filed his notice of appeal on November 28, 2022. (DE734, AD15); s*ee* Fed. R. App. P. 4(b)(1)(A).

---

1.    The references to the record will be: DE (Docket Entry or Entries for CR15-633; GE (Government's Exhibit(s)); DI (Defendant's Identification(s)); No. (Number); AB (Appellant's Brief); AD (Appellant's Addendum); AA (Appellant's Appendix); ASA (Appellant's Sealed Appendix).

### STATEMENT OF ISSUES ON APPEAL

I.    Did the district court correctly determine that the statute of limitations had not expired on Counts Two and Six of the Superseding Indictment?

II.    Did Padilla waive the issue of additional funding for expert and investigator services under 18 U.S.C. § 3006A(e)(1) without a hearing and, even if not waived, did the district court plainly or otherwise err when it denied Padilla's additional funding requests for expert and investigator services under 18 U.S.C. § 3006A(e)(1)?

III.    Did the court abuse its discretion in denying Padilla's 30-day continuance motion?

IV.    Did the district court clearly err at Padilla's bench trial in making its credibility and fact findings?

V.    Did the district court abuse its discretion in its evidentiary rulings?

## STATEMENT OF THE CASE

In the early morning hours of October 26th, a group of men disguised as police took two police officers hostage and robbed a police department shooting range. They stole 125 firearms. Padilla masterminded that robbery and later oversaw the sale of the firearms. A district court found him guilty after a bench trial and sentenced him to a total of 25 years in prison.

### I. Statement of the Facts

#### A. Planning

For years, Padilla (himself a former police officer and currently serving time for masterminding armed bank robberies) visited Isla de Cabras two to four times a week. (AA128-29, 234, 247, 349-50, 500-01, 653-58); *United States v. Padilla-Galarza*, 990 F.3d 60, 70-72(1st Cir. 2021). He always did so at night or in the early morning hours. (AA129-31, 349, 504, 653). He planned to rob the shooting range the Puerto Rico Police Department operated for law enforcement agents on the small islet.[2] (AA102, 504-07). A large cache of firearms – Padilla's target – was kept there. (AA126-27, 386-88, 504-05).

---

[2] Isla de Cabras houses only the shooting range, its stationhouse, and a government-run recreational park.

During his visits, Padilla befriended and frequently hung out with the people who worked the nightshifts there, like security guard Emmanuel Cosme and police officer Luis Oquendo. (AA109, 248, 349-50, 653-58). On one visit to Isla de Cabras, Padilla conspired with Gilberto Ramos to "hit [the stationhouse,] to do a job." (AA505). He developed a plan with Ramos and set about procuring supplies, recruiting confederates, police uniforms to use as disguises, and a vehicle they could modify to look like a police patrol car. (AA506-14).

### B. Robbery

In the early morning hours of October 26, 2010, three men disguised as police officers arrived at Isla de Cabras in a white car made to look like a police patrol car. (AA133-34, 253-56, 357-58, 516-17). Among them was Ramón Santiago, dressed as a sergeant. (AA158-59, 161). They passed through the gate guarded by Cosme, who let them through thinking they were police, and approached the shooting range stationhouse. (AA133-34, 253-56, 357-58). There, they assaulted police officers Orlando Rosado and María Alvarez, took them hostage at gunpoint, threatened to kill them, bound them, and locked them inside a padlocked bathroom. (AA135-41, 359-70). One of the gunmen sexually assaulted Alvarez. (AA367, 370). The

robbers gained access to the gun vault and made off with 125 firearms. (AA368, 380-82, 1790, 1798-801).

In the meantime, Ramos stood as a lookout just outside Isla de Cabras. (AA513, 515-21). He and the robbers were in constant contact with Padilla, who had spirited Oquendo away from Isla de Cabras under the guise of going out drinking. (AA506-07, 511-12, 515-21, 664-73, 1847-51, 1861-66, 1877-86). Padilla feared that Oquendo could prove an obstacle to the robbery if he was present at the shooting range. (AA506).

Ramos saw the robbers exit Isla de Cabras in the white vehicle they had disguised as a patrol car. (AA521). He followed them past an electrical power plant – the Palo Seco Plant – and advised them to remove a magnet on the side of the car that depicted the seal of the Puerto Rico Police Department. (AA521-23, 524, 530, 532). They then parted ways. (AA532).

### C. Aftermath

Padilla arrived at Isla de Cabras to drop off Oquendo. (AA670, 672-73). On the way there, they had seen police vehicles rushing to the area. (AA671-73). They got out of the car and went over to Rosado, who "was destroyed." (AA673-74).  Padilla "left to his car" and Oquendo followed to retrieve some

shorts from inside it. (AA674). Oquendo testified that, once he opened the door and took his shorts out:

> Padilla had the steering wheel like this, (indicating), and he hit it. And he tells me, "motherfucker, that – man, that was me." And I said, "what are you talking about, motherfucker?" And he said, "the robbery, man. Those weapons." And then he said, "but if you say anything, I'm going to kill your children."

(AA674). Padilla mentioned Oquendo's children, who he knew, by name. (AA674-75). Oquendo "took off running to the police station." (AA675). He "was confused," "couldn't understand things," and "was nervous." (AA675). Oquendo was told to leave the stationhouse, by then a crime scene, because he "couldn't be there." (AA675).

Soon after leaving Isla de Cabras, Padilla arrived at Samuel Figueroa's house with a car full of firearms. (AA775, 777-78). Some of the guns were moved to one of Figueroa's cars, and then the pair drove to Santiago's house where the guns were initially stored. (AA536, 779-82). That night, Figueroa converted the white "patrol" car used during the robbery into a taxicab, and Padilla later sold it. (AA783-85).

The guns were subsequently moved from Santiago's house to the second floor of a motorcycle repair shop Ramos owned. (AA536-37, 590). They were later moved to Figueroa's house. (AA787-88). During all that

6

time, Padilla retained control of the firearms and oversaw their sale. (AA587-88).

## II. Procedural History

### A. 2015-2018

In October 2015, a Grand Jury returned a five-count indictment charging Padilla and three co-defendants with: (1) conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951 (Count One); (2) possessing and brandishing firearms and ammunition in furtherance of a crime of violence, as charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Two); (3) stealing 125 firearms, in violation of 18 U.S.C. § 924(I) and (a)(2) (Count Three); (4) engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1), 923(a), 924(a)(1)(D) (Count Four); and (5) being a felon in possession of ammunition and 125 firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Five). (AA1-11). The latter four counts included 18 U.S.C. § 2 aiding and abetting liability. (*Id.*).

In mid-2016, the government informed that discovery had been provided to the parties. (DE45, 49, 51, 54). At a March 2017 status conference, Padilla informed that he "[was] going to trial." (DE66). Between 2015 and

7

2018, Padilla went through three counsels because he had, in part, a "negative attitude," already represented himself in another criminal case, and did not "want an attorney" but wanted "someone that followed his commands." (DE26, 51, 56, 57, 66, 72, 73, 75, 76, 85, 86). In March 2018, the district court appointed Padilla's fourth counsel, Rafael Castro-Lang. (DE88).

In a mid-August 2018 status conference, the government informed again "that discovery had been provided and that remaining discovery requested as to [Padilla] would be available th[at] Friday." (DE108). In a follow-up October 2018 status conference, Attorney Castro-Lang indicated that he "was not available to start trial during February or March [2019] due to another trial." (DE121). In February 2019, the government submitted a Rule 12 Designation of Evidence motion listing the specific evidence that it intended to use in its case-in-chief. (DE148).

Between 2018 and May 2022, Padilla's counsel inundated the district court with 35 ex-parte motions. (DE93, 94, 97, 99, 103, 145, 177, 189, 197, 205, 212, 215, 217, 236, 249, 256, 258, 282, 297, 303, 311, 317, 377, 389, 402, 414, 455, 459, 469, 481, 490, 499, 505, 559, 653).

In 2019, counsel filed motions for additional discovery, to compel the identification of speakers from a recording and alleged *Brady* evidence, as well as a motion in limine. (DE195, 234, 246, 252, 258)

For example, in late March 2019, Padilla submitted a motion requesting production of 67 alleged missing ATF ROI reports because they "could" contain relevant or exculpatory information. (DE159). And he noted that he had made "numerous additional discovery requests." (*Id*.). In response, the government informed that Padilla misstated the number because it had already produced 13 of the ROIs. (DE 161). And although Padilla failed to show the required "materiality," it would make available all ROIs not related to the government's cooperators. (*Id*.). Likewise, the government noted the "numerous additional requests" and advised that "some if not all" of this evidence had already been provided to Padilla's counsel but it would be reproduced for counsel. (*Id*.). And it advised that if what had not been produced would be provided. (*Id*.).

In April 2019, counsel submitted a motion in limine requesting authorization to cross-examine witnesses who failed the polygraph test or refused one. (DE165). The government opposed. (DE172). The court noted

the motions and informed that the matter would be resolved prior to trial. (DE194).

In 2019, the court held status conferences on February 3rd, March 11th, June 6th, August 5th, and October 29th. (DE150, 158, 179, 191, 200). In the first three conferences, the government informed the court regarding Padilla's additional discovery requests and its arrangements to respond or meet to discuss them with Padilla's counsel. (DE150, 158, 179). At the August status conference, Padilla's counsel advised the court that he was in the process of "reviewing discovery." (DE191). In the October conference, the government informed that Padilla "insist[ed] on going to trial." (DE200).

**B. 2020**

In January 2020, another status conference was held. The government informed that "the trial should not last more than a week." (DE231). The court set the jury trial for April 21st. (*Id*.). A few days afterwards, Padilla's counsel submitted a series of motions including motions to compel alleged additional *Brady* and discovery material, which the court either granted or ordered the parties to meet in person and discuss. (DE233, 234, 237, 240, 246, 250 252, 258, 260).

At a February 26, 2020 status conference, the parties requested a continuance of the trial date. (DE266). The court denied the request but requested informative motions. (*Id.*).

In its informative motion, the government advised that it was ready for trial on April 20th and requested a pretrial conference. (DE267). It also informed that: "[m]ost if not all of the ROI's [were] provided and reviewed with Defense Counsel" in which any "pending ones c[ould be discussed]"; "[a]ll other reports that fall under Rule 16, ha[d] been provided" to counsel; and other issues had been primarily resolved so "the pending matters [we]re minor" and that the prosecutor was "available to meet with defendant to minimize any issues." (*Id.*).

Padilla's counsel, however, requested a continuance "to 2021." (DE269 at 4). Counsel relied on his heavy workload in other criminal and appellate cases and his representation of Padilla in three other unrelated civil/appellate processes. (*Id.* at 1-3). Counsel also advised that more time was necessary because "a substantial amount of defense trial witnesses need[ed] to be located and interviewed prior to trial which w[ould] take investigator Robert Vizcarrondo time to complete." (*Id.* at 3; DE269-1). And

11

counsel asserted that there were other pending matters including some discovery issues, motions, and court orders. (DE269 at 3-4).

The court vacated the April 20th trial date. (DE279). It then ordered the parties to file a joint informative motion. (DE271). In early April, Padilla's counsel submitted a joint informative motion notifying the status of the case. (DE272). Counsel reiterated, in part, his deadlines with other cases claiming these affected his ability to prepare for trial. (*Id*. at 1-2). Thus, counsel claimed that he was "unable to prepare for trial in this case during the last two months." (*Id*. at 2).

A month later, Padilla filed a motion to compel production of grand jury evidence alleging prosecutorial misconduct and requesting dismissal of the indictment. (DE276; DE276-1 to -18). The government opposed arguing Padilla "filed a disingenuous motion alleging prosecutorial misconduct." (DE292). The government advised that following the court's practice, it had open discovery and "held over ten meetings with defense counsel to discuss the background of the case, the evidence and internal intricacies of the investigation." (*Id*. at 1). The government argued that, in a misleading manner, Padilla alleged the prosecutor falsified documents and knowingly presented false testimony to the Grand jury because Padilla "cherry picked

12

some internal reports and tables" which "f[e]ll outside of the scope of Rule 16" and "deliberately concealed from the Court other documents that refute[d] his assertion." (*Id*. at 1-2). The government explained that it never altered any documents or presented false testimony to the Grand Jury, had provided discovery and all relevant information to Padilla's counsel, and of the 18 exhibits attached to Padilla's motion, none were presented to the grand jury. (*Id*. at 2-16; DE292-1 and -2). It therefore requested a finding of no prosecutorial misconduct and the denial of Padilla's motion to compel. (DE292 at 16).

In response, Padilla's counsel filed a motion to compel discovery and additional extensions of time to sur-reply. (DE293, 323). The government again opposed the motion to compel. (DE328 at 1, 9). It explained that Open Mobile telephone records were the actual records that showed Padilla's communication with the co-defendants, and the PenLink software was merely an analytical or investigatory tool into which the telephone service provider's information was input by the agent. (*Id*. at 1-2). And although the court encouraged open discovery, the government argued that it had come to a point that enough was enough and it requested the application of the rules claiming the information was not subject to disclosure under Rule 16.

(*Id*. at 2-3). It argued that counsel's request was a "fishing expedition" with without allegations of materiality to his defense. (*Id*. at 3, 4-8). And, in any event, the government asserted that the alleged documents did not exist, or it did not possess the alleged documents. (*Id*. at 6-9).

In September 2020, the court denied Padilla's requests to "dismiss based on purported grand jury misconduct." (DE329). After in camera review of the grand jury testimony and exhibits, the court found that the "the government did not engage in prosecutorial misconduct in the indictment stage." (*Id*.). It informed that the *Brady*, *Giglio*, and *Jencks* Act material would be provided "at the appropriate time." (*Id*.). It further noted that if there was outstanding discover under Rule 16, Padilla "sh[ould] file a motion." (*Id*.).

Padilla unsuccessfully sought reconsideration of his motion to dismiss. (DE331, 334). Padilla followed with a motion for discovery requesting a laundry list of items including unredacted ROIs and *Jencks* Act materials. (DE343). The government opposed by addressing each item, indicating a majority of them had already been previously produced in discovery but another copy could be provided and that the remaining few

items were either not discoverable under Rule 16 or did not have to be provided yet. (DE353 at 1-5).

### C. 2021

After multiple extensions, on January 19, 2021, Padilla's counsel filed a supplemental motion for discovery and reply. (DE380). He requested, in relevant part, that "the Government provide all cell phone location data that they obtained in the case," any diagrams prepared regarding the cellular phone, copies of unredacted ROIs, the presentence investigative reports ("PSR") of the cooperating witnesses, and the photos and documents of four individuals who allegedly admitted to participating in the robbery. (*Id*. at 4-6). And he requested earlier release of *Jencks* Act material because it would allow him "to consult with Padilla[], who w[ould] provide numerous insights due to his being a police investigator." (*Id*. at 5).

The government opposed. (DE 382, 409). It argued that Padilla's reply failed to address the court's order that he provide legal authority for each request. (*Id*. at 1). In any event, the government addressed Padilla's current requests arguing: (1) the unredacted ROIs and any HSI diagram and/or analysis were not discoverable but the diagram and analysis were anyways already provided; (2) it was aware of the ongoing obligation to provide

15

*Brady*/*Giglio* materials; (3) the six requested ROIs were already provided in 2019 and 2020; (4) the request for clear audio recording and translation issue was already decided by the court[3]; (5) the lack of reason for MDC Unit assignments; (6) the police's inventory of seized property and newspaper article were provided in 2020; and (7) the other requests were moot or need not be disclosed. (*Id*. at 2-10, 12-15).

After the government's response, the court ordered Padilla to file a reply "narrow[ing] down any outstanding discovery requests." (DE417). And it requested Padilla to inform when he "[wa]s ready to stand trial." (*Id*.). Padilla replied indicating that he was "not ready to stand trial since there [we]re still several ex-parte discovery requests pending to be received in addition to the discovery requested herein." (DE418). The court advised the unredacted ROIs, *Giglio* and *Jencks* Act material would be produced once a trial date was set. (DE419). It also gave the government until May 3rd to produce certifications of whether cell phone data locations existed and whether the Wendy's video was in any federal agency's possession; provide

---

3.    Later, Padilla obtained the court's approval to have an expert inspect the original audio recordings. (DE442). The expert "examined the recordings and determined they were unintelligible." (*Id*.).

16

access to the original Padilla audio recording; and produce all phone diagrams. (*Id*.).

The government moved for a status conference to "determine the parties['] readiness for trial." (DE420). At the April 28th pretrial conference, the court informed that a trial dated would be set. (DE437).

On May 4th, the government filed the motion in compliance. (DE434). Padilla responded with a motion for contempt because the government refused to provide phone "diagrams claiming they [we]re not discoverable." (DE435). He "requested that the Court require the Government to provide the diagrams o[r] be sanctioned for contempt." (*Id*.). The court denied the contempt motion finding "[t]elephone diagrams [we]re not discoverable under Rule 16 as these constitute work product," but "should any of the diagrams constitute Brady/Giglio material, then they must be produced." (DE436). The government then followed with an additional motion in compliance advising the production of photos related to the Wendy's incident and 13 of 17 requested unredacted ROIs to Padilla because four ROIs involved cooperating witnesses. (DE438).

Padilla moved for in camera inspection of the government's diagrams to "**insure (sic) the Government [wa]s complying with its Brady/Giglio**

**obligations**." (DE440 (emphasis in original)). After in camera inspection, the court found the diagrams "contain[ed] work product and not Brady/Giglio material" and therefore did not have to be produced to Padilla. (DE444). The court also noted that Padilla's "case [wa]s ready for trial" and requested from counsel the earliest date that the case could be set for trial. (*Id.*). But Padilla did not respond to the court's request.

At a September 15th status conference, the court set trial for December 1, 2021. (DE449). And it set dates for the amended designation of evidence, proposed jury instructions, and motions *in limine*. (*Id.*).

On November 2, 2021, the case was reassigned to Judge Silvia L. Carreño-Col because Judge Gustavo A. Gelpí had been appointed to the First Circuit Court of Appeals. (DE457). The next day, the government requested the court "to hold all previously set pre-trial deadlines and trial dates in abeyance and to set a new pretrial conference for the parties to resolve any pending matters." (DE460). The court agreed setting a pretrial conference date. (DE461). It also extended the designation of evidence deadline until November 10th. (DE464). And the court found moot Padilla's motion to compel and allowed him to file objections and motions *in limine* until November 15th. (DE645).

On November 10th, the government submitted the First Amended Rule 12 Designation of Evidence eliminating three prior designated evidence from the initial motion. (DE148 at 1-2; DE470 at 2). It also noted the specific dates that the discovery packages had been produced to Padilla between October 2015 to May 2021. (DE470 at 1). Two days later, Padilla submitted a motion waiving trial by jury. (DE471). The government joined Padilla's request for a bench trial. (DE475). Padilla's counsel informed the court that he would be out of the jurisdiction from December 23, 2021, to January 8, 2022, which the court noted. (DE476, 477). Counsel requested the allowance of dual (hybrid) representation because Padilla was "fluent in English," "was a police robbery investigator for years," had "studied the present case **intensely** and ha[d] provided valuable assistance to the discovery matters, which warrant[ed] allowing to participate as co-counsel." (DE478 at 1).

At the November 30th pretrial conference, the parties requested a continuance of the trial date to February 2022 because additional time was needed. (DE485). Padilla alleged that two new pieces of discovery had been provided and he would be filing motions *in limine*. (*Id*.). He also mentioned a new motion *in limine* would be filed related to the recent designation of evidence although nothing new was added to the designation since the

19

initial February 2019 designation. (*Id*.). So, the court reset the motions dates and scheduled the trial for February 7, 2022. (*Id*.).

Three days later, Padilla filed a motion to compel production of color photo spreads. (DE479). Although the photo spreads and sketches were listed in the initial February 2019 designation, he now requested exclusion of this evidence at trial claiming the pre-indictment out-of-court identifications were unreliable. (*Id*.). The court granted the motion to compel production of the color photo spreads. (DE483).

In mid-December 2021, the government filed a motion *in limine* asking the court to bar Padilla from presenting speculative evidence of other individual's guilt and from introducing or referencing polygraph testing during trial. (DE488). It also opposed Padilla's motion for dual/hybrid representation. (DE495).

Padilla responded arguing that third-party perpetrator evidence and failed or refused polygraph tests were admissible. (DE497). Particularly, he contended he could impeach the witnesses with the failed or refused polygraph tests. (*Id*. at 4).

Meanwhile, Padilla requested time to file his motions *in limine* until January 15, 2022, claiming a new development of impermissible suggestion

arose due to the color of one photo in a photospread and the lack of production of other color photospreads. (DE503). And he claimed that he might now need an expert to explain the color issue and raise potential suppression of the photospread. (*Id*.). While these motions were pending, the court denied Padilla's request for hybrid representation. (DE513).

By December 22, 2021, the government submitted a Rule 404(b). (DE516). The court granted Padilla's extension motion to respond. (DE517, 522). It also ordered the parties to file their motions *in limine* and responses and the government to inform whether it had complied with the production of the color photo spreads. (DE521).

The government submitted a motion in compliance. (DE528). It notified that Padilla mistakenly claimed the government intended to use sketches and photo spreads with its two witnesses. (*Id*. at 1). But this contention was incorrect because it purposely did not include the photo spreads in the First Amended Rule 12 Designation of Evidence, nor did it intend to use them at trial. (*Id*.). In any event, the government advised the court that it reproduced its prior discovery production of the photo lineups and spreads and gave them on December 10, 2021. (*Id*. at 1-2). And it informed that the sketches had been provided in 2015 and 2019 discovery

packages, but additional copies were also given on December 10, 2021. (*Id*. at 2). In relation to the two witnesses, the government clarified about the witnesses and photo line-ups which were provided in prior discovery packages and reproduced by December 10, 2021. (*Id*. at 2-5). Finally, it argued that if Padilla was contesting a co-defendant's identification, he would have to file a motion to suppress. (*Id*. at 5).

**D. 2022**

In January 2022, the court issued an opinion and order tentatively denying the government's motion *in limine* to bar alternative-perpetrator evidence and polygraph evidence at trial. (DE538 at 4). In relation to the polygraph evidence, the court expressly declined "right now to bar polygraph evidence." (*Id*. at 3). But it noted the lack of reliability and rare admission of polygraph evidence and the inadmissibility of a person's refusal to take a polygraph test and therefore indicated this was "an issue that [it] c[ould] quickly resolve at trial, if necessary." (*Id*. at 3-4).

Upon return from vacation, Padilla's counsel requested additional time to file his motions *in limine*. (DE543). Besides being on vacation and contracting COVID-19, counsel raised several other reasons including his need to meet with Padilla because he was "informed via letter" from Padilla

that "he ha[d] additional materials relevant to the motion and wanted to meet personally." (*Id.* at 2). The court granted an extension until the motion hearing which was set for January 21st. (DE541, 545).

Five days later, Padilla filed a response in opposition to the government Rule 404(b) notice. (DE546). A day prior to the motion hearing, counsel requested another extension of time to file motions *in limine*. (DE 550). The next day, at a motion hearing, the court granted Padilla's extension request and reset the time to file motions to February 22nd. (DE551). It also vacated the February 7th trial date and rescheduled for April 18th. (*Id.*; *see* DE553). The government informed it would provide any outstanding discovery evidence in person to Padilla's counsel and a "meeting would be schedule[d] among the parties." (DE551).

On February 22, 2022, Padilla submitted a motion *in limine* requesting the exclusion of alleged unreliable/suggestive eyewitness identifications of co-defendant Santiago-Ortega. (DE556, 556-1 to-20). While awaiting the government's response, the court issued and Opinion and Order granting in part and denying in part the government Rule 404(b) motion. (DE557).

The government opposed Padilla's motion *in limine* arguing it was a disguised suppression motion which Padilla lacked standing to raise such

suppression claim for the co-defendant. (DE563 at 2-7). In any event, it asserted the issues raised went to the weight and not the admissibility of the evidence. (*Id*. at 7-8). Padilla replied. (DE565). On March 29th, the court denied Padilla's motion agreeing with the government's rationale. (DE567 at 1). The court also reminded that the deadline for pretrial motions had passed, except for motions in limine, which "[we]re due by April 5, 2022," and "responses due by April 12, 2022." (*Id*. at 7).

On April 1, 2022, the government submitted an informative motion advising about its efforts to meet with Padilla's counsel "to discuss various pending clarifications and information requests" and the results of a March 30th meeting. (DE568). Four days later, the government submitted a request for a one-day extension of time to file pretrial motions until April 6th, which the court granted. (DE572, 574). On the other hand, Padilla submitted an informative motion and request for additional time to file pretrial motions. (DE 573). In support, he alleged the government provided discovery packages on February 12th and March 30th containing new material that had to be analyzed. (*Id*.). And he contended this caused additional informal discovery requests. (*Id*.). Padilla advised that depending on the

government's responses, he "may have to file additional pretrial motions" and thus needed "additional time to file pretrial motions." (*Id*.).

The court noted Padilla's "open-ended extension of time" and found such "request unwarranted given the proximity to trial and the age of the case." (DE574). So, a final extension of time to file pretrial motions was granted until April 8th with responses due April 13th. (*Id*.).

The next day, the Grand Jury returned a six-count superseding indictment, which added a sixth count: interference with commerce by robbery, in violation of 18 U.S.C. § 1951 (Count Six) and changed the predicate offense for Count Two from Count One (Hobbs Act conspiracy) to Count Six (Hobbs Act robbery). (DE577; AA13-23).

On April 8th, the government filed a Second Amended Rule 12 Designation of Evidence which added four pieces of evidence (*i.e.*, AT&T phone toll records of Luis E. Oquendo, two recovered stolen firearms, pictures of surveillance and search warrant involving Perfumeria Chris, and the DTOP record for Gilberto Ramos Quiñones. (DE470 at 2; DE579). It also noted the specific dates that the discovery packages had been produced to Padilla. (DE579 at 1).

On the same day, the government submitted a motion *in limine*. (DE578). Relying on Rule 404(b), it requested the admission of witnesses' testimonies regarding Padilla's participation in three different criminal acts to "show background and relationship of the parties, as well as bias of the witnesses to be called." (*Id*. at 3). Padilla opposed. (DE586).

On April 11th, Padilla waived the personal appearance at that arraignment and entered a plea of not guilty. (DE580). The magistrate judge ordered the government to inform by the next day whether it intended to produce additional discovery. (DE582).

The next day, Padilla's counsel moved to continue the trial date and requested the scheduling of a status conference. (DE583). He asserted various grounds for the continuance including the recent superseding indictment, alleged extensive discovery, continued discovery issues, the need to locate potential witnesses, and his other work obligations. (*Id*. at 2-4). The government opposed raising multiple reasons including: the superseding indictment was not a basis to seek a continuance; no outstanding Rule 16 discovery requests were pending; the recent production of discovery was minimal; the case was very old; Padilla's counsel worked

the case already four years; the case was not too complex; and the requested continuance appeared indefinite. (DE585).

After considering Padilla's "laundry list of reasons," (DE589 at 1), the court agreed to a "brief continuance to allow [Padilla] to draft a motion to dismiss the superseding indictment" by April 18th and the government to respond to it the next day. (*Id*. at 10). It therefore set the trial for April 21st. (*Id*.).

On April 18th, Padilla filed a motion to compel discovery. (DE591). He requested psychiatric records of a potential witness, the polygraph tests of four potential witnesses, the search warrant and surveillance evidence of Perfumeria Chris, the evidence of benefits and proffers to Figueroa, any tracking device records as part of the investigation, and the grand jury exhibits shown to María Alvarez. (*Id*.). On the same day, Padilla moved to dismiss the superseding indictment arguing it did not relate back to the original indictment because it materially broadened and substantially amended the original indictment and was filed in a tardy manner that prejudiced him, and thus it should be dismissed on statute of limitation and prosecutorial delay grounds. (DE592, AA 2299, 2232). Likewise, on that date, the court denied the government's Rule 404(b) motion. (DE594).

27

The next day, the government opposed Padilla's motion to compel discovery explaining the evidence was either not admissible, was provided already to counsel, was provided to the court for an in-camera inspection, did not exist, or was not going to be used at trial. (DE598). And the government filed a memorandum of law regarding the elements of the charged offenses. (DE610).

On the same day, Padilla's counsel again moved to continue the trial. (DE601). He claimed that when he was provided early *Jencks* Act material, it "included a new, previously unknown witness, Samuel Figueroa" and he therefore need time to investigate the witnesses' statement, locate "at least three impeachment witnesses," "develop an alibi defense," and obtain discovery about the witness because he had a prior history of alleged dismissals from employment for stealing and evictions for failure to pay his rent and might be biased against Padilla due to him being beaten by Padilla. (*Id*. at 1-2). Counsel also raised other contentions claiming inundation of motions and discovery materials by the government, his need to "still conduct[] discovery . . . for trial preparation," the need to prepare letters and serve a potential of at least "28 defense witnesses," the need for Padilla to review discovery at MDC, the need to reformulate the trial strategy due to

the superseding indictment, the need to review again the discover due to the age of the case, and his age/sole practitioner status. (*Id*. at 2-4).

The government opposed. (DE606). It noted that just two days prior to trial, counsel moved again for continuance of the trial after he had been provided *Jencks* and *Giglio* material. (*Id*. at 1). It argued Padilla was not entitled to a continuance based on the trial witness and *Jencks* disclosures. (*Id*. at 2-8). And it asserted that counsel had ample opportunity to prepare his defense and rehashed the same arguments that the court already dismissed as a basis for a continuance. (*Id*. at 6, 10-11).

The government also opposed Padilla's motion to dismiss the superseding indictment. (DE607; AA2239). It argued that the superseding indictment "did not materially broaden or substantially alter the charges contained in the original indictment." (AA2248). In comparing the charges from the superseding indictment and initial indictment (AA2239-47), it asserted that "[t]he changes contained in the superseding indictment relate to the *same statute*, with the *same elements*, . . . to be proven by the Government with the *same evidence*, and *reduce[d]* [Padilla's] sentence exposure." (AA2248 (emphasis in original)).

That same day, the court denied Padilla's motion to compel discovery. (DE608). The court addressed each request and concluded that Padilla "failed to explain why the items that he s[ought] [we]re material to his defense, the government ha[d] already disclosed some of the items, and some of them d[id] not exist." (*Id*. at 2-6). Moreover, in relation to the polygraph results, it had "serious concerns about the reliability and accuracy of polygraph tests." (*Id*. at 4). And since the court "would not place any weight on polygraph results, [it] w[ould] not admit them at trial and, thus, there [wa]s no need for the government to disclose them." (*Id*.).

On April 20th, Padilla's counsel filed a supplemental motion in support of a continuance of the next day's bench trial. (DE612). He noted that he received some AT&T records for the first time on April 8th which provided the cellular phone location data for Oquendo and allegedly revealed that Padilla's phone was also tracked after being informed none of this existed. (*Id*. at 1). Counsel also claimed that the records were incomplete because page 6 was missing. (*Id*.). And he advised that he needed to retain an expert to review and interpret the phone location data records to see if "they contain helpful or prejudicial data." (*Id*. at 2). On the same day, Padilla also submitted a memorandum of elements and case law pertaining to the

charged offenses. (DE613). Likewise, Padilla filed a motion for reconsideration of the court's denial of his motion to compel discovery. (DE615).

Meanwhile, the government filed a Third Amended Rule 12 Designation of Evidence that included the designation of three additional pictures that had been provided to Padilla on April 15, 2022, which was prior to the *Giglio/Jencks* Act deadline. (DE621).

### E. April 20, 2022 Pretrial Conference

On that same date, the court held the pretrial conference. (DE617, 622, 757; AA24-25). At the conference, the parties addressed the recent amended designation of evidence and the disclosure of the three photographs which were provided one day prior to the deadline. (AA26-30). And the government advised that all *Jencks* and *Giglio* materials were already provided to Padilla on April 15th. (AA30-32). It also explained how Figueroa came about as a "viable" witness. (AA32). In 2017, Figueroa was debriefed by the government, but he did not want to cooperate. (*Id*.). The government then recently located Figueroa, who was in a halfway house, and approached him about testifying at trial. (*Id*.). Figueroa was not provided a

plea and cooperation agreement. (AA32-33). He initially was not even sure if he wanted to testify so the government waited to hand over his ROI. (*Id*.). But, since Figueroa would now testify, the government provided the ROI even though it was not *Jencks* Act material. (AA30-33).

The court addressed the pending motions. (AA25). In terms of the motion to dismiss the superseding indictment, the court informed it intended to deny it and would issue the opinion and order later that day. (*Id*.). As for Padilla's continuance request, the court informed it was "adamant not to continue this case because it's a 2015 case." (AA33). It understood there was a "need to ensure the fairness of the process" towards Padilla and counsel was "afforded every opportunity to review discovery." (*Id*.). But the court expressed its concerned that the longer it took "to try this case the more convoluted the issues [we]re going to become, and the memory fade[d] … on part of the witnesses." (*Id*.).

Indeed, the court noted that counsel was appointed "back in 2018." (AA34). It also noted that there were "621 entries in this CM/ECF" which the court reviewed. (*Id*.). It found that "[t]he amount of motions, discovery motions, that ha[d] been filed in this case, the amount of rulings, the very

32

acrimonious litigation suggest[ed] that [Padilla's counsel had] been on top of this case since 2018." (*Id*.).

The court was, however, concerned with the toll record issue. (AA34). The court was aware that there were numerous orders related toll records dating back to 2019 and early 2020. (*Id*.). But it understood that the recent disclosed toll records involved the cell phone locations for two phone numbers in which the phone numbers were not identified in the prior orders. (AA34-35).

The government corrected the court's misunderstanding. It advised that the toll records involved only "one number" which related to 930-7165 and Luis Oquendo which was submitted by AT&T via fax to the Puerto Rico Police Bureau on October 26, 2010, based on a subpoena. (AA35-36, 39). The government provided the records to Padilla's counsel even though they did not fall under Rule 16 or *Brady*/*Giglio*/*Jencks* material. (AA38). The government then showed the original that was also missing page 6 and explained that it had no answer for this missing page. (AA35). The government also had no information for phone involving 645-8410 which was cited in the AT&T fax. (*Id*.). Nor did it have the cell phone locations of the phones belonging to Padilla and other co-defendants as reflected in

Docket Entry No. 434 because they had Open Mobile which "d[id] not have cell site locations." (AA37, 39, 40). And Padilla's phone was not tracked. (AA38, 40). So, it argued that Padilla was incorrect, especially in requesting a continuance due to these toll records. (AA38, 40).

Moreover, the government argued that the robbery was done at approximately 3:00 am on October 26th. (AA40). It had always represented that Padilla was "not at the crime scene" but "was the mastermind," so "he was not there" and thus, there was no "alibi" issue. (*Id*.). Nor was there a need for continuance for Padilla to retain an expert to see where he was located because the there were no calls between Padilla and Oquendo "either six, seven hours before the robbery or 14 hours after the robbery." (AA41-43). And the Open Mobile tolls would be used to the show the certain times on certain dates that the calls were made. (AA43).

In response, Padilla's counsel argued the recent toll record documentation was incomplete and that he was entitled to a complete package, incorrectly claiming the page 6 dealt with the time-period of the robbery. (DE612-1; AA43-44). And although the government was not using these toll records to establish location, counsel asserted the location was important to establish Padilla's location. (AA45). But the government

34

countered that it would establish only Oquendo's and not Padilla's cell tower location. (*Id*.). Padilla's counsel dismissed this contention stating Padilla's number was on the toll record and would not accept the government's explanation because counsel was not an expert so he "didn't know if it was helpful or prejudicial." (AA45-46).

Citing to prior orders, the court noted that the "issue of cell phone location dates back to 2020-2019" and counsel never requested an expert to use these the toll records of the three Open Mobile phones for purposes of location after the government notified "there were cell phone location data as to these three phones." (AA46). The court found that based on Padilla's two prior motions, the prior assigned judge granted his request for two of the three phones and ordered AT&T and Open Mobile to produce the cell phone location data for the two phones. (AA46-47). Padilla's counsel agreed. (AA46). He mentioned "too many years ha[d] passed." And although the requested orders were issued in 2020, he "never got the location data for those phones." (*Id*.).

Counsel attempted to deflect this concern claiming the government had "different ones" kept them "hidden," and now presented them on the "eve of trial." (AA47). And he complained that the government produced an

incomplete document reflecting Oquendo only spoke to Padilla hours before the robbery. (*Id*.). Counsel demanded the production of page 6. (*Id*.).

The court questioned how page 6 could be obtained. (AA47). And the government responded that Padilla's counsel was "completely changing the facts." (AA47-48). Relying on the document, it reiterated that the document contained the calls until 12 hours after the robbery and was faxed at 7:29 pm on October 26th, so AT&T could not have "produce[d] calls after that time." (AA48). And in relation to calls and communications between Padilla and others, counsel had been provided "his client's toll records from Open Mobile," giving him "that information." (*Id*.).

Padilla's counsel again raised that the record ended "at 4:12 p.m. of the 26th" which the government responded was over 12 hours after the robbery. (AA49). He again addressed the issue of it being "an old case," claiming "the last two weeks this [resulted in] a whole new case." (AA50). Counsel claimed he was not prepared for trial raising the addition of Samuel Figueroa and the six-page ROI which he "reviewed" with Padilla. (AA50-51, 53). He asserted that he needed time to conduct an investigation concerning Figueroa, locate witnesses, and "needed to conduct discovery concerning the information [Padilla] provided." (AA50). And under Rule 613, counsel

36

asserted that he could use the ROI to impeach Figueroa which the court disagreed because it was not signed by the witness. (*Id*.).

When the court questioned what counsel intended to do if the case was continued, counsel advised that he would send out the investigator "to locate at least three witnesses and locate many other witnesses that can prove that [Figueroa] . . . lies, steals which affect[ed] his credibility." (AA52). He generally claimed that he "ha[d] a lot of areas that [he] c[ould] investigate . . . that would affect his credibility." (*Id*.). Counsel then reiterated the case involved "credibility." (*Id*.). He advised that he had to subpoena 28 witnesses, but he had no time to prepare certification letters because he allegedly had so much discovery plus motions. (AA53). He informed that he had been "very diligent" in the case. (*Id*.).

The court agreed noting as proof the "motion practice." (AA53). The court also noted that the case had been set for "trial back in 2020," and there was a first motion to continue in March 2020. (AA53-54). It found counsel had been preparing for trial for years and the only new thing was the announcement of Figueroa. (AA54).

Counsel responded that there was also the superseding indictment. (AA 54). He argued that this affected his trial strategy because he had banked

on the prior defective Count 2 being dismissed. (AA54). And he asserted "this [wa]s trial by ambush" because he was "being overloaded with new discovery." (AA54-55). Counsel further claimed that the government had "filed all kinds of motions" which required "research to object to their motions." (AA55). But the court found that counsel was the "one filing the motions" because he was "the movant in almost all of the motions." (*Id*.). Counsel did not dispute this and merely responded that he "had to file to positions [the government] filed too." (*Id*.). And he alleged that he was not ready because it was an old case. (*Id*.). He asserted that there were "multiple discovery packages" and needed time because he had not opened them maybe in two years and needed to review the evidence and prepare the witnesses. (AA56).

The court found that a review of the docket showed counsel to be "on top of the case." (AA56). It held that "the docket show[ed] that [counsel] ha[d] a very good handle of the facts of the case, that [he] filed every possible motion, every possible discovery motion" and "the amount of ex parte motions" resulting in a full record. (AA56-57). The court also found the superseding indictment did "not change the facts" of the case. (AA57). And regarding Figueroa, the court believed counsel was on a "fishing

expedition," because he wanted to send out an investigator "to find dirt on him and discredit him." (*Id*.). Counsel butted in arguing "the dirt exist[ed]" but he was incapable to do "that in a week" and expressed that "in the last two weeks this [wa]s a new case. (*Id*.). The court disagreed. (*Id*.).

After counsel was reprimanded by the court for being disrespectful to it, the government explained that Figueroa was no stranger to Padilla and his counsel because Padilla and Figueroa were convicted together for a prior federal bank robbery. (AA8). It explained again about the attempt to have Figueroa cooperate in the current case in 2017, but he was hesitant and agreed five or six days before trial so there was little discovery to provide. (AA59-60, 62-63).

Although Padilla knew Figueroa, Padilla's counsel argued this did not mean that he knew Figueroa was a cooperating witness and only learned of him when the government provided Figueroa's *Jencks* material. (AA40-41). In response, the court found it proper because the *Jencks* Act required the material be provided after the witness testified. (AA64). If that had occurred, counsel stated he would have requested a continuance which the court indicated that it "would have given a few hours to prepare for cross." (*Id*.).

Counsel then reasserted that as to Figueroa, he "need[ed] more time to prepare" and "request[ed] time." (*Id*.).

The government opposed arguing the entry of a new cooperator did not require a continuance because Figueroa brought "more of the same" information as the other cooperator, whose *Jencks* material was disclosed in 2019. (AA65). It argued that Figueroa's information was similar but related to "what elapsed after the robbery" and corroborated the other cooperator's statements. (AA65-66). And if the court was considering a continuance due to the AT&T records, the government would "forego[] the introduction of that" at trial. (AA66). But it realleged the missing page did not contain impeachment. (*Id*.). Indeed, it argued that just because it produced documents that were not going to be used at trial, this did "not entail" Padilla a right to now investigate them. (*Id*.). As a final comment, the government also noted that from Padilla's motion, he knew Figueroa better than the government, especially regarding evictions from houses, dismissals from employment, and Padilla's assault of Figueroa. (AA66-67). And if Figueroa came in and admitted to the facts, this would come as part of his cross-examination. (AA67).

40

In response, counsel argued that he had a right to investigate the version of testimony provide by Figueroa and how he knew Padilla. (AA67). Counsel asserted that he was not conducting a fishing expedition because there were "numerous witnesses to provide important impeachment information as to version and what he informed the government." (AA67-68). If Figueroa did not admit to the impeachment information, counsel claimed he was "not in a position to rebut him." (AA68). But the court advised that counsel could move "for rebuttal witnesses" which counsel advised that he would "have to find them." (*Id*.). Counsel then reiterated that this was "a new case" because his "old trial strategy was ruined" with the superseding indictment and "essentially new witness." (*Id*.).

The court found that "it [wa]s not a new case." (AA68). It held that "[t]his [wa]s a 2015 case" which Padilla's counsel represented "since 2018." (*Id*.). The court determined that "the superseding indictment contain[ed] the same underlying conduct and the allegations [we]re identical" where "the statutory scheme m[ight] have changed but the allegations [we]re identical." (*Id*.). Moreover, in relation to the toll records and Padilla's supplemental continuance request, the court held that although counsel alleged the document contained cell phone locations, the government did not proffer

41

this document for the locations but to establish the contact between the individuals. (AA68-69). And as to the missing page, the government could not produce what it did not have, and in any event, the document "provide[d] the timeframe for the whole time in which this alleged criminal conduct occurred." (AA69). Finally, regarding Figueroa, the court determined counsel could have learned about him after he testified. (*Id*.). And, the court was very concerned that a continuance "would be putting people at risk" which the court was "not going to do that." (*Id*.); *see Padilla-Galarza*, 990 F.3d at 76-79 (affirming the district court's issuance of a protective order regarding the witnesses).

The court and the parties then addressed some administerial matters, including the process of the government to provide its potential witnesses' names to counsel on the afternoon or night before the next day of trial. (AA70-72).

On that same day, the court issued an order denying Padilla's reconsideration motion to compel discovery. (DE623). The court also rendered an Opinion and Order denying Padilla's motion to dismiss the superseding indictment. (DE625; AA2251-61).

42

## F. The Trial

On April 21, 2022, Padilla proceeded to trial. (DE 86). Prior to the government's opening argument, Padilla's counsel "reiterated [his] position" from the prior day that he "should be given additional time" which the court acknowledged. (AA81). But the court noted that counsel had been granted two prior continuances in November 2021 and January 2022. (AA755). At trial, the government then presented 11 witnesses and 62 exhibits in its case-in-chief. (DE639, 640, 641, 642).

During trial, Padilla's counsel admitted that Padilla "kn[e]w this case very well" and constantly conferred with him during trial. (AA321, 440, 452, 601, 605, 725, 879, 883, 1166-67, 1233, 1280, 1372, 1400, 1429, 1467-68). Counsel also admitted that he had prepared "several notebooks of questions to ask" of the government witnesses. (AA311, 601). In addition, he was provided additional time to review his notes and make sure he "ask[ed] the questions that [he] fe[lt] that [we]re important." (AA312, 601). Moreover, the court accommodated counsel because trial would start at approximately 9:30 am, lunch breaks were about 1 ½ to 2 hours, and trial day would end early. (DE631, 639, 640, 641, 642, 6763, 674, 675, 676, 677; AA611-12, 993). And although Padilla's counsel claimed he was not ready to cross-examine

43

government cooperating witness Figueroa, the government had announced Figueroa and provided *Jencks* materials and discovery pertaining to him at least five days before trial. (AA747-52). The court was also flexible and "moved the case to start on Thursday instead of Monday" in which two days later, counsel had then "a weekend." (AA748, 752). Besides, the case took longer so by the time Figueroa testified on behalf of the government, counsel already had 11 days. (AA748-49, 752, 756, 758). Figueroa was well known by Padilla. (AA749). The court advised that it would provide more time to identify and find the witnesses to impeach Figueroa, but it did not warrant stoppage of the trial. (AA757).

After the government rested its case-in-chief, the court denied Padilla's Rule 29 request for judgment of acquittal. (DE642; AA871-908). Padilla needed additional time so the court "granted Thursday and Friday together with Saturday and Sunday" and moved another trial. (AA1190). So, the bench trial was continued to May 2nd. (DE642). In his defense, Padilla presented 11 witnesses and various exhibits. (DE673, 674, 675, 676, 677). The court continued giving Padilla breaks and even recessed when he had presented only one witness. (AA1191-92). After Padilla rested, the court denied Padilla's renewed Rule 29 motion for judgment of acquittal. (DE677).

And after hearing the parties' closing arguments, the court reached a verdict finding Padilla guilty of Counts One, Two, Three, Five, and Six but not guilty as to Count Four (dealing in firearms). (*Id.*).

In November 2022, Padilla was sentenced to 240 months as to Counts One and Six and 120 months as to Counts Three and Five, to be served concurrently with each other, as well as 60 months as to Count Two, to be served consecutively to the other counts, for a total of 300-months imprisonment. (DE732, 733). The court denied Padilla request for the sentence to be served concurrent to the sentences imposed in Criminal Case Nos. 15-78 and 15-079. (DE732); *see Padilla-Galarza*, 990 F.3d at 86, 90-92.

This appeal ensued.

## SUMMARY OF THE ARGUMENT

The district court properly ruled the Superseding Indictment was not barred by the statute of limitations. The Superseding Indictment did not impermissibly broaden the charges and, therefore, related back to the date of filing the original Indictment. The original Indictment tolled the statute of limitations because it gave Padilla notice of the charges against him within five years of the end of the offense.

The court also did not abuse its discretion in denying Padilla's requests for continuance of the trial. Even if it had erred, Padilla cannot show that his defense was substantially prejudiced.

Padilla waived the contention that the district court abused its discretion in failing to provide additional funding for expert and investigative services under 18 U.S.C. § 3006A(e)(1) without an ex parte hearing. And even if not waived, the district court did not plainly err or otherwise abuse its discretion in denying Padilla's general requests for additional funds for an investigator or expert. Padilla has failed to demonstrate that further investigation or an expert was "necessary for adequate representation." He has further failed to demonstrate that he was prejudiced by the district court's denial of his § 3006A(e)(1) motion because

the denials were without prejudice which allowing him the opportunity to submit requests with more specificity. And an ex parte hearing was not warranted.

Padilla's challenges to discrete credibility and fact determinations cannot pass muster because failed to request the district court provide its findings, thereby waiving them. He also waives his claims by failing to develop arguments as to how the district court's alleged credibility and fact determination errors impact the sufficiency of his conviction. In any event, his challenges to the district court's determinations do not stand up to the clear error standard and are without merit or basis in the record.

Padilla waived his claims that the district court did not allow him to present extrinsic evidence of prior inconsistent statements because he does not cite to the record to show when the district court rejected admission of those statements. In any event, his arguments are without merit. Finally, the district court did not abuse its discretion in excluding polygraph evidence because such evidence was unreliable, and the court further specified that it, sitting as factfinder, would not place any weight on polygraph evidence. Accordingly, Padilla's conviction and judgment should be affirmed.

<div align="center">ARGUMENT</div>

**I.    Padilla has waived the dismissal claim for failure to address the district court's reasoning. And even if not waived, the district court did not err in finding Counts Two and Six of the superseding indictment were not barred by the statute of limitations because they related back to the date of filing the original indictment.**

## The Issue

Padilla argues that Counts Two and Six of the Superseding Indictment should have been dismissed based upon an alleged violation of the statute of limitations. (AB118, 122).

## Standard of Review

The Court reviews *de novo* a district court's decision not to dismiss on statute of limitations grounds. *United States v. Fernandez*, 722 F.3d 1, 27-28 (1st Cir. 2013); *United States v. Muñoz-Franco*, 487 F.3d 25, 52 (1st Cir. 2007). But if a defendant raises new claims in support, the claims are either waived or abandoned, *see United States v. Holmquist*, 36 F.3d 154, 162 (1st Cir. 1994), or alternatively reviewed for plain error, s*ee United States v. Takesian*, 945 F.3d 553, 562-63 (1st Cir. 2019). "Review for plain error entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired

<div align="center">48</div>

the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001). Plain error review "is not defendant-friendly." *Takesian*, 945 F.3d at 562 (internal quotations omitted).

**Discussion**

Padilla dismissal claim falters. First, the claim is waived because Padilla fails to address the court's rationale for denial. Even if not waived, Padilla cannot claim surprise and prejudice to his defense because the superseding indictment involved the same underlying conduct and the allegations in which the statutory scheme, in part, might have changed but the allegations were identical.

In *United States v. Turner*, 501 F.3d 59 (1st Cir. 2007), the Court "concluded that [18 U.S.C. § 1951] conspiracy under the Hobbs Act constitute[d] a 'crime of violence' for purposes of 18 U.S.C. § 924(c)." *Id*. at 68. In mid-October 2015, Padilla was charged in a five-count indictment which included a conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One), and aiding and abetting in the brandishing and possession of firearms and ammunition in furtherance of a crime of violence as charged in Count One of the Indictment, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Two). (AA1-12). After *United States v. Davis*, 588 U.S.

445 (2019), the Court accepted the government concessions that conspiring to commit a Hobbs Act robbery no longer counted as a crime of violence.[4] *See United States v. Serrano-Delgado*, 29 F.4th 16, 27-28 (1st Cir. 2022); *United States v. Lara*, 970 F.3d 68, 74 (1st Cir. 2020). But a § 1951 Hobbs Act robbery continued to qualify as a crime of violence under the force clause of § 924(c). *See Serrano-Delgado*, 29 F.4th at 27 (citing *United States v. Garcia-Ortiz*, 904 F.3d 102, 106 (1st Cir. 2018)). Padilla's counsel had hoped that the government would not catch the change in law because he had "banked" on requesting the dismissal of the § 924(c) firearms offense at trial. (AA54; *see id*. at 68, 2231). But on April 7, 2022, the Grand Jury returned a six-count superseding indictment charging Padilla with, in relevant part, aiding and abetting in the carrying and use of firearms during and in relation to a crime of violence as charged in Count Six of the Indictment, in violation of 18

---

4.    In *Davis*, the Supreme Court struck down the § 924(c) "residual clause" as unconstitutionally vague. 588 U.S. at 470. The residual clause had "denominated as a 'crime of violence' a felony 'that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'" *Lara*, 970 F.3d at 74 (citing 18 U.S.C. § 924(c)(3)).

U.S.C. §§ 924(c) and 2 (Count Two) and aiding and abetting in substantive Hobbs Act robbery, in violation of 18 U.S.C. § 1951. (Count Six). (AA13-23).

The Supreme Court has explained that the statutes of limitation are "mechanisms to guard against possible … prejudice resulting from the passage of time between crime and arrest or charge." *United Staes v. Marion*, 404 U.S. 307, 322 (1971). According to 18 U.S.C. § 3282(a), "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." Padilla rightly alleges that under § 3282(a), a five-year limitations period applies to the offenses charged in Counts Two and Six of the Superseding Indictment. (AB120-21); *see* 18 U.S.C. §§ 924(c) and 1951; *United States v. Praddy*, 725 F.3d 147, 156 (2d Cir. 2013) (stating that the "statute of limitations on a § 924(c) offense is five years"); *United States v. Bucci*, 839 F.2d 825, 829 (1st Cir. 1988) (stating that "the statute of limitations for a [§ 1951] Hobbs Act violation is five years"). And Padilla does not dispute that the original indictment was timely.

Padilla instead argues that the substantive § 1951 Hobbs Act robbery (Count Six) added in the Superseding Indictment and then the inclusion of

this Count Six as the crime of violence in the § 924(c) firearms offense (Count

Two) constituted a broadening or substantial amendment of the original

indictment which prevented the tolling of the statute of limitations for those

two counts. (AA121-22). In support, he contends that both counts should

have been found time-barred because the superseding indictment was filed

"over 11 years after the robbery," which "exceeded the 5-year statute of

limitations period." (AB121). He asserts that both offenses were known to

the government when the original indictment was filed, and it could have

charged the two offenses before the statute of limitations expired.[5] (AA120-

---

5.      The government has broad discretion in how to charge a defendant.
*United States v. Armstrong*, 517 U.S. 456, 464 (1996). A prosecutor may also
seek a superseding indictment at any time prior to a trial on the merits, so
long as not for harassment of the defendant or done for vindictive purposes.
*United States v. Barner*, 441 F.3d 1310, 1315-16 (11th Cir. 2006); *United States
v. Chagra*, 669 F.2d 241, 247-48 (5th Cir. 1982); *see United States v. Stokes*, 124
F.3d 39, 46 (1st Cir. 1997) (concluding that, where prosecutorial
vindictiveness had not been shown, trial court's "disagreement with the
government's decision to prosecute" constituted an "inappropriate" basis to
dismiss indictment). "No prejudice in fact is an incident of such proceeding."
*United States v. Herbst*, 565 F.2d 638, 643 (10th Cir. 1977). And "where the
government, purpose for its charging decision can be traced to a legitimate,
nonvindictive rational," it may add "new charges*.*" *Chagra*, 669 F.2d at 248 .
Here, the government's decision was not motivated by vindictiveness nor to
harass Padilla but instead was the product of a legitimate desire to correctly
charge Padilla after the change in law after *Davis*. And addressed below, he
cannot show prejudice because he was on notice of the charges from the

123). Thus, he contends as a matter of law, the court erred in denying his dismissal. (AB120-21, 123; AA2229, 2230-31).

But Padilla presents no authority or binding precedent of such a discovery-type rule in a case like this to support the dismissal of the two counts under the statute of limitations. (AA 120-22); *see, e.g.*, *United States v. Perry*, 757 F.3d 166, 173-74 (4th Cir. 2014) (finding the defendant "pointed to no binding precedent applying such a discovery rule in a case like this, nor ha[d] [the Court] found any" in relation to the statute of limitations defense of whether the government knew of or could have discovered the continued fraud offense). Padilla's perfunctory argument is therefore waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

Even if not deemed waived, precedent contradicts Padilla's contention. In relation to a statute of limitation defense, the case law makes

---

original indictment. So, the superseding indictment involved in the instant case was not improper or subject to dismissal as vindicative. Padilla's allegation of error fall short of establishing prejudice from the return of the superseding indictment. *See United States v. Chenaur*, 552 F.2d 294, 302 (9th Cir. 1977) (finding no due process violation with the superseding indictment's returned four days prior to trial which included a new count because the Court failed to see how the defendant could be "'surprised' when the identical statement served as the basis for" another count).

it abundantly clear, and Padilla even cites to it, that the filing of a timely indictment tolls the statute of limitations for purposes of a superseding or new indictment if the subsequent "neither materially broadens nor substantially amends the charges against the defendant." *See United States v. O'Bryant*, 998 F.2d 21, 23 (1st Cir. 1993); *see also United States v. Davis*, 953 F.2d 1482, 1491 (10th Cir. 1992) (collection of cases)*; United States v. Italiano*, 894 F.2d 1280, 1282 (11th Cir. 1990). "That is, such an indictment relates back to the date of the original indictment 'so long as a strong chain of continuity links the earlier and later charges.'" *United States v. Ojedokun*, 16 F.4th 1091, 1109 (4th Cir. 2021) (quoting *O'Bryant*, 998 F.2d at 24). The central policy purpose underlying statute of limitations is to provide fair notice to a defendant. *See O'Bryant*, 998 F.2d at 24; *Italiano*, 894 F.2d 1283. As for "'the notice-related concerns[,'] . . . . a timely indictment serves notice on named defendants by apprising them 'that they will be called to account for their activities and should prepare a defense.'" *O'Bryant*, 998 F.2d at 24 (quoting *United States v, Grady*, 544 F.2d 598, 601 (2d Cir. 1976)); *see United States v. Smith*, 197 F.3d 225, 229 (6th Cir. 1999) (holding that "notice" to the defendants so they can "adequately prepare their defense is the

"touchstone" in determining whether a superseding indictment broadened the original).

"For purposes of the statute of limitations, the 'charges' in the superseding indictment are defined not simply by the statute under which the defendant is indicted but also the factual allegations that the government relies on to show a violation of the statute." *Italiano*, 894 F.2d at 1282. Neither identical charges nor identical means of establishing liability dictate whether the superseding indictment substantially amended or broadened a prior indictment; it is notice. *See United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 778-79 (9th Cir. 1986); *United States v. Charney*, 537 F.2d 341, 354 (9th Cir. 1976).

But "[i]f the allegations and charges are substantially the same in the old and new indictment, the assumption is that the defendant has been placed on notice of the charges against him." *Italiano*, 894 F.2d at 1283; *see United States v. McMillan*, 600 F.3d 434, 444 (5th Cir. 2010); *Davis*, 953 F.2d at 1941. "That is, he knows that he will be called to account for certain activities and should prepare a defense." *Italiano*, 894 F.2d at 1283 (citing *United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976)). It may even add new counts and

statutory violations, as long as the original indictment gave the defendant notice of the charges. *Davis*, 953 F.2d at 1491.

So, the essential question is whether the two indictments are similar enough that the original indictment gave the defendant sufficient notice of the charges in the superseding indictment. *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990); *see Italiano*, 894 F.2d at 1285 ("[T]he crucial inquiry is whether approximately the same facts were used as the basis of both indictments.").

In determining whether the charges and underlying facts in the two indictments returned against Padilla were sufficiently similar to provide him with notice, the district court, like the Court should do here, examined the language of the indictments. *See Italiano*, 894 F.2d at 1283; *Sears, Roebuck & Co.*, 785 F.2d at 779; *Grady*, 544 F.2d at 602. "An indictment must be read in its entirety and construed in accord with common sense and practicality." *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015). (internal quotations omitted).

### A. Padilla has waived his claim for failure to address the district court's ruling.

As a preliminary matter, Padilla fails to address on appeal the district court's examination of the original and superseding indictments and rationale for denying his dismissal motion and has therefore waived the challenge to the court's order. *See United States v. Sacko*, 247 F.3d 21, 24 (1st Cir. 2001) (finding waiver of the claim results because the appellant failed to challenge the district court's conclusions in the initial brief even though the Court's review is de novo); *see also United States v. Kantengwa*, 781 F.3d 545, 560 n.19 (1st Cir. 2015) (appellate argument that fails to address the district court's reasoning deemed waived); *see United States v. Henry*, 848 F.3d 1, 7 (1st Cir. 2017) (stating that defendant waived argument by not raising it in opening brief and, therefore, could not raise it for the first time in his reply brief); *see also In re Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1112 & n.5 (10th Cir. 2017) (applying this waiver rule where appellant failed to address district court's reasoning in its opening brief and instead addressed it for the first time in its reply brief). Accordingly, the Court should affirm the district court's order denying Padilla's dismissal of Counts Two and Six of the Superseding Indictment.

## B.    Even if not waived, the district court did not err in the dismissal.

Even if not deemed waived, the district court did not err in denying Padilla's request for dismiss of these two counts. (AA2251-61). The district court applied the relevant legal standard controlling the relation-back inquiry. It properly determined that "[t]he key question [wa]s whether the original indictment gave Padilla[] notice that he would have to account for the conduct charged in the superseding indictment." (AA2254).

"An indictment is not amended impermissibly by a superseding indictment which . . . contains a slightly different mix of closely related statutory violations as objects . . . provided the essential nature . . . alleged in the indictment remains the same." *Davis*, 953 F.2d at 1491.  Indeed, like here, "a practical reading of the counts in question, . . . 'essentially the same facts were used to charge almost identical offenses.'" *Davis*, 953 F.2d at 1491 (quoting *Charney*, 537 F.2d at 355). As addressed in detail below, the district court properly held, the § 1951 Hobbs Act robbery conspiracy charge remained the same, and the addition of the substantive § 1951 Hobbs Act charge (which contained the same description as the conspiracy and statute) was not materially different.  *See, e.g.*, *Davis*, 953 F.2d at 1491. Nor did the

change from Hobbs Act robbery conspiracy to substantive Hobbs Act robbery materially broaden or substantially amend the § 924(c) offense. The original indictment gave Padilla ample notice of the charges the superseding indictment contained and did not broaden or substantially amended those charges. (AA2251-61).

Here, the district court correctly "disagreed" that "adding one count of aiding and abetting interference with commerce by robbery (count six of the superseding indictment) substantially amended the original indictment, which charged [Padilla] with conspiring to interfere with commerce by robbery." (AA2254-55). As the district court found, "[al]though the original [indictment] d[id] not charge [Padilla] with the underlying substantive [§ 1951 Hobbs Act robbery] offense, it d[id] allege that the substantive offense occurred and that he committed it."[6] (AA2255). In "[c]omparing the

---

6.    In relation to the § 924(c) firearms offense charged in Count Two, the superseding indictment merely changed the predicate from the conspiracy charged in Count One to the substantive offense now at Count Six. Padilla argues for the first time that "[t]o equate the original conspiracy with aiding and abetting criminal conduct is incorrect as a matter of law and should be treated differently as it pertains to the application of statute of limitations periods." (AB 121). But Padilla fails to recognize or address the components of plain error review which amounts to a waiver. (*Id.*); *see United States v. Rodríguez-Torres*, 939 F.3d 16, 40 (1st Cir. 2019) (holding that because the

language in [C]ount [O]ne of the original indictment and [C]ount [S]ix of the superseding," the court found that "while the charge itself differ[ed], the allegations and underlying conduct d[id] not." (*Id*.). The comparison of the original and superseding indictment supports the court's determination.

Count One of the original Indictment charged Padilla and co-defendants with "conspiring to interfere with commerce by threats and violence, in violation of 18 U.S.C. § 1951." (AA2255; *see* AA2). This count specifically advised Padilla that "[b]eginning on a date unknown, but not later than in or about October, 2010 and up to January, 2011," Padilla and others conspired to "knowingly and unlawfully obstruct, delay and affect

---

defendant made no effort to satisfy the four prongs of the plain-error standard, he waived the argument). In any event, Padilla's claim is further waived because he fails to cite any authority for such a treatment with respect to the statute of limitations, and thus, his perfunctory argument should be deemed waived. *See Zannino*, 895 F.2d at 17. Nor can he develop his contention in a reply brief. *See Henry*, 848 F.3d at 7. And even if not waived, in relation to the relation-back inquiry, Padilla "gives short shrift to the broader due process and notice concerns while focusing on the 'elements'" *Ojedokun*, 16 F.4th at 1110. As addressed above, the standard is whether the two indictments are similar enough that the original indictment gave Padilla sufficient notice of the charges in the superseding indictment which, in return, he fails to contest on appeal the district court's determination of notice. In any event, the facts/conduct remained the same for both indictments providing notice.

commerce as that term is defined in Title 18, <u>United States Code</u>, Section 1951(b)(3), and the movements articles and commodities in such commerce, by robbery as that term is defined in Title 18, <u>United States Code</u>, Section 1951(b)(1)." (AA5, 2255). It then provided as supporting facts that "the defendants, did unlawfully take one hundred and twenty-five (125) firearms from the POPR Shooting Range at Isla de Cabra[s] . . . in the presence of the duty police officers, against their will buy means of actual and threatened force, violence, and fear of injury, immediate and future to their person, that is assaulting and threatening the employees with firearms in order to commit the robbery." (AA2-6, 2255-56). And Count One also stated that "[t]he object . . . was to commit a robbery at the POPR Shooting Range where the co-conspirators would subdue the duty officers and then steal the POPR's firearms stored in the vault to subsequently illegally sell then for significant pecuniary gain and profit." (AA2256). So, as the district court correctly determined, "the original, though it charged only conspiracy, alleged the defendants—including Padilla[]—committed the underlying substantive offenses." (AA2256); *see United States v. Escobar-de Jesús*, 187 F.3d 148, 175 (1st Cir. 1999) (holding that "[t]o prove the elements of a conspiracy, the government must show beyond a reasonable doubt that the 'defendant

and one or more coconspirators intended to agree and ... to commit the substantive criminal offense which was the object of their unlawful agreement.'"); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...."); *United States v. Marino*, 277 F.3d 11, 29 (1st Cir. 2002) ("Aiding and abetting liability is inherent in every federal substantive crime," including conspiracy.).

Meanwhile, in comparison, Count Six of the Superseding Indictment charged Padilla and others with "interfering with commerce robbery, also in violation of 18 U.S.C. § 1951." (AA2256; *see* A21). The count then narrowed the date to "on or about October 26 2010," and stated that Padilla, "aiding and abetting other persons,. . . did knowingly, intentionally, and unlawfully obstruct, delay and affect commerce as that term is defined in Title 18, United States Code, Section 1951(b), and the movements articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951(b)(1)." (AA21, 2256). And like Count One of the original Indictment, Count Six asserted the same supporting facts that "the defendant, did unlawfully take one hundred and twenty-five (125) firearms from the POPR Shooting Range at Isla de Cabra[s] . . .  in the

62

presence of the duty police officers, against their will by means of actual and threatened force, violence, and fear of injury, immediate and future to their person, that is assaulting and threatening the employees with firearms in order to commit the robbery." (AA21-22, 2256).

"This side-by-side comparison [of the initial and superseding indictments] show[ed] that, while the [substantive Hobbs Act robbery] charge [wa]s new, the underlying allegations and conduct [we]re not." (AA2256). As reflected, "the same facts form[ed] the basis of the Hobbs Act [robbery] conspiracy and Hobbs Act robbery charges, both charges allege[d] the same statute, the government did not disclose any new evidence after the grand jury returned the superseding indictment, and the government ... rel[ied] on the same evidence to prove both charges." (AA1-23, 2256-57); *see United States v. Gengo*, 808 F.2d 1, 3-4 (2d Cir. 1986) (a superseding indictment relates back, and avoids bar of statute of limitations, where it does not charge new theories of culpability that requires the preparation of new evidence or defenses on the defendant's part); *see also United States v. Martin*, 920 F.2d 345, 349 (6th Cir. 1990) (the facts of the conspiracy and the substantive drug charge were "inextricably linked"). "Thus, the original indictment informed Padilla[] 'that he would have to account for essentially the same conduct

which he was ultimately charged in the superseding indictment.'" (AA2256-57 (quoting *O'Bryant*, 998 F.3d at 24)). So "[u]nder these circumstances," the district court properly held that "adding the underlying substantive [Hobbs Act robbery] offense did not materially broaden nor substantially amend[ed] the charges." (AA2257); *see Gengo*, 808 F.2d at 3 (finding that the addition of a new charge in a second indictment was proper when the charge did not fall outside the circumstances presented in the original indictment); *see also United States v. Jesenik*, Case No. 3:20-cr-228-SI, 2022 WL 11815826, at *16-18 (D. Or., Oct. 20. 2022) (finding the statute of limitations was tolled because the three new counts related back to the conspiracy count of the original indictment); *United States v. Babichenko*, Case No. 1:18-cr-00258-BLW, 2020 WL 4462066, at *4 (D. Id., Aug. 3. 2020) (finding the statute of limitations was tolled because the four new money laundering counts related back to the money conspiracy count of the original indictment); *United States v. Kuper*, Crim. No. 05-167-3, 2009 WL 1119490, at *3-4 (E.D. Pa., April 27, 2009) (finding the statute of limitations was tolled because the original indictment fairly put the defendant on notice of the 11 new mail fraud counts in the superseding indictment).

Moreover, as the district court properly held, "[b]ecause adding the [substantive] Hobbs Act robbery charge did not materially broaden of substantially amend the original indictment, it follow[ed] that neither did replacing Hobbs Act [robbery] conspiracy with Hobbs Act robbery as the § 924(c) predicate" in Count Two of the Superseding Indictment.[7] (AA2258). As explained above, "the underlying facts, conduct, and evidence [we]re identical for both offenses, so swapping them a § 924(c) predicate d[id] not trigger any notice concerns." (AA2258); *see Italiano*, 894 F.2d at 1285-86 (no broadening of charges even though the object of the mail fraud scheme changed); *United States v. Davis*, 714 F. Supp.  853, 856, 865 (S.D. Ohio 1988) (same). Nor can Padilla contend that he lacked notice because he knew from the facts from original indictment that he could be charged with Counts Two

---

7. Padilla contends that as to Count Two of the original Indictment, he was charged with possession of a firearm in furtherance of a crime of violence. (AB119). But Padilla was charged with aiding and abetting in the brandishing and possession of firearms and ammunition in furtherance of a crime of violence. (AA 8). And in Count Two of the Superseding Indictment, he was charged with aiding and abetting in carrying and use of firearms during and in relation to a crime of violence. (AA 19). This change narrowed the charged conduct and reduced Padilla's mandatory minimum to "a five-year mandatory minimum as opposed to a seven-year one." (AA2259 (citing 18 U.S.C. § 924(c)(1)(A)). Padilla's sentence on Count Six was identical and concurrent to Count One. (DE773).

and Six in the superseding indictment. He admitted to the district court that after the *Davis* decision, he had "banked" on requesting the dismissal of the § 924(c) firearms offense at trial if the government had not superseded. (AA54; *see* AA68, 2231).

Padilla relies on *United States v. Ben Zvi*, 168 F.3d 49, 55 (2d Cir. 1999). In *Ben Zvi*, the Second Circuit generally stated that "[s]uperseding indictments have been deemed timely when they simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous." 168 F.3d at 55. In *United States v. Salmonese*, 352 F.3d 608 (2d Cir.2003), the Second Circuit, however, clarified that in determining if a superseding indictment or indictment brought post-dismissal "materially broadens or amends the original charges," it is appropriate to consider whether the additional pleadings "allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." 352 F.3d at 622 (citing *Ben Zvi*, 168 F.3d 55). But "[n]o single factor is determinative; rather, the 'touchstone' of the analysis" is "whether the original indictment provided notice of the charges such that the defendant can adequately prepare his or her defense.

66

*Id.* (quoting *Gengo*, 808 F.2d at 3); *cf. Ben Zvi*, 168 F.3d at 55 (holding that notice must come in indictment). And here, Padilla was provided notice with the original indictment. Besides, *Ben Zvi* is a Second Circuit that is not binding on this Court, and if construed as Padilla intends, would conflict with binding caselaw of this Court.

*Ben Zvi* is also clearly distinguishable. Unlike Padilla's case, the Second Circuit found no relation back because the counts added in the superseding indictment "required the defendants to defend against additional charges that alleged violations of a different statute, contained different elements, relied on different evidence, and exposed the defendants to a potentially much greater sentence." 168 F.3d at 55.

Padilla's reliance on *United States v. Rounsavall*, 905 F. Supp. 662 (D. Neb. 1995), is also misplaced. In *Rounsavall*, the district court primarily relied on the fact that, unlike in Padilla's case, the initial indictment did not put the defendant on notice of the amended charges in the superseding indictment. *Id.* at 669. In any event, the case is not binding precedent. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 n. 10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom

67

sits alone and renders decisions not binding on the others."). Nor does Padilla provide any other cases that indicate the government's awareness of the illegal activity prior to the expiration of the statute of limitation is a factor bearing in a statute of limitation analysis. And even if it was considered a factor, "[n]o single factor is determinative; rather, the 'touchstone' of the analysis" is whether the original indictment provided notice of the charges such that the defendant can adequately prepare his or her defense. *Salmonese*, 352 F.3d at 622; *see McMillan*, 600 F.3d at 444; *United States v. Muñoz–Franco*, 487 F.3d 25, 53 (1st Cir.2007); *United States v. Smith*, 197 F.3d 225, 229 (6th Cir. 1999).

In short, the district court properly found that the original indictment gave Padilla sufficient notice of the acts for which he would be accountable, and the superseding indictment did not impermissibly broaden those charges. The facts and scheme were the same in both indictments and provided Padilla with notice of the conduct which he would have to provide a defense. *See United States v. Sorich*, 523 F.3d  702, 714-15 (7th Cir. 2008) (affirming the district court's denial of dismissal finding no prejudice with the superseding indictment's returned 13 days prior to trial where the government substituted one mailing for another in in the mail fraud count);

*United States v. Grossman*, 843 F.2d 78, 84 (2d Cir. 1988) (finding no prejudice with the superseding indictment's return two days prior to trial because the superseding indictment charges and timeframe did not alter substantially the government's case against the defendant); *U.S. v. Schmick*, 904 F.2d 936, 940-41 (5th Cir. 1990) (second indictment filed outside five-year statute of limitations not prejudicial because initial indictment still pending gave defendant notice of novel allegations in second indictment). Therefore, Counts Two and Six of the Superseding Indictment did not violate the statute of limitations. The district court's Opinion and Order should be affirmed.

II.    **The district court did not abuse its discretion in denying Padilla's 30-day trial continuance request.**

<u>**The Issue**</u>

Padilla argues that the district court abused its discretion in failing to grant his 30-day continuance request. (AB90).

<u>**Standard of Review**</u>

"Trial courts are granted broad discretion in scheduling trials and ruling on motions for continuances." *United States v. Delgado-Marrero*, 744 F.3d 167, 195 (1st Cir. 2014). Accordingly, the "denial of a motion to continue trial is reviewed for abuse of discretion." *Id*.

<u>**Discussion**</u>

The district court properly denied Padilla's continuance because counsel had many years to prepare for trial, and he and Padilla had adequately prepared for trial.

"Now, trial judges are busy people, obviously, operating under extreme pressure to manage exploding dockets fairly and efficiently." *United States v. Maldonado*, 708 F.3d 38, 42 (1st Cir. 2013). "Trial management is peculiarly within the ken of the district court." *United States v. Saccoccia*, 58 F.3d 754, 769 (1st Cir. 1995). "Necessarily, then, [the trial judges] must have

'broad discretion' to control their calendars by granting or denying continuance motions--and because they do, 'only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.'" *Maldonado*, 708 F.3d at 42 (citing *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)).

Yet, there is no mechanical test for deciding when the denial of a continuance is so arbitrary as to warrant reversal. Each case must be evaluated on its own peculiar facts and circumstances. *United States v. Williams*, 630 F.3d 44 (1st Cir. 2010); *see Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *United States v. Rodriguez-Duran*, 507 F.3d 749, 763 (1st Cir. 2007) (holding that in "assessing whether the denial of a request to postpone the start of trial constitutes an abuse of discretion requires a careful review of the facts of the particular case"). "The aggrieved party bears a 'heavy burden' in pressing an appeal." *United States v. Robinson*, 753 F.3d 31, 41 (1st Cir. 2014).

In its review, this Court looks at a variety of factors. *Williams*, 630 F.3d at 48. "A reviewing court must first look at the reasons contemporaneously presented in support of the request for the continuance." *Saccoccia*, 58 F.3d at 770. Other relevant factors include the amount of time necessary for trial

preparation, the amount of time actually available for preparation, the defendant's diligence, the inconvenience to the court and parties, the complexity of the case, likely utility of a continuance, and the unfair prejudice caused to the defendant. *See Williams*, 630 F.3d at 48; *United States v. Soldevila-Lopez*, 17 F.3d 480, 488 (1st Cir. 1994). "The later that a motion for continuance is made, the more likely it is made for dilatory tactics; hence it is less likely that the district court arbitrarily denied the continuance." *United States v. La-Rouch*, 896 F.2d 815, 824 (4th Cir. 1990).

"Thus, [the Court] will find an abuse of discretion only 'if no reasonable person could agree with the judge's ruling.'" *Robinson*, 753 F.3d at 41 (quoting *Maldonado*, 708 F.3d at 42). "Furthermore, the party denied the continuance must show that the judge's decision caused specific, 'substantial prejudice.'" *Id*. (citing *Maldonado*, 708 F.3d at 42). Again, it must be remembered that this Court accords deference to the trial court's decision to deny the motion. *See Soldevila-Lopez*, 17 F.3d at 487.

Although Padilla alleged various grounds to allegedly support a continuance, viewed individually or cumulatively, the district court did not abuse its discretion in not granting Padilla's requests for continuance starting the week before and during trial. Nor did the denial violate Padilla's

due process right. Padilla had adequate time to prepare for trial. As the district court properly noted, Padilla was originally indicted in October 2015. (DE589 at 3). Since March 2017, Padilla informed that he intended to go to trial. (DE66). And since 2018, Padilla's counsel filed hundreds of pretrial motions which reflected his knowledge of the case. (AA52-53, 755, 1591-1623). Moreover, prior continuances were requested and granted, and the trial was continued many times, including November 2021, January 2022, and briefly in April 2022. (AA755). Due to the age of the case, the court was properly concerned that "the longer it takes to try the case the more convoluted the issues are going to become, and the memory fades … on part of the witnesses." (AA33). And the charged offenses and supporting facts—conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, carrying a firearm during and in relation to a crime of violence, theft of firearms, engaging in a business without a license (firearms), and possession of a firearm by a convicted felon—were not complex. (AA13-23). "A defendant is not entitled to a new trial unless he or she can identify specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense." *United States v. Rodríguez-Marrero*, 390 F.3d 1 (1st Cir. 2004).

Padilla first contends that on April 15, 2022, as *Jencks* Act material, his counsel was provided a copy of Ramos's PSR. (AB93-94). He claims that due to the volume of work and discovery, his counsel failed to cross-examine Ramos concerning impeachment and/or contradictory statements from this PSR. (AB 93). He argues that if he had been granted a continuance, he would have "noticed and used" this impeachment evidence.[8] (AB94; *see* AB102). "But this argument about the continuance is empty." *United States v. Mott*, 772 F.2d 366, 370 (7th Cir. 1985).

"The *Jencks* Act by its term limits disclosure of the disputed information until after a witness' direct testimony. 18 U.S.C. § 3500(a). The district court then, 'in its discretion, upon application of [the] defendant, may recess proceedings in the trial for such time as it may determine to be

---

8.    Padilla also argues that because he had no appointed investigator, he was unable to demonstrate that Ramos's version of events as to surveillance at the beach was false. (AB103). Padilla fails, however, to present any developed argument regarding this falsity claim (*id.*) and thus, the claim is waived. *See Zannino*, 895 F.2d at 17. And even if not waived, as addressed in Issue III(C), Padilla's counsel could have easily driven to the location to take pictures during the 4-year period. Alternatively, after Ramos testified, counsel presented Miguel Maldonado-Maldonado, the President of the Isla de Cabras Fishing Club, who could have testified if there was or was not such a beach area. (DE704 at 5; AA963). So, a court-appointed investigator was not necessary.

reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.'" *United States v. Arboleda*, 929 F.2d 858, 863 (1st Cir. 1991); *see* 18 U.S.C. § 3500(c).

Here, a day prior to the court's deadline and five days prior to the trial date, the government complied with the *Jencks* Act when it provided Ramos's PSR. (AA27-28). "The government's ... disclosure of the material … before trial gave [Padilla] no rights [he] would not otherwise have had." *United States v. Williams*, 536 F.2d 1202, 1204-05 (7th Cir. 1976). Second, Ramos testified April 25th, which was 10 days after the PSR was produced. (AA27, 474). Likewise, counsel was provided a 1 ½ hour lunch break after the government completed its direct examination, giving him ample time to review documents and notes. (AA546). "[A] violation of due process" does not occur "where the government complied with the Jencks Act and defense counsel had time to read the documents prior to cross-examination." *United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979). Finally, Padilla did not request a brief continuance or recess at any time during Ramos's testimony despite requesting and/or receiving recesses at other times. *See United States v. Girard*, 97 F.3d 1445, 1996 WL 550087, at *1 (1st Cir. 1996) (*per curiam*).

Therefore, no abuse occurred in this case. *Mott*, 772 F.2d at 370; *Jones*, 612 F.2d at 455, *Williams*, 536 F.2d at 1204-05.

Padilla also alleges that on February 15 and April 8, 2022, the government provided: (1) new discovery containing extensive messages and call logs of two government witnesses; and (2) videos and recordings which were provided to him at MDC but was unable to review until April 11th.[9] (AB95). But the court properly found the alleged messages and call records involved only 33 pages of material: 22 from February 15th and 11 from April 8th. (DE589 at 7-8). And as addressed in Issue III(C), an expert was not needed to interpret the cell location data because counsel had a copy of the AT&T legend that was necessary to interpret the cell location data which in return, merely required counsel to input the longitude/latitude into Google Maps to find the cell tower location. In any event, Padilla cannot show prejudice. Oquendo testified that he approached Isla de Cabras at approximately 3:50 am and remained at the Isla de Cabras. (AA672). And

---

9.    Padilla also argues that his counsel had to file two appellate briefs in March 2022. (AB95). But this factor did not warrant a continuance. Counsel already used his busy appellate and district court practice to request a prior continuance. (DE269). And as argued by the government, counsel would always have appellate deadlines and could easily request extensions. (AA1655-56).

even without the use of Google Maps, Oquendo's calls reflect the same cell location data (*i.e.*, [51998/00972:-66.11611:18.465:] from 3:53 am onward supporting Oquendo approximate 3:50 am arrival at the station. (DE626-4 at 6; GE 67 at 6). Therefore, the cell location data would not have impeached Oquendo. Similarly, it would not undercut Figueroa's timing of Padilla's arrival to his house.

Moreover, Padilla's presents a meritless claim that the government actually or constructively possessed the cell information and location for 645-8410.[10] (AB97-98). At the pretrial conference, the government properly stated that it had no information regarding this phone number. (AA35). And although a PRPD agent requested subscriber, transactional, and location date for both (787)645-8410 and (787)930-7165, AT&T sent a 11-page fax with only subscriber information and mobility usage with cell location for

_____

10.    Padilla argues that he previously requested the cell phone location information from the prosecutor, but he had been advised, no information existed. (AB93 n.50). But Padilla misstates the record. As the government noted at the pretrial conference, Padilla's counsel sent an email requesting cell site location for cell phone starting with 627 and another 420. (AA37). But the government only had cell phones starting with 627, 533, and 603 which were "provided by Open Mobile and d[id] not have cell cite locations." (*Id.*; DE34). Padilla was provided those Open Mobile phone records. (DE626-5).

(787)930-7165. (DE626-4; GE 67; AA35-36). And in that fax's "RESPONSE COVER SHEET, AT&T expressly stated: "All available requested Information is enclosed." (DE626-4 at 1; GE 67 at 1). Thus, a continuance was not warranted because Padilla could not show the government possessed the cell location data for (787)645-8410.[11]

In relation to the discovery disks, the government included discovery previously made in March 2019 and mid-February 2022. (AA1654). The mid-February items were provided in response to specific requests by Padilla. (*Id*.). And the government provided two video recordings displaying a reenactment of the robbery which did not involve substantive evidence and were early *Jencks*. (*Id*.). As the court properly determined, a continuance was not warranted because Padilla failed to explain why a week was "not enough

---

11. Padilla's brief is peppered with allegations of prosecutorial misconduct and judicial bias. (*See, e.g.*, AB78, 85, 93, 97-98, 102, 106, 111, 115). But he does not directly raise either claim, waiving them. *United States v. DiTomasso*, 621 F.3d 17, 26 n.7 (1st Cir. 2010) (explaining that where a claim is "available to [a defendant] when he filed his opening brief," failing to address it "falls within the familiar rule that issues not advanced in an appellant's opening brief are deemed waived"), *vacated on other grounds*, 565 U.S. 1189 (2012); *United States v. Crocco*, 15 F.4th 20, 25 (1st Cir. 2021) ("These arguments, not raised in his opening brief, are waived."). While his allegations are meritless and unfounded, the government focuses solely on those related to his claims of error, explaining how the record refutes them.

to look through materials the government ha[d] already disclosed and watch two videos displaying a reenactment of the robbery." (DE589 at 8-9).

Padilla also argues that he submitted an April 18th motion to compel discovery. (AB98; AA1738-43). Based on the government's opposition, the court promptly and properly denied the motion and a subsequent reconsideration request. (AA28, 1744-59). Padilla does not dispute on appeal the court's reasonings for their denials. (AB98). Nor can he raise arguments contesting the denials in a reply brief because they are waived. *Henry*, 848 F.3d at 7. Padilla therefore failed to show a continuance was warranted based on this discovery motion.

Padilla further cites to the district court's statement that it was "adamant not to continue the case because it's a 2015 case" and there were 621 docket entries."[12] (AB 100). He claims that the age of case "justified

_____

12.    Padilla also contests the court's statement that it "imagined" Padilla wanted "his day in court." He argues that court should "have asked him instead of relying on [its] imagination" because like his counsel, he "also wanted a continuance." The court, however, was not incorrect with its assumption. Indeed, in 2017 Padilla informed he would go to trial (DE66), and reiterated this in 2019 (DE200), and then requested that it be a bench trial in November 2021 (DE471). If Padilla's counsel had understood the court's comment to be incorrect, he could have objected and corrected the court's assumption. Instead, counsel remained silent. (AA33-34). Plain error review

granting a continuance" because his counsel was a sole practitioner, who had to deal with pretrial motions and trial preparation, and it was impossible to remember discovery provided 3-4 years prior to trial." (*Id*.). But, as the district court indicated at the pretrial conference, the record contradicted Padilla's contention. First, the court noted that the case was scheduled for trial in March 2020, but Padilla requested "the first motion to continue." (AA53-54). "So [counsel had] been preparing for trial for years." (AA54). And after review of the "621 entries in CM/ECF," the court properly found that "[t]he amount of motions, discovery motions, that had been filed in this case since, the amount of rulings, the very acrimonious litigation suggest[ed] [counsel had] been on top for this case since 2018." (AA34). "The docket show[ed] that [counsel] ha[d] a very good handle of the facts of the case, that [he] filed every possible motion, every possible discovery motion" and many "ex parte motions." (AA56-57). Moreover, counsel's contention that with an old case, there comes memory problems for him in which the court properly asserted was another reason "why we can't continue it." (AA55). And

---

applies. *United States v. Pabon*, 819 F.3d 26, 34 (1st Cir. 2016). Padilla fails to address this standard, and thus, Padilla's claim is waived. *See Id*. (holding waiver if the defendant does not address the plain error prongs).

Padilla's counsel admitted to notebooks with questions. (AA311, 601). Finally, although adamant, the court understood that it "need[ed] to ensure the fairness of the process" and Padilla would be "afforded every opportunity to review discovery and that the process in general [wa]s fair towards [Padilla]." (AA33). And Padilla cannot show prejudice. At trial, the court provided Padilla's counsel substantial leeway. (*See* above **Procedural History**, **The Trial**).

Padilla argues that a continuance should have been granted because he was not able to obtain evidence from PRPD Custodian of Record regarding his boot size in order to impeach Oquendo. (AB101-02). Padilla admits that the boot size issue involved Oquendo's testimony regarding a prior incident of violence. (AB102). But the boot size issue was irrelevant. "A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" *United States v. Paladin*, 748 F.3d 438, 448 (1st Cir. 2014) (quoting *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993)). The boot-size issue was collateral because it would not have permitted impeachment of the factual evidence underlying the government's case. *Id*. Likewise, the reason Padilla hit

81

Figueroa would also be a collateral issue. (AB45, 101; AA806-10). Figueroa admitted Padilla hit him, which would have shown Figueroa's alleged "bias." (AA810, 1663). And Padilla does not dispute that he hit Figueroa. (AB101). Accordingly, the boot size and reason for beating evidence would have been inadmissible because "in order to be admissible, ... testimony must not only contradict a statement ... but also be material to [the defendant's] guilt or innocence." *United States v. Mulinelli–Navas*, 111 F.3d 983, 988 (1st Cir. 1997).

In a cursory manner, Padilla also generally adopts on appeal the arguments that he made at the pretrial conference to support his prejudice claim for a lack of continuance. (AB99). Even is such wholesale adoption were sufficient, he fails to explain how the district court abused its discretion in denying his 30-day continuance request. "Issues adverted to in a perfunctory manner, [like here,] unaccompanied by some effort at developed argumentation, are deemed waived." *Zannino*, 875 F.3d at 17. Accordingly, this prejudice contention is waived.

Padilla further argues that he was required a continuance because his counsel was required to respond to a number of motions that required time. (AB99). But the record belies this contention. Between January 11th until

April 8th, counsel was only required to file three substantive motions involving an opposition to a Rule 404(b) disclosure, a motion *in limine*, and reply to the government opposition to his *in limine*. (DE546, 556, 565). After April 8th, counsel opposed a government's motion *in limine*. (DE586). And he requested dismissal of the second superseding indictment that was returned on April 7th. (DE578). In addition, besides several continuance requests, counsel decided to file a motion to compel discovery, a reconsideration of the court's denial to compel discovery, and a memorandum of law of the elements of the offense and case law pertaining to the charged offenses. (DE591, 613, 615). So, during the three months leading up to trial, counsel's motion practice was not excessive. And the court continued the trial three days to provide counsel time to file the superseding indictment dismissal motion. (DE589; AB 99).

Contrary to Padilla's claim, he cannot show prejudice with the superseding indictment and disclosure of Figueroa. First, as addressed in Issue I, the original indictment gave Padilla sufficient notice of the acts for which he would be accountable, and the superseding indictment did not impermissibly broaden those charges. Moreover, "the superseding indictment d[id] not change facts" (AA57) because the facts and scheme

83

were the same in both indictments and provided Padilla with notice of the conduct which he would have to provide a defense. Padilla's counsel actually hoped that the government would not catch the change in law because he had "banked" on requesting the dismissal of the § 924(c) firearms offense at trial. (AA54; *see id*. at 68, 2231).

Likewise, he cannot contend that he was ambushed by the announcement of Figueroa. It is clear at the outset that under general legal principles the government had no obligation to supply a list of witnesses. (AA755); *see United States v. Reis*, 788 F.2d 54, 58 (1st Cir. 1986) (no requirement under Rule 16 mandating disclosure of "identity of the government's trial witnesses"); *United States v. Larson*, 555 F.2d 673, 676 (8th Cir. 1977). Nor was it required to provide the *Jencks* Act material until the witness had testified. (AA750, 755-56); *see* 18 U.S.C. § 3500. Likewise, *Brady* imposes no obligation on the government to disclose inculpatory evidence prior to trial. *See United States v. Prochilo*, 629 F.3d 264, 268-269 (1st Cir. 2011). Thus, Padilla cannot claim that he was ambushed.

Moreover, in this case, the district court ordered the government to make the *Jencks* and *Giglio* disclosures no later than 5-days before trial. (AA27-28, 751). Here, the government disclosed a day early, on April 15th.

(AA27-28, 749, 751). As the government explained, Figueroa had recently decided to cooperate, and based on counsel's arguments, Padilla knew him very well. (AA32, 59, 66-67). Figueroa did not have a Plea and Cooperation Agreement. (*Id*.). But a Rule 35 motion was filed which was disclosed to Padilla's counsel. (AA751, 760-61). And Padilla was provided the ROI, PSR, and Amended Judgment of Figueroa. (AA749, 751-52). When Figueroa testified, counsel already had this information for 11 days in order to cross-examine him. (AA752). Now, Padilla argued that he needed time to find and subpoena impeachment witnesses. (AA755-56). The court correctly found he "still had time" to "put forward impeachment witnesses" but the case could keep "moving forward." (AA756).

Moreover, "[i]t appears from the record that [Padilla] had ample time prior to trial to request service of witnesses." *United States v. DeCoteau*, 648 F.2d 1191, 1192 (8th Cir. 1981). The court gave Padilla adequate "time to find those witnesses for impeachment."[13] (AA757). It "started the trial date three

---

13.    Padilla argues for the first time that the name of a witness should not be given ahead of time because Federal Government agents place the fear of retaliation in the witness. (AB96 n.51). But Padilla fails to provide any support for this claim and has therefore waived. *Zannino*, 895 F.2d at 17. It is further waived because Padilla fails to address plain error standard. *See*

or four days after the original date to give [his counsel] additional time." In addition, the court "took recesses so that [counsel] could spend the time preparing and trying to locate witnesses." (AA1552). While Padilla was provided this time and had also well over a week after Figueroa's testimony, counsel admitted that a private investigator was "trying … to locate the witnesses that would impeach Mr. Samuel Figueroa." (AA2299-300, 2303). Although the CJA funds were exhausted, the investigator still worked "spend[ing] time subpoenaing people and trying to locate witnesses." (AA2302). And "he definitely made efforts" to find them. (AA2305). Padilla even provided "some directions as to where he lived years ago" and names. (AA2306, 2313). But counsel conceded that "you know, trying to find these witnesses – Your Honor, these are people that years ago, they talked about events of years ago, so it's not that easy to locate and to interview them" (AA2302).

In response, the court understood "this [wa]s an all-out fishing expedition to see if someone out there may come about and provide some information that may be used for impeachment purposes." (AA2319). So, if

---

*Pabon*, 819 F.3d at 34. And even if not waived, his claim is totally baseless and egregious.

the alleged witnesses were not produced the following day, the court wanted the name, address, and specific proffer of impeachment information to be provided by that witness. (AA2318-20). The next day, counsel informed the court that the investigator was unsuccessful, so he was "not in the position to comply with what the Court order. (AA1430). "To justify a continuance for the purposes of locating a witness, the moving party must show that the witness would have given substantial favorable evidence and that he was available and willing to testify." *United States v. Boyd*, 620 F.2d 129, 132 (6th Cir. 1980). But although the court gave Padilla time to find the alleged witnesses, he failed to produce them. Therefore, the court properly proceeded with the trial. *See Boyd*, 620 F.2d at 132.

In view of the foregoing, the district court did not abuse its discretion by denying Padilla's request for continuance. Nor did the district court violate Padilla's due process rights.

**III.    After the mid-April 2022 disclosure of the AT&T records and Figueroa, Padilla waived any request for additional funds for expert and investigative services because he never submitted a request for additional funds for an expert or an investigator under 18 U.S.C. § 3006A(e). In any event, he failed to address the plain error prongs, warranting waiver. But even if not deemed waived, the district court did not plainly or otherwise err in failing to *sua sponte* provide additional funding for these services under § 3006A(e). And the district court did not abuse its discretion in failing to hold an ex parte proceeding regarding his two prior requests for additional funding.**

<u>**Background**</u>

Prior to trial, on April 8, 2022, the government provided Padilla an 11-page fax from AT&T involving Oquendo's cellular and text usage with cell tower location that AT&T had sent to a PRPD agent in 2010. (AA8; DE626-4; GE67 at 1-12). A week later, the government also provided early *Jencks* and *Giglio* material for its witnesses, including Figueroa. (AA30-32).

In a motion, Padilla requested a continuance of the trial date because he had been provided information regarding Figueroa. (DE601; AA1662). He contended that he needed additional time to investigate Figueroa. (AA1662-63).

On April 20, 2022, Padilla filed a supplemental motion for a continuance. (DE612; AA1680). The motion alleged that the government provided AT&T records for Oquendo that tracked Padilla's cell phone

location. (AA1680). He claimed that "[t]he records [we]re incomplete since page 6 [wa]s missing." (*Id*.). Padilla also indicated that he did "not have knowledge as to the interpretation of [the AT&T] records" because the records "contain numerical sequences that only an expert c[ould] explain." (AA1681). More specifically, Padilla claimed that he was "ignoran[t] of what the cell phone location records reveal[ed]" and therefore required "sufficient time to retain an expert on those matters to learn what they contain." (*Id*.). But Padilla attached only a portion of the AT&T records the government provided through discovery to the motion as exhibits 1 and 2. (DE612-1 & -2; DE626-4; AA1682-88; GE 67). Notably, he did not attach the 2-page legend that AT&T included and the government provided, which explained how to interpret the cell phone location data. (DE612-1 & -2; DE626-4 at 10-11; GE67 at 10-11). Nor did he attach the certificate of authenticity of the AT&T records from the AT&T Custodian of Records/Compliance Security Analyst Edwin Tabares.[14] (DE612-2; DE624-4 at 12; GE67 at 12).

---

14.    Since Padilla did not produce the entire AT&T fax and the AT&T's certificate of authenticity in his appendix (AA1682-89), Docket Entry 624-4 and/or GE 67 has the 11-page fax and the certificate.

On the same day, the district court held a pretrial conference. (DE622; AA25). At the conference, the court addressed Padilla's continuance requests. (AA25). The government explained that the AT&T report was produced to the PRPD on same day as the robbery, at 7:29 pm, and thus, AT&T could not have produced phone calls after that time, which the court understood. (AA35, 47-48). The robbery was conducted from approximately 3:00 am until 3:49 am on October 26th. (AA41). So, the government asserted that Padilla had the AT&T records involving before and after the robbery. (AA41-42, 48).

With regards to Padilla's complaint about incomplete information (AA43-45), the government explained that the 11 pages were produced to PRPD, and the document provided to Padilla was also 11 pages. (AA36). Therefore, despite the fact that the pages numbering sequence at the bottom of the AT&T record goes from 5 to 7, nothing was omitted from what was originally produced. (*Id*.). And the location would establish the nearest cell tower for Oquendo and not Padilla. (AA45). The government did not possess the cell phone locations for Padilla's and two co-defendants' phones. (AA37). Padilla admitted that although he had a 2020 court order for the production of his and another co-defendant's cell phone location data from

90

Open Mobile and AT&T, he "never got location data for those phones." (AA46-47).

During the pretrial conference, the government also explained that the AT&T record involved only Oquendo's phone, not Padilla's. (AA37). And in 2010, the AT&T phone records contained the cell site location data, but Open Mobile did not provide such location data at that time for Padilla's cellular phone. (AA37). Padilla was provided his and several co-defendants' Open Mobile call log records. (AA40). The government further explained that the cell site location from the AT&T records involved the cell tower's location that was providing the coverage, not the actual location of the cellular phone itself. (AA39). This fact was also explained in the legend provided in the AT&T document which the government gave to Padilla. (DE624-4 at 10-11).

At the pretrial conference, the government also explained that it was only able to find Figueroa a few weeks earlier, on February 28th or March 1st. (AA32). In response, Padilla claimed that the information revealed in discovery made it "a whole new different case" (AA50). Padilla stated that he "needed to conduct discovery in order to collaterally impeach Figueroa on his prior statements. (AA50). And he needed a continuance so his private investigator could locate at least three witnesses to prove that Figueroa "lies,

steals, which affect[ed] his credibility seriously."[15] (AA52; see AA57). After hearing the parties' argument, the district court denied the continuance. (AA68-69, 72).

**Issue**

Padilla argues that the district court abused its discretion in denying his requests for additional funds for his private investigator and to hire an expert without conducting a hearing, pursuant to 18 U.S.C. § 3006A(e)(1). (AB2, 66-68, 103-09).

---

15. In his continuance motion, Padilla asserted that he needed additional time for an investigator to find at least three impeachment witnesses, alleging, in part, Figueroa was repeatedly evicted for non-payment of rent and fired by his employee for stealing. (AA1662). But as the government properly responded in the preliminary hearing, Padilla knew Figueroa better than the government. (AA66-67). And a witness could not be called to present evidence or testimony that Figueroa had prior evictions because this was not impeachment evidence since it does not go to credibility. (AA67; see AA812); *see* Fed. R. Evid. 608; *United States v. Tarantino*, 846 F.2d 1384, 1409 (D.C. Cir.1988). In relation to the alleged dismissals from employment due to theft, the government noted that Figueroa had not testified and if he agreed with the theft contentions in Padilla's cross-examination, it would be a non-issue. (*Id*.). But, if Figueroa denied them, a rebuttal witness could be called. (*Id*.). And in any event, this impeachment would be cumulative because as Padilla knew, Figueroa had a prior bank theft conviction which could be brought out during his counsel's cross-examination. (AA67). Thus, he could not show prejudice.

**Standard of Review**

This Court reviews for abuse of discretion a district court's denial of a request for authorization to obtain investigative or expert services under 18 U.S.C. § 3006A(e)(1). *See United States v. Manning*, 79 F.3d 212, 218 (1st Cir. 1996) (citing *United States v. Mateos-Sanchez*, 864 F.2d 232, 240 (1st Cir. 1988)). Review of the merits of the district court's denial by this Court is "deferential." *United States v. Abreu*, 202 F.3d 386, 389 (1st Cir. 2000). And with respect to such denial, "[i]t has consistently been held that '[i]n the absence of clear and convincing evidence showing prejudice to the accused, refusal to authorize funds under § 3006A is not reversible error.'" *United States v. Canessa*, 644 F.2d 61, 64 (1st Cir. 1981) (quoting *United States v. Eagle*, 586 F.2d 1193, 1197 (8th Cir. 1978)). But if a defendant fails to make a § 3006A(e)(1) request, the claim is deemed waived. *See United States v. Scott*, 48 F.3d 1389, 1395-96 (5th Cir. 1995), *United States v. Patterson*, 438 F.2d 328, 329 (5th Cir. 1971) (collecting cases).

**Discussion**

In April 2022, Padilla did not request additional funding for an expert or investigative services after the government provided the AT&T records and Figueroa's name. He therefore waived the argument of entitlement to

these services. And he further waived for developing the plain error prongs. Likewise, under plain error, the court did not sua sponte fail to provide the services. And it did not abuse its discretion in denying additional investigative services without an ex parte hearing.

Under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(e)(1), counsel for an indigent defendant may request funding for "investigative, expert or other services necessary for adequate representation[.]" The court can authorize counsel to obtain such services "[u]pon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to attain them." *Id*. "[T]he burden is on the movant to demonstrate the need of the expert [or investigative] services for an adequate defense." *United States v. De Jesus*, 211 F.3d 153, 155 (1st Cir. 2000). To meet this burden, "a defendant must demonstrate with *specificity*, the reasons why such services are required." *United States v. Gadison*, 8 F.3d 186, 191 (5th Cir. 1993) (emphasis in original) (citation omitted). So, a defendant "must do more than allege the services would be helpful, rather he must show they are 'necessary' to afford him an adequate opportunity to present [his] claims fairly within the adversary system." *United States v. Ross*, 210 F.3d 916, 921 (8th Cir. 2000) (internal quotations and

citations omitted). "The Supreme Court has made clear that a defendant does not have the right to public funding for all possible avenues of investigation or all possibly useful expert services, but only to the level of support required by the Due Process Clause." *United States v. Hartsell*, 127 F.3d 343, 349 (4th Cir. 1997) (citing *Ross v. Moffit*, 417 U.S. 600, 616 (1974)).

"Any application for § 3006A(e)(1) funds must be evaluated against a standard of reasonableness, which reflects the fact of the pertinent case." *United States v. Kasto*, 584 F.2d 268, 273 (8th Cir. 1978). This standard is not to be applied in a manner that requires the government to finance a "fishing expedition." *United States v. Stapleton*, 56 F.4th 532, 541 (7th Cir. 2020); *see United States v. Sailer*, 552 F.2d 213, 215 (8th Cir. 1977) (stating "a trial court need not authorize an expenditure under subsection (e) [of § 3006A] for mere fishing expedition"). "Therefore, before granting a § 3006A(e)(1) motion, 'it is appropriate' for a judge to first satisfy himself 'that a defendant may have a plausible defense.'" *Id.* (quoting *United States v. King*, 356 F.3d 774, 778 (7th Cir. 2004)); *see United States v. Roman*, 121 F.3d 136, 143 (3d Cir. 1997) (same). Moreover, "[i]t has consistently been held that 'in the absence of clear and convincing evidence showing prejudice to the accused, refusal to authorize funds under § 3006A is not reversible error.'" *United States v. Canessa*, 644

95

F.2d 61, 64 (1st Cir. 1981) (quoting *United States v. Eagle*, 586 F.2d 1193, 1197 (8th Cir. 1978)).

But compensation under this statute is limited to $2,400.00 for the person who does the service, unless payment in excess of that amount is certified by the court "as necessary to provide fair compensation for services of an *unusual character or duration*, and the amount of the excess payment is approved by the chief judge of the circuit." 18 U.S.C. § 3006A(e)(3) (emphasis added). So "if counsel seeks funding in excess of certain predetermined limits, counsel must make a formal request and convince the district judge those limits are unreasonable and a waiver is necessary." *In re Carlyle*, 644 F.3d 694, 698 (8th Cir. 2011) (citing 18 U.S.C. § 3006A(d), (e)). "If the district court agrees, the district court certifies the request to the chief judge of the circuit for approval." *Id.*

### A.    Padilla's contentions are waived.

As a preliminary matter, Padilla's contentions should be deemed waived regarding additional funding for an expert and an investigator. For starters, Padilla primarily argues should have been provided additional CJA funding to have a private investigator locate and interview witnesses to impeach Figueroa and an expert witness to interpret Oquendo's cell phone

location data under § 3006A(e)(1). (AB66-67, 105-09). But after the government's disclosure of the AT&T records and Figueroa as a witness in April 2022, Padilla did not file motion or submit an oral request for additional funding under § 3006A(e). *See Gadison*, 8 F.3d at 191 (reviewing the district court's refusal to appoint an investigator in light of only the information available to the trial court at the time it acted on the motion). And addressed below, Padilla cannot rely on his continuance motions to support that he requested additional funding for these services. *See*, *e.g.*, *Scott*, 48 F.3d at 1394-95.

In his motions to continue, Padilla never requested funding for expert and investigative fund. Indeed, he merely stated that he "need[ed] to be provided sufficient time to investigate" Figueroa (AA 1662), and "need[ed] sufficient time to retain an expert" to interpret and explain the AT&T records. (AA1662, 1681). And in the course of the preliminary hearing, the court noted that as a ground for his continuance request, Padilla expressed that "he need[ed] time to hire an expert to explain the[] numbers . . . that would suggest cell location." (AA43). And in the context of his continuance request, Padilla only contended at the pretrial conference that he had to "begin an investigation concerning" Figueroa and to have "our private

97

investigator" locate and interview potential impeachment witnesses to rebut

Figueroa's credibility.[16] (AA 51-52; *see* AA 57). Besides, Padilla's counsel also

never referred to the statute in his continuance motions or at the pretrial

conference. (AA24-75, 1662-65, 1680-81). The request made by counsel was

for only time to employ an expert to review the AT&T records and his

---

16.     Any contention that, at the April 2022 pretrial conference, he presented oral motion requesting an expert is also waived. To present an argument on appeal, a party must develop its position by providing citation to the relevant portions of the record and supporting authority. *See* Fed. R. App. P. 28(a)(9)(A); *see Conto v. Concord Hospital, Inc.*, 265 F.3d 79, 81 (1st Cir. 2001) (holding "[n]ot surprisingly, the Federal Rules of Appellate Procedure require that appellants, rather than the courts of appeals, ferret out and articulate the record evidence considered material to each legal theory advanced on appeal"). Padilla asserts that the court refused his request to consult an expert because the government was not going to use the cell location data at trial. (AB106). And he also makes an allegation that the incomplete or missing pages were crucial because the allegedly occurred after 12:00 am on October 26th. (*Id*.). But he fails to adequately develop his contentions with citations to the record (AB105-06), which amounts to the waiver of any claims. *See Zannino*, 895 F.2d at 17; *see also Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 719–20 (1st Cir. 1999) (observing that counsels are not permitted to "leav[e] the [appellate] court to do counsel's work") (citations omitted). Nor can Padilla cure it in a reply brief. *See Henry*, 848 F.3d at 7. Padilla's claims must therefore be deemed waived. In any event, the district court's responses related to Padilla's request for continuance and not a request for an expert or additional funding for an expert. (AA25, 33-50; *see* AB106) ("Under the above circumstances, the refusal of the Court to allow Padilla-Galarza **sufficient time to consult an expert** and obtain the missing information constitutes and abuse of discretion and prejudiced his defense." (emphasis added)).

investigator to investigate Figueroa, "not permission to employ an expert [and/or his investigator] at government expense." *Scott*, 48 F.3d at 1396. "'The rights established by 18 U.S.C. § 3006A(e) are procedural, and the failure to make a timely motion or request waives the necessity for the court's consideration of an appointment of an expert witness'" or investigator. *Id*. (quoting *Patterson*, 438 F.2d at 329).

Padilla cites that the district court had previously denied his prior *ex parte* requests for funding for investigative services. (AB107-08). He argues for the first time that "[g]iven [the court's] repeated rulings that an investigator was not necessary for trial preparation, counsel gave up trying to obtain said compensation."[17] (AB108). This argument is, however, flawed.

---

17.    Although the government was not provided access to his ex parte motions, Padilla cites on appeal to five separate ex parte motions allegedly requesting funds for an investigator which he made on 5/23/18 (DE94), 5/25/2020 (DE282), 10/27/2021 (DE455), 11/08/2021 (DE469), and 12/10/2021 (DE490). He claims the first motion for $2,450.00 was approved by the court and the rest were denied. (AB107). But, as reflected from the docket, the ex parte May 25, 2020 motion Padilla asserts asked for extra funds was granted the next day (DE284), while the ex parte November 8, 2021 motion involved a reconsideration that was denied, (DE482 "ORDER denying 469). So, only two *ex parte* motions were denied for alleged additional funding for an investigator. (DE455, 490). In the ex parte December 10, 2021 motion (DE490), Padilla alleges on appeal that he requested $2,500.00 in additional funding. (AB107).

"[W]hen the defendant is able to show that refiling the motion would be useless, he may be excused from engaging in what is then a futile exercise." *United States v. Brown*, 870 1354, 1360 (7th Cir. 1989). But here, Padilla admits that "the motions were denied without prejudice." (AB108). If in fact refiling would have been useless, the court would have denied them with prejudice. Waiver therefore still applies. *Id.* (holding the defendant's claim waived because the district court had denied the prior motion with leave to refile, and "[i]f in fact refiling would have been useless, the court would not have invited refiling.").

Accordingly, Padilla's "failure to make a formal § 3006A(e) motion or request thus relieved the district court of any responsibility to authorize the expenditure of government funds on a[n] . . . expert" and an investigator. *Scott*, 48 F.3d at 1396.

**B.    Even if not waived and reviewed under plain error review, Padilla has waived his contentions for failure to address the plain error prongs.**

Even assuming arguendo, after the government's April 2022 disclosures, Padilla's failure to request for additional funding for investigator and/or expert services is not waived, the review would then be plain error review. *See United States v. Gagnon*, 616 F. App'x 332 (9th Cir.

2015) (Memo) (finding "[b]ecause [the defendant] made no request for such [§ 3006A(e)] funds," the review for "this issue" is for "plain error").

Here, as appellant, Padilla bears the burden of establishing plain error on appeal. *See Pabon*, 819 F.3d at 34. But he does not acknowledge the proper plain error standard of review, nor does he set forth any plain error argument establishing all four prongs of the test. (AB103-09). Thus, Padilla has waived this challenge. *See Pabon*, 819 F.3d at 34 (explaining an appellant waives challenges subject to plain error review when "he has not even attempted to meet his four-part burden for forfeited claims"). Nor can he raise new arguments in a reply brief. *Henry*, 848 F.3d at 7. Padilla's arguments should therefore be denied due to waiver.

**C.   Even if not waived, the district court did not plainly or otherwise err by failing to *sua sponte* provide additional funding for an expert or investigator after the April 2022 disclosures.**

Padilla contends that Oquendo's AT&T location data records were "impossible to interpret" and thus, his trial counsel needed an expert to review and interpret the location data for him and "to determine if they were useful for the defense." (AB105-06). He argues for the first time that "cell phone data would be very useful to determine the time periods, particularly

101

when [Oquendo and he] arrived at the station house that night." (AB106).

But Padilla's challenge falters for multiple reasons.

>  1. *Padilla failed to demonstrate that funding for an expert was necessary for an adequate defense.*

For starters, with the AT&T records, Padilla was provided a legend that "explain[ed] the columns and information on the attached record." (DE624-4 at 10). As reflected by the legend, a column would display the cell location "if location information was requested." (*Id.*) Since location was requested (*id.* at 2), the AT&T document provided "the longitude/latitude and the azimuth (center point of the sector) of all cell sites that serviced the call." (*Id.* at 10-11). Padilla could obtain the cell tower's location by inputting the provided latitude/longitude into Google Maps. (*Id.* at 4).

Even disregarding that ease, an expert was not necessary. To show reversible error in refusal to appoint an expert, the defendant must show that it was "prejudicial to his defense." *United States v. Perrera*, 842 F.2d 73, 77 (4th Cir. 1988). In other words, he must show necessity. There is no brightline rule for determining what demonstrates sufficient showing of necessity, rather, it is a "context-dependent and sensitive inquiry" in which the district court is given "considerable leeway in reaching that decision."

*United States v. Prieto*, 812 F.3d 6, 16 (1st Cir. 2016) (citing *United States v. Abreu*, 202 F.3d 386, 389 (1st Cir. 2000)).

Here, the AT&T location data involved only the location of the "cell sites that serviced the call." (DE624-4 at 11). Indeed, the cell site location record would not reflect an alibi defense. As the government properly argued at the preliminary hearing, the location data did not track Padilla's cellular phone. (AA40). Nor it did track Oquendo's specific cellular phone's location but provided only the cell site/tower location which serviced the call. (AA38-40; *see* DE624-4 at 11). Moreover, the government "always represented that Padilla was not at the crime scene; he was the mastermind but he was not there" during the robbery. (AA41). And at trial, Oquendo testified that he and Padilla arrived just after the commission of the robbery. (AA669-73, 706; *see* A 693, 704, 708).

In any event, Padilla cannot show prejudice under the third prong of plain error. For example, Padilla argues that "the cell location data would be very useful to determine the time periods particularly when [he and Oquendo] arrived at the station house that night." (AB106). At trial, Oquendo testified that he and Padilla left the restaurant and approached Isla de Cabras area at approximately 3:50 am. (AA672). The AT&T records reflect

a call at 3:51 am with two cell location data. (DE624-4 at 6). The AT&T legend states that "[i]f the target was traveling, you may see more than one cell site in this field." (DE624-4 at 11). Taking the latitude/longitude of the two calls (i.e., 18.451, -66.1477 and 18.46012, -66.18564), the cell site locations are in Cataño and Levittown, respectively, which are near Isla de Cabras. *See* https://maps.app.goo.gl/8kTQn1LbyNGQF84g7; https://maps.app.goo.gl/QK4xzHemApBnXQKP8. Afterwards, from 3:53 am to 7:14 am, Oquendo's calls reflected only one cell site location (i.e., 18.465, -66.11611) which is in Old San Juan and across the bay from Isla de Cabras. *See* https://maps.app.goo.gl/4rwhJNH1KhvffpJM8. The cell phone locations therefore support Oquendo's testimony as to the timing of his arrival to station at Isla de Cabras.

So, Padilla has failed show that the evidence of the cell tower location was relevant to his defense. *See United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979) (holding the district court did not abuse its discretion in denying funds for an expert when the expert's testimony "would have limited, if any, relevance"). Therefore, the use of an expert here would not have been relevant, and Padilla cannot show he was prejudiced in the refusal to allocate additional CJA funding for an expert.

Moreover, even 12 days after production, substantive justifications were also lacking. *See De Jesus*, 211 F. 3d at 156. Other than his general statement to the court that he needed an expert, there was no indication of the availability or identification of an appropriate expert. (DE 612; AA 43-49, 1680); *see De Jesus*, 211 F. 3d at 156. Nor did he expressly provide any estimate of the expert's fees and expenses. *See De Jesus*, 211 F. 3d at 156; *see also Stapleton*, 56 F.4th at 541 (holding the defendant failed to established necessity for his expert funding request because the motion failed to "identify the expert and outline the expert's qualifications and likely testimony, nor did it estimate the cost"); *United States v. Campos*, 237 F. App'x 949 (5th Cir. 2007) (unpublished) (same).

Padilla contends that he needed an expert because "page 5 is incomplete, and page 6 is missing" from Oquendo's cellular toll records. (AB106). He claims that "[t]he missing toll records happened to be the period after 12 am [for October 26th], the crucial time periods of this case." (*Id.*). Padilla also alludes that this "raises the possibility that it was purposely blocked out when being photocopied, and page 6 withdrawn to hide its contents." (*Id.* at n.54). Padilla's claims are red hearings.

As the government properly argued before the district court at the pretrial conference, it provided to Padilla's counsel all 11 pages of the 11-page fax that the PRPD agent received from the AT&T National Compliance Center at 7:29 pm on October 26, 2010.[18] (AA35-36; GE67 at 1-11). It was undisputed that "[t]he robbery took place at 3:00 a.m. o[n] October 26th." (AA49; *see* AA41). The AT&T fax contained Oquendo's cellular phone usage with cell locations from October 25 at 12:08 am until October 26 at 4:12 pm. (*Id*. at 4-8). It also contained Oquendo's SMS usage (texts) with cell locations from October 25 at 12:10 am until October 26 at 3:05 pm. (*Id*. at 9). At the pretrial conference, Padilla's counsel actually acknowledged that the toll data was cut off at "4:12 in the afternoon," meaning "4:12 p.m." of October 26th. (AA48). And as the government asserted, this time was "12 hours after the robbery finished." (*Id*.). So, contrary to Padilla's contention, trial counsel

---

18.    The AT&T 11-page fax contained an AT&T cover sheet, a request form, and a two-page legend, as well as a seven-page "AT&T PROPRIETARY" document. (GE67 at 1-11). When Padilla references the alleged missing information, it relates to pages of the AT&T PROPIETARY document. This document contained the "SUBSCRIBER INFORMATION" and "MOBILITY USAGE (with cell location)." (*Id*. at 3-9). It also reflected at the bottom pages 1 through 5 and page 7. Padilla's complaint is about page 5 being partially blank and a page 6 lacking from the AT&T PROPIETARY document. (AB106).

possessed Oquendo's cellular and text usage with the cell tower locations prior to, during, and after the offense was committed on October 26, 2010. (AA48-49, 69; GE67 at 4-9). So, the district court properly held that the produced AT&T document "provide[d] the timeframe for the whole time in which this criminal conduct occurred." (AA69). An expert was therefore not needed.

Padilla's claim of the government's potential tampering is also utterly false. As addressed above, the government provided the 11-pages. And at the preliminary hearing, the government expressed that it did not know why the lower part of page 5 and entire page 6 to the AT&T PROPRIETARY documents appear like they do. (AA36). As the court also properly determined, the government c[ould not] produce what it d[id]n't have or what  maybe d[id]n't exist." (AA69).

Moreover, the record contradicts Padilla's tampering contention. The government provided Padilla a "**VERIFICATION OF AUTHENTICITY OF AT&T RECORDS**" document dated March 7, 2022. (DE624-4; GE67 at 12). It was previously given in discovery. (AA846-47; *see* DE626-4 at 12). As reflected in the document, the AT&T Compliance Security Analyst/Custodian of Records Edwin Tabares verified that the "copies of

usage records appear[ed] to be in the same format as records that were maintained and produced by AT&T." (*Id.*). He also certified that "[t]hese documents [we]re in the same format and contain[ed] call data consistent with AT&T records and d[id] **not appear to have been modified or altered in any way**." (*Id.*) (emphasis added)). And if Padilla had been concerned, he could have easily contacted or called as a witness the AT&T Compliance Security Analyst/Custodian of Records, who certified the record and provided his phone number, to find out as to why the AT&T document was partially blank on page 5 and did not include a page 6 in the AT&T fax to the PRPD. (AA846-47; GE67 at 12). And the AT&T fax cover expressly stated this was all AT&T possessed. (GE67 at 1). Bottom line, Oquendo's cellular usage and location for the relevant time-period of the robbery was provided to Padilla. (AA69; GE67 at 4-9).

Padilla therefore failed to meet his burden and show that the expert was necessary. *See United States v. Valverde*, 846 F.2d 513, 516-17 (8th Cir. 1988) (defendant's burden under 18 U.S.C. 3006A(e) to establish expert services are necessary).

   2. *Padilla also failed to demonstrate that additional funding for an investigator was necessary for an adequate defense.*

Here, Padilla admits on appeal that the district court had previously provided him a total of $2,450.00 for an investigator to locate and interview witnesses, conduct field examinations, find any alibi evidence, and conduct background examination of the government witnesses under § 3006A(e)(1). (AB107). He claims that this funding "was used up quickly." (*Id*.). As a result, Padilla alleges that he sought court approval for additional $2,500 for the investigator in 2020 and 2021 ex parte requests. (*Id*.). He generally alleges that he needed "additional funds for the private investigator since he was needed to locate and interview additional witnesses, to be present when counsel interviewed potential witnesses, and for trial preparation." (AB107).

Padilla alleges that the district court abused its discretion in both failing to hold an ex-parte hearing before ruling on these prior requests for additional funds for his investigator and denying these requests for additional funding. (AB109). But as addressed above, Padilla bore the burden to "demonstrate with specificity, the reasons why such [investigative] services [we]re required." *Gadison*, 8 F.3d at 191. The requests must "provide enough information to justify granting them." *United States v. Knox*, 540 F.3d 708, 718 (7th Cir. 2008). Likewise, Padilla was required to persuade the court that the alleged services were of an unusual character or

duration such that the payment beyond the statutory maximum was justified. 18 U.S.C. § 3006A(e)(3) (requiring a finding that the excess funds were "necessary to provide fair compensation for services of an unusual character or duration").

Other than citing to his ex parte motions and alleging a general argument for need of an investigator (AB107), Padilla has made no showing on appeal that the proposed need for an investigator "would produce any evidence likely pivotal to his defense."[19] *Mateos-Sanchez*, 864 F.2d at 240. Nor has he demonstrated that the services were of an unusual character or

---

19. Padilla's counsel did not need an investigator to be present for interviews. Even if trial counsel cannot impeach a witness with his own testimony, there are numerous other methods by which counsel "can 'lock-in' a witness' testimony." *United States v. Lancaster*, 64 F.3d 660, 1995 WL 490272, at *2 (4th Cir. 1995) (Table). "For example, counsel could take handwritten notes of the interview, have the witness sign a sworn statement, record the interview, or bring a secretary or paralegal to the interview." *Id*. And "[a] general statement about the unreliability of [interviewed witnesses] does not constitute necessity [for an investigator] under section 3006A(e)(1)." *Id*. Padilla's counsel also did not need an investigator for trial preparation. At trial, counsel admitted that he had prepared several notebooks with questions to ask the government witnesses. (AA311, 601). Moreover, counsel admitted that Padilla knew the case very well, and Padilla assisted counsel during trial. (AA321, 440, 452, 601, 605, 725, 879, 883, 1166-67, 1233, 1280, 1372, 1400, 1429, 1467-68).

duration. So, the district court did not abuse its discretion, let alone plainly err, in denying the prior ex parte requests for additional funding.

Now, in relation to his ex parte hearing contention, Padilla claims for the first time that he was "trying to locate 3 witnesses to impeach Figueroa regarding material facts of the case that were in dispute." (AB108). But at the pretrial conference, Padilla's counsel merely alleged in relation to the three witnesses and others, he wanted to find them to show Figueroa "lies, steals which he affects his credibility." (AA52, *see* AA57). Counsel had claimed in his supplemental continuance request that Figueroa was repeatedly evicted for non-payment of rent and fired by his employee for stealing. (AA1662). But counsel never argued that the three alleged witnesses dealt with material facts involving the current robbery offense. *See Gadison*, 8 F.4th at 191 (holding the review of a district court's refusal to appoint an investigator is the information available at the time it acted upon the request). So plain error review applies. *See United States v. Ponzo*, 853 F.3d 558, 586 (1st Cir. 2017) (holding "an unpreserved contention receives plain-error review, naturally"). Padilla fails to address this standard and has therefore waived the contention that the court erred in failing to provide additional funding

for the investigator to find three alleged witnesses dealt with material facts involving the robbery offense. *See Pabon*, 819 F.3d at 34.

Even if not waived, Padilla cannot show that the district court plainly or otherwise erred. The denial of funds for an investigator is proper when the reason the funds were requested could have been performed by the attorney or the attorney failed to demonstrate that he had exhausted other investigative efforts. *See Gadsion*, 8 F.3d at 191; *United States v. Harris*, 542 F.2d 1283, 1315-16 (7th Cir. 1976) (finding no error in denying request for investigative services funds when the attorney could not show that they could not have performed the services themselves). Padilla argues that his counsel could not take pictures of the area Ramos parked his truck and surveilled at Isla de Cabras because he was "too busy with his trial preparation of examining witnesses." (AB109 n.56; SA54 n.1). Yet, Padilla's attorney had four years to go to the location of the robbery and could have taken photographs of the area, including where Ramos was located during the robbery. Moreover, Padilla does not dispute that prior to trial, his counsel had Ramos's report of investigations and PSR and could have easily seen any inconsistencies and gone over to the location to take photographs. And even after Ramos testified, Padilla's attorney works in Old San Juan

(AA70), which is right across the bay from Isla de Cabras – an approximate 12.1 mile or half hour drive. *See* https://maps.app.goo.gl/HKjZKvWWreSBDGBa9. During the days off or early release (DE640, 641, 642, 673, 674, 675, 677; AA 1407-08), he could have gotten a ride over there to take the photographs. Padilla cannot now claim that the Court abused its discretion in allocating CJA funds for a task he had ample time and opportunity to perform himself.

As addressed above, Padilla's counsel also claimed that he needed the investigator to "locate[] at least three witnesses and locate many other witnesses that can prove that [Figueroa] is not – is a person that lies, steals which affects his credibility." (AA52). And although he was provided ample opportunities, Padilla also never identified the alleged witnesses he was seeking. (AA52, 57, 66-67, 1680-89, 1400-02, 1430, 2304-06); *see Mateos-Sanchez*, 864 F.2d at 240. The district court properly rejected counsel's general argument and referred to the need for an investigator to find the unnamed witnesses as "vague" and "a fishing expedition." (AA57). *See United States v Schultz*, 431 F.2d 907, 911 (8th Cir. 1970) ("a trial court need not authorize an expenditure under subdivision (e) for a mere 'fishing expedition'"); *see also United States v. Harris*, 165 F.3d 24 (5th Cir. 1998) (*per curiam*) (affirming the

113

denial of investigative service where because the defendant failed to demonstrate with specificity why the appoint of counsel was necessary with the defendant's request to locate unidentified witnesses to provide alibi testimony).

There was also no reason why Padilla's counsel could not attempt to locate, interview, and bring in witnesses about Figueroa to impeach him. As the court explained during trial, "You can still do that [without an investigator]." (AA754). "[S]ection 3006A(e)(1) is not meant to be a substitute for the normal investigation and witness interviewing conducted by defense counsel." *United States v. Lancaster*, 64 F.3d 660 (4th Cir. 1995) (unpublished). So, a court-appointed investigator was not "necessary" to find and interview potential witnesses in this case.[20] *Id.*; *see Gadison*, 8 F.3d at 191 (holding that "a request for investigative services did not pass muster under § 3006A(e) where the defendant failed to . . . demonstrate that he had exhausted other investigative efforts"); *United States v. Pulley*, 891 F.2d 296, 1989 WL 150059,

---

20. After Figueroa was announced as a government witness, Padilla's "failure to renew the funding request . . . or seek  [to find these witnesses] by other means, . . . undercuts [Padilla]'s claim that more funds were necessary or that he was prejudiced by the district court's failure to approved further funding." *United States v. Obasi*, 435 F.3d 847, 853 (8th Cir. 2006).

at *2 (9th Cir. 1989) (Table) (finding no abuse of discretion in denying the defendant's request for investigative services under § 3006A(e) because the investigation, in part, could have been conducted by counsel); *United States v. Mundt*, 508 F.3d 904, 907 (10th Cir. 1974).

Indeed, there was no guarantee that an investigator would have been physically able to locate the alleged unnamed witnesses, or that theses witnesses would have been willing to talk with counsel if they were found. And, the district court even allowed Padilla "time to find those witnesses for impeachment." (AA754). In fact, at trial, counsel informed the court that his investigator was working during trial to locate witnesses. (AA1230-31, 1430, 2298-300, 2304-06). But counsel admitted that although the prior funds had been "exhausted, the investigator continued working because we've known each other a long time" but was unable to find the alleged impeachment witness. (AA2298-99, 2302-03).

So, Padilla failed to show any possibility of obtaining his alleged witnesses or that an investigator could have done so. *Pulley,* 1989 WL 150059, at *2. Therefore, Padilla has not shown necessity. *See, e.g., Id.* Nor has he shown by clear and convincing evidence that he was prejudiced by the denial of his request for investigative services under 18 U.S.C. § 3006A(e). *Id.*

115

Indeed, as reflected in Issue IV, Padilla was able to present his theory and defense by attempting to impeach the witnesses against him, including Figueroa. (AB39-46, 82-86); *see Bonin v. Calderon,* 59 F.3d 815, 837-38 (9th Cir. 1995) (finding the district court did not abuse its discretion for the denial of additional funding for investigative services where the additional information would have been merely redundant). "A defendant is entitled to a fair trial, not a prefect one." *Mateo-Sanchez*, 864 F.2d at 241.

Because counsel failed to make the appropriate showing of need for the excess funds, or alternatively, Padilla cannot show prejudice, the district court did not abuse its denying Padilla's requests for additional CJA funds to continue to retain a private investigator.

Finally, "contrary to [Padilla]'s argument, 18 U.S.C. § 3006A(e) did not require the district court to conduct an ex parte hearing before denying his motion[s]."[21] *United States v. Winbush*, 580 F.3d 503, 510 (7th Cir. 2009); *see*

---

21.   The government was not given access on appeal to the ex parte motions. And the Court has not ruled on the government October 2024 request for access to the ex parte motions filed in Padilla's Supplemental Sealed Appendix. So, the government assumes Padilla's argument of preservation is correct for his claims. If not and plain error review applies, Padilla does not address the plain error prongs and has waived his contention. *See Pabon*, 819 F.3d at 34.

116

*United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2005); *United States v. Bertling*, 370 F.3d 818, 820 (8th Cir. 2004); *Lawson v. Dixon*, 3 F.3d 743, 752-53 (4th Cir.1993). The plain language of the statute does not require a hearing. *See Harden*, 437 F.3d at 468 (finding "[n]either the statutes plain language, nor our caselaw interpreting it supports such a broad rule"); *Bertling*, 370 F.3d at 820. The only requirement in § 3006A(e)(1) is that there be an appropriate inquiry in an *ex parte* proceeding. *Lawson*, 3 F.3d at 752. Proceeding does not necessarily mean hearing. "Proceeding is a word much used to express the *business done in court* and is an act done *by the authority or direction of the court*, express or implied." *United States. v. Ermoian*, 752 F.3d 1165, 1171 (D.C. Cir. 2013) (internal quotations omitted and emphasis in original). "The purpose of [§ 3006A(e)(1)]'s 'proceeding' requirement is to ensure that the petitioner's motion is carefully examined by the court, not to force the holding of formal hearings for their own sake." *Lawson*, 3 F.3d at 753; *see United States v. Brant*, 112 F.3d 510 (4th Cir. 1997) (*per curiam*). In addition, District of Puerto Rico Local Rule 144A(j)(2) requires only that "[p]roceedings concerning those services may be held *ex parte* and *in camera*, upon a proper showing." So, "[t]he language of the statute requires [only] that the . . . services not be authorized in the absence of 'an appropriate

117

inquiry in an ex parte proceeding' and two determinations of the court: that the services are necessary for an adequate defense and that the defendant is financially unable to obtain those services." *Hardin*, 437 F.3d at 468.

If Padilla had "more details of the many reasons he" needed an additional funding for the investigator (AB108), he could have easily put them in his ex parte motions. "[I]t would not be unduly burdensome, and would avoid potential delay and waste of judicial resources, to require a defendant[, like here,] to include in the request for investigative services a specific statement of why the services are necessary." *United States v. Goodwin*, 770 F.3d 631, 635 (7th Cir. 1985). And the district court denied Padilla's request for an investigator without prejudice (AB108), thus leaving him with every opportunity to refile a request that met these simple requirements. See *Goodwin*, 770 F.3d at 635.

Therefore, the district court did not abuse its discretion in failing to hold a hearing on the merits of his request for additional funding for investigative services. Accordingly, Padilla's arguments should be denied.

**IV.    The district court did not clearly err in making its determinations of fact and credibility.**

**Issue**

Padilla argues the district court clearly erred in making determinations of credibility and fact at his bench trial. (AB71-91).

**Standard of Review**

Credibility and fact findings at a bench trial are subject to clear error review. *See United States v. Strong*, 724 F.3d 51, 60 (1st Cir. 2013). "As long as such findings are supported by a plausible view of the evidence, they will not be overturned." *United States v. Pontoo*, 666 F.3d 20, 27 (1st Cir. 2011) (citing *United States v. Espinoza,* 490 F.3d 41, 46 (1st Cir. 2007)). And if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (citations omitted).

Credibility determinations are factual findings, and especially wide latitude must be accorded to them. *Id.* (citing *United States v. Ruidíaz,* 529 F.3d 25, 32 (1st Cir. 2008)). Indeed, when "the trial court sits as the factfinder, judgments about witness credibility are ordinarily within its exclusive

119

province." *United States v. Raymond*, 697 F.3d 32, 38 (1st Cir. 2012) (citing *Pontoo*, 666 F.3d at 27).

"From [Padilla's] coign of vantage, clear error is an inhospitable standard of review." *United States v. Fitzpatrick*, 67 F.4th 497, 502 (1st Cir. 2023). Indeed, clear error "will be found only when, upon whole-record-review, an inquiring court forms a strong, unyielding belief that a mistake has been made." *Id.* (cleaned up). That is, clear error "means the judge got things wrong with the force of a 5 week old, unrefrigerated, dead fish." *United States v. Marino*, 833 F.3d 1, 8 (1st Cir. 2016) (cleaned up). And Padilla bears the burden of establishing clear error. *See United States v. Rivera-Carrasquillo*, 933 F.3d 33, 42 (1st Cir. 2019).

## <u>Discussion</u>

Padilla does not attack the sufficiency of the evidence against him. Instead, he challenges discrete credibility and fact determinations he contends the district court made in error. His claims cannot pass muster because he waived them by failing to request the district court provide its findings and by failing to develop arguments as to how the district court's alleged credibility and fact determination errors impact the sufficiency of his conviction. In any event, his challenges to the district court's determinations

do not stand up to the clear error standard and are without merit or basis in the record.

## A. Padilla is Doomed by His Failure to Request Findings

Padilla waived asserting the district court's determinations of credibility and fact are clearly erroneous because he did not request the district court make those findings. His failure renders his claims unreviewable on appeal.

Rule 23(c) of the Federal Rules of Criminal Procedure requires a district court that sits as factfinder in a bench trial to "state its specific findings of fact in open court or in a written decision or opinion" if a party so requests. Fed. R. Crim. P. 23(c). This Court has required that defendants request special findings to preserve claims for appeal. *Cesario v. United States*, 200 F.2d 232, 233 (1st Cir. 1952) ("That rule indicates the proper procedure by which a defendant may preserve a question of law for purposes of appeal."); *see also United States v. Bishop*, 469 F.2d 1337, 1346 (1st Cir. 1972) (citing Wright & Miller, Federal Practice and Procedure: Criminal, 4th Ed., § 374) ("We agree that the issue of the common law definition of criminal responsibility was not properly preserved at trial and find that the record here is not so complete nor the defendant's position at trial so clear that we

should undertake determination of this complex issue notwithstanding the failure to comply with Rule 23."). Padilla's failure to do so here constitutes waiver.

In certain cases, like when an appellant contends that the trial evidence did not establish an element of the offense, courts may review a claim of error regardless of whether the appellant complied with Rule 23(c), and even imply the district court's findings when needed. *See, e.g., United States v. Melendez-Torres*, 420 F.3d 45, 48–49 (1st Cir. 2005) (scrutinizing sufficiency of the evidence claim without regard to or mention of district court's findings); *United States v. Hernandez-Salazar*, 813 F.2d 1126 (11th Cir. 1987); *United States v. Gant*, 691 F.2d 1159 (5th Cir. 1982). But this Court cannot work around Padilla's noncompliance with Rule 23(c) in that manner when his claim on appeal is an explicit attack on the very findings of fact and credibility he opted not to request.

The bottom-line is that Padilla's choice to forego compliance with Rule 23(c) puts the United States at an extreme disadvantage in terms of responding to his claims of error, and this Court on its backfoot in terms of properly reviewing them. Absent the district court's findings of credibility and fact, this Court has no way of ascertaining what fact determinations

122

drove the district court's verdict, how the district court evaluated the credibility of the witnesses, and which of them it found to be credible.[22] In a simpler case, this hurdle might not be as insurmountable. But this case involves reams of physical and documentary evidence and testimony by over 20 witnesses. Those evidentiary materials at times stand independent and at others overlap, interplay, corroborate or complement each other in a way that would allow the district court to supportably reach a guilty verdict via different combinations of credibility and factual findings. Against that backdrop, fumbling in the dark for errors in findings that Padilla chose not to request would be a futile and unjustifiable exercise. He waived his claim of error when he ignored Rule 23(c). *See Cesario*, 200 F.2d at 233; *Bishop*, 469 F.2d at 1346.

### B. Padilla Fails to Develop His Arguments

Padilla also waives his claims because he fails to argue how his laundry list of alleged fact and credibility errors and purported

---

22.    Through this lens, Padilla's choice appears strategic, given that clarity of findings would disfavor his chances on appeal. This Court looks unfavorably upon such sandbagging tactics. *C.f. Puckett v. United States*, 556 U.S. 129, 134, (2009); *United States v. Correa-Osorio*, 784 F.3d 11, 22 (1st Cir. 2015).

inconsistencies undermine his conviction, either cumulatively or standing alone.[23] And most of his claims of clear error are not developed beyond short and conclusory statements devoid of reasoned argument and backing. Indeed, "arguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal." *United States v. Sevilla-Oyola*, 770 F.3d 1, 13 (1st Cir. 2014) (quoting *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011); *see also Zannino*, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). And the "first task of an appellant is to explain to [the Court of Appeals] why the district court's decision was wrong." *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015); s*ee also United States v. Mala*, 7 F.3d 1058, 1061 (1st Cir. 1993) ("The devoir of persuasion rests with the appellant to show error in the ruling below."). Particularly on clear error review, where appellants like Padilla bear the heavy burden. *See Rivera-Carrasquillo*, 933 F.3d at 42; *see also Fitzpatrick*, 67 F.4th at 502 (clear error "is an inhospitable standard" to appellants).

---

23.    Doing so could have ameliorated some of the reviewability obstacles discussed above.

As stated above, the complex evidentiary backdrop of this case means that Padilla's bench trial conviction could stand even if parts of the trial testimonies and physical and documentary evidence were discarded. He therefore does not carry his burden of showing a reversible error plaguing his conviction, particularly on clear error review. *See Rivera-Carrasquillo*, 933 F.3d at 42; *Nixon*, 784 F.3d at 1366. Padilla essentially takes a scattershot approach to his appeal: indiscriminately contesting a host of evidentiary materials without explaining how they matter. *Zannino*, 895 F.2d at 17. To make matters worse, Padilla's arguments are largely devoid of record citations (a problem pervasive in his opening brief). (AB 75-92). *See* Fed. R. App. P. 28(a)(8)(A) (stating that the argument portion of an opening brief must include the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

His claims are therefore, again, waived.

## C.  His Claims Are Meritless

In any event, Padilla's aspersions are without merit. Below, the United States will explain how each of his contentions cannot carry the day. And, again, even if some of his allegations were credited by this Court, that would

not require vacatur because no single piece of evidence or testimony is determinative in this case from a sufficiency point of view.

   1. *The Police Logo*

Padilla complains that the descriptions given by Rosado, Alvarez, Cosme, and Figueroa of the police logo (or lack thereof) on the white car used to carry out the robbery contradict each other, (AB75-76), but that is not true when viewing the testimony in context.

Rosado said that on the driver's side of the car there was "a small police logo, like the ones that are used in the motor vehicles on the driver door." (AA133; *see also* AA170-71 (explaining that the logo was like the one placed on various police cars and motorcycles, including Crown Victorias). Alvarez said "the front doors had the big patch of the Puerto Rico Police Department." (AA357; *see also* AA393 ("It was the logo that all the Crown Victorias in the police department would carry at that time, that model precisely.")). Padilla focuses on Rosado's and Alvarez's use of adjectives to describe the police logo to argue the descriptions are inconsistent, but that is a red herring.

Describing size using relative adjectives such as "small" and "big" is a subjective exercise. A person might say a baseball is a small ball if comparing

it to a basketball or call it a big ball if comparing it to a golf ball. In the same manner, Rosado could have, from his perspective, accurately described the police logo as "small" if comparing it to the one on the side of a police building while Alvarez could have described the same logo as "big" if comparing it to the patch police officers wear on their uniform. Absent a frame of reference, assigning objective meaning to the subjective descriptors Rosado and Alvarez employed during their testimonies is a fool's errand.

However, there is context in the record, and it shows that Rosado's and Alvarez's testimonies about the logo corroborated, rather than contradicted, each other. Both Rosado and Alvarez said that the logo was the one used on police force Crown Victorias.[24] (AA133, 170-71, 393). So, the court could ably conclude, free of clear error, that Rosado and Alvarez were talking about the same logo despite the conflicting subjective adjectives each used. *See Pontoo*, 666 F.3d at 27 (plausible renditions of the record are not clearly erroneous). Similarly, most Americans would correctly surmise that the basketball

---

24.    On appeal, Padilla argues that Rosado said the logo was used on motorcycles but obviates he said they were used on cars and SUVs like Crown Victorias, Monteros, and Cherokees too. (AB75; *compare with* AA133, 170-71). This is one of Padilla's many misrepresentations of the record.

player's "small ball" and the golfer's "big ball" is simply a baseball if both say that the ball is like the ones used when the Red Sox play the Yankees.

Padilla also protests that Cosme said the white car did not have a police logo on the driver-side door. (AA256-57, 278, 280-81). But the district court could have concluded, again without clear error, that Cosme simply did not see the logo if it was there. *See Pontoo*, 666 F.3d at 27. After all, it was late at night and dark out, and Cosme could have been focusing on the police lights on the patrol-like car that the car's uniformed occupants turned on when they got to the gate or on the conversation he had with them rather than on scrutinizing the side of the car itself. (AA254-56). Plus, during cross-examination, Cosme said that "there could have been some words" on the car, (AA278), which denotes he was not necessarily confident in his perception of the door being bare.

More importantly, Ramos testified that the police logo was a removable magnet that was placed on the door and later taken off after exiting Isla de Cabras. (AA522-23). The district court could have thus inferred, absent clear error, that the logo had not been placed on the driver-side door yet when the white car passed through Cosme's gate (and before it reached the station house). *See Pontoo*, 666 F.3d at 27. For that same reason,

128

Padilla's insistence that Figueroa's testimony that the car did not have a police logo when it arrived at his house after the robbery contradicts Rosado's and Alvarez's testimonies is demonstrably wrong: The logo was removed shortly after leaving Isla de Cabras, well before the white car arrived at Figueroa's house and before he started working on it to turn it into a taxi. (AA522-23, 783, 795).

### 2. *The Red Pick-Up Truck Outside the Gate*

Padilla next contends that Ramos's testimony that he was parked outside the Isla de Cabras's gate in a red pick-up truck is not credible because Cosme testified he did not see that vehicle. (AB76, 88). However, Cosme testified it was very dark outside the gate and the nearest lamppost was by La Boya 4, an establishment around 400 meters away.[25] (AA286-89). Between that spot and the gate, there was no lighting. (AA288). So, it would not have

---

25.     At trial, Cosme said that La Boya 4 "could [have been] half a mile or a mile away, *I don't know*." (AA287 (emphasis added)). On appeal, Padilla asserts that it was "about ½- 1 mile away," and cites to an exhibit that shows the 1.4 mile distance between the shooting range and the Palo Seco power plant as proof. (AB76 (citing AA1951)). However, this Court can take judicial notice that publicly available maps show the distance between the Isla de Cabras gate and La Boya 4 was around 400 meters (or a quarter of a mile). Based on the maps that were also shown at trial, the district court understood the actual distance.

been clear error for the court to conclude that Cosme did not see Ramos or his car due to the darkness, and thus their testimonies did not contradict each other. *See Pontoo*, 666 F.3d at 27. To be sure, it is plausible and a reasonable inference – rather than a clearly erroneous conclusion – that Cosme could not see what was in the unlit area between the gate and La Boya 4.

To boot, Ayala, who Padilla called as his witness, testified that she saw a man sitting on a rock outside the gate by a red vehicle. (AA987-88). So, she corroborated Ramos's testimony about being outside the gate that night.[26] This independent corroboration by a witness Padilla himself called pushes this case further outside the stringent bounds of clear error. And there is further corroboration too: Video cameras at the nearby gate of the Palo Seco Plant (that record the only road through which Isla de Cabras is accessible to cars) captured a pick-up truck leaving the Isla de Cabras area behind a white car (consistent with the description of the robbery vehicle) at a time

---

26    Padilla was able to impeach his own witness with Ayala's earlier interview in which Ayala had told Agent Ivys Rosado that she saw a green pick-up truck "that belonged to some individuals that were fishing" and "an individual sitting on the rocks staring towards the area of the shooting range at Isla de Cabras" next to a "brown or wine" minivan, and that she did not see a red pick-up truck. (AA1035, 1039).

consistent with the robbery. (*See* GE40-A, 40-B; AA526, 528, 530-31); *see also*

still shots from different video below).



(GE84 at 5; AA1109).



(GE84 at 6; AA1109).

### 3. *The Sargasso Treatment Area*

Padilla insists that this Court should somehow disregard this corroborating evidence and discredit Ramos's testimony because he told the court he only went to Isla de Cabras twice and could not know that there was a sargasso treatment area at the Palo Seco Plant on the road there. (AB78). However, while Ramos did testify that he visited Isla de Cabras twice, (AA502), he said nothing about – and Padilla did not cross-examine him on – his knowledge of the surrounding area (*outside* of Isla de Cabras) where the Palo Seco Plant was located. So, Ramos's trial testimony cannot be taken to mean, as Padilla assumes, that he was unfamiliar with the area where the Palo Seco Plant was located. And, indeed, Ramos's testimony that he and Padilla planned the robbery for close to two years, (AA506), supports the fair inference that they had cased Isla de Cabras and its surrounding areas and knew them well. Furthermore, Padilla's unfounded conclusion that Ramos's knowledge of the  sargasso treatment area means he was coached rings hollow given that (1) Padilla neglected to press Ramos on the

basis of that knowledge at trial,[27] (2) there are many ways that Ramos could have attained that knowledge, (3) the area contains at least two signs notifying the general public of dangerous seawater suction pumps located there, (GE81, 81-a &-b; AA1094), and (4) there is, again, no basis in the record to find that Ramos was unfamiliar with the area.[28]

### 4. *Approaching Through the Sandy Area*

Padilla also complains that Ramos's testimony that he was outside the gate contradicts a line in his PSR that says "he was a lookout and was driving around outside the establishment" during the robbery. (AB76; SA136). However, that statement was never introduced at trial – so the trial court could not have committed clear error based on any such discrepancy because it was not part of the record. And it is improper for Padilla to raise this argument now for the first time. *See United States v. Rivera-Rodriguez*, 75 F.4th 1, 28 (1st Cir. 2023) (arguments cannot make their debut on appeal).

---

27. During his cross-examination of Ramos, Padilla addressed the sargasso identification only to ask for Ramos's estimation of the distance between the treatment area and the entrance to Isla de Cabras. (AA598-99). *See also United States v. Rivera-Rodriguez*, 75 F.4th 1, 28 (1st Cir. 2023) (arguments cannot make their debut on appeal).

28. To boot, Ramos's knowledge of the sargasso treatment area does nothing to invalidate the reliability of the pictures and videos themselves.

Regardless, given that Ramos did drive the pick-up truck in and out of the area, the PSR's summation of Ramos's lookout and driver role does nothing to discredit his testimony.

Padilla also challenges Ramos's testimony that he approached the gate "through the area where the sand [was] so the security guard [didn't] see me" and that he was at a "beach area." (AB76-77; AA520). He maintains he disproved that testimony with photos that show that "there [was] no beach or sandy area there, only steep rocks that go into the sea." (AB77). However, these pictures were never introduced at trial and Padilla never impeached Ramos about the makeup of the area by the gate. *See Rivera-Rodriguez*, 75 F.4th at 28. So, the court could not have committed clear error by crediting uncontroverted evidence at trial.

Besides, the United States introduced the sole trial exhibit depicting the area: GE 2. (AA1802). This picture, shown below, depicts a sandy area by the gate.



(AA1802). So, any finding by the court that there was an area of sand by the gate would not be clear error. *See Anderson*, 470 U.S. at 574; *United States v. Flete-Garcia*, 925 F.3d 17, 26 (1st Cir. 2019).

In addition, a "beach" is "a shore of a body of water covered by sand, gravel, or larger rock fragments" or "a seashore area." *Merriam-Webster.com Dictionary*, s.v. "beach," accessed October 2, 2024, https://www.merriam-webster.com/dictionary/beach. The area in question comports with those definitions.



Google Maps (2024) Isla de Cabras, [Accessed 19 December 2024].[29] In addition, the passage of Hurricane Maria in 2017 greatly impacted beaches in Puerto Rico, reducing or erasing sand width, impacting sand and water depth, and even erasing entire beaches off the map. *See* Barreto-Orta, M., Méndez-Tejeda, R., Rodríguez, E., Cabrera, N., Díaz, E., & Pérez, K. (2019). "State of the beaches in Puerto Rico after Hurricane Maria (2017)." *Shore & Beach*, 87(1), 16; Pérez Valentín, J. M., & Müller, M. F. (2020). "Impact of Hurricane Maria on beach erosion in Puerto Rico: Remote sensing and causal

---

29.     Available from: https://maps.app.goo.gl/M8q1jt41ypXcdRRUA

inference." *Geophysical Research Letters*, 47. So any photograph of the area near the entrance to Isla de Cabras postdating Hurricane Maria would not necessarily be representative of it in 2010.[30]

### 5. Ramos's trustworthiness and potential motivations

Padilla, to undermine Ramos's credibility, points to his statements during a 2014 interview denying that he and Padilla participated in the robbery and asserting that they found out about it through the news. (AB77). However, Ramos testified that before 2016, he gave various false statements to distance Padilla and himself from the robbery. (AA542, 544-45, 557-58, 573-74). He also testified that, at one point in 2014, he (in consultation with Padilla) tried to reach out to an ATF agent to provide false information implicating police officers in the robbery to lead the investigation astray. (AA544). And he told the court about his decision to cooperate. (AA544-45, 573-74, 608-09). The court could not have committed clear error by finding credible that Ramos lied to government authorities to evade accusation and conviction before he decided to cooperate. *See Pontoo*, 666 F.3d at 27.

---

30.   Ocean tides, which change according to the time and moon phase, affect the amount of sand exposed along the shoreline too.

Padilla also maintains that Ramos was inherently untrustworthy because his "lifestyle [had] been one of deceit and lying. He spent years preparing false checks and identifications, successfully cashing them, defrauding banks for years without getting caught. During his supervised release term, he lied for 2 years to his probation officer, filing monthly reports that he had not talked nor been with a convicted felon." (AB77). But Ramos was open and honest throughout his testimony about these circumstances, and the court was ably positioned to gauge his credibility while on the stand. Similarly, Padilla complains that Ramos "important reasons to lie" like "to regain his liberty." (AB79). But, again, the district court was keenly aware of these potential motivations and necessarily factored them in when weighing Ramos's credibility. Padilla would have this Court assume that the district court found the entirety of Ramos's testimony credible and then determine that doing so was clear error. But that is improper. Even if some factual or credibility determinations can constitute clear error due to implausibility or internal inconsistencies, clear error review cannot be weaponized like Padilla intends: to throw transparent testimony into the trashcan simply because the witness committed dishonest

acts in the past. If that were the case, bench trials would screech to a halt every time prior acts of dishonesty of a witness came up.

And discarding all of Ramos's testimony like Padilla urges would disregard the ways his testimony was corroborated by other evidence, such as phone records and portions of Cosme's, Oquendo's, and Figueroa's testimonies. (*See, e.g.*, AA1847-51, 1861-66, 1877-86).

### 6. *The Printer Padilla Provided*

Padilla maintains that Ramos lied when he testified that Padilla "provided" him with a computer and printer while he was at a halfway house. (AB77). He muses that cannot be true because computers were not allowed at the halfway house. However, to "provide" means "to supply or *make available* (something wanted or needed)" or "to make something available to." *Merriam-Webster.com Dictionary*, s.v. "provide," accessed October 3, 2024, https://www.merriam-webster.com/dictionary/provide. So, Ramos's testimony that Padilla "provide[d] [him] with a printer and a computer," (AA548),[31] does not mean, like Padilla assumes, that he

---

[31] It was Padilla's counsel, rather than Ramos, who used those words. To be sure, he asked Ramos: "And while you were at the halfway house, did Padilla ever provide you with a printer and a computer?" (AA 548). Ramos replied: "Uhm, yes." (AA548).

physically kept at the halfway house a printer and a computer that Padilla gave him. Instead, it merely means that Padilla made a printer and a computer available to Ramos. And that is consistent with Ramos's testimony that he would prepare checks on the computer at Padilla's house. (AA490). Even if the testimony meant that Padilla gave Ramos a printer and computer that he kept at the halfway house, Padilla's argument on appeal that Ramos must have lied because the halfway house did not allow computers assumes that Ramos followed the rules at the halfway house. But Padilla himself argues that Ramos did not. (AB77 (pointing out that Ramos lied about being in contact with Padilla, a convicted felon, during this time)).

### 7.  *Planning the Robbery for Two Years*

Padilla next takes aim at Ramos's testimony that he and Padilla planned the robbery for two years, protesting that this cannot be true because Ramos was under supervised released for a portion of that time. (AB 78). However, Ramos testified that he was in contact and behaving unlawfully with Padilla while on supervised release, (AA548-49), and Padilla's opening concedes that fact as well. (AB77 (pointing out that Ramos lied about being in contact with Padilla, a convicted felon, during this time)). More importantly, Padilla keeps to his trend of calling foul on supposed

inconsistencies he did not challenge below: He did not press Ramos on cross-examination as to his assertions regarding the length and timing of the robbery's planning. Yet, he intends – contrary to this Court's precedent – to make them an issue on appeal. *See Rivera-Rodriguez*, 75 F.4th at 28.

In any event, Ramos at trial explained the length of the planning phase: He said that the robbery "was always delayed because there [were] always things that were missing, either money or the vehicle that the things were going to be put in, certain things." (AA507-08). And the planning was necessarily complex. For example, Ramos testified that "the vehicle that [they] were searching for was one that was similar to a patrol car" which they had to "disguise … like a patrol car" using "logos," "sirens," and "hubcaps." (AA508). Furthermore, he said "almost $10,000 were needed to buy the car, the uniforms, the weapons, all the things that were needed to do [the robbery]." The district court can therefore not have clearly erred by finding Ramos's testimony about the planning of the robbery unproblematic. *See Anderson*, 470 U.S. at 574; *Flete-Garcia*, 925 F.3d at 26.

### 8. *The Motorcycle Repair Shop*

Padilla also insists that Ramos lied in his testimony because he said that he had a motorcycle repair shop and a former PSR detailed he was an

141

ice cream truck salesman and included nothing about a motorcycle repair shop. (AB79). But at trial, Padilla did nothing to question that Ramos had a motorcycle repair shop and did not introduce the PSR into evidence or bring it to the court's attention. *See Rivera-Rodriguez*, 75 F.4th at 28. So, the district court cannot have committed clear error by crediting Ramos's unimpeached and uncontroverted testimony that "[he] had ice cream trucks and also a motorcycle repair shop." (AA499).[32] Padilla's insistence that Ramos is "caught lying" is thus of no moment because nothing in the trial record establishes the purported lie. *See Pontoo*, 666 F.3d at 27; *Rivera-Carrasquillo*, 933 F.3d at 42.

### 9. *"Exonerating" Guill Reabing-Padilla*

Padilla further complains that Ramos "exonerated" co-defendant Guill Reabing-Padilla, and that must mean he lied because Reabing pleaded guilty

---

32.    Padilla had access to the PSR since at least April 15th. (AA28, 749). He thus had ample time to investigate any inconsistencies arising therein. Besides, given Padilla's known association with Ramos and the fact that counsel had notebooks with questions for the witnesses and Padilla was heavily involved in his own defense (going as far as to request hybrid representation between himself and counsel and conferring constantly with counsel at trial), Padilla cannot now summarily blame his failure to ask on lack of investigatory funds. Instead, the logical inference is he did not ask because there was no impeachment testimony to be obtained.

for his role in the robbery conspiracy. (AB79-80). However, this is simply not true. As was discussed during trial, Reabing plead guilty for his role in moving and disposing of the stolen firearms, (DE129 at 9), and Ramos did not exonerate him of that insofar as he only testified that Reabing did not participate in the robbery itself. (AA575-77). So, Ramos's testimony at trial is corroborated rather than contradicted by Reabing's guilty plea. *See Pontoo*, 666 F.3d at 27; *Rivera-Carrasquillo*, 933 F.3d at 42.

### 10. The Purchase of the Red Pick-Up Truck

Padilla again challenges Ramos's credibility because he testified at trial that he had bought the red pick-up truck he used during the robbery in 2005, and he attempted (unsuccessfully) to impeach him with an interview statement where he said he bought the pick-up truck in 2011 or 2012. (AA559-64). For starters, the interview statement was not part of the trial record because Padilla was unable to properly introduce it. (AA562 (the district court ruling that the statement "was in a note made by someone else").

Even if it was introduced, the inconsistency between the purchase dates would have been consistent with Ramos's other testimony because that interview took place in the 2014, (AA559-60), and Ramos testified that

before 2016, he gave various false statements to distance Padilla and himself from the robbery. (AA542, 544-45, 557-58, 573-74). He also testified that, at one point in 2014, he (in consultation with Padilla) he tried to reach out to an ATF agent to provide false information implicating police officers in the robbery to lead the investigation astray. (AA544). And he told the court about his decision to cooperate. (AA544-45, 573-74, 608-09).

So, the district court could not have committed clear error by finding credible that Ramos lied to government authorities to evade accusation and conviction before he decided to cooperate, and crediting his statement that he bought the truck in 2005 even if he said otherwise in a 2014 interview. *See Anderson*, 470 U.S. at 574; *Pontoo*, 666 F.3d at 27.

*11. The Palo Seco Videos*

Padilla next maintains that the videos and still images taken from the Palo Seco surveillance cameras showing a white car consistent with the one used to commit the robbery and a red pick-up truck "don't help either" because "it is impossible to identify what type of vehicle is going by Palo Seco" and Ramos's testimony explaining the videos is this "unbelievable." (AB80). However, the court was able to view the videos in conjunction with Ramos's testimony describing the videos and images. (*See* GE40-A, 40-B, 84

144

at 5, 6; AA526, 528, 530-31, 1109). Padilla cannot establish that the court committed clear error if it relied on them. After all, the district court would only clearly err if the only interpretation of that evidence was the one Padilla urges on appeal. *See Anderson*, 470 U.S. at 574; *Flete-Garcia*, 925 F.3d at 26.

### 12. The Open Mobile Phone Records

Padilla contends that the Open Mobile phone records introduced at trial, which depict dozens of phone calls between Ramos and himself, are unreliable because Open Mobile security analyst Edgardo Ruiz-Sánchez certified that "their system could not identify calls less than a minute and if any were made, they would be rounded out to 1 minute." (AB81). But Ruiz certified that Open Mobile's system "collected the call duration in minutes and not in seconds" and thus "fractions or seconds of a call would be automatically rounded up to the nearest minute." (AA1964). This certification, far from making the records unreliable, provided context for interpreting the records and thereby increased (rather than negated) their probative value. So, the court could not clearly err by interpreting the phone records in a manner consistent with corroborating testimony and Open Mobile's guidance to conclude that (1) phone calls were in fact completed between Padilla and Ramos and other relevant persons, and that (2) the

duration of these calls was rounded up to the nearest minute, which was one minute for many of the calls. *See Anderson*, 470 U.S. at 574; *Pontoo*, 666 F.3d at 27. And Padilla concedes that interpreting the records in this manner is consistent with Ramos's testimony, though he comments without more that Ramos "conveniently" testified as such. (AB81).

*13. The Pen Link Analysis*

Padilla insists that the duration of the phone calls in the Open Mobile records is wrong because "the Pen Link [sic] analysis performed by HSI Intel analyst Moreno reflects that the majority of the calls lasted 1 second." (AB81). He either misunderstands or deliberately misstates the record by representing to this Court that Moreno "testified Pen Link [sic] will not create anything that is not put into the system, and that the data obtained reflected that it included seconds duration of a call" and that "Pen Link [sic] was used because it would provide better results." (AB81). That is not true. Moreno testified at trial that PenLink is an analytical tool rather than a database or a phone data extraction software. (AA1360, 1363, 1369). It is used to group and organize phone data to provide for better analysis by grouping, searching, and filtering data that is input into the system from an outside

source.[33] (AA1360). Moreno explained that he populated his PenLink analysis by taking the PDF documents of the Open Mobile phone records and scanning them. (AA1390). So, PenLink could not collect information as to the phone calls lasting seconds because the PDF documents used to populate it did not contain that information. (AA1390). Instead, PenLink erroneously read and input the numbers that reflected minutes in the Open Mobile records as if they were seconds. (AA1393-94). So, to the extent Padilla attempted to impeach Ramos's testimony and the Open Mobile records with the PenLink analysis, the district court could not have clearly erred in determining that it did not accomplish that goal. Again, Padilla could only succeed on clear error review if his erroneous reading of the PenLink evidence was the only reasonable interpretation of it – but given Moreno's testimony, it is not. *See Anderson*, 470 U.S. at 574; *Flete-Garcia*, 925 F.3d at 26. Plus, the district court made pellucid that it understood that PenLink had mistakenly read the minutes in the Open Mobile records as seconds. (AA1394, 1397).

_____

33.    This is what Moreno meant by obtaining a "better result." (AA1365, 1370).

The PenLink analysis could also never accomplish the goal of impeaching the Open Mobile records because it was, in fact, based on the exact same data contained in the Open Mobile records. An excel spreadsheet created using raw data could never be used to contradict the raw data on which it is based. Per Moreno's testimony, PenLink functions in the same manner. (AA1390, 1394). Any inconsistency, like here, would necessarily have to be based on a simple inputting error. By the same token, information in a primary source can never be called into question by information in a secondary source that is grounded on that same original source. Thus, the district court could not have clearly erred by finding that the PenLink evidence did not impeach Ramos's testimony or the Open Mobile records. *See Pontoo*, 666 F.3d at 27.

### 14. *Time of Arrival at Figueroa's House and Transfer of Guns*

Padilla cries foul at some minor inconsistencies in the testimonies of Rosado, Oquendo, and Figueroa concerning what time he arrived at the station house at Isla de Cabras after the robbery and at Figueroa's house with the stolen firearms. (AB82-83). He maintains the district court should have disregarded Figueroa's testimony because of it, but he cannot establish that

the district court would have clearly erred by crediting Figueroa's testimony. (AB83)

Indeed, Rosado testified that Oquendo and Padilla arrived at the station house at "about 4:30 a.m." on the morning of the robbery. (AA204, 208). Oquendo, in turn, testified that at "approximately 3:50 [a.m.]" he and Padilla were approaching Isla de Cabras. (AA671-72). Figueroa, on the other hand, said that Padilla arrived at his house at "approximately 4:00 to 4:30 a.m." with the stolen firearms. (AA793). While each witness's accounting of the time may not precisely line up with each other, any potential minor time inconsistencies are not significant enough to amount to a finding of clear error in the court's credibility determinations. *C.f. United States v. Santos-Rivera*, 726 F.3d 17, 25 (1st Cir. 2013) (citing *United States v. Rodriguez,* 457 F.3d 109, 119 (1st Cir. 2006)) ("minor inconsistencies in otherwise lengthy and corroborated testimony will not undermine the witness's credibility"); *see also Fitzpatrick*, 67 F.4th at 502 (clear error requires "an inquiring court forms a strong, unyielding belief that a mistake has been made"); *Marino*, 833 F.3d at 8 (clear error "means the judge got things wrong with the force of a 5 week old, unrefrigerated, dead fish"). Even less so when over ten years passed between the date of the robbery and trial, and each witness let the

court know that they were giving estimations of time by using qualifying words like "about," "around," and "approximately." (AA204, 208, 672, 793). Furthermore, Oquendo testified that at the time he and Padilla arrived at Isla de Cabras shortly after the robbery, Rosado "was destroyed." (AA674). And there is no evidence in the record as to how long it would take Padilla to reach Figueroa's house from Isla de Cabras. So, Padilla failed to show the court clearly erred.

Padilla also says that it's unbelievable that firearms were transferred from the white car used to commit the robbery to a gray town car before arriving at Figueroa's house. (AB83-84). But this is a logical thing to do to avoid capture. (*See* AA781 (stating that he noticed police presence in the area that morning and that they "could see a lot of helicopters")). After all, the white car had been seen committing the robbery and it makes sense to move the firearms to cars that have not been made. And the record demonstrates that Padilla was aware of the need to get distance from that white car, as it was disguised as a taxi and disposed of. (AA783-84, 785, 802). To boot, it was also logical to enlist Figueroa in order to use multiple cars so as to (1) split the contraband, (2) make sure that all the firearms were in the trunk of the cars, instead of visible in the backseats (like they were in Padilla's car when

150

he arrived at Figueroa's (AA779)), and (3) avoid that a single car ride noticeably low due to the weight of the over-one-hundred firearms. The latter was particularly important given that Ramos testified that the white robbery car was riding so heavy when it left Isla de Cabras that the bottom was scraping speed bumps due to the weight of the stolen guns. (AA521).

And it would not be a time-consuming process to transfer the guns between cars given that the guns were in duffel bags, (AA778, 782), and it is a reasonable inference that the group of robbers that were travelling in the white car used to commit the robbery would have been available to help. *See Pontoo*, 666 F.3d at 27 (plausible rendition of the record should not be overturned). In fact, once at Figueroa's house, Padilla and Figueroa also transferred the guns that were in the backseat of Padilla's car to the trunk of Figueroa's car.[34] (AA779).

    *15. Whether Ramos and Figueroa Knew Each Other*

Padilla argues that it is incredible that Figueroa "never identified knowing [Ramos,] stating he did not know him from the street, only that he is in MDC." (AB83). However, Padilla does not cite anything to back up that

---

34.    Again, a logical thing to do to avoid capture.

assertion (a common occurrence throughout his brief), and Figueroa did not testify about Ramos at all. So, at trial, Figueroa did not make any of the representations about Ramos that Padilla ascribes to him.

Ramos did identify Figueroa, stating that he recognized him from making fake identification cards for him using his picture so that he could cash checks as part of a cloned check scheme.[35] (AA491-92, 493). Ramos stated that he went to Figueroa's house with Padilla twice but did not go inside and did not personally meet Figueroa until he met him in prison in Atlanta in 2017 or 2018. (AA491-93, 497-98). He explained that he "stayed outside because Padilla didn't want [him] to get to know the people that cashed the checks, to protect me in case something happened that they didn't have an opportunity to rat me out." (AA497). Contrary to what Padilla avers, there is nothing implausible or inconsistent about these statements and identification. *See Pontoo*, 666 F.3d at 27. And, to the extent that Padilla states that Ramos and Figueroa "both participated in the storing of firearms," they

---

35.    Ramos testified about how he and Padilla ran a check fraud scheme in which others, like Figueroa, were enlisted to cash cloned checks using fake identification cards Ramos prepared. (AA478-80, 490-500, 585, 603). Figueroa testified about cashing checks for Padilla too. (AA773). But Padilla objected to the government's questioning of Figueroa about this scheme so no further were asked by the government. (AA773-74; *see* AA73-75).

each testified as to participating at different times and never together. (*Compare* AA536-37 *with* AA779-82, 787-88). For example, Ramos did not go to Figueroa's house with Padilla, nor to the house in Cataño where the firearms were initially stored, because he testified that he met up with Padilla at a gas station in the evening of October 26th for the first time after the robbery. (AA533).

### 16. Storage of the Firearms

Padilla next complains that Ramos's and Figueroa's testimonies about where the guns were stored is inconsistent. (AB84-85). That is not true.

Ramos testified that Santiago kept the guns at his house for several days until Padilla decided to move them, after which Santiago drove the guns, covered in blankets, in a van to a mechanic shop Ramos had with a friend. (AA536-37). The guns, over one hundred of them, were counted and stored in plastic boxes on the second floor of the shop. (AA537). Ramos "had them for six or seven months." (AA590).

Figueroa said that he helped move the guns to a house in Cataño the day of the robbery. (AA778-82). This lines up with Ramos's testimony that the guns were initially kept at Santiago's house before they were moved to the mechanic shop several days later. (AA536). And Figueroa testified that

the guns were later stored in a room at his house for about six months. (AA787-88). During that time, Padilla would sleep at Figueroa's house every day. (AA787). After that, they were placed in the trunk of a car that was parked underneath some tarps next to Figueroa's house. (AA788). This does not contradict Ramos's testimony either, given that Padilla and his cohorts had the firearms for years after 2010, and it is not inconsistent that they be stored for six or seven months in one place and later moved to a different location where they remained for many more months.[36]

Padilla further argues it is nonsensical that the guns were moved to Figueroa's house due to problems between Padilla and Santiago when the guns were not in Santiago's possession but instead in Ramos's mechanic shop by that time. (AB85). But Figueroa did not testify that the guns were moved to his house due to Padilla having problems with Santiago. He talked about Padilla and Santiago having problems, (AA786-87), and then Figueroa was asked by the prosecution whether the firearms had ever been in his house. (AA787). But the prosecution's question about the firearms being in

---

36.    By 2016, the firearms (minus the ones that had already been sold) were in possession of one of Padilla's associates: a cousin called Cano. (AA588-89).

Figueroa's house was untethered to Figueroa's testimony about Padilla and Santiago having problems with each other. (AA786-87). Figueroa did not explain why the firearms were stored at his house. Padilla's attempt to create a link between separate testimonies should not be entertained by this Court. None exists.

Padilla also insists that Figueroa's testimony about storing the guns in his house is unbelievable because Ramos testified that he sold dozens of the guns, which in his view means Ramos had direct access to the guns, yet never testified "he went to Figueroa's residence to pick up firearms." (AB85). However, Ramos testified that Padilla was the one who had "those weapons" and "[Ramos] would sell them but [Padilla] was the one who would give them to [him]." (AA587-588). So, Ramos testimony defeats Padilla's arguments of inconsistency because it established that Ramos did not have continuous direct access to the guns and instead Padilla would supply him with the ones he sold.

### 17. Cooperation Agreement

Padilla asserts Figueroa lied when he said he had not entered into a cooperation agreement with the United States because the United States filed a substantial assistance motion on his behalf in another case. (AB85-86). But

155

Figueroa did not have a Plea and Cooperation Agreement with the United States. (AA56, 749). The United States did file a motion for a "minimal" reduction "in light of the anticipatory testimony" at Padilla's trial. (SA159; *see also* AA790). The district court granted it, which – as Figueroa transparently testified – effectively reduced Figueroa's term of home confinement by seven months. (AA790). But that does not mean that Figueroa provided false testimony when he said he did not enter into a Plea and Cooperation Agreement with the United States. (AA764). To be sure, a cooperation agreement is not a prerequisite to a substantial assistance motion. *C.f. Carey v. United States*, 50 F.3d 1097, 1101 (1st Cir. 1995); *United States v. Brechner*, 99 F.3d 96, 99 (2d Cir.1996). The United States may award a defendant with a substantial assistance motion irrespective of any agreement or promise between the parties.

There is nothing in the record to indicate that Figueroa's testimony or the filing of the substantial assistance motion were a result of a cooperation agreement between the United States and Figueroa. Instead, the record supports the opposite. The United States, keeping with its duty of candor, told the court at trial, prior to Figueroa's testimony, that he "was made available, or he made himself available very recently. And we've gone into

156

the record as to the – this witness has no Plea and Cooperation Agreement. And he had shown resistance to testifying up until the end." (AA56, 749).

In any event, Figueroa's testimony about the lack of a Plea and Cooperation Agreement was counteracted by his testimony about the benefits he received from testifying: the substantial assistance motion which reduced his term of confinement by seven months and $1,150 in monetary assistance from the United States Attorney's Office Witness and Victim Program. (AA 790-91). The district court was keenly aware of how Figueroa benefitted from his testimony and of his potential motivations, and necessarily factored them in when weighing his credibility. And even if Figueroa had received some promise from the United States, that promise would not necessarily rise to the level of a Plea and Cooperation Agreement so as to stain his testimony.

### 18. *Santiago's Identification and Fingerprints*

Padilla insists the description of the fake sergeant who participated in the robbery is "totally contradictory" and does not match Santiago. (AB86-87). However, the descriptions provided by Rosado and Alvarez are largely consistent with each other. Rosado said that the fake sergeant was around six feet tall, had a gray mustache, gray hair, and sunken cheekbones.

(AA134-35). Alvarez said he had "thin features of the face," a black mustache, black hair, and large thick black eyebrows. (AA419-20). She also said he had sunken cheeks. (AA419). These descriptions, far from being "totally contradictory," corroborate each other and differ only as to Rosado describing the mustache as gray and Alvarez calling it black. But, especially on clear error review, this minor inconsistency – if it can be called that – is not enough to cast aside the descriptions as contradictory and can be easily explained by differences in the lighting conditions at Isla de Cabras. *See Fitzpatrick*, 67 F.4th at 502 (clear error requires "an inquiring court forms a strong, unyielding belief that a mistake has been made"); *Marino*, 833 F.3d at 8 (clear error "means the judge got things wrong with the force of a 5 week old, unrefrigerated, dead fish"). Indeed, both witnesses testified that the lighting conditions were generally poor at Isla de Cabras, and they each saw Santiago at different locations and under different lighting conditions.[37] (AA198, 203, 429-30)

Alvarez described Santiago as being "*trigueño*," which the interpreter

---

[37]. The environmental conditions, as well as the selection of footwear, necessarily also impacted Rosado's perception of height. (*See* AA363-64 (mentioning that one of the assailants wore boots)).

translated as "dark skin." (AA415-16 (emphasis added)). Padilla seizes upon this translation to say the description does not match Santiago, who he deems as "white." (AB86). The district court commented that "the word *trigueño* has a very particular meaning in Puerto Rico. To be translated as dark-skinned that's not necessarily correct." (AA416 (emphasis added). The interpreter explained that he "does use dark skin because dark skin is only saying that it's dark, it's not saying the shade of dark." (AA416). The district court retorted that *trigueño* is "a very particular word used in Puerto Rico to describe a range of colors of [skin.]" (AA417). So, the district court was evidently aware that calling someone *trigueño* does not necessarily mean that a person is dark skinned and can be used to refer to people of a complexion close to that of white and to those that are olive-skinned. *See Trigueño*, WordReference.com.[38] *See also United States v. Teixeira*, 62 F.4th 10, 19 (1st Cir. 2023) (judges may "bring to bear [their] own knowledge and experience in evaluating the evidence admitted in the case"). In fact, the district court plainly resisted the suggestion that *trigueño* describes only someone of dark

---

38.    Accessible at: https://www.wordreference.com/es/en/translation.asp?spen=trigue%C3%B1o.

skin. (AA416-17). Later on, during Rule 29 arguments, the court again clarified what the record said *trigueño* meant and maintained it was not limited to dark skin. (AA890-91).[39] Against that backdrop, the district court cannot have committed clear error by determining that the description matched Santiago, particularly when he appears to be at least olive-skinned in the picture Padilla entered into evidence. (AA1949).[40] Again, clear error cannot be found if the record can be read in a manner consistent with the district court's interpretation, even when it can also be read in a competing one. *See Anderson*, 470 U.S. at 574; *Diaz-Alarcon v. Flandez-Marcel*, 944 F.3d 303, 312-13 (1st Cir. 2019) (burden of showing clear error could not be met by pointing to competing testimony); *Rivera-Carrasquillo*, 933 F.3d at 42 ("the challenger must do more than show that the finding is 'probably wrong'");

---

39. "Well, that was a point of contention because the word was trigueño and I actually made a point with the word, with the translation, because in Puerto Rico trigueño -- Is really -- trigueño is really a -- it's really difficult to define tone of skin. And Mr. Pérez said that in Puerto Rico anything that is not white is trigueño, but it does not establish the darkness of the skin. That's what the record reflects." (AA890-91).

40. Padilla maintains that one of the sketches of Santiago depicts someone who is dark-skinned, but he mistakes the illustrator's use of shading in the drawing for an indication of skin color or tone. (AA1944; *see also* AA1939-49, 1943-45 (all containing shading)).

160

*Flete-Garcia*, 925 F.3d at 26 (explaining that if there are two permissible views of the evidence, "a district court's choice between those two competing views cannot be clearly erroneous").

Padilla's argument that Santiago wore glasses, yet the witnesses did not describe him as wearing them, (AB86-87), does not hold up to clear error review either. Assuming the fake sergeant did not wear glasses neither exonerates Santiago nor undermines the witnesses' descriptions and identifications. Glasses are easily removed, and the evidence amply establishes that the robbers went through great pains to disguise themselves. (*See, e.g.*, AA538).

Padilla also protests, in a meager sentence, that no fingerprints matching Santiago were lifted from the site of the robbery. (AB 87; *see also* AA1970-1971). But that would only establish that Santiago did not leave fingerprints behind, which does not necessarily mean that he was not there. *See United States v. Matthews*, 498 F.3d 25, 31 (1st Cir. 2007) (absence of fingerprints did not preclude finding of guilt). The lack of fingerprints matching Santiago is thus not enough to, on clear error or any other review, rebut all the other evidence tying him to the robbery. *See Fitzpatrick*, 67 F.4th at 502; *Pontoo*, 666 F.3d at 27.

161

Padilla's arguments regarding Santiago also disregard Rosado's lineup identification of Santiago, and that both Ramos and Figueroa further tagged him as a perpetrator of the robbery. (AA158-59, 161 (referring to exhibit reproduced at AA1830), 510, 514, 515, 534, 537-38 (identifying Santiago, who Ramos referred to as "El Viejo," in a picture reproduced at AA 1831), 539, 786-87, 818 (identifying Santiago, who Figueroa referred to as "Pucho," in a picture reproduced at AA1952 and another reproduced at AA1831)). This evidence, which supports that Santiago was one of the perpetrators of the robbery and the fake sergeant, necessarily dooms Padilla's challenges on clear error review.[41] *See Anderson*, 470 U.S. at 574; *Diaz-Alarcon*, 944 F.3d at 312-13.

### 19. *Padilla's Threat to Oquendo*

Padilla next argues that the district court should have disregarded Oquendo's testimony of Padilla's confession to him because it is unbelievable. (AB89-90). Padilla avers that Oquendo is a large man with

---

41.     And, of course, there is also the matter of Santiago's guilty plea and accompanying acceptance of responsibility for his role in the robbery before the district court while under oath – though Padilla, unconvincingly and based only on supposition, alleges that plea was merely one of convenience (AB 87-88) in an attempt to walk back Santiago's solemn declarations before the district court.

tactical training who did not fear Padilla. (AB89). However, Oquendo's trial testimony aptly explained why he believed Padilla's threat and became afraid of him.

Oquendo testified that, after arriving at Isla de Cabras with Padilla shortly after the robbery, he and Padilla got out of the car and went over to Rosado, who "was destroyed." (AA673-74). Padilla "left to his car" and Oquendo followed to retrieve some shorts from inside it. (AA674). Oquendo testified that, once he opened the door and took his shorts out:

> Padilla had the steering wheel like this, (indicating), and he hit it. And he tells me, "motherfucker, that – man, that was me." And I said, "what are you talking about, motherfucker?" And he said, "the robbery, man. Those weapons." And then he said, "but if you say anything, I'm going to kill your children."

(AA674). Padilla mentioned Oquendo's children, who he knew, by name. (AA674-75). Oquendo "took off running to the police station." (AA675). He "was confused," "couldn't understand things," and "was nervous." (AA675). Oquendo was told to leave the station, by then a crime scene, because he "couldn't be there." (AA675).

When he was interviewed by investigators that same day, he did not tell them of Padilla's confession and threat because Oquendo "was afraid. [Padilla] had the weapons. [Padilla] knew [Oquendo's] children. [Oquendo]

163

was disarmed. And [Padilla] would do it." (AA676). Later that day, Padilla called Oquendo and again threatened him: "hey, motherfucker, remember your children." (AA676).

Padilla's conclusory and unsupported aspersions of doubt are not enough to establish that the district court would have committed clear error in crediting Oquendo's uncontroverted testimony of Padilla's confession and threat against his children. *See Rivera-Carrasquillo*, 933 F.3d at 42. Moreover, Oquendo explained in his testimony why he behaved how he did after hearing the confession and threat. He was in shock. (AA 684). He was confused and nervous. (AA 675). He was afraid. (AA676). Padilla "had the weapons. [Oquendo] was disarmed. And [Oquendo] believed that he would do it." (AA678). Oquendo put protecting his children over reporting Padilla's confession straight away. (AA684, 686). Plus, Oquendo testified about seeing Padilla being violent in the past, (AA687-92), which further explains why he would be fearful of Padilla and believe he could follow through on his threat. Thus, contrary to Padilla's contentions, there is nothing plainly uncredible about Oquendo's testimony of Padilla's confession and threat, and his reactions to them. *See Pontoo*, 666 F.3d at 27.

He also insists that Oquendo "did fear being considered a suspect in the robbery and had reason to invent the story to disassociate himself with it." (AB89). But there is nothing in the record to support that theory. And Padilla also avers that it is unbelievable that he would blurt out a confession to Oquendo at all, (AB89-90), but it is entirely plausible that Padilla admitted to Oquendo that he conducted the robbery during an emotional outburst, (AA674 (stating that Padilla hit the steering wheel before making the confession)), after witnessing the aftermath of the robbery and seeing Rosado "destroyed." (AA674).

In short, Padilla could only successfully challenge Oquendo's testimony on clear error review if the only interpretation of it was that Oquendo lied on the stand. But he cannot do so because Oquendo's testimony could reasonably be deemed believable. *See Anderson*, 470 U.S. at 574; *Flete-Garcia*, 925 F.3d at 26.

### 20. *The Rusty Guns*

Finally, Padilla complains that some guns were left at the Isla de Cabras station house after the robbery. (AB90). He does not elaborate what significance he ascribes to these firearms, or why they are problematic to Padilla's conviction. Instead, Padilla merely muses: "Why were they left

where [Alvarez] sits in the front desk? Did [Alvarez] tell them they were ruined?" (AB90). That is not enough to establish clear error, or to develop an argument at all. *See Zannino*, 895 F.2d at 17; *Rivera-Carrasquillo*, 933 F.3d at 42.

In any event, there could be myriad reasons why the robbers left those guns behind outside the vault. They could have realized that they could not take that many weapons. And they could have noticed, as is apparent from the evidence and to anyone who looked at them, that the guns in question were rusty and old. (AA1827). Indeed, Alvarez testified they "were old, full of rust." (AA437). And contrary to Padilla's musings, they were not ruined, since she testified that they worked, despite their state and age. (AA437).[42] Leaving those guns behind makes sense too because the robbers intended to sell the firearms they stole, and the value of the rusty old guns would be greatly diminished due to their state and age. *See Pontoo*, 666 F.3d at 27 (plausible renditions of the record do not call for clear error).

---

42.    Padilla seemingly suggests that Alvarez told them the guns were ruined, but there is nothing in the record to back that up. First, and again, they were not ruined per Alvarez's testimony, but merely rusty and old. (AA437). Second, both Rosado and Alvarez testified that Alvarez was bound and locked in a bathroom during the time the robbers were removing the guns and transporting them away. (AA139-47, 367-74).

**V.    The District Court did not abuse its discretion in its treatment of prior inconsistent statements or polygraph results.**

**Issue**

Padilla claims the district court abused its discretion by preventing him from introducing extrinsic evidence through leading questions about prior statements absent an in-court statement from the witness. (AB 109-13). He also contends the court abused its discretion by excluding polygraph evidence. (AB114-18).

**Standard of Review**

This Court reviews preserved challenges to evidentiary rulings for abuse of discretion. *United States v. Cortés-Medina*, 819 F.3d 566, 569 (1st Cir. 2016). Even if abuse of discretion is identified, however, this Court will not reverse an evidentiary ruling if it is a harmless error. *United States v. Santana-Avilés*, 120 F.4th 7 (1st Cir. 2024).

**Discussion**

Padilla waived his claims that the district court did not allow him to present extrinsic evidence of prior inconsistent statements because he does not cite to the record to show when the district court rejected admission of those statements. In any event, his arguments are without merit. Finally, the

district court did not abuse its discretion in excluding polygraph evidence because such evidence was unreliable, and the court further specified that it, sitting as factfinder, would not place any weight on polygraph evidence.

### A. Padilla Waives His Claim by Failing to Cite the Record

Padilla's opening brief fails to comply with Rule 28 of the Rules of Federal Appellate procedure. That rule announces that "a party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected." Fed. R. App. P. 28(e); *see also* Fed. R. App. P. 28(a)(8)(A) (stating that the argument portion of an opening brief must include the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). This Court should accordingly find that Padilla's contentions that the court improperly excluded prior inconsistent statements are waived.

Recently, this Court refused to entertain challenges to the admissibility of hearsay statements because of an appellant's analogous noncompliance with Rule 28. *See United States v. Martinez-Hernandez*, 118 F.4th 72, 97-98 (1st Cir. 2024). There, "the appellant broadly assert[ed] that the court improperly admitted the hearsay statements of the four named witnesses … and he then

[went] on to recite well established legal principles … without connecting those principles to the testimony he challenge[d] [there.]" *Id*. at 97. Padilla does the same here. (*See* AB 110-13). First, he broadly complains that he was not allowed to introduce extrinsic evidence of prior inconsistent statements. (AB111-12). Then he refers as "examples," without citation or specificity, to some statements made by Anabel Ayala and Miguel Maldonado. (AB112-13). Consideration of Ayala's and Maldonado's statements should be barred by Padilla's noncompliance with Rule 28, but they will nonetheless be discussed later. However, this Court should, as it did in *Martinez-Hernandez*, decline to mine the record to substantiate Padilla's broad assertions – especially when faced with a voluminous record like the one at hand.[43] To

---

43.   Throughout trial, Padilla attempted to introduce prior statements when there was not inconsistent in-court statement to impeach. (*See e.g.* App. 1018-19, 1021-34). However, to introduce extrinsic evidence of a prior inconsistent statement under Fed. R. Evid. 613(b), there must be two statements: "one made at trial and one made previously." *United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir. 1999). The inconsistent statement must offer "some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *United States v. Barrett*, 539 F.2d 244, 254-256 (1st Cir. 1976); *see also United States v. Martin*, 694 F.2d 885 (1st Cir. 1982). Furthermore, a lack of memory is not the equivalent to denying that a statement was made, and therefore does not open the door for introducing extrinsic evidence meant to undermine the witness's credibility under Rule 613(b). *United States v. DeSimone*, 488 F.3d 561, 572 (1st Cir. 2007).

do so would be "to do counsel's work" where Padilla "has failed to put flesh on the bones of his [evidentiary] argument." *Martinez-Hernandez*, 118 F.4th at 98 (citing *Zannino*, 895 F.2d at 17) (cleaned up). Padilla's claim is thus "waived for lack of developed argumentation." *Id*. (cleaned up).

## B. Ayala's and Maldonado's Statements

Padilla contends that he was precluded from introducing prior inconsistent statements to impeach Ayala's testimony that she saw a red pick-up truck outside Isla de Cabras on the night of the robbery, but that is simply not true. He argues that:

> The most glaring example of [the district court rejecting impeachment evidence] occurred during the direct examination by the defense of hostile witness Municipal Police officer Anabel Ayala who on direct examination incredibly testified she had seen a red truck parked at the entrance when she made rounds at 2:15 and 3:00 am. the night of the robbery when 2 days after the robbery she gave a statement to agent Ivys Rosado emphatically denying having seen a red truck that night, depriving the judge from hearing admissible extrinsic impeachment evidence that contradicted her perjured trial testimony.

(AB112). However, Padilla did introduce Ayala's prior inconsistent statement at trial.

Padilla called Ayala to the stand as a defense witness, and she testified that she saw a man sitting on a rock outside the Isla de Cabras gate by a red

vehicle the night of the robbery. (AA987-88). Padilla did not press Ayala or ask her about any prior inconsistent statement. (AA985-89). Padilla asked her whether she had been interviewed by Ivys Rosado in 2010 about that night, whether her memory had been better at that time, and whether she had been truthful in that interview. (AA988-89). Later that same trial-day, Padilla called Ivys Rosado to the stand, and asked her about Ayala's prior inconsistent statements during the 2010 interview. (AA1031-39). Rosado testified that Ayala had said that she saw a green pick-up truck "that belonged to some individuals that were fishing" and "an individual sitting on the rocks staring towards the area of the shooting range at Isla de Cabras" next to a "brown or wine" minivan, and that she did not see a red pick-up truck. (AA1035, 1039). So, contrary to Padilla's contentions, the district court did allow him to introduce Ayala's prior inconsistent statements and he was in no way deprived from eliciting them. There can be no error there.

Padilla also complains that he was not allowed to elicit prior inconsistent statements for Maldonado, who was the president of the fishing club at Isla de Cabras. His argument there goes like this:

> [Maldonado] had told police investigators shortly after the robbery that Cosme had requested keys for the entrance, the day before the robbery. At trial he couldn't remember what he had

said. When counsel tried to confront him with the specific extrinsic impeachment statement, the Government objected as being leading and the Court refused to allow the question. Counsel objected to the Court's ruling and the Government's strategy of objecting as leading questions that required a witness to recall what he/she had said 12 years ago. Under those circumstances allowing counsel to ask leading questions was permissible.

(AB112).

At trial, Padilla asked Maldonado: "Now, during your interviews, what complaints, if any, did you make in your interview about Capitol security guard Emanuel Cosme?" (AA974). Maldonado responded: "I honestly have to say that I don't even recall because it's been years." (AA974). Padilla then attempted to continue asking Maldonado about Cosme and the key in increasingly leading ways, despite his insistence that he did not remember. (AA974-78).[44] But Padilla did not attempt to refresh Maldonado's memory or introduce the statement by alternate means (like, for example, calling the interviewer like he did with Ayala's statements). His contention that the district court barred him from eliciting the inconsistent

---

44.    Maldonado did testify, however, that keys had been misplaced and had to be replaced. (AA976-77).

statement is unsupported by the record, which instead shows that he was unable to elicit the answer from Maldonado he was looking for.

Padilla contends that he should have been allowed to use leading questions to attain the inconsistent statement. However, no number of leading questions could have changed the fact that, as Maldonado testified, he did not recall making any complaints during the interviews about Cosme. Refreshing Maldonado's memory could have helped, but Padilla forwent attempting to do that.

In any event, district courts have "extensive discretion over the phrasing of questions, because the trial judge is best situated to strike a practical and fair balance." *United States v. Greaux-Gomez*, 52 F.4th 426, 437 (1st Cir. 2022) "[T]he use of leading questions ... must be left to the sound discretion of the trial judge who sees the witness and can, therefore, determine in the interest of truth and justice whether the circumstances justify leading questions to be propounded to a witness by the party producing him." *Id.* (quoting *United States v. Brown*, 603 F.2d 1022, 1025-26 (1st Cir. 1979)).

And, contrary to Padilla's arguments, Maldonado was not a hostile witness or "identified with an adverse party." (AB112-13). *See also* Fed. R.

Evid. 611(c)(2) (allowing leading questions "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party"). "A hostile witness, in the jargon of evidence law, is not an adverse party but a witness who shows himself or herself so adverse to answering questions whatever the source of the antagonism, that leading questions may be used to press the questions home." *Greaux-Gomez*, 52 F.4th at 438. Maldonado was in no way antagonistic. Instead, he merely did not remember things he was being asked about. And Padilla at no point argued to the court that he was hostile or request to treat him as such. This was waiver. *See Rivera-Rodriguez*, 75 F.4th at 28. Even on appeal, Padilla does not develop any argument as to why Maldonado should have been considered a hostile witness. *See Zannino*, 895 F.2d at 17.

This Court has said that a witness identified with an adverse party could be an employee or the romantic partner of a party. *See Suarez Matos v. Ashford Presbyterian Cmty. Hosp., Inc.*, 4 F.3d 47, 50 (1st Cir. 1993) (citing *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir. 1979); *United States v. Hicks*, 748 F.2d 854 (4th Cir. 1984)); *see also Keefe v. LendUS, LLC*, 659 F. Supp. 3d 196, 202 (D.N.H. 2023) ("A witness is identified with an adverse party, for purposes of Rule 611, when the witness is an employee, agent,

friend, or relative of an adverse party." (cleaned up)). Maldonado does not fall into any of those categories. Indeed, he – as the president of a fishing club called to testify by Padilla – has no connection with the United States within the context of Rule 611. And, again, Padilla does not develop an argument as to how Maldonado would qualify as a witness identified with an adverse party, which is waiver. *See Zannino*, 895 F.2d at 17. And he never raised that argument before the district court either. *See Rivera-Rodriguez*, 75 F.4th at 28. Nor can he do so in a reply brief. *See Henry*, 848 F.3d at 7.

Finally, any inconsistent statement introduced as to Cosme having lost a set of keys would do nothing to undermine Cosme's testimony and Padilla's conviction would be amply supported even if the district court had not found him credible because of it.

### C. Polygraph Results

Padilla next raises a host of arguments pertaining to the production and admissibility of polygraph results of various witnesses. However, the district court did not abuse its discretion in ruling that they would not be admissible at the bench trial.

The principal objective of many evidentiary rules is to exclude unreliable evidence. *See, e.g.*, Fed. Rules Evid. 702, 802, 901; *see also Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). Polygraph results are of dubious reliability. *See generally United States v. Scheffer*, 523 U.S. 303, 312 (1998); *Acosta v. Lynch*, 819 F.3d 519, 526 (1st Cir. 2016) ("[p]olygraph results have long been considered of dubious value"). Against that backdrop, it is no surprise that they "are rarely admissible at trial." *United States v. Rodríguez-Berríos*, 573 F.3d 55, 73 (1st Cir. 2009). "[T]here is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." *Scheffer*, 523 U.S. at 312. *See also United States v. Lea*, 249 F.3d 632, 639 (7th Cir.2001) ("district judges often exclude[] such evidence because doubts about the probative value and reliability of this evidence outweigh any rationale for admission" (cleaned up)).

The district court held as much when it decided it would not admit polygraph results at Padilla's bench trial. (DE608 at 4). And, given the well-established unreliability of polygraph results, doing so was not an abuse of discretion. *See deVries v. St. Paul Fire & Marine Ins. Co.,* 716 F.2d 939, 944–45 (1st Cir.1983) (finding that the district court did not err in granting motion to exclude evidence regarding the refusal to take a polygraph).

Even if the district court's exclusion of polygraph evidence in this case was error, it would be a harmless one. This being a bench trial, the court sat as factfinder. In that capacity it specified that it "would not place any weight on polygraph results." (DE608 at 4). All the district court did in excluding the polygraph results was unclutter the trial of evidence to which it would assign no probative value. Thus, introduction at trial of the results would have been futile and there is no reversible error to be spied here. *See Lynch*, 819 F.3d at 526 (holding that immigration judge "did not err in declining to give [appellant's] polygraph examination any significance in his weighing of the evidence").[45]

---

45.    Padilla mentions he was entitled to receive the polygraph results in discovery as potential impeachment evidence under *Brady* and *Giglio* but does not develop a *Brady* or *Giglio* claim beyond that. (AB116). This is waiver. *See United States v. Balser*, 70 F.4th 613, 617 (1st Cir. 2023); *Zannino*, 895 F.2d at 17. In any event, a *Brady* or *Giglio* claim pertaining to the production of polygraph results for impeachment purposes would not succeed: Padilla cannot establish "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," given that the district court would not have admitted or given any weight to such impeachment evidence. *Etienne v. Edmark*, 119 F.4th 194, 198 (1st Cir. 2024) (citations omitted); *see also United States v. Ramos-Baez*, 86 F.4th 28, 57 (1st Cir. 2023).

On appeal, Padilla asks this Court to order the government to produce the polygraph results for Oquendo and Cosme. (AB166 n.58). Below, the

## CONCLUSION

For the foregoing reasons and authorities, Padilla's judgment and conviction should be affirmed.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 27th day of December 2024.

<div style="margin-left:50%">

W. STEPHEN MULDROW
United States Attorney


/s/ Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

</div>

| | |
|---|---|
| /s/ Thomas F. Klumper | /s/ Ricardo A. Imbert-Fernández |
| Assistant United States Attorney | Assistant United States Attorney |
| Senior Appellate Counsel | U.S. Attorney's Office |
| United States Attorney's Office | Torre Chardón, Suite 1201 |
| Torre Chardón, Room 1201 | 350 Carlos Chardón Avenue |
| 350 Carlos Chardón Avenue | San Juan, Puerto Rico 00918 |
| San Juan, Puerto Rico 00918 | Tel. (787) 766-5656 |
| Tel. (787) 766-5656 | Fax (787) 771-4050 |
| Fax (787) 771-4050 | |

---

government represented it was not in possession of those results. (*See, e.g.,* AA1744-45). However, while preparing this response brief, the government was able to locate Oquendo's polygraph and it will be produced by the trial AUSA. Efforts continue as to Cosme's. All other polygraph results were previously produced. (AB113-14).

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

_____

### APPEAL NO. 22-1950
### UNITED STATES
### APPELLEE

### V.

## JOSE PADILLA-GALARZA, a/k/a Joey
### DEFENDANT - APPELLANT

1.    This brief has been prepared using:

  X   14 point, proportionally spaced, serif typeface. Software name and version, typeface name, and point size: <u>MS Word 2016, Book Antiqua, 14 point.</u>

2.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f):

  X    this document contains <u>37,665</u> words, or

  ____    this brief uses a monospaced typeface and contains [state the number of] lines of text.

        I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions.  If the Court so directs, I will provide a copy of the word or line print-out.

                                        /s/ Thomas F. Klumper
                                        /s/ Ricardo A. Imbert-Fernández
Date: <u>December 27, 2024</u>             Signature of Filing Party

179

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 27, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsels of record for the appellant.


/s/ Thomas F. Klumper                    /s/ Ricardo A. Imbert-Fernández
Assistant United States Attorney     Assistant United States Attorney
Senior Appellate Counsel